## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| E.Q.*<br>c/o National Immigrant Justice Center<br>111 W. Jackson Blvd., Suite 800<br>Chicago, IL 60604<br><br>AMICA CENTER FOR IMMIGRANT RIGHTS<br>1025 Connecticut Ave. NW, Suite 701<br>Washington, DC, 20036;<br><br>FLORENCE IMMIGRANT AND REFUGEE<br>RIGHTS PROJECT<br>P.O. Box 86299<br>Tucson, AZ 85754;<br><br>REFUGEE AND IMMIGRANT CENTER FOR<br>EDUCATION AND LEGAL SERVICES<br>131 Interpark Blvd.<br>San Antonio, TX 78216,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY,<br>Office of the General Counsel<br>2707 Martin Luther King Jr. Ave SE,<br>Washington, DC 20528;<br><br>KRISTI NOEM, Secretary of Homeland Security, in<br>her official capacity,<br>Office of the General Counsel<br>2707 Martin Luther King Jr. Ave SE,<br>Washington, DC 20528;<br><br>U.S. CITIZENSHIP AND IMMIGRATION<br>SERVICES,<br>5900 Capital Gateway Drive<br>Camp Springs, MD 20746;<br><br>KIKA SCOTT, Senior Official Performing the duties<br>of the Director of U.S. Citizenship and Immigration<br>Services, in her official capacity, | No. 1:25-cv-_____<br><br>***Document Electronically Filed***<br><br>**COMPLAINT** |

---

\* An unopposed motion for this Plaintiff to proceed under pseudonym has been concurrently filed with this complaint.

5900 Capital Gateway Drive )
Camp Springs, MD 20746; )
)
EXECUTIVE OFFICE FOR IMMIGRATION )
REVIEW, )
5107 Leesburg Pike )
Falls Church, VA 22041; and )
)
SIRCE OWEN, Acting Director of the Executive )
Office for Immigration Review, )
5107 Leesburg Pike )
Falls Church, VA 22041, )
)
*Defendants.* )
)

## INTRODUCTION

1. The Immigration and Nationality Act ("INA") sets out a comprehensive scheme for determining whether a noncitizen may receive asylum or related humanitarian relief in the United States.

2. First, the INA grants any noncitizen who is physically present in, or arrives in, the United States the right to apply for asylum, subject only to a short list of enumerated exceptions. Second, the INA lists the eligibility factors noncitizens must demonstrate to prevail in their applications for relief. And third, the INA sets forth certain "mandatory bars" that, if deemed applicable after a decision on the merits, require the denial of relief to otherwise-eligible noncitizens.

3. Defendants have upended this statutory framework. In December 2024, the Department of Homeland Security ("DHS") issued a rule that bars certain noncitizens from even applying for asylum and withholding of removal if it "appears" that a mandatory bar applies. DHS, Application of Certain Mandatory Bars in Fear Screenings, 89 Fed. Reg. 103370 (Dec. 18, 2024) ("the Mandatory Bars Rule"). That Rule took effect on January 17, 2025.

4. The Mandatory Bars Rule gives asylum officers broad discretion to apply mandatory bars to asylum and withholding of removal in screening interviews conducted before a noncitizen ever applies for these protections and at a time when a noncitizen has no access to the evidence that might be used to rebut the bars.

5. After DHS issued the Mandatory Bars Rule, the Executive Office for Immigration Review ("EOIR") issued a companion rule expressly authorizing its immigration judges to ratify these premature and predictive judgments. EOIR, *Clarification Regarding Bars to Eligibility During Credible Fear and Reasonable Fear Review*, 89 Fed. Reg. 105392 (Dec. 27, 2024) ("the EOIR Companion Rule").

1

6.      Both rules violate the INA in multiple respects. Both are also arbitrary and capricious. The stated justification for the Mandatory Bars Rule—and, thus, the derivative EOIR Companion Rule—rests on assumptions that are inconsistent with the plain text of the rule. And, among many other deficiencies, the core rationale of the Mandatory Bars Rule—that it is more efficient to apply bars in screening interviews—reverses Defendants' own position from 2022 without recognizing, much less justifying, that inconsistency.

7.      These deficiencies have serious consequences. The mandatory bars are factually and legally complex, and rebutting those bars typically requires both the presentation of documentary evidence and nuanced legal arguments. Neither is possible in the context of screening interviews, which are often rushed and conducted while a noncitizen is being held in immigration detention without access to counsel or the outside world. Applying the mandatory bars at the screening stage will cause meritorious refugees to be erroneously barred from relief, tagged as serious criminals (or worse), and deported to persecution.

8.      Both the Mandatory Bars Rule and the EOIR Companion Rule violate the INA and are contrary to law and arbitrary and capricious under the Administrative Procedure Act ("APA"). Plaintiffs seek vacatur of both.

## JURISDICTION AND VENUE

9.       This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 8 U.S.C. § 1252(e)(3).

10.      Venue is proper under 28 U.S.C. § 1391(e)(1), because Defendants are agencies of the United States and officers of the United States acting in their official capacities; Defendants reside in this District; one Plaintiff resides in this District; and a substantial part of the events or omissions giving rise to the claims occurred in this District. Venue is also appropriate under 8 U.S.C. § 1252(e)(3)(A).

## PARTIES

### A.    Plaintiffs

11.    Plaintiff E.Q. is an asylum seeker from Afghanistan who received a credible fear interview at the Eloy Detention Center in Eloy, Arizona on February 4, 2025. At the interview, E.Q. testified that he fled Afghanistan after being targeted and threatened by the Taliban based on allegations that he was "an American spy." E.Q. received a negative credible fear determination based on a finding that "there are reasonable grounds to believe that the applicant may be subject to a bar(s) to asylum or withholding of removal."

12.    Organizational Plaintiffs are organizations that serve asylum seekers, including many whose ability to seek relief will be affected by the Mandatory Bars Rule and the EOIR Companion Rule.

13.    Plaintiff Amica Center for Immigrant Rights ("Amica Center") is a § 501(c)(3) nonprofit legal services organization with its principal place of business in the District of Columbia. Amica Center provides direct legal services to migrant adults and children at risk of detention and deportation in the Washington, D.C. metropolitan area and beyond. Amica Center operates a Legal Orientation Program ("LOP"), whose staff run "Know Your Rights" presentations, conduct pro se workshops, operate a telephone hotline, and give pro se legal assistance to individuals detained in the two Immigration and Customs Enforcement ("ICE") facilities located in Virginia. In 2024, Amica Center's LOP served approximately 198 people in screening interviews, including both credible and reasonable fear interviews. Amica Center also provides direct legal services through its universal representation program, including with respect to credible and reasonable fear interviews, asylum applications, and adversarial proceedings in immigration court. Through this work, Amica Center has substantial experience with the application of the mandatory bars at issue in this litigation. The Mandatory Bars Rule will

adversely impact core aspects of Amica Center's work, in particular its services to people undergoing credible and reasonable fear interviews.

14.     Plaintiff Florence Immigrant and Refugee Rights Project ("Florence Project") is a nonprofit organization headquartered in Tucson, Arizona, with additional offices in Phoenix and Florence, Arizona. It provides free legal and social services to people in immigration custody in Arizona and strives to ensure that noncitizens facing removal have access to counsel, understand their rights, and are treated fairly and humanely. The Florence Project provides "Know Your Rights" and other pro se assistance to detained noncitizens, including creating and distributing materials that are used by other organizations and individuals nationwide. Many of the people that the Florence Project serves, both through the provision of these pro se services and through full representation, are in or have been through the credible or reasonable fear process. The Florence Project also directly represents detained immigrants before the immigration courts and the Board of Immigration Appeals ("BIA") in full removal proceedings, including people who are deemed incompetent to represent themselves. As a result, it has substantial experience with the application of the mandatory bars at issue in this litigation. In 2024, the Florence Project served over 10,000 detained adults and children; placed over 100 cases with pro bono attorneys; and provided over 500 noncitizens with social services. The Mandatory Bars Rule at issue in this case will impact core aspects of the Florence Project's work, particularly its pro se support and full legal representation to people going through the credible and reasonable fear processes.

15.     Plaintiff Refugee and Immigrant Center for Education and Legal Services ("RAICES") is a nonprofit, non-partisan organization headquartered in San Antonio, Texas. RAICES's mission is to defend the rights of immigrants and refugees; empower individuals, families, and communities of immigrants and refugees; and advocate for liberty and justice. RAICES provides free and low-cost immigration legal services to underserved immigrant children,

families, and individuals, and it is the largest immigration legal services provider in Texas. RAICES also conducts social services programming for immigrants, engages in advocacy work, and provides bond assistance to individuals seeking release from DHS custody. A central aspect of RAICES' work is providing legal services to migrants seeking asylum and other statutory protections upon crossing the border, i.e., the population most often subjected to expedited removal and the credible fear process. The Mandatory Bars Rule at issue in this case significantly impedes RAICES' core work, particularly as it relates to individuals going through the credible fear process.

16.    RAICES also conducts social services programming for immigrants, engages in advocacy work, and provides bond assistance to individuals seeking release from DHS custody.

**B.    Defendants**

17.    Defendant DHS is a cabinet-level department of the federal government responsible for enforcing the immigration laws of the United States.

18.    Defendant Kristi Noem is the Secretary of Homeland Security. She is sued in her official capacity.

19.    Defendant USCIS is the agency within DHS charged with, among other things, conducting credible fear and reasonable fear interviews.

20.    Defendant Kika Scott is the Senior Official Performing the duties of the Director of USCIS. She is sued in her official capacity.

21.    Defendant EOIR is the component of the Department of Justice that adjudicates applications for relief in immigration court.

22.    Defendant Sirce Owen is the Acting Director of EOIR. She is sued in her official capacity.

## BACKGROUND

23.     The modern U.S. asylum system was established by the Refugee Act of 1980, Pub.

L. 96-212, 94 Stat. 102. The Refugee Act reflects "one of the oldest themes in America's history—

welcoming homeless refugees to our shores," and it "gives statutory meaning to our national

commitment to human rights and humanitarian concerns." S. Rep. No. 96-256, 1st Sess. at 1

(1979), reprinted in 1980 U.S.C.C.A.N. 141.

24.     One of Congress's "primary purposes" in enacting the Refugee Act was "to bring

United States refugee law into conformance" with the treaty obligations of the United States—

principally the 1967 Protocol Relating to the Statutes of Refugees. *INS v. Cardoza-Fonseca*, 480

U.S. 421, 436 (1987). Under the Refugee Act and the 1967 Protocol, the United States has a

"commitment to avoid refouling individuals to countries where their lives are threatened." *E. Bay*

*Sanctuary Covenant v. Biden*, 993 F.3d 640, 674 (9th Cir. 2021) (citing Article 31(1) of the

Refugee Convention).

### A.     Forms of Protection for People Fleeing Persecution and Torture

25.     The INA, which implements U.S. obligations under the 1967 Protocol Relating to

the Status of Refugees and the Convention Against Torture ("CAT"), provides three primary forms

of protection for people fleeing persecution or torture: asylum under 8 U.S.C. § 1158; statutory

withholding of removal under 8 U.S.C. § 1231(b)(3); and protection under CAT, *see* Note to 8

U.S.C. § 1231; 8 C.F.R. § 1208.

### i.     Asylum

26.     The asylum statute, 8 U.S.C. § 1158, grants noncitizens a broad right to apply for

asylum, *see* 8 U.S.C. § 1158(a) ("Authority to apply for asylum"), while providing narrow

conditions that limit who may ultimately receive this discretionary form of relief. 8

U.S.C.§ 1158(b) ("Conditions for granting asylum").

27.     Section 1158(a)(1) provides that:

Any [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such [noncitizen]'s status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title.

28.     The right to *apply for* asylum is limited in § 1158(a)(2), which provides three narrow "exceptions" to that right. Those exceptions generally foreclose applications by noncitizens who: (1) can be removed to a safe third country pursuant to a treaty; (2) wait more than one year after arriving in the United States to apply for asylum; or (3) previously applied for asylum and were denied. *Id.* § 1158(a)(2)(A)-(C).[1]

29.     Section 1158(b)(1)(a) ("Eligibility") provides the fundamental eligibility criteria for *receiving* asylum, which requires that the noncitizen meet the definition of a "refugee":

The Secretary of Homeland Security or the Attorney General may grant asylum to a [noncitizen] who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section if the Secretary of Homeland Security or the Attorney General determines that such [noncitizen] is a refugee within the meaning of section 1101(a)(42)(A) of this title.

30.     Noncitizens qualify as refugees by showing a "well-founded fear of persecution" on account of one or more of five protected grounds—race, religion, nationality, political opinion, or membership in a particular social group—and that their country is unable or unwilling to protect them from that harm. 8 U.S.C. § 1101(a)(42)(A). A "well-founded fear of persecution" has been construed to encompass even a ten percent chance that the applicant will be persecuted based on a protected characteristic. *See Cardoza-Fonseca*, 480 U.S. at 440.

---

[1] An applicant can overcome two of these exceptions—the one-year filing deadline and the bar on successive applications—by demonstrating changed or extraordinary circumstances. *See id.* § 1158(a)(2)(D).

31.     Section 1158(b)(2) (titled "Exceptions") requires the denial of asylum to otherwise eligible refugees under six circumstances (the "mandatory bars").

32.     Under 8 U.S.C. § 1158(b)(2)(A), asylum must be denied "if the Attorney General determines that" noncitizens: (1) persecuted others; (2) have convictions for particularly serious crimes; (3) committed serious nonpolitical crimes outside the United States; (4) are a danger to national security; (5) have engaged in terrorist activity; or (6) were firmly resettled in another country prior to arriving in the United States. *Id.* § 1158(b)(2)(A)(i)-(vi).

33.     The mandatory bars concerning particularly serious crimes, serious nonpolitical crimes, and national security are taken directly from the text of the Refugee Convention. *See* Refugee Convention, arts. 1(F)(b) & 33(2). The remaining mandatory bars similarly have roots in the Convention. *See id.* art. 1(F)(a). Congress chose to track the Convention in this way "so that U.S. statutory law clearly reflect[ed] our legal obligations under international agreements." *INS v. Stevic*, 467 U.S. 407, 426, n.20 (1984) (quotation omitted).

### ii.     Statutory Withholding of Removal and Protection under the Convention Against Torture

34.     The withholding of removal statute prohibits the government from removing a noncitizen "to a country if . . . the [noncitizen's] life or freedom would be threatened in that country because of the [noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3).

35.     Whereas asylum can be obtained based on a well-founded fear of persecution, the withholding of removal statute requires the applicant to show that persecution is more likely than not—a higher standard. *Stevic*, 467 U.S. at 429-30. The withholding statute prevents removal to any country as to which this showing is made. It is possible to receive withholding of removal as to multiple countries.

36.     With the exception of the firm resettlement bar, the mandatory bars to asylum in 8 U.S.C. § 1158(b)(2)(A) also generally apply to eligibility for statutory withholding of removal. A noncitizen is barred from statutory withholding of removal "if the Attorney General decides" that one of those mandatory bars applies. 8 U.S.C. § 1231(b)(3)(B).

37.     Regulations implementing CAT prohibit the removal of a noncitizen to any country where "it is more likely than not that he or she would be tortured." 8 C.F.R. § 208.16(c)(2).

38.     CAT protection takes two forms. One is withholding of removal, which is analogous to statutory withholding of removal under § 1231(b)(3) and subject to the same mandatory bars. The other kind of CAT protection, deferral of removal, is not subject to any mandatory bars.

39.     Although withholding of removal and CAT protection are available to people who do not qualify for asylum, the denial of asylum has major implications. In addition to the higher burden of proof these forms of protection impose, withholding of removal and CAT relief can only be granted after a person is ordered removed, and the grant of protection simply prevents the government from executing the removal order to the specific country or countries where the applicant has demonstrated a likelihood of persecution or torture. By contrast, people granted asylum do not receive a removal order. Their grant of asylum extends to their spouse and children who are present in the United States and part of the same adjudication, and they may petition for reunification with a spouse or children who remain abroad. 8 U.S.C. § 1158(b)(3). They are eligible to become lawful permanent residents, 8 U.S.C. § 1159(b), and eventually U.S. citizens, *id.* § 1427. And they may travel abroad with advance permission in the form of a refugee travel document. *Id.* § 1158(c)(1)(C).

**B.        The Mandatory Bars Involve Highly Complex Factual and Legal Determinations.**

40.        Application of the mandatory bars is exceedingly complex and requires the application of detailed, multi-step tests.

41.        The relevant legal and factual analyses are so complex that the ICE Office of the Principal Legal Advisor ("OPLA") has created a team of mandatory bar specialist attorneys to assess them. As DHS acknowledged in the proposed version of the Mandatory Bars Rule, "[c]ases involving potential bars to relief or protection such as terrorism-related inadmissibility grounds or assistance in the persecution of others[ ] are assigned to certain designated attorneys specializing in such cases, entail special reporting requirements, and [require] coordination with OPLA headquarters divisions." Application of Certain Mandatory Bars in Fear Screenings, 89 Fed. Reg. 41347, 41352 (May 13, 2024).

42.        Indeed, as reflected below, mandatory bar analyses are so complex that immigration judges frequently reach erroneous determinations even after a full merits hearing and administrative appeal.

<u>The Persecutor Bar</u>

43.        The persecutor bar requires a detailed factual inquiry into whether the applicant "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1158(b)(2)(A)(i); 8 U.S.C. § 1231(b)(3)(B)(i). Before applying this bar, an adjudicator must grapple with whether the applicant's actions constitute "ordering, inciting, assisting," or "participating" in persecution, whether they had the requisite knowledge that their conduct would result in the persecution of others, and whether the harm alleged bore any nexus to a protected ground. *Id.*

44.     The adjudicator must also determine whether any defenses to the bar are implicated, such as self-defense, or whether mitigating factors, like trying to help the purported target, that counsel against applying the bar are present. These determinations require intensive factual investigation and the application of complex legal analyses.

45.     For example, in 2008 the BIA affirmed the decision of an immigration judge denying asylum to Vijay Kumar, a former guard at an Indian detention facility used to house and interrogate suspected Sikh separatists. In his removal proceedings, Kumar testified about having witnessed beatings and persecution leading to prisoner deaths at the facility. Based on his testimony, both the immigration judge and the BIA found that Kumar's employment qualified as "personal involvement" sufficient to trigger the persecutor bar. The Ninth Circuit, however, granted Kumar's petition for review, finding that the immigration judge and BIA had failed to properly consider evidence that, *inter alia:* (i) Kumar never tortured, interrogated, or struck any prisoners himself; (ii) he made formal complaints to multiple supervisors about the misconduct he witnessed; and (iii) he ultimately lost his job at the facility and was himself subject to menacing death threats precisely because he made those complaints. *Kumar v. Holder*, 728 F.3d 993, 998-1000 (9th Cir. 2013).

46.     Similarly, in 2007, the BIA affirmed a finding that Igor Krasnoperov, a former Russian soldier, was subject to the persecutor bar because he testified about witnessing soldiers in his unit raping two Azerbaijani women. The immigration judge had found sufficient "personal involvement" based on testimony that Krasnoperov had participated in a routine search operation that preceded the rape. On appeal, the Second Circuit vacated the underlying removal order and remanded the case for further proceedings, finding that the immigration judge and BIA had failed to properly consider evidence that (i) Krasnoperov refused to beat the girls or force them into his vehicle; (ii) "was relieved of his gun before the molestation of the girls began" for that reason; and

(iii) "was handcuffed and on the floor of the car when they were actually raped" and was "beaten" for "refus[ing] to participate." *Balachova v. Mukasey*, 547 F.3d 374, 387 (2d Cir. 2008).

**The Particularly Serious Crime Bar**

47.    Like the persecutor bar, the particularly serious crime ("PSC") bar requires fact-intensive inquiries and the application of complicated legal tests. 8 U.S.C. § 1158(b)(2)(A)(ii); 8 U.S.C. § 1231(b)(3)(B)(ii). As the Department acknowledged in an interim final rule published in 2022, what constitutes a PSC is "not statutorily defined in detail." Procedures for Credible Fear Screening & Consideration of Asylum, Withholding of Removal, and CAT Prot. Claims by Asylum Officers, 87 Fed. Reg. 18078, 18093 (Mar. 29, 2022).

48.    Aggravated felonies are categorically PSCs for both asylum and, if they involved a prison sentence of more than five years, for withholding of removal. However, adjudicators must engage with complex multi-tiered tests—the categorical and modified categorical approaches—to determine whether a state criminal conviction is an aggravated felony under the INA. *See, e.g.*, *Mellouli v. Lynch*, 575 U.S. 798 (2015); *Moncrieffe v. Holder*, 569 U.S. 184 (2013). This involves comparing the state criminal statute to the corresponding federal statute.

49.    Furthermore, PSCs are not limited to aggravated felonies. For non-aggravated felonies, adjudicators look to whether the elements of the crime "potentially bring it within the ambit" of a PSC and, if so, the nature of the conviction, the underlying facts and circumstances, the sentence imposed, and the type and circumstances of the crime to determine if they trigger the bar.

50.    Adjudicators must also consider whether the applicant's mental health mitigates the application of the PSC bar. *See Matter of B-Z-R-*, 28 I. & N. Dec. 563, 567 (A.G. 2022). Thus, the adjudicator must first assess whether the crime elements fit into one of the statutory aggravated felonies, then assess whether they fall into the ambit of a PSC, and then closely analyze the actual

circumstances of the criminal conduct, including, among other matters, the applicant's mental health at the time of the offense.

51.    Even after a full merits review and administrative appeal, adjudicators often misapply the PSC bar. In *Dor v. Garland*, 46 F.4th 38 (1st Cir. 2022), for example, the First Circuit vacated a determination that the PSC bar applied because, among other errors, the BIA called 25 grams of marijuana a "large amount" in violation of its own precedent. *See also, e.g.*, *Annor v. Garland*, 95 F.4th 820 (4th Cir. 2024) (vacating for relying on the elements of the wrong criminal statute and failing to properly assess whether noncitizen represented a danger to the community); *Ojo v. Garland*, 25 F.4th 152 (2d Cir. 2022) (vacating and remanding for, among other things, fundamental mischaracterization of the crime in question).

**The Serious Non-Political Crime Bar**

52.    The "serious non-political crime bar" is even more obscure and ill-defined than the PSC bar. 8 U.S.C. § 1158(b)(2)(A)(iii); 8 U.S.C. § 1231(b)(3)(B)(iii). The INA does not define "serious non-political crime," and no criminal charge, arrest, or conviction is required to conclude that the bar applies. The adjudicator need only have "serious reasons"—*i.e.*, probable cause—"to believe that the applicant has committed a serious non-political crime." *Matter of E-A-*, 26 I. & N. Dec. 1, 3 (BIA 2012). Such probable cause could be based on the applicant's own statements, country conditions reports, news articles, foreign indictments, police reports, or arrest warrants, among other sources.

53.    If the bar is potentially implicated, adjudicators must determine whether the crime is political in nature. If so, they must further consider whether the applicant meets an exception. For example, if the crime would be juvenile delinquency in the United States, it is not a "crime" for purposes of the INA. *See Matter of Ramirez-Rivero*, 18 I. & N. Dec. 135, 137 (BIA 1981); *Matter of De La Nues*, 18 I. & N. Dec. 140, 142 (BIA 1981).

54.    As with the persecutor bar, the adjudicator must look to the totality of the circumstances to determine whether there are mitigating circumstances, such as self-defense, that diminish the seriousness of the offense. This bar, too, thus requires an extraordinarily fact-dependent inquiry.

55.    For example, in *Berhane v. Holder*, 606 F.3d 819 (6th Cir. 2010), the BIA found that Biniam Berhane, a native and citizen of Ethiopia, committed a serious non-political crime while throwing rocks at police during anti-government demonstrations. On appeal, the Sixth Circuit vacated the decision, finding that "[n]either the Board nor the Immigration Judge . . . addressed one of Berhane's principal arguments: that his rock throwing was an act of self-defense and was never directed at civilians." *Id*. at 825.

56.    In addition to the sheer complexity of the serious non-political crime bar, real-world examples demonstrate the dangers of relying on foreign legal records. For example, Ms. Andrade, a survivor of domestic violence, was the subject of an INTERPOL Red Notice that was issued in an abuse of process by her persecutor in her home country of El Salvador. Ms. Andrade was not even aware the Red Notice existed and could never have met her burden of proof in a credible fear interview to show that the serious non-political crime bar did not apply. In fact, she had to find an attorney and retain an expert witness to analyze deficiencies in the notice before she could win her asylum case and have the INTERPOL notice voided. [2]

57.    In another case, Jessica Barahona-Martinez fled severe abuse in El Salvador based on her sexual orientation. She spent six years in immigration detention while DHS opposed her application for asylum. DHS argued that she was subject to the serious non-political crime bar, relying on a Salvadoran warrant and INTERPOL Red Notice based on the reissuance a false

---

[2] *See* Letter from Ctr. for Gender & Refugee Studies to Daniel Delgado, Dir. for Immigration Pol'y, U.S. Dep't of Homeland Sec., 15, (June 12, 2024), https://downloads.regulations.gov/USCIS-2024-0005-4260/attachment_1.pdf.

aggravated extortion charge for which she had previously been acquitted. After she finally retained pro bono counsel, the INTERPOL Commission deleted the Red Notice, and Ms. Barahona-Marinez was finally granted asylum. *In Re Jessica Barahona-Martinez*, AXXX-XXX-604 (BIA Apr. 12, 2024).[3]

58.    In a particularly egregious example, DHS's reliance on a Red Notice resulted in Jose Guerra-Castañeda's erroneous return to torture in El Salvador. Mr. Guerra-Castañeda had fled after he was persecuted by police and arrested based on false allegations that he had committed aggravated homicide in El Salvador and was a member of the MS-13 gang. The Red Notice was based on those unfounded charges which were later dismissed by the Salvadoran government. Prior to the dismissal, however, DHS removed Mr. Guerra-Castañeda in violation of a judicial stay of removal. Thereafter, he was imprisoned in El Salvador for nearly 300 days and subjected to atrocious torture. *See* Order Denying Mot. to Dismiss, *Guerra-Castañeda v. U.S.*, No. 22-10711, (D. Mass. Feb. 16, 2023), Dkt. 27.[4]

**Terrorism-Related Bars**

59.    The terrorism bar is sweeping and complex, and, like the other mandatory bars, highly dependent on individual facts and circumstances. Because the bar incorporates several terrorism-related inadmissibility grounds, the "terrorism bar" is less a bar in its own right and more of an umbrella category encompassing nine distinct bars, each capturing a different kind of activity or status.

60.    While the State Department designates certain groups as Foreign Terrorist Organizations, the INA also broadly defines as an undesignated "terrorist organization" any "group

---

[3] *See id.* at 16.
[4] *See also* Salvadoran Man Sues Feds Claiming Wrongful Deportation From Mass. by ICE, NBC Boston (May 10, 2022 10:43PM) https://www.nbcboston.com/news/local/salvadoran-man-sues-feds-claiming-wrongful-deportation-from-mass-by-ice/2716837/.

of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in" terrorist activity. 8 U.S.C. § 1182(a)(3)(B)(vi). These "undesignated" or "Tier III" terrorist organizations are not listed or designated as such by any central authority. Accordingly, determining whether a group qualifies for this status is inherently case-specific and typically involves detailed consideration of factual and historical evidence in addition to legal analysis. *See*, *e.g.*, *Ghousheh v. Sessions*, 719 F. App'x 629, 630 (9th Cir. 2018) (vacating BIA's application of the terrorism bar because "[a]lthough the [Palestinian Liberation Army] in Lebanon was clearly 'a group of two or more individuals,' nothing in the record suggests that, as it existed in 1982, the PLA in Lebanon met either of the other two statutory criteria"); *see also Uddin v. Att'y Gen. United States*, 870 F.3d 282, 289 (3d Cir. 2017), *as amended* (Sept. 25, 2017) (recognizing a Tier III terrorist organization requires not only a factual finding that the group committed acts of terrorism, but also a separate finding that those acts were authorized by the group's leaders).

61.    Further complicating any analysis, conduct defined as "terrorist activity" under the sweeping language of the INA includes "any activity which is unlawful under the laws and place where it is committed . . . and which involves . . . the use of any . . . explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property." 8 U.S.C. § 1182(a)(3)(B)(iii). The INA also defines "material support" for terrorism or for terrorist organizations (including undesignated ones) as "terrorist activity." 8 U.S.C. § 1182(a)(3)(B)(iv)(VI). DHS and DOJ construe "material support" in this context broadly to mean *any* provisions of goods or services, voluntary or involuntary, even the ransom of family members by groups defined as "terrorist organizations" under the INA. In *Matter of A-C-M-,* for example, the Board of Immigration Appeals upheld a terrorism-bar finding against a Salvadoran woman who she was kidnapped in 1990 by guerillas in El Salvador who forced her husband to dig his own

grave before killing him in front of her, and coerced her into undergoing weapons training and performing forced labor in the form of cooking, cleaning, and washing their clothes. *Matter of A-C-M-,* 27 I&N Dec. 303 (BIA 2018).

62.     In light of this administration's recent designation of various drug cartels and gangs as "terrorist" organizations, that broad interpretation threatens to sweep many thousands of the *victims* of cartels and gangs into the "terrorism" bar. *See* 90 Fed. Reg. 10030, Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana (Feb. 20, 2025).

63.     Overreach by DHS and DOJ in the application of this bar is common, and its correction in egregious instances, whether by the courts, by Congress, or by later DHS policy decisions, has been possible only because those targeted by such overreach have had access to a full legal process. In 2004, for example, DHS invoked the material support bar against a Christian member of the Chin ethnic minority in Burma based on her donations to the Chin National Front ("CNF"), and an immigration judge agreed. The Board of Immigration Appeals upheld that decision, based only findings that the CNF's military wing, the Chin National Army, engaged in the use of armed force against the military forces of the military junta then in power in Burma. *Matter of S-K-,* 23 I&N Dec. 936 (BIA 2006). This decision, and similar denials affecting Burmese minority groups otherwise slated for resettlement to the United States, prompted Congress to pass legislation specifically removing the CNF (among other groups) from the scope of the INA's definition of an "undesignated terrorist organization" for any acts predating the legislation's enactment. Consolidated Appropriations Act of 2008, Pub. L.110-161, 121 Stat. 1844, Sec. 691.

64.     Similarly, in *Ndudzi v. Garland*, 2022 WL 9185369 (5th Cir. July 22, 2022), the Fifth Circuit vacated a denial of relief based on the Immigration Judge's belief that the noncitizen

belonged to a terrorist organization even though the uncontradicted evidence showed she was *not* a member of the organization—and even though it was not clear whether the organization was a terrorist one.

65.    The misapplication of the bar combined with the new designation of certain gangs as Tier I organizations and Defendants' reliance on erroneous international documents, will lead to *refoulement*. As discussed above (¶ 58), DHS's previous reliance on false allegations of Mr. Guerra-Castañeda's membership in MS-13 resulted in his return to El Salvador where he was tortured. That was prior to El Salvador President Bukele's "State of Exception," the sweeping gang crackdown that has resulted in the wrongful arrests and torture of thousands of innocent people, who now, like Mr. Guerra-Castañeda, have unfounded criminal records and the stigma of gang affiliation. Amna Nawaz, et al., "Thousands of innocent people jailed in El Salvador's gang crackdown," *PBS News Hour* (Feb. 13, 2024). Under the Rule, those people will almost assuredly be subjected to the terrorism bar or other mandatory bars and, unable rebut allegations of terrorism in the course of their screening interviews, will be returned to mistreatment and torture in Salvadoran jails.

**The National Security Bar**

66.    The national security bar was intended to provide only a narrow exception to the United States' non-refoulement obligations and has, therefore, typically been applied only where an asylum seeker has been found to be subject to the terrorism bar or found to support violence against the United States. *See, e.g.*, *Yusupov v. Att'y Gen.*, 650 F.3d 968, 978-79 (3d Cir. 2011). Like many of the bars previously discussed, the national security bar requires "reasonable grounds"—*i.e.*, probable cause—to believe that the asylum seeker is a security risk. 8 U.S.C. § 1158(b)(2)(A)(iv); 8 U.S.C. § 1231(b)(3)(B)(iv).

67.     Applying this standard in practice poses significant challenges requiring careful scrutiny of a fully developed evidentiary record. For example, in *Yusupov*, the BIA invoked the security bar in denying relief to applicants known to be victims of persecution by the Uzbek government. In reversing the decision below and instructing the BIA to grant withholding of removal, the Third Circuit noted numerous evidentiary issues, including that the BIA had: (i) erroneously construed as terrorist videos on a computer that were actually news reports on terrorism, and (ii) misinterpreted an email using the common term "jihad" as terrorist in nature when the email lacked any reference to any sort of violence or terrorist activity. *Id*. at 987.

### C.     The Expedited Removal System and Credible Fear Screening Interviews

68.     In 1996, Congress established expedited removal to "substantially shorten and speed up the removal process" for certain noncitizens arriving without valid immigration documents. *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020); *see* 8 U.S.C. § 1225(b)(1).

69.     Expedited removal may be applied to certain noncitizens who arrive at the border without valid entry documents or who enter without inspection. 8 U.S.C. § 1225(b)(1)(A)(i). At the time the Mandatory Bars Rule was promulgated, DHS applied expedited removal to these noncitizens if they encountered DHS agents within 100 miles of a U.S. border and within 14 days of entry. On January 21, 2025, DHS expanded its application of expedited removal to all noncitizens anywhere in the country if they cannot prove two years of continuous presence in the United States. *See* Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025).

70.     People subjected to expedited removal are ordered removed by an immigration officer "without further hearing or review" unless they express an intention to apply for asylum or a fear of persecution. *Id.*

19

71.     Congress's interest in "efficient removal" was balanced against "a second, equally important goal: ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution." *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020). Congress thus created a threshold screening mechanism—a credible fear interview with an asylum officer— intended to screen out only those "who *indisputably* have no authorization to be admitted to the United States" while permitting people with colorable asylum claims to seek humanitarian relief from inside the United States. *Grace*, 965 F.3d at 887 (quotation omitted and emphasis added); *see* 8 U.S.C. § 1225(b)(1).

72.     Because the credible fear interview is only a threshold screening device, a noncitizen can show a credible fear of persecution by demonstrating "a significant possibility, taking into account the credibility of the statements made by the [noncitizen] in support of the [noncitizen's] claim and such other facts as are known to the officer, that the [noncitizen] could establish eligibility for asylum under section 1158 of this title" 8 U.S.C. § 1225(b)(1)(B)(v); *see* 8 C.F.R. § 208.30(e)(2)-(3). A noncitizen in a credible fear interview must therefore show only a significant possibility of eventually being able to demonstrate at least a 10% chance that they would be persecuted in the future.

73.     As the statutory focus on "the credibility of the [noncitizen's] statements" indicates, credible fear interviews have never required the presentation of documentary evidence. To the contrary, they cover only the noncitizen's personal experiences—a topic that would be within the noncitizen's personal knowledge.

74.     Documentary evidence cannot be required in a credible fear interview given the circumstances under which these interviews occur. Asylum applicants are subject to detention both before and during the credible fear process. 8 U.S.C. § 1225(B)(1)(b)(ii). Historically, a noncitizen would have such an interview while in the custody of ICE, typically within a week or two of

arrival. But in recent years, DHS has begun conducting many such interviews while a person is held by CBP. Physical access to noncitizens in CBP custody is strictly prohibited; neither a noncitizen's family members nor legal representatives are even told the name of the CBP facility at which the noncitizen is detained.

75.     CBP facilities are infamous for routine family separations, freezing temperatures, and their use of torturous practices such as intentional sleep deprivation. And while detained, noncitizens lack access to their personal property, which would contain any evidentiary information that they brought with them to the United States.[5]

76.     Furthermore, over the past two years, DHS has sped up the timeline for credible fear interviews. Until 2023, that period was a minimum of 48 hours after the noncitizen's arrival in the United States. In 2023, DHS halved the period to 24 hours after arrival. And in 2024, DHS further reduced the period—to as little as four hours. In practice, this does not mean that a noncitizen has four hours with a telephone. Rather, it means that a CFI may be conducted four hours after a noncitizen is given the ability to make a single phone call—often outside of business hours—that cannot feasibly be returned if it goes unanswered.[6]

77.     These changes have made it practically impossible for noncitizens to vindicate their statutory right to "consult with a person or persons of [their] choosing prior to the interview." 8 U.S.C. § 1225(b)(1)(B)(iv).

---

[5] *See, e.g.*, Human Rights Watch, *"We Need to Take Away Children": Zero Accountability Six Years After "Zero Tolerance*," (Dec. 16, 2024) https://www.hrw.org/report/2024/12/16/we-need-take-away-children/zero-accountability-six-years-after-zero-tolerance

[6] The reductions in the consultation period before credible fear interviews are being challenged in two cases pending before this Court: *M.A. v. Mayorkas*, No. 1:23-cv-1843 (filed June 23, 2023), which is currently stayed, and *Las Americas Immigrant Advocacy Center v. DHS*, No. 1:24-cv-1702 (filed June 12, 2024).

78.    The use of CBP custody, the accelerated timelines, and the inability to consult with counsel or others collectively prevent noncitizens from accessing documentary evidence before their credible fear interviews.

79.    Those problems are further exacerbated by the circumstances in which credible fear interviews occur. Many interviews are conducted by telephone, which means that the noncitizen could not present relevant documentary evidence to the asylum officer for consideration even if they possessed such evidence. And interpretation during screening interviews is not always conducted in the noncitizen's native language and is often imprecise— problems of great significance in the context of legally and factually complex issues like the mandatory bars.[7]

80.    If the asylum officer finds that a noncitizen has a credible fear of persecution despite these restrictive conditions, the noncitizen is taken out of the expedited removal process. 8 U.S.C. § 1225(b)(1)(B)(v). The person's case, including claims for asylum and other forms of protection, is then generally adjudicated in full removal proceedings conducted under 8 U.S.C. § 1229a before an immigration judge.

81.    In removal proceedings, noncitizens have the right to counsel, to present evidence, and to cross-examine witnesses. *See* 8 U.S.C. §§ 1229, 1229a; 8 C.F.R. §§ 1003.12-1003.47. They also have substantially more time to gather evidence, find and consult with counsel, develop arguments, obtain copies of countervailing evidence presented by DHS, and otherwise prepare to present their claims for asylum and other relief. Significantly, noncitizens in removal proceedings have a right to appeal, if necessary, to the BIA and a federal court of appeals. *See* 8 U.S.C. § 1252(a)-(b); 8 C.F.R. § 1003.38.

---

[7] *See, e.g.*, Rachel Nolan, *A Translation Crisis at the Border*, New Yorker (Dec. 30, 2019), *available at* https://www.newyorker.com/magazine/2020/01/06/a-translation-crisis-at-the-border.

82.     By contrast, if the asylum officer finds no credible fear, the noncitizen can request review of that decision only by an immigration judge. That review occurs "to the maximum extent practicable within 24 hours, but in no case later than 7 days" following the initial interview, 8 U.S.C. § 1225(b)(1)(B)(iii)(III), generally by telephone, and while the applicant remains detained in the same settings described above.

83.     If the immigration judge finds a credible fear, the noncitizen is then generally placed in full removal proceedings. 8 CFR § 1208.30(g)(2)(iv)(B). If, however, the immigration judge affirms the asylum officer's adverse finding, the applicant is subject to removal "without further hearing or review." 8 U.S.C. § 1225(b)(1)(B)(i), (iii); *see* 8 U.S.C. § 1252(a)(2)(A), (e).

### D.     The Reasonable Fear Interview Process

84.     In addition to the statutorily mandated credible fear interview described above, DHS created a "reasonable fear" process that applies to a different population of noncitizens. Reasonable fear interviews are "[m]odeled on the credible fear screening mechanism" and serve to prevent the wrongful removal to persecution or torture of noncitizens who are not eligible for asylum. Reguls. Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8479 (Feb. 19, 1999); *see* 8 C.F.R. § 1208.31.

85.     Noncitizens can receive reasonable fear interviews in two sets of circumstances: (1) if they have previously received a removal order and have that removal order reinstated under 8 U.S.C. § 1231(a)(5); or (2) if they have been convicted of an aggravated felony and then receive a final administrative removal order from DHS under 8 U.S.C. § 1228(b).

86.     Reasonable fear interviews involve a heightened screening standard. Rather than establishing a "significant possibility" of persecution, noncitizens subject to reasonable fear interviews must establish a "reasonable possibility" of persecution or torture in the country of removal. 8 C.F.R. § 208.31(c).

23

87.     If an asylum officer finds that a person has a reasonable fear of persecution or torture, the person is referred for proceedings in immigration court and given an opportunity to show that they are entitled to withholding of removal or protection under CAT. 8 C.F.R. § 1208.31(e). The procedural protections available in immigration court, including appeal to the BIA and review by a federal court of appeals, then apply just as they do after a positive credible fear finding.

88.     If an asylum officer finds no reasonable fear, the person seeking protection may request review of that decision by an immigration judge. 8 C.F.R. § 1208.31(f). If the immigration judge agrees with the asylum officer, the person is subject to immediate removal. *Id.* § 1208.31(g)(1). A negative reasonable-fear finding may, however, be appealed to a federal court of appeals.

### E.     Defendants Have Never Before Applied the Mandatory Bars in Screening Interviews

89.     Until the Mandatory Bars Rule went into effect on January 17, 2025, Defendants had never applied the mandatory bars in either credible fear or reasonable fear screening interviews.

90.     This is unsurprising. The legal and factual complexity of the bars means that applying them in the context of screening interviews conducted on rushed timetables—without counsel or the opportunity to present documentary evidence—will inevitably result in the return to persecution (*refoulement*) of many people who could show eligibility for asylum or withholding of removal on the merits. Indeed, the Rules at issue will result in the *refoulement* of many people who, far from being willing participants in persecution, crime, or terrorism, are *survivors* of such actions. Accordingly, Congress never contemplated, much less intended, that these cursory screening interviews could be used to make determinations regarding the applicability of the highly complex mandatory bars.

24

91.     Congress enacted 8 U.S.C. § 1225, which governs the expedited removal process, through the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA").[8]

92.     Congress adopted the provisions of 8 U.S.C. § 1225 from H.R. 2022, the Immigration in the National Interest Act of 1995.

93.     During Congressional debate over H.R. 2022, opponents raised significant concerns that the new credible fear screening process would lead to the denial of meritorious asylum claims in violation of international obligations.

94.     In reporting out H.R. 2022, the Judiciary Committee assured opponents of the bill that:

> Under this system, there should be no danger that a [noncitizen] with a genuine asylum claim will be returned to persecution. The initial screening, which should take place in the form of a confidential interview, will focus on two questions: is the [noncitizen] telling the truth; and does the [noncitizen] have some characteristic that would qualify the [noncitizen] as a refugee.

H. Rep. 104-469 - Immigration in the National Interest Act of 1995, p. 158.

95.     Reflecting this congressional intent, over the next twenty-four years, the credible fear determination process remained focused on answering these "two questions." *Id.*

96.     In December 2020, however, the Departments of Justice and Homeland Security enacted a rule that would, if it had not been enjoined, have radically departed from historical practice.

---

[8] In March 1996, Congress had enacted a prior version of 8 U.S.C. § 1225 through the Antiterrorism and Death Penalty Act of 1996. Months later, however, Congress passed IIRIRA, which provided that "Effective as of the date of the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, section 422 of such Act [*i.e.*, 8 U.S.C. § 1225] is repealed and the Immigration and Nationality Act shall be applied as if such section had not been enacted." Omnibus Consolidated Appropriations Act, 1997, PL 104–208, September 30, 1996, 110 Stat 3009.

97. That rule, titled "Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review," 85 Fed. Reg. 80274 (Dec. 11, 2020), included a multitude of amendments to 8 CFR § 208.30. Among these was a provision stating that, if a noncitizen "is subject to one or more of the mandatory bars to applying for asylum or being eligible for asylum . . . then the asylum officer will enter a negative credible [or reasonable] fear of persecution determination with respect to the alien's eligibility for asylum." 85 Fed. Reg. 80391.

98. This rule never became effective, because the U.S. District Court for the Northern District of California issued a temporary restraining order and preliminary injunction against its implementation. The court's order was based on the fact that Acting Secretary of Homeland Security Chad Wolf, who signed the proposed rule, "did not have valid authority to act in that capacity." *Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, 512 F. Supp. 3d 966, 972 (N.D. Cal. 2021).

**F.      In 2022, Defendants Concluded That Applying Mandatory Bars in Screening Interviews Was Unreasonable, Inefficient, and Would Expand Screening Interviews Beyond Their Congressionally Intended Purpose**

99. On March 29, 2022, DHS and DOJ published an interim final rule titled "Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers," 87 Fed. Reg. 18078 (Mar. 29, 2022).

100. Recognizing the complexities inherent in enforcing the mandatory bars, DHS and DOJ expressed strong disapproval of the enjoined 2020 proposal to apply mandatory bars in the context of credible fear interviews. *Id*. at 18093-94. For example, Defendants noted that the "particularly serious crime" bar requires "fact-intensive" and "complex" "case-by-case adjudication." *Id.* They therefore concluded that it would be purely "speculative" to believe "consideration of mandatory bars at the credible fear screening stage would result in elimination of removal delays for individuals subject to the bars." *Id.* at 18094.

26

101.    Defendants likewise concluded that "broadly" applying the mandatory bars in screening interviews would make those interviews "less efficient," because asylum officers would need to take "detailed testimony" and conduct complicated legal analyses. *Id.* at 18093. In reaching these conclusions, Defendants relied on their experience, under a now-defunct rule, considering a non-statutory bar in credible fear interviews. *Id*.

102.    Defendants' analysis in 2022 also noted that, although asylum officers already could ask questions about potential bars in screening interviews, "the record [did] not need to be developed to the level of detail that would be necessary if the issue of a mandatory bar was outcome-determinative for a credible-fear determination." 87 Fed. Reg. at 18093.

103.    Further, Defendants concluded that, in many cases, consideration of bars would expand screening interviews "beyond [their] congressionally intended purpose … and would instead become a decision on the relief or protection itself." 87 Fed. Reg. at 18093.

104.    Finally, Defendants recognized in 2022 "that considerations of procedural fairness counsel against applying mandatory bars that entail extensive fact-finding during the credible fear screening process." 89 Fed. Reg. at 18093. Given the "intricacies of the fact-finding and legal analysis often required to apply mandatory bars," Defendants concluded that people with a credible fear of persecution "generally should be afforded the additional time, procedural protections, and opportunity to further consult with counsel" that come with proceedings on the merits. *Id.* at 18094.

105.    Thus, as DHS conceded in the proposed version of the Rule, both DHS and DOJ "explained" in 2022 "that not applying mandatory bars at the credible fear screening stage both preserves the efficiency Congress intended in making credible fear screening part of the expedited removal process and helps ensure a fair process for those individuals found to have a significant possibility of establishing eligibility for asylum or statutory withholding of removal but for the potential applicability of a mandatory bar." 89 Fed. Reg. at 41350.

27

### G.    The Mandatory Bars Rule and the EOIR Companion Rule

106.    In December 2024, Defendants completely reversed their 2022 position and announced the Mandatory Bars Rule and the EOIR Companion Rule.

107.    The Mandatory Bars Rule provides broad discretion for asylum officers conducting credible fear and reasonable fear interviews to "consider the applicability" of bars to eligibility for asylum or withholding of removal if a person "appears to be subject to" such a bar. 89 Fed. Reg. at 103413-14; 8 C.F.R. §§ 208.30(e)(5)(ii), 208.31(c); *see also id.* § 208.33(b)(2)(i) ("if there is evidence that" the bar applies).

108.    Specifically, the Mandatory Bars Rule gives asylum officers discretion to: (i) consider all of the mandatory bars to asylum eligibility except the firm-resettlement bar, and (ii) consider all of the mandatory bars to withholding of removal. 89 Fed. Reg. at 103413-14; 8 C.F.R. §§ 208.30(e)(5)(ii), 208.31(c), 208.33(b)(2)(i).

109.    The EOIR Companion Rule states that immigration judges will review the application of the mandatory bars whenever asylum officers consider a bar in the context of a screening interview. *See* 89 Fed. Reg. at 105402; 8 C.F.R. §§ 1003.42(d), 1208.31(g), 1208.33(b)(1). EOIR promulgated the Companion Rule as a "clarification" without public notice and comment because of the Mandatory Bars Rule. *See* 89 Fed. Reg. at 105396 (stating the "clarification is particularly important" because of the Mandatory Bars Rule).

110.    The Mandatory Bars Rule does not allow asylum officers to consider the exceptions to the right *to apply for* asylum during credible fear interviews. *See* 89 Fed. Reg. at 103392; 8 C.F.R. § 208.30(e)(5)(i).[9]

---

[9]    Because the exceptions to the right to apply for asylum do not preclude applications for withholding of removal or CAT relief, they are not relevant to the reasonable fear context.

111.    If an asylum officer decides to consider a mandatory bar, a noncitizen in a credible fear interview must demonstrate "a significant possibility that [they] would be able to show by a preponderance of the evidence that such bar(s) do not apply." 89 Fed. Reg. at 103413; 8 C.F.R. § 208.30(e)(5)(ii)(B). Similarly, a noncitizen in a reasonable fear interview must demonstrate "a reasonable possibility that no mandatory bar applies." 89 Fed. Reg. at 103413-14; 8 C.F.R. §§ 208.31(c) & 208.33(b)(2)(ii).

112.    In addition, the Mandatory Bars Rule specifies that it is meant to be applied even in "credible fear screenings where the Circumvention of Lawful Pathways or Securing the Border rules apply." Mandatory Bars Rule, 89 Fed. Reg. 103370. Those rules, from 2023 and 2024, contain asylum bans based on a noncitizen's manner of physical entry into the United States. They also specify that noncitizens subject to their bans must clear heightened screening standards—a "reasonable possibility" and "reasonable probability," respectively—in order to proceed with an application for withholding of removal.[10] Thus, noncitizens interviewed under those rules must show a reasonable possibility or reasonable probability that a bar does not apply. *See* 8 C.F.R. § 208.35(b)(2)(i); 89 Fed. Reg. at 103397. To satisfy the "reasonable probability" standard, noncitizens must rebut the application of the bar with "greater specificity" than under the other standards. 89 Fed. Reg. at 81246.

113.    If a noncitizen does not adequately rebut the application of a bar considered by the asylum officer, the Mandatory Bars Rule states that "[t]he asylum officer shall issue a negative fear finding." 8 C.F.R. § 208.30(e)(5)(ii)(A); *see id.* § 208.33(b)(2)(iii) (using "will").

114.    Simply put, the Mandatory Bars Rule moves forward consideration of the mandatory bars to the screening process. It further instructs that, where an officer decides to

---

[10]    Both the asylum bans contained in the 2023 and 2024 rules and the heightened screening standards imposed by those rules are being challenged in the cases listed in footnote 6 above.

consider the mandatory bars, the officer must issue a negative finding unless the noncitizen—who is very likely to be detained and lack counsel or access to documents—can establish the relevant possibility that the bar does not apply. The EOIR Companion Rule has the same effect.

115.    The Mandatory Bars Rule leaves the question whether to adjudicate these mandatory bars in the screening interview to the discretion of asylum officers and does not provide guidance concerning when they should or should not apply the mandatory bars.

### 1.    Defendants' Reasoning Relies on False Assumptions and Mischaracterization.

116.    In the nonbinding preamble to the Mandatory Bars Rule, Defendants assert roughly 30 times that the mandatory bars will be considered in credible and reasonable fear interviews only if there is "easily verifiable evidence" available that suggests a Mandatory Bar might apply. 89 Fed. Reg. at 103373, 103376, 103378, 103383-89, 103391, 103394-97, 103403, 103411. The preamble even asserts that the Mandatory Bars Rule "instructs" asylum officers to consider mandatory bars "only" in such situations. *Id.* at 103385.

117.    The Mandatory Bars Rule itself, however, includes no such limitation; indeed, the phrase "easily verifiable" appears nowhere in the Rule's text. Rather, the Mandatory Bars Rule instructs asylum officers to consider mandatory bars whenever it "appears" that one might apply. 89 Fed. Reg. at 103413-14, 8 C.F.R. §§ 208.30(e)(5)(ii), 208.31(c), 208.33(b)(2)(i).[11]

118.    In the nonbinding preamble, Defendants also assert that the Mandatory Bars Rule gives asylum officers "discretion to not apply the mandatory bar at the screening stage" in complicated cases. 89 Fed. Reg. at 103379, 103385. That is at best partly true. Although the Mandatory Bars Rule provides functionally unlimited discretion for asylum officers to decide

---

[11] Even if "easily verifiable evidence" were required, which it is not, as discussed *supra* (¶¶ 56-58), foreign or international documents—such as INTERPOL notices—are often unreliable and/or products of the very persecution noncitizens are fleeing.

when to consider a mandatory bar in the first instance, it does *not* provide discretion for asylum officers to ignore a bar once they decide to consider it. Rather, the Mandatory Bars Rule mandates that asylum officers "shall issue" negative fear findings whenever a mandatory bar is considered and a noncitizen does not adequately rebut its applicability. 89 Fed. Reg. 103413; 8 C.F.R. § 208.30(e)(5)(ii)(A).

119.    Defendants' false assumption that the Mandatory Bars Rule cabins discretion to cases with "easily verifiable evidence" vitiates the Rule's "main purpose." 89 Fed. Reg. at 103398. That purpose is, according to Defendants, "to facilitate efficiency in the expedited removal process." *Id*. But Defendants conclude that the Mandatory Bars Rule serves an efficiency purpose by assuming that it can be applied only to a small number of cases with easily verifiable evidence. *See* 89 Fed. Reg. at 41359, 103381. The Mandatory Bars Rule's plain text and broad applicability—which allow consideration of a bar whenever it "appears" that the bar might apply—belie that assumption.

120.    Defendants' responses to public comments on the proposed version of the Mandatory Bars Rule rely on the same false assumptions. As one example, Defendants cite the (nonexistent) "easily verifiable evidence" limitation as their chief basis for rejecting concerns that the Mandatory Bars Rule—which, again, allows asylum officers to consider any bar they think "appears" to be implicated—would be open to "abuse" by an "overtly hostile anti-immigrant administration." 89 Fed. Reg. at 103383 (quotation omitted).[12] As a further example, Defendants dismiss concerns that Mandatory Bars Rule will result in erroneous removals solely by invoking the (nonexistent) discretion not to remove a person who fails to meet their burden of proof as to a Mandatory Bar. *Id.* at 103389.

---

[12] Defendants' secondary reason for rejecting this concern—that everyone who fails a screening interview on the basis of a Mandatory Bar would necessarily see their claim fail on the merits for the same reason—is equally untenable. *See* 89 Fed. Reg. at 103384.

2.     **Defendants Fail to Acknowledge or Explain Departures from Prior Policy Judgments**

121.    Defendants fail to acknowledge the many reversals of prior judgments that the Mandatory Bars Rule and the EOIR Companion Rule represent.

122.    Defendants contend that the Mandatory Bars Rule "is not inconsistent with [the] earlier position" taken by DHS and DOJ in 2022 that considering mandatory bars in screening interviews is inefficient. 89 Fed. Reg. at 103386. They similarly contend the Mandatory Bars Rule "does not represent a reversal of [that] prior judgment." *Id.* at 1033887. These contentions are based solely on Defendants' view that the Mandatory Bars Rule "will allow for consideration of mandatory bars in limited instances." *Id.* at 103387 (emphasis added). The Mandatory Bars Rule, however, allows for the consideration of mandatory bars in almost all instances. Defendants' claim that the Mandatory Bars Rule will increase efficiency therefore represents an unacknowledged change of position.

123.    Defendants repeatedly use the fact that asylum officers "are already required to ask questions regarding the mandatory bars in all screenings" as a justification for the Mandatory Bars Rule's provisions. 89 Fed. Reg. at 103385, 103388-91, 103411. Defendants, however, never acknowledge their finding from 2022 that an outcome-determinative assessment of mandatory bars would, in all cases, require details not already elicited during screening interviews. Nor do Defendants assess the effect of eliciting those additional details on the Mandatory Bars Rule's core efficiency rationale.

124.    In 2022, DOJ—as well as DHS—found that considering mandatory bars in screening interviews would be inefficient because application of the mandatory bars required consideration of additional facts and complex legal issues. In the Mandatory Bars Rule, however, DHS assumes that immigration judges in DOJ will not have to commit extra time and resources to review of negative fear determinations based on application of the mandatory bars. *See* 89 Fed.

Reg. 103379. Neither the Mandatory Bars Rule nor the EOIR Companion Rule acknowledges that this assumption is contrary to DOJ's earlier conclusion.

125.    Defendants ignore their own prior discussion of their experience implementing a non-statutory bar in screening interviews. Defendants instead treat the 2023 and 2024 asylum bans—and asylum officers' experience applying those bans—as analogous to the Mandatory Bars Rule's provisions. *See* 89 Fed. Reg. at 103387. Defendants, however, previously took the position that such bans are not analogous to the mandatory bars to asylum and withholding of removal because they are "easier to apply." 89 Fed. Reg. at 41353 (citing 88 Fed. Reg. at 11744-45). They do not acknowledge this reversal of judgment in the final Rule.

126.    Defendants assert that "the particularly serious crime bar analysis"—which requires the application of complex, multi-step analyses that are different in the asylum context and the withholding context—is not "legally and factually too complex to be analyzed in a screening interview." 89 Fed. Reg. at 103390-91. They do not acknowledge, however, that this assertion reverses DHS's 2022 judgment that the same bar was unsuited for consideration in screening interviews. *See* 89 Fed. Reg. at 18093. Nor do Defendants provide any reasoning to support their newly revised position.[13]

127.    Defendants assert that the Mandatory Bars Rule obviates their 2022 conclusion that procedural fairness strongly counsels against considering bars in screening interviews. 89 Fed. Reg. at 103387. They base that assertion solely on the view that asylum officers "will only consider

---

[13] The Mandatory Bars Rule contradicts itself concerning the ability of asylum officers to assess the particularly serious crime bar in screening interviews. At one point, the Mandatory Bars Rule "disagrees" with the suggestion that "because the particularly serious crime bar is applied differently in asylum and withholding of removal, it will be confusing for [asylum officers] to analyze." 89 Fed. Reg. at 103391. Elsewhere, the Mandatory Bars Rule states that, where the difference between asylum and withholding of removal is relevant, an asylum officer "would likely be unable to efficiently address the particularly serious crime bar." *Id.* at 103395.

the mandatory bars where there is easily verifiable evidence that a mandatory bar applies." *Id.* The Mandatory Bars Rule's plain text and broad applicability belie that assertion.

128.    In the Mandatory Bars Rule, Defendants fail to respond meaningfully to comments. For example, commenters showed that the Mandatory Bars Rule would effectively shift the burden of proof onto noncitizens at a stage when they do not have access to documentary evidence, are almost never represented by counsel, might not be told the basis for the asylum officer's belief that a bar applies, and do not have a meaningful opportunity to rebut that belief. Defendants failed to meaningfully engage with these concerns, instead drawing facially inapt analogies to the burden on noncitizens to show a credible fear of persecution (which requires nothing more than verbal testimony) and the burden imposed in full removal proceedings (where documentary evidence and legal representation is much more readily available).

### 3.    Defendants Failed to Consider Important Aspects of the Problem

129.    In the Mandatory Bars Rule, Defendants also failed to take relevant evidence into account and reached conclusions contrary to the record. Among other things, Defendants failed to account for significant evidence concerning the factual and legal complexity of the bars and recent policy changes.

130.    Among other things, Defendants do not consider the effect of policies that require holding noncitizens in CBP custody with exceedingly little time to consult with counsel or others on noncitizens' ability to satisfy the burdens of proof imposed by the Mandatory Bars Rule. *See* 89 Fed. Reg. at 103374 (claiming that concerns about access to counsel are "outside the scope of this rulemaking").

131.    Similarly, although the Mandatory Bars Rule applies in interviews conducted under the 2024 asylum ban, in which noncitizens must satisfy the "reasonable probability" standard, the Mandatory Bars Rule does not consider whether noncitizens will be able to provide the "specificity

required" by that standard, 89 Fed. Reg. at 81248, even though in most cases evidence relevant to the mandatory bars will be in the noncitizen's country of origin.

## III.    Harms to Plaintiffs

### A.    E.Q.

132.    Plaintiff E.Q. is an asylum seeker from Afghanistan who participated in a credible fear interview at the Eloy Detention Center in Eloy, Arizona on February 4, 2025.

133.    E.Q. testified that a close family member worked for an international organization that cooperated with the previous Afghan government. That family member now lives in the United States and is a U.S. citizen.

134.    E.Q. testified that in the spring of 2024, the Taliban raided his home and accused him of being an "American spy." Shortly thereafter, E.Q. fled Afghanistan and ultimately traveled to the United States.

135.    E.Q. also testified that, before he left Afghanistan, he worked at a business that served members of the general public. Sometimes members of the Taliban would patronize that business, although E.Q. never served them.

136.    An asylum officer deemed E.Q.'s testimony credible but nonetheless issued a negative credible fear determination under the Mandatory Bars Rule, stating that "there are reasonable grounds to believe that the applicant may be subject to a bar(s) to asylum or withholding of removal."

137.    According to the asylum officer:

[T]he applicant worked for a place of work that gave material support to the Taliban. As of 2010, the Taliban has been designated as a Foreign Terrorist Organization by the Department of State (https://www.state.gov/foreign-terrorist-organizations/). Government records indicate that the applicant was confirmed by National Targeting Center and security checks confirm the applicant to be a member of the Taliban and is a Suspected Terrorist (KST). As such, there are reasonable grounds to believe that the applicant is a danger to the security of the

United States and is a person described in the Terrorism-Related Inadmissibility Grounds (TRIG).

138.    In sum, an asylum officer accepted that E.Q. had been threatened by the Taliban and accused of working as a U.S. spy, but nonetheless ordered E.Q.'s removal to Afghanistan based on the hypotheses that (i) he worked at a business that sometimes served members of the Taliban just as it served the general public, and (ii) a government database suggested that E.Q. was a member of the Taliban—the very group that the asylum officer accepted would persecute him.

139.    Following his interview, E.Q. was never advised of the reasons for his negative CFI determination and was never told at all about his name appearing in any database. As a result, E.Q. was not provided with any opportunity to rebut this "evidence"—including by disputing that he was the individual allegedly named in the database—during the immigration judge's review of the negative finding.

140.    E.Q.'s case is emblematic of the arbitrary and capricious manner in which the Mandatory Bars Rule impermissibly shifts the burden of proof to noncitizens while depriving them of time or access to information and documents necessary to meet that burden.

141.    In applying mandatory bars to relief, Defendants must first make "a threshold showing of particularized evidence of the bar's applicability before placing on the applicant the burden to rebut it." *Budiono v. Lynch*, 837 F.3d 1042, 1048 (9th Cir. 2016). In this case, the chief basis for suggesting that E.Q. *may be* subject to a mandatory bar for providing material support for terrorism is based on testimony that he worked at a business where *other employees* serving the general public occasionally served customers who were members of the Taliban.

142.    Such an assessment is particularly irrational given that the Taliban resumed control over the entire country of Afghanistan shortly after E.Q. became an adult. Application of the material support bar under these circumstances would effectively render ineligible for asylum every Afghan person who ever worked in a private business that engaged in commerce.

143.    Equally problematic in this case, Defendants appear to have identified E.Q. as a member of the Taliban based solely on his name appearing in "government records." But Defendants never advised E.Q. that his name appeared in any database, thus depriving him of any opportunity to rebut this evidence. This is remarkable given that Defendants accepted as credible all of E.Q.'s testimony, including his testimony that he had never "been a member of an armed group or a group that uses violence to achieve its goals" and never "provided any type of support, like food, housing, money, or transportation, to an armed group or any group or person that uses violence to achieve their goals."

144.    In the absence of the Mandatory Bars Rule, E.Q. would have passed his CFI and would have been referred for full removal proceedings to seek asylum or withholding of removal. Instead, because of the Mandatory Bars Rule, he received a negative credible fear determination, is subject to an expedited removal order, and faces the possibility of removal to persecution by the Taliban.

### B.    Amica Center

145.    The Mandatory Bars Rule and EOIR Companion Rule harm Plaintiff Amica Center in multiple ways, including by perceptibly impairing its core mission of providing legal services to the greatest possible number of migrants who are detained in the Washington, D.C. metropolitan area.

146.    For example, the Rules will impose significant burdens on and divert already-limited resources from Amica Center's Legal Orientation Program ("LOP") team, which provides legal information and assistance to hundreds of detained noncitizens each month at two ICE facilities in Virginia. The overwhelming majority of the noncitizens with whom the LOP team interacts are unrepresented in their removal proceedings, and many go through credible and reasonable fear interviews, as well as subsequent Immigration Judge reviews, while in contact with

the LOP team. The LOP team provides these noncitizens with information about the asylum and immigration court systems, as well as limited logistical support, such as gathering and submitting evidence.

147.    LOP staff conducting Know Your Rights presentations and intake meetings with those detained noncitizens will now be forced to spend additional time and resources to explain how the Rules work, so that those pro se noncitizens can attempt to understand whether the bars might come up in their fear interviews and potentially impact their eligibility for relief. As a result, the LOP team will be forced to reduce the number of individuals to whom they can provide intake meetings and know-your-rights presentations.

148.    The LOP team will also be forced to dedicate further time and money to drafting and reproducing new informational materials about the Rules to share with the detained noncitizens they serve.

149.    Likewise, the Rules will hinder the work of Amica Center's Detained Adult Program ("DAP") team, which provides merits representation to detained adult noncitizens in removal proceedings, including at the fear interview stage, in immigration courts, and on appeal before the BIA and federal courts. Under DAP's existing case placement model, it takes multiple weeks from the time a referral is received until DAP attorneys can commence substantive legal representation in a case. If a noncitizen may be subject to one of the mandatory bars to asylum and/or withholding, Amica Center attorneys are currently able to assist them in addressing the bar by representing them in their merits proceedings in immigration court, where they can present and respond to relevant evidence and complex legal arguments regarding whether the bars apply or not.

150.    As a result of the Rules, DAP staff will have to dramatically reallocate resources from their existing case placement model and commence representation much earlier, at the fear

interview and Immigration Judge review stage, in order to contest mandatory bars and preserve their clients' eligibility for relief. To contest the bars when they have been applied in the context of reasonable fear interviews, Amica Center attorneys will also be forced to file more Petitions for Review in federal court, further diverting resources from Amica Center's immigration court docket.

151.    As a result, Amica Center will likely be forced to reduce the number of clients they represent or connect with pro bono counsel and thus will be forced to reject cases of noncitizens with viable claims for relief.

152.    Finally, Amica Center, across these and its other programs, will be forced to devote additional time and resources to training its own staff, as well as the volunteers and pro bono attorneys upon which it heavily relies, on the mechanics and applicability of the Rules—at a time when the organization is already struggling to meet the needs of an ever-increasing number of detained noncitizens.

153.    The Rules will thus force Amica Center to divert scarce resources away from other important programs to compensate for the additional time, procedures, and staffing required by the Rules.

154.    As a result, Amica Center will be able to serve fewer clients, which will undermine sources of funding that are based on the number of clients served.

### C.    Florence Immigrant and Refugee Rights Project

155.    The Mandatory Bars Rule and the EOIR Companion Rule harm the Florence Project in multiple ways, including by perceptibly impairing its core mission of providing legal services to detained adults and children in all three ICE detention centers that currently operate in Arizona: the Eloy Detention Center, the Florence Detention Center, and the Central Arizona Florence Correctional Complex.

156.    The heart of the Florence Project's work is helping as many asylum seekers as possible by providing detailed legal orientation, technical support, and representation. The Florence Project provides services to thousands of detained pro se respondents each year, including group orientations and workshops that enable people to represent themselves in bond and removal proceedings. It also represents hundreds of adult clients before the asylum office, immigration courts, and the BIA each year, including many who are seeking humanitarian relief, such as asylum, withholding of removal, and CAT protection. And the Florence Project serves as appointed counsel for individuals deemed mentally incompetent to represent themselves in removal proceedings and, with support from legal assistants and social workers, maintains a caseload of approximately one hundred such clients throughout Arizona.

157.    Due to its proximity to the border, many of the individuals detained in the facilities that the Florence Project serves are facing expedited or reinstated removal proceedings, and thus they must go through the credible or reasonable fear process in order to have an opportunity to pursue protection in the United States. Historically, however, the Florence Project has concentrated their efforts on serving detained noncitizens once their cases complete threshold screening interviews and arrive in the immigration court system. The Mandatory Bars Rule will increase the pressure that Florence Project faces to reach people in threshold screening interviews, because those interviews are likely to represent the only opportunity that Florence Project staff will have to advise and assist people who may be barred from protection because of a mandatory bar. Waiting for people to reach immigration court will be insufficient because the review of negative credible and reasonable fear findings allows for a limited opportunity for legal assistance. This means the Florence Project will have to take additional steps to reach people earlier in the process in order to have a chance to serve people who may be at risk of being denied protection due to a mandatory bar.

158.    Another core aspect of the Florence Project's work that will be impacted is its work as appointed counsel for people who are incompetent to represent themselves. A substantial number of the people whom the Florence Project is appointed to represent are seeking asylum, withholding of removal, and protection under the CAT, and many are at risk of being barred from relief because of a mandatory bar. But the Florence Project gets appointed in these cases by immigration judges only after the credible fear or reasonable fear process has been completed. Because the Mandatory Bars Rule will result in the application of the bars to people in this category before they have an opportunity to receive appointed counsel, the Florence Project's ability to be appointed to represent these individuals will be jeopardized. The follow-on result is that these individuals are likely to face removal based on the premature application of a bar, even in cases where the Florence Project would have been able to rebut the application of that bar if given the opportunity to do so.

159.    The Mandatory Bars Rule will cause additional harms to the Florence Project's core work. For example, attorney and staff will have to study the Rules and attempt to ascertain their full scope and impact, about which Defendants have provided no public guidance. This work will be necessary to enable the Florence Project to update the materials it uses to educate immigrants at the border and in ICE detention centers about their legal rights. That work is significant not just for the Florence Project and the people that the project serves, but it is all the more critical because many other nonprofit organizations around the country use legal materials that the Florence Project creates as part of their own pro se education programming.

160.    In addition, the Florence Project will now need to devote substantial additional time and resources to provide information and legal advice related to mandatory bars to individuals facing credible and reasonable fear interviews. Preparing applicants for these interviews was already complex, and now staff will have to incorporate new, additional complexities into this

time-compressed educational process. The Florence Project will likewise have to spend significant additional time and resources helping applicants collect documentary evidence that could be used to dispute allegations that a mandatory bar applies.

161.    The Mandatory Bars Rule will also result in negative initial fear determinations for a larger number of noncitizens, which will increase the frequency of reviews by immigration judges. As a result, the Florence Project will have to advise and/or represent a greater number of clients in immigration judge reviews.

162.    All told, the Rules will force the Florence Project to restructure one of its core programs: the provision of service to people facing credible and reasonable fear interviews. It will also jeopardize the Florence Project's ability to continue another core program of acting as appointed counsel for people incompetent for self-representation. And it will require the Florence Project to divert scarce resources away from other important programs.

### D.    RAICES

163.    The Mandatory Bars Rule and EOIR Companion Rule harm Plaintiff RAICES in multiple ways, including by perceptibly impairing its core mission of providing pro bono legal services to noncitizens.

164.    A central piece of RAICES's work with detained people involves helping them prepare for their screening interviews. RAICES serves people detained at the Karnes County Detention Facility in Karnes City, Texas, and—to the extent possible given restrictions on access—people detained by CBP. RAICES represents as many clients as possible from these populations in credible and reasonable fear interviews and in review of negative fear determinations by immigration judges.

165.    This work is directly and significantly affected by the Mandatory Bars Rule and the EOIR Companion Rule. RAICES will have to update its Know-Your-Rights presentations and its

interview protocols for prospective clients—with those interviews now requiring additional questions and additional time for each prospective client. As a result, RAICES will be forced to reduce the number of intake interviews and Know-Your-Rights presentations it can provide.

166.    The Rules also will force RAICES to divert scarce resources away from other important programs to compensate for the additional time, procedures, and staffing required by the Rules.

167.    Because of the Rules, RAICES will be forced either to serve fewer clients or to provide fewer services, which will undermine funding sources that are tied to the number of clients served and/or the services provided.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Violation of Immigration and Nationality Act and Administrative Procedure Act, Contrary to Law – 8 U.S.C. § 1158, 5 U.S.C. § 706(2))**

168.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

169.    The INA defines asylum "Eligibility" in § 1158(b)(1)(a) as follows:

The Secretary of Homeland Security or the Attorney General may grant asylum to a[ noncitizen] who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section if the Secretary of Homeland Security or the Attorney General determines that such [noncitizen] is a refugee within the meaning of section 1101(a)(42)(A) of this title.

170.    The mandatory bars enumerated in § 1158(b)(2) are not eligibility criteria, but rather "Exceptions" that foreclose asylum to otherwise eligible refugees.

171.    The INA distinguishes between exceptions to the right to apply for asylum in § 1158(a)(2) and the mandatory bars in § 1158(b)(2), which require the denial of relief to

otherwise-eligible applicants following a decision on the merits. Indeed, the INA permits people potentially subject to the mandatory bars to apply for asylum. 8 U.S.C. § 1158(a)(1).

172.    In contrast to § 1158(b)(1), which entrusts decisions concerning asylum eligibility to either the Attorney General or the Secretary of Homeland Security, § 1158(b)(2) provides that only "the Attorney General determines" whether the mandatory bars apply.

173.    The APA provides that courts "shall … hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

174.    The Mandatory Bars Rule and the EOIR Companion Rule are contrary to law, including 8 U.S.C. § 1158. The Mandatory Bars Rule—and, by extension, the EOIR Companion Rule—prevent noncitizens from applying for and being granted asylum on the basis that a mandatory bar "appears" to apply, even though there is no determination—as required by statute—that a mandatory bar does apply. The Mandatory Bars Rule also impermissibly allows DHS asylum officers to decide issues entrusted solely to the Attorney General.

**SECOND CLAIM FOR RELIEF**
**(Violation of Immigration and Nationality Act and Administrative Procedure Act,**
**Contrary to Law – 8 U.S.C. § 1231, 5 U.S.C. § 706(2))**

175.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

176.    The INA provides that a person cannot receive statutory withholding of removal if "the Attorney General determines" that a bar in 8 U.S.C. § 1231(b)(3)(B) applies.

177.    The APA provides that courts "shall … hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

178.    The Mandatory Bars Rule and the EOIR Companion Rule are contrary to law, including 8 U.S.C. § 1231. The Mandatory Bars Rule—and, by extension, the EOIR Companion Rule—prevent noncitizens from applying for and being granted withholding of removal on the

basis that a mandatory bar "appears" to apply, even though there is no determination—as required by statute—that a mandatory bar does apply. The Mandatory Bars Rule also permits DHS asylum officers to make determinations entrusted solely to the Attorney General.

**THIRD CLAIM FOR RELIEF**
**(Violation of Immigration and Nationality Act and Administrative Procedure Act,**
**Contrary to Law – 8 U.S.C. § 1225, 5 U.S.C. § 706(2))**

179.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

180.    The INA mandates that any noncitizen who is placed in expedited removal proceedings and is then determined to have a "credible fear of persecution" be referred to immigration court for further proceedings. 8 U.S.C. § 1225(b)(1)(B)(ii).

181.    A "credible fear of persecution means that there is a significant possibility, taking into account the credibility of the statements made by the [noncitizen] in support of the [noncitizen's] claim and such other facts as are known to the officer, that the [noncitizen] could establish eligibility for asylum." *Id.* § 1225(b)(1)(B)(v).

182.    Although the INA contemplates that screening interviews will be conducted solely on the basis of the noncitizen's testimony, each of the mandatory bars implicates factual and legal issues that require complex analyses and the presentation of documentary evidence not in the possession of a noncitizen at the time of a screening interview.

183.    The APA provides that courts "shall … hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

184.    The Mandatory Bars Rule and the EOIR Companion Rule are contrary to law, including 8 U.S.C. § 1225. The Mandatory Bars Rule—and, by extension, the EOIR Companion Rule—impermissibly transform the bars into eligibility requirements; impermissibly shifts the burden of proof to the noncitizen, effectively heightening the "significant possibility" standard;

45

and impermissibly force noncitizens to make showings that require documentary, as opposed to only testimonial, evidence.

## FOURTH CLAIM FOR RELIEF
### (Violation of Administrative Procedure Act – Rule is Arbitrary and Capricious – 5 U.S.C. § 706(2))

185.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

186.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

187.    The Mandatory Bars Rule—and, by extension, the EOIR Companion Rule—are arbitrary and capricious because, among other things, Defendants: (i) failed to articulate reasoned explanations for their decisions, including but not limited to their decision to depart from prior policies; (ii) offered explanations at odds with the plain text of the Mandatory Bars Rule; (iii) considered factors that Congress did not intend to be considered; (iv) entirely failed to consider important aspects of the problem; (v) failed to consider or respond to significant comments; (vi) failed to consider the effects of related policies; (vii) ignored record evidence; and (viii) offered explanations for their decisions that run counter to the evidence before Defendants.

## PRAYER FOR RELIEF

Plaintiffs respectfully request the following relief:

a.    Vacatur of the Mandatory Bars Rule and the EOIR Companion Rule;

b.    A declaratory judgment holding that the Mandatory Bars Rule and the EOIR Companion Rule are contrary to law and arbitrary and capricious;

c.    An order staying or enjoining E.Q.'s removal from the United States pending a final judgment in this case or, in the event E.Q. is removed prior to the Court's Order, an order returning E.Q. to the United States for the duration of his removal proceedings so that he may apply for asylum, withholding of removal, and/or CAT protection in the United States;

d.    An order awarding Plaintiffs' costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable law; and

e.    Such other and further relief as the court deems equitable, just, and proper.

Dated: March 17, 2025                              Respectfully Submitted,

| | |
|---|---|
| s/ Amanda Shafer Berman<br>Amanda Shafer Berman (DC Bar No. 497860)<br>CROWELL & MORING LLP<br>1001 Pennsylvania Ave., N.W.<br>Washington, D.C. 20004<br>(202) 624-2500<br>ABerman@crowell.com<br><br>Jared A. Levine*<br>Joachim Steinberg*<br>CROWELL & MORING LLP<br>375 9th Ave, 44th Floor<br>New York, NY 10001<br>(212) 223-4000<br>JLevine@crowell.com<br>JSteinberg@crowell.com<br><br>Judy He*<br>Jeremy Iloulian*<br>Jung Shin*<br>CROWELL & MORING LLP<br>455 N Cityfront Plaza Dr #3600,<br>Chicago, IL 60611<br>(312) 321-4200<br>JHe@crowell.com<br>JIloulian@crowell.com<br>JShin@crowell.com | Keren Zwick (D.D.C. Bar. No. IL0055)<br>Richard Caldarone (D.C. Bar. No. 989575)*<br>Cowleen Cowgill*<br>Fizza Davwa*<br>NATIONAL IMMIGRANT JUSTICE CENTER<br>111 W. Jackson Blvd., Suite 800<br>Chicago, IL 60604<br>(312) 660-1370<br>kzwick@immigrantjustice.org<br>rcaldarone@immigrantjustice.org<br>ccowgill@immigrantjustice.org<br>fdavwa@immigrantjustice.org<br><br>Melissa Crow (D.C. Bar. No. 453487)<br>CENTER FOR GENDER & REFUGEE STUDIES<br>1121 14th Street, NW, Suite 200<br>Washington, D.C. 20005<br>(202) 355-4471<br>crowmelissa@uclawsf.edu<br><br>Anne Peterson*<br>CENTER FOR GENDER & REFUGEE STUDIES<br>200 McAllister Street<br>San Francisco, California 94102<br>T: 415.610.5729<br>*petersonanne@uclawsf.edu* |

|  | Robert Pauw*<br>CENTER FOR GENDER & REFUGEE STUDIES<br>c/o Gibbs Houston Pauw<br>1000 Second Avenue, Suite 1600<br>Seattle, WA 98104<br>(206) 682-1080<br>rpauw@ghp-law.net<br><br>Peter Alfredson (D.C. Bar No. 1780258)<br>AMICA CENTER FOR IMMIGRANT RIGHTS<br>1025 Connecticut Ave. NW, Suite 701<br>Washington, DC 20036<br>(202) 899-1415<br>peter@amicacenter.org<br><br><br>*Certificate of pro bono representation or pro hac vice forthcoming |
|---|---|