## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

E.Q. *et al*.,

        Plaintiffs,

        v.

U.S. DEPARTMENT OF HOMELAND
SECURITY *et. al*,

        Defendants.

Case No.: 1:25-cv-00791

## PLAINTIFF E.Q.'S <u>EMERGENCY</u> MOTION TO STAY REMOVAL
## WITH SUPPORTING POINTS AND AUTHORITIES

**(Plaintiff E.Q. Faces Removal to Danger as Early as May 23, 2025)[1]**

---

[1] Defendants have agreed not to remove E.Q. prior to May 23, 2025. *See* Dkt. #22.

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

    A.    The Mandatory Bars Rule ...................................................................... 2

    B.    The February 25, 2025 IJ Decision ....................................................... 4

    C.    The Reinterview Process and the May 9, 2025 IJ Decision .................... 6

LEGAL STANDARD ......................................................................................... 10

ARGUMENT ..................................................................................................... 10

    I.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS............................ 10

        A.    This Court Has Jurisdiction Over E.Q.'s Challenge to the
            Mandatory Bars Rule. ................................................................... 10

        B.    The Mandatory Bars Rule Is Contrary to Law........................................ 15

            1.    The Mandatory Bars Rule Violates the INA by Preventing
                Eligible Noncitizens from Applying for Asylum........................ 16

            2.    The Mandatory Bars Rule Violates the INA by Denying
                Asylum and Withholding of Removal Based on a DHS
                Determination that a Mandatory Bar "Appears" to Apply .......... 18

            3.    The Mandatory Bars Rule Is Contrary to the INA Because
                It Undermines the Significant Possibility Standard in the
                Expedited Removal Statute ............................................................ 19

        C.    The Mandatory Bars Rule Is Arbitrary and Capricious .......................... 21

            1.    Defendants' Reasoning Relies on the False Factual Premise
                that Asylum Officers Will Assess Mandatory Bars Only
                Where There is "Easily Verifiable Evidence" That They
                Apply........................................................................................... 22

            2.    Defendants Fail to Consider Important Aspects of the
                Problem or Explain Departures from Prior Policy
                Judgments ................................................................................... 24

    II.    E.Q. WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A
        STAY ...................................................................................................... 28

    III.    THE BALANCE OF HARMS AND THE PUBLIC INTEREST BOTH
        FAVOR A STAY OF REMOVAL ............................................................. 29

    IV.    THE NEW CFI RESULTS ARE A LEGAL NULLITY .................................... 31

    V.    A STAY IS INDEPENDENTLY APPROPRIATE TO PRESERVE THIS
        COURT'S JURISDICTION ...................................................................... 32

CONCLUSION.................................................................................................. 33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.B.-B. v. Morgan*,
548 F. Supp. 3d 209 (D.D.C. 2020) ........................................................................12

*Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*,
532 U.S. 598 (2001) ...............................................................................................14

*Budiono v. Lynch*,
837 F.3d 1042 (9th Cir. 2016) ...............................................................................25

*Cap. Area Immigrants' Rights Coal. v. Trump*,
471 F. Supp. 3d 25 (D.D.C. 2020) ..............................................................1, 11, 15

*Cigar Ass'n of Am. v. United States Food & Drug Admin.*,
132 F.4th 535 (D.C. Cir. 2025) ...............................................................21, 22, 24

*Ctr. for Biological Diversity v. Regan*,
No. CV 21-119, 2024 WL 1740078 (D.D.C. Apr. 23, 2024) .................................10

*D.A.M. v. Barr*,
486 F. Supp. 3d 404 (D.D.C. 2020) ......................................................11, 12, 28, 29

*Damus v. Nielsen*,
313 F. Supp. 3d 317 (D.D.C. 2018) ........................................................................29

*Davis v. Mich. Dep't of Treasury*,
489 U.S. 803 (1989) ...............................................................................................16

*Desta v. Ashcroft*,
365 F.3d 741 (9th Cir. 2004) ..................................................................................29

*Dugdale v. United States Customs & Border Prot.*,
88 F. Supp. 3d. 1 (D.D.C. 2015) ............................................................................12

*Elkins v. United States*,
364 U.S. 206 (1960) ...............................................................................................21

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ..........................................................................................22, 27

*Genuine Parts Co. v. Env't Prot. Agency*,
890 F.3d 304 (D.C. Cir. 2018) ...............................................................................22

*Grace v. Barr,*
  965 F.3d 883 (D.C. Cir. 2020) ............................................................................11, 12, 20, 27

*Grace v. Whitaker,*
  344 F. Supp. 3d 96 (D.D.C. 2018) ..........................................................................................13

*Gustavsen v. Alcorn Labs., Inc.,*
  903 F.3d 1 (1st Cir. 2018) .......................................................................................................23

*Judulang v. Holder,*
  565 U.S. 42 (2011) ...................................................................................................................21

*In re Kagan,*
  351 F.3d 1157 (D.C. Cir. 2003) ...............................................................................................22

*Kiakombua v. Wolf,*
  498 F. Supp. 3d 1 (D.D.C. 2020) ...............................................................................12, 17, 19

*Klay v. United Healthgroup, Inc.,*
  376 F.3d 1092 (11th Cir. 2004) .........................................................................................32, 33

*Kurnaz v. Bush,*
  Nos. 04-cv-1135(ESH), 05-cv-0392(ESH), 2005 WL 839542 (D.D.C. 2005) .....................32

*L.M.-M. v. Cuccinelli,*
  442 F. Supp. 3d 1 (D.D.C. 2020) ............................................................................................12

*Las Americas Immigrant Advoc. Ctr. v. United States Dep't of Homeland Sec.,*
  No. 1:24-cv-1702 (D.D.C. May 9, 2025)............................................................2, 13, 27, 31

*Lindstrom v. Graber,*
  203 F.3d 470 (7th Cir. 2000) ...................................................................................................32

*M.G.U. v. Nielsen,*
  325 F. Supp. 3d 111 (D.D.C. 2018) .........................................................................................29

*M.M.V. v. Garland,*
  1 F.4th 1100 (D.C. Cir. 2021) ..................................................................................................15

*Make the Rd. N.Y. v. Wolf,*
  962 F.3d 612 (D.C. Cir. 2020) .................................................................................................11

*Mejia-Velasquez v. Garland,*
  26 F.4th 193 (4th Cir. 2022) ....................................................................................................22

*Morton v. Mancari,*
  417 U.S. 535 (1974)..................................................................................................................16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)..............................................................................21

*Nat'l Wildlife Fed. v. EPA,*
    286 F.3d 554 (D.C. Cir. 2002)............................................................22

*Nken v. Holder,*
    556 U.S. 418 (2009)................................................................10, 28, 29

*In re NTE Conn., LLC,*
    26 F.4th 980 (D.C. Cir. 2022)........................................................10, 32

*O'Donnell Constr. Co. v. District of Columbia,*
    963 F.2d 420 (D.C. Cir. 1992)............................................................29

*O.A. v. Trump,*
    404 F. Supp. 3d 109 (D.D.C. 2019)........................................11, 13, 14, 15

*Pub. Citizen, Inc. v. Fed. Energy Regul. Comm'n,*
    92 F.4th 1124 (D.C. Cir. 2024)..........................................................13

*R.I.L-R. v. Johnson,*
    80 F. Supp. 3d 164 (D.D.C. 2015)......................................................30

*RAICES v. Noem,*
    No. 1:25-cv-306 (D.D.C. filed Feb. 3, 2025)......................................29

*Ramsameachire v. Ashcroft,*
    357 F.3d 169 (2d Cir. 2004)...............................................................8

*S.E.C. v. Vision Commc'ns, Inc.,*
    74 F.3d 287 (D.C. Cir. 1996)........................................................10, 32

*Sierra Club v. EPA,*
    964 F.3d 882 (10th Cir. 2020) ...........................................................22

*Tesoro Alaska Petroleum Co. v. FERC,*
    234 F.3d 1286 (D.C. Cir. 2000)..........................................................26

*Texas Children's Hosp. v. Burwell,*
    76 F. Supp. 3d 224 (D.D.C. 2014)......................................................22

*Ukrainian-Am. Bar Ass'n v. Baker,*
    893 F.2d 1374 (D.C. Cir. 1990)..........................................................14

*United States v. N.Y. Tel. Co.,*
    434 U.S. 159 (1977).........................................................................33

*Wakkary v. Holder,*
    558 F.3d 1049 (9th Cir. 2009) ...................................................................................8

**Statutes**

5 U.S.C. § 706(2)(A)...................................................................................................15

8 U.S.C. § 1158 .............................................................................................. *passim*

8 U.S.C. § 1225(b) .......................................................................................... *passim*

8 U.S.C. § 1231(b) ................................................................................3, 15, 18, 19

8 U.S.C. § 1252(e)(2)...................................................................................................11

8 U.S.C. § 1252(e)(3) ...................................................................................... *passim*

Refugee Act of 1980, Pub. L. No. 96- 212, § 101(a), 94 Stat. 102........................30

**Other Authorities**

8 C.F.R. § 208.30(e)........................................................................4, 17, 19, 22

8 C.F.R. § 208.35(a) ...................................................................................................31

8 C.F.R. § 208.35(b) ...................................................................................................31

8 C.F.R. § 1003.42(d) ...............................................................................................12

87 Fed. Reg. 18078 (Mar. 29, 2022)........................................................... *passim*

89 Fed. Reg. 48710 (June 7, 2024) .............................................................................8

89 Fed. Reg. 48710, 48769 (June 7, 2024) ...............................................................31

89 Fed. Reg. 103370 (Dec. 18, 2024) .......................................................... *passim*

89 Fed. Reg. 105392 (Dec. 27, 2024)...................................................................4, 12

H.R. 2022 ...................................................................................................................17

H. Rep. 104-469 ..................................................................................................3, 18

https://www.regulations.gov/comment/USCIS-2024-0005-2345................................24

https://www.regulations.gov/comment/USCIS-2024-0005-4196................................24

https://www.regulations.gov/comment/USCIS-2024-0005-4260................................24

U.S. Customs and Border Protection, CBP National Targeting Center
(https://www.cbp.gov/frontline/cbp-national-targeting-center)..................................................5

U.S. Department of State, Human Rights Report: Afghanistan (2023),
https://www.state.gov/reports/2023-country-reports-on-human-rights-
practices/afghanistan/.............................................................................................................28

## INTRODUCTION

Plaintiff E.Q. seeks an emergency stay of his removal from the United States.[2] E.Q. is detained by Defendants in Arizona and may be removed as soon as May 23, 2025. After fleeing harm and death at the hands of the Taliban, E.Q. sought humanitarian protection in the United States. He was deemed ineligible for such relief under the Mandatory Bars Rule challenged in this litigation and received an expedited removal order. Weeks later, Defendants—acting on their own initiative—reinterviewed E.Q. This time, Defendants conceded that E.Q. is not subject to a mandatory bar but denied him the opportunity to apply for relief on other grounds.

E.Q. satisfies all the elements for a stay of removal. This Court has jurisdiction over his Administrative Procedure Act ("APA") challenge to the Mandatory Bars Rule, which—like the claim in *Cap. Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020)—is expressly permitted by 8 U.S.C. § 1252(e)(3). E.Q. is likely to succeed on the merits of his challenge because the Mandatory Bars Rule violates the Immigration and Nationality Act ("INA") and APA in several respects. Moreover, E.Q. will be irreparably harmed if he is removed to Afghanistan—either directly or via one or more third countries—because he is likely to be imprisoned, disappeared, or killed on political grounds. The public interest also heavily favors a stay.

Defendants declined to oppose E.Q.'s earlier motion to stay removal (Dkt. 8), asking the Court to hold the motion in abeyance (Dkt. 18) while they provided E.Q. with a second credible fear interview ("CFI"). After the second CFI, Defendants issued a new decision: (i) retracting their prior application of the Mandatory Bars Rule to E.Q. (*i.e.,* conceding that Defendants had wrongly accused him of potential ties to terrorism), but (ii) nonetheless barring him from seeking relief

---

[2] Pursuant to Local Civil Rule 7(m), Plaintiffs' counsel conferred with Defendants' counsel, who indicated that Defendants oppose the stay of removal requested in this motion.

based on a new, dubious conclusion that he was not credible.

Defendants will argue that their new decision divests this Court of authority to issue a stay. Not so. This Court's jurisdiction is established based on the facts as they existed at the time of filing and, when E.Q. filed this case, he had been denied the opportunity to seek asylum because of the Mandatory Bars Rule. Moreover, Defendants conducted E.Q.'s second CFI pursuant to the "Securing the Borders" rule, which was vacated by a judge in this district before E.Q.'s negative-fear determination became final. Order, *Las Americas Immigrant Advoc. Ctr. v. United States Dep't of Homeland Sec.*, No. 1:24-cv-1702, (D.D.C. May 9, 2025), Dkt. 91. As a result, the second CFI determination and the associated removal order are legal nullities issued in violation of that Court's order.

Finally, as an alternative, this Court has the inherent authority to issue a stay of removal to protect its own jurisdiction over this case. Such a stay is clearly warranted here. If E.Q. is imprisoned (or worse) in Afghanistan or elsewhere, he will be unable to prosecute this action. And because of the statutory limits set forth in 8 U.S.C. § 1252(e)(3), if he cannot bring this case, no other individual noncitizen can.

## BACKGROUND[3]

This case presents a timely, facial challenge to a regulation, the Mandatory Bars Rule, which implements changes to the expedited removal system under 8 U.S.C. § 1225(b) in violation of law. See 8 U.S.C. § 1252(e)(3).

### A.    The Mandatory Bars Rule

The mandatory bars include six statutory conditions that, if found applicable, require the denial of asylum to otherwise eligible noncitizens. 8 U.S.C. § 1158(b)(2)(A). Five of the six bars

---

[3] Plaintiffs refer the Court to the Complaint (Dkt.1, ¶¶ 23-39, ¶¶ 68-98) for a fuller recitation of the relevant statutory background.

to asylum are relevant here. Under 8 U.S.C. § 1158(b)(2)(A)(i)-(v), asylum and withholding of removal must be denied "if the Attorney General determines that" a noncitizen: (1) persecuted others; (2) was convicted of a particularly serious crime; (3) committed serious nonpolitical crimes outside the United States; (4) is a danger to national security; or (5) has engaged in terrorist activity. *Id*. § 1158(b)(2)(A)(i)-(v); *see* 89 Fed. Reg .103370 (Dec. 18, 2024). These bars also generally apply to eligibility for withholding of removal under both 8 U.S.C. § 1231(b)(3) and the Convention Against Torture.

Congress created credible fear screening interviews in 1996 to "focus on two questions: is the [noncitizen] telling the truth; and does the [noncitizen] have some characteristic that would qualify the [noncitizen] as a refugee." H. Rep. 104-469 - Immigration in the National Interest Act of 1995, p. 158. Congress never contemplated, much less intended, that screening interviews would be used to deny relief to refugees based on application of the mandatory bars. Until the Mandatory Bars Rule went into effect on January 17, 2025, Defendants had *never* applied the mandatory bars in these screening interviews.

This is unsurprising. The legal and factual complexity of the bars means that applying them in the context of screening interviews conducted on rushed timetables—usually without counsel or the opportunity to present documentary evidence—will inevitably result in the return to persecution (*refoulement*) of many people who could show eligibility for relief on the merits. As Defendants themselves acknowledged in 2022, these cursory screening interviews are incompatible with the "intricacies of the fact-finding and legal analysis often required to apply mandatory bars." 87 Fed. Reg. at 18094. Defendants also previously recognized that application of the mandatory bars in this context would stretch those screening interviews "beyond [their] congressionally intended purpose[.]" 87 Fed. Reg. at 18093.

Nonetheless, in December 2024, Defendants reversed their 2022 position and finalized the Mandatory Bars Rule, which directs asylum officers in screening interviews to "consider the applicability" of the mandatory bars if a person simply "appears to be subject to" such a bar. 89 Fed. Reg. at 103413-14; 8 C.F.R. §§ 208.30(e)(5)(ii), 208.31(c); *see also id.* § 208.33(b)(2)(i) ("if there is evidence that" the bar applies). If a noncitizen does not adequately rebut the application of a bar considered by the asylum officer, "[t]he asylum officer *shall* issue a negative fear finding." 8 C.F.R. § 208.30(e)(5)(ii)(A) (emphasis added); *see id.* § 208.33(b)(2)(iii) (using "will").

Once an asylum officer decides to consider a mandatory bar in a credible fear interview, the burden immediately shifts to the noncitizen to demonstrate "a significant possibility that [they] would be able to show by a preponderance of the evidence that such bar(s) do not apply." 89 Fed. Reg. at 103413; 8 C.F.R. § 208.30(e)(5)(ii)(B). Noncitizens in reasonable fear interviews (which are also at issue in this case, but not in E.Q.'s particular situation) likewise must prove "a reasonable possibility that no mandatory bar applies." 89 Fed. Reg. at 103413-14; 8 C.F.R. §§ 208.31(c) & 208.33(b)(2)(ii). Defendants also issued the EOIR Companion Rule (89 Fed. Reg. 105392), which covers the optional Immigration Judge review of screening interviews.

## B.    The February 25, 2025 IJ Decision

E.Q. received a CFI on February 4, 2025. As confirmed by the interview notes, the interpreter during that CFI spoke Farsi, while E.Q. speaks Dari. *See* Dec. of Colleen Cowgill ("Cowgill Dec."), Ex. A, at 16-18. In the CFI, E.Q. testified that a close family member had worked with the U.S. military through an international organization that cooperated with the previous Afghan government. That family member now lives in the United States and is a U.S. citizen. E.Q. also testified that in 2024, the Taliban raided his home and accused him of being an "American spy." Shortly thereafter, E.Q. fled Afghanistan and traveled to the United States. *See id.* at 24-28.

E.Q. testified further that, before he left Afghanistan, he worked at a business that served the general public. Members of the Taliban would sometimes patronize that business, although E.Q. never personally served them. *See id.*, at 33-34. An asylum officer deemed E.Q.'s testimony credible but nonetheless issued a negative credible fear determination under the Mandatory Bars Rule, finding that "there is no reasonable probability that [E.Q. is] not subject to one or more mandatory bars." *Id.* at 1. According to the officer:

> [T]he applicant worked for a place of work that gave material support to the Taliban. As of 2010 . . . Government records indicate that the applicant was confirmed by National Targeting Center[4] and security checks confirm the applicant to be a member of the Taliban and is a Suspected Terrorist (KST). As such, there are reasonable grounds to believe that the applicant is a danger to the security of the United States and is a person described in the Terrorism-Related Inadmissibility Grounds (TRIG).

*Id.* at 37.

In sum, an asylum officer accepted that the Taliban had threatened E.Q. and accused him of working as a U.S. spy, but nonetheless ordered E.Q.'s removal to Afghanistan, ostensibly because: (i) he worked at a business that sometimes served members of the Taliban just as it served the general public, and (ii) a government database suggested that E.Q. was a member of the Taliban—the very group that the asylum officer accepted would persecute him. An Immigration Judge affirmed the asylum officer's finding on February 25, 2025. Cowgill Dec. ¶ 2.

In the absence of the Mandatory Bars Rule, E.Q. would have received a positive credible-fear determination and been referred for full removal proceedings. In those proceedings, E.Q. would have had the opportunity to rebut the secret, unreliable evidence relied on by the asylum

---

[4] Part of Customs and Border Protection, the National Targeting Center ("NTC") flags passengers and cargo believed to pose a risk to national security. *See* U.S. Customs and Border Protection, CBP National Targeting Center (https://www.cbp.gov/frontline/cbp-national-targeting-center). But the NTC is frequently incorrect and overbroad. *See, e.g.*, Melissa del Bosque, *Secretive CBP Counterterrorism Teams Interrogated Over 180,000 U.S. Citizens Over Two-Year Period,* The Intercept, Sept. 4, 2021.

officer, and the Immigration Judge would be able to evaluate issues related to the mandatory bars based on a complete record, including documentary evidence and witness testimony. Instead, because of the Mandatory Bars Rule, E.Q. received a removal order following a cursory process in which he was unrepresented by counsel and had no opportunity to gather evidence or contest the accusations against him. Indeed, the documentation of his interview does not indicate that he was ever informed that he had been flagged in a government database or that he was allowed an opportunity to rebut such information. *See* Cowgill Dec., Ex. A.

### C.    The Reinterview Process and the May 9, 2025 IJ Decision

On March 19, 2025, Plaintiffs moved to stay E.Q.'s removal. Dkt. 8. On March 27, 2025, Defendants requested that E.Q. stipulate to hold that motion in abeyance "based on Defendants' representations that the Defendants are reconsidering Plaintiff E.Q.'s credible fear determination and will conduct a followup credible fear interview." Dkt. 18. On April 14, 2025, an asylum officer conducted a second CFI with E.Q. *See* Cowgill Dec., ¶ 9. During that interview, the asylum officer did not ask a single question about any alleged affiliation between E.Q. and the Taliban. *See id.*; *id.*, Ex. B. Nor did the officer ask any questions about the alleged government records supposedly indicating that E.Q. was "a member of the Taliban and [] a Suspected Terrorist (KST)." *See id.*

During this second CFI, E.Q. confirmed the experiences that he recounted in the first CFI. *See* Cowgill Dec., Ex. B at 47. He added that, prior to fleeing Afghanistan, he had received a summons from the head of law enforcement in his neighborhood requesting that he present himself for questioning. *Id.* at 47-48. E.Q. believed the summons was "related to the work" a family member had done for the U.S. military that he described in his first CFI. *Id.* at 48. Fearing for his life, he went into hiding. *Id.* at 51-52. The asylum officer asked why E.Q. had failed to mention the summons during his prior CFI, and E.Q. responded that he did not remember the summons

during the February 2025 interview because he was stressed and confused during that interview. *Id*. at 48, 54-55. In response to further questioning, E.Q. could not recall the exact date he had received the summons but stated that it "was sent to my home 2 months before I left my country to travel to the United States." *Id.* at 47. He advised the asylum officer, however, that "[m]y attorney has the form."[5] *Id.* at 48. Translated copies of the summons indicate that the document was actually sent on three separate dates (written in accordance with the Afghan calendar as 1403/4/2, 1403/4/11, and 1403/4/20). See. Cowgill Decl., ¶8, Ex. C.

The asylum officer also inquired about E.Q.'s prior testimony concerning the Taliban visiting his home and seizing electronics. The asylum officer, for the first time, specifically asked whether E.Q. was home at the time of that visit, and E.Q. confirmed he was not present because he was already "in hiding" at that time. Cowgill Dec., Ex. B, at 59. The asylum officer would subsequently treat this as an inconsistency based on the non-verbatim notes of the first CFI, which stated that "once we answered [the door,] they [*i.e.*, the Taliban] came in broke our TV and took other devices with them." *Id*.

In several instances, the asylum officer attempted to press E.Q. on his inability to recall the specific dates or months when events occurred. At one point, the interpreter interjected to note that "the calendar in Afghanistan is different than ours," leading the asylum officer to state "I am going to withdraw this question based upon differences in the calendar that you use." Cowgill Dec., Ex. B, at 55. In another instance, E.Q. also explained that "[r]emembering dates is not something well done in my country." *Id.* at 50. The asylum officer continued, however, to ask questions regarding specific months that do not correspond to the Afghan calendar. *See id.* at 59. After this second CFI,

---

[5] Counsel had received copies of the relevant summonses from a U.S. citizen family member of E.Q. two days before the second CFI and had not yet obtained a translated version. Cowgill Dec., ¶ 8. Counsel did, however, get the document translated prior to the immigration court review. *Id.* at ¶¶ 14, 16, 20, Ex. C.

the asylum officer determined that E.Q. was barred from asylum by the so-called "Securing the Borders" rule that took effect in 2024, *see* 89 Fed. Reg. 48710 (June 7, 2024). Cowgill Dec., Ex. B, at 16-17. As to withholding of removal, the asylum officer determined that (i) the mandatory bars did not apply, but (ii) E.Q.'s testimony was no longer credible. *Id*., at 1-2.

Notably the asylum officer confirmed two facts that could be found sufficient to show a likelihood of persecution in a full removal proceeding. *See Ramsameachire v. Ashcroft*, 357 F.3d 169, 185 (2d Cir. 2004) (even where an adverse credibility determination undermines a noncitizen's asylum claim, "it may not be a particularly significant aspect of the CAT inquiry."); *Wakkary v. Holder*, 558 F.3d 1049, 1060 (9th Cir. 2009). (Where an adverse credibility finding bars asylum claim based on past persecution a "likelihood of future persecution may still be sufficient to merit withholding of removal.")

The asylum officer confirmed: (i) that there was documentary evidence establishing that E.Q.'s family member "worked with/for the prior Afghan government and with/for members of the U.S. government who were working in Afghanistan," and (ii) that "[r]eliable reports also indicate that the Taliban has harmed the family members of those whom they seek to harm," including that "members of [the] Taliban have been going door to door and arresting or threatening family members of targeted individuals." *Id.* at 65.

The asylum officer nonetheless listed four credibility "concerns" and relied on them to deny protection to E.Q. despite the risk of persecution established by these undisputed facts. Cowgill Dec., Ex. B, at 63-64. First, he found that E.Q.'s failure to discuss the summons in his first CFI—which was conducted soon after E.Q.'s arrival and detention in the United States, without the benefit of consultation with counsel, and using an interpreter who did not speak Dari— was a relevant omission that "calls into question whether the applicant ever received a summons

to appear before the Taliban as he claimed in his 2nd credible fear interview." *Id.* at 63. Second, the asylum officer noted that "[w]hen asked for details about the summons, the applicant responded that he was not able to recall the exact date, or even the month the summons directed him to report to a law enforcement office for questioning." *Id.* The summons does not direct E.Q. to report on a specific date. *See* Cowgill Dec., Ex. C.

Third, the asylum officer found that E.Q.'s inability to recall what month he stopped working prior to fleeing Afghanistan "is not reasonable considering the applicant was able to provide specific dates for other events during his 1st credible fear interview." Cowgill Dec., Ex. B, at 64. But as the interpreter at the second CFI made clear, translating Afghan months to Western months is confusing and difficult. *See id.*, Ex. B at 55. And contrary to the asylum officer's statement, E.Q. provided only one precise date in the first CFI—the date on which he departed Afghanistan by plane. *See id.*, Ex. A, at 26.

Finally, the asylum officer relied on the fact that the CFI notes state that "we" answered the door when the Taliban came to his home even though E.Q. did not answer the door. *Id.* Ex. B, at 64. The asylum officer did so even though the CFI interview summary expressly states it is "not a verbatim transcript of this interview," *id.*, Ex. A, at 11, the first CFI involved an interpreter who did not speak the same language as E.Q., *id.* at 16-18, and E.Q. explained that he had meant that his mother, as part of his family, had opened the door, *see id*, Ex. B, at 59.

On May 8, 2025, an Immigration Judge held a credible fear review hearing, but Defendants had not provided the court with the record so the hearing could not proceed. Cowgill Dec., ¶ 15. With one hour's notice during business hours, Defendants corrected the issue, and the court reset the hearing for the following day. *Id.* ¶ 16. At the hearing on May 9, 2025, E.Q.'s counsel was not permitted to provide any argument. Cowgill Dec. ¶ 17. The Immigration Judge asked E.Q. a few

questions and proceeded to issue a decision affirming the asylum officer's determination. *See id.*

## LEGAL STANDARD

Courts deciding whether to grant a stay of removal weigh four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation omitted). As courts in this district have noted, "there is substantial overlap between these factors and the factors governing preliminary injunctions." *Ctr. for Biological Diversity v. Regan*, No. CV 21-119, 2024 WL 1740078, at *2 (D.D.C. Apr. 23, 2024) (cleaned up).

As an alternative authority for a stay of removal, "the All Writs Act, 28 U.S.C. § 1651(a), empowers a district court to issue injunctions to protect its jurisdiction." *S.E.C. v. Vision Commc'ns, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996). This includes the power "to stay agency action in order to preserve its prospective jurisdiction." *In re NTE Conn., LLC*, 26 F.4th 980, 987 (D.C. Cir. 2022) (internal quotation omitted)*.*

## ARGUMENT

### I.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS.

#### A.    This Court Has Jurisdiction Over E.Q.'s Challenge to the Mandatory Bars Rule.

This Court has jurisdiction over this case. Although the INA strips courts of jurisdiction over many claims concerning expedited removal, 8 U.S.C. § 1252(e)(3) expressly permits "[j]udicial review" of claims asserting that "regulation[s]" and other written policies "issued by or under the authority of" the expedited removal statute are "in violation of law." 8 U.S.C. § 1252(e)(3)(A)(ii). Section 1252(e)(3) thus "expressly provides in the expedited removal context

for more traditional judicial review of challenges on the validity of the system." *Grace v. Barr*, 965 F.3d 883, 891 (D.C. Cir. 2020). Or, as this Court put it in *D.A.M. v. Barr*, 486 F. Supp. 3d 404, 419 n.6 (D.D.C. 2020) (Cooper, J.), Section 1252(e)(3) "authorizes suits challenging regulations and written policies regarding the expedited-removal statute."

That is precisely the type of suit Plaintiffs have brought. E.Q. and the other Plaintiffs challenge two sets of regulations—the Mandatory Bars Rule and the EOIR Companion Rule—that Defendants promulgated under the authority of 8 U.S.C. § 1225(b), the expedited removal statute. *See* 89 Fed. Reg. at 103371-72 (invocation of authority in Mandatory Bars Rule); *id.* at 105393 (same, in EOIR Companion Rule); *see id.* at 103413-14 (amendments to credible fear regulations in Mandatory Bars Rule); *id.* at 105402-03 (same, in EOIR Companion Rule).

This case is thus distinct from *D.A.M.*, in which the petitioners invoked 8 U.S.C. § 1252(e)(2), a separate provision that provides for limited jurisdiction over habeas petitions in the expedited-removal context. In *D.A.M.*, the petitioners attempted to retroactively apply a prior, successful challenge to immigration regulations—*Cap. Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020) ("*CAIR Coal.*")—to directly challenge their own expedited removal orders. *D.A.M.*, 404 F. Supp. 3d at 410-11. Because Plaintiffs here challenge the validity of the Mandatory Bars Rule, the analogy for this case is *CAIR Coalition* itself, not *D.A.M.*

Both the D.C. Circuit and other courts in this district have repeatedly held that federal jurisdiction exists in this context. *See, e.g.*, *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 625-31 (D.C. Cir. 2020) (challenge to published notice expanding expedited removal.); *CAIR Coal.*, 471 F. Supp. 3d at 60 n.29 (regulation changing the credible fear and expedited removal process to bar asylum to people who did not seek protection in a transit country.); *O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019), *appeal dismissed,* No. 19-5272, 2023 WL 7228024 (D.C. Cir. Nov. 1, 2023)

(regulation barring asylum to people who cross the border between ports of entry and similarly modifying the expedited removal screening process). Consistent with 8 U.S.C. § 1252(e)(3), courts in this district have likewise entertained challenges to other writings and policy documents that have changed the expedited removal process. *See, e.g.*, *Grace v. Barr*, 965 F.3d at 891-96 (written guidance and written decision of the Attorney General); *A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 216-18 (D.D.C. 2020) (memorandum allowing CBP officers to conduct credible fear interviews); *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 31-35 (D.D.C. 2020) (K.B. Jackson, J.) (lesson plan used to train asylum officers); *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 16-19 (D.D.C. 2020) (memorandum concerning interview procedures).

Of course, § 1252(e)(3) contains venue and time limitations on challenges to expedited-removal regulations. *See* 8 U.S.C. § 1252(e)(3)(B). This Court recognized those limitations in *Dugdale v. United States Customs & Border Prot.*, 88 F. Supp. 3d. 1, 8-9 (D.D.C. 2015) (Cooper, J.), and dismissed a challenge related to expedited removal that was not timely filed. Here, however, Plaintiffs have satisfied the statutory requirements. Under the statute, a suit must be filed in this district within 60 days after the "challenged … regulation … is first implemented." 8 U.S.C. § 1252(e)(3)(B); *see, e.g.*, *D.A.M.*, 486 F. Supp. 3d at 419 n.6. The Mandatory Bars Rule took effect on January 17, 2025, *see* 89 Fed. Reg. at 103370, and Plaintiffs filed this suit 59 days later, on March 17, 2025.[6] There can thus be no question Section 1252(e)(3) supplies jurisdiction in this case.

Because E.Q.'s second credible fear decision was not based on the Mandatory Bars Rule,

---

[6] The EOIR Companion Rule states that Immigration Judges will, "where relevant, … review the asylum officer's application of any bars to asylum and withholding of removal." 89 Fed. Reg. at 105402; 8 C.F.R. § 1003.42(d). Because asylum officers did not begin applying the bars under the Mandatory Bars Rule until at least January 17, 2025, Plaintiffs' challenge to the EOIR Companion Rule is also timely.

Defendants are likely to contend that E.Q. lacks standing to sue, and this Court lacks jurisdiction. That is incorrect because "standing is assessed upon the facts as they exist at the time the complaint is filed." *Grace v. Whitaker*, 344 F. Supp. 3d 96, 116 (D.D.C. 2018), *aff'd in part, remanded by, Grace v. Barr,* 965 F.3d 883 (D.C. Cir. 2020); *see also O.A. v. Trump*, 404 F. Supp. 3d at 140 (The usual rule "fixes statutory jurisdiction at the time the complaint is filed."). At the time of filing, E.Q. had been denied the opportunity to seek asylum and withholding of removal solely because Defendants applied the Mandatory Bars Rule against him. That is sufficient to confer his standing. Any other approach—particularly in the context of a challenge to the expedited removal system under Section 1252(e)(3)—would enable and indeed incentivize Defendants to change course after the 60-day limit had ended to avoid judicial review of a rule entirely.

That same concern counsels against a mootness finding. "The mootness doctrine ensures that federal courts decide only 'actual, ongoing controversies.'" *Pub. Citizen, Inc. v. Fed. Energy Regul. Comm'n*, 92 F.4th 1124, 1127 (D.C. Cir. 2024). E.Q.'s case presents an actual controversy: if Defendants had not wrongly applied the Mandatory Bars Rule, he would have received a positive fear finding and he would be on his way to a full hearing on his claims. A second interview, with a dubious credibility finding, would never have occurred. Moreover, as detailed in Section V below, the removal order that resulted from that second CFI is a legal nullity because the regulations on which it is based were vacated by a federal court before the order became final. *See* Order, *Las Americas Immigrant Advoc. Ctr. v. United States Dep't of Homeland Sec.*, No. 1:24-cv-1702, (D.D.C. May 9, 2025), Dkt. 91. Thus, if E.Q. is subject to any removal order at this point, it is the *first* order, which was issued based on the application of the Mandatory Bars Rule.

But even if the second removal order had legal effect, which it does not, this case would not be moot for at least three reasons. *First*, E.Q. is not the only Plaintiff, and the claims of the

Organizational Plaintiffs are entirely unaffected by the outcome of his second CFI.

*Second*, a case that "challenges the Government's policy[ and] not merely the Government's handling of" a particular individual does not become moot even if "the particular situation that precipitated" the challenge "is no longer 'live.'" *Ukrainian-Am. Bar Ass'n v. Baker*, 893 F.2d 1374, 1377 (D.C. Cir. 1990). That rule applies to cases brought under Section 1252(e)(3), which are necessarily programmatic in nature.

And *third*, a case is not moot if a party voluntarily ceases an unlawful practice. *See, e.g.*, *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.,* 532 U.S. 598, 609 (2001). One Court in this District has previously applied this doctrine in the context of § 1252(e)(3), holding that Defendants' action to take a person out of the expedited-removal process did not moot her ability to challenge changes to that process. *O.A. v. Trump*, 404 F. Supp. 3d at 140 (Congress did not "empower the government to avoid an unfavorable decision at any time" by changing determinations "before the Court enters final judgment").

In this case, Defendants' apparent attempt to generate mootness raises significant questions as to whether Defendants provided E.Q. with a new CFI in good faith. After initially labeling E.Q. as "a member of the Taliban and [] a Suspected Terrorist (KST)," Cowgill Decl., Ex. A at 37, Defendants did not ask E.Q. a single question about any alleged terrorist affiliation in his second CFI. Id., Ex. B. This omission makes no sense if the purpose of the second CFI was to clear up the issue that gave rise to this case. In contrast, the omission would make perfect sense if Defendants had decided to pursue a new CFI to generate alternative grounds for denial. Indeed, on its face, E.Q.'s second CFI reads like a cross examination intended to generate support for a revised credibility determination rather than a non-adversarial fact gathering interview. And this concern is further amplified by the tenuous grounds underlying the new credibility determination, which,

as discussed above (at pp. 6-9), are so thin that they could never survive review by an independent adjudicator as would occur if E.Q. had an opportunity for a full hearing on his case.

Moreover, Defendants would unquestionably benefit from a holding that E.Q.'s claims are moot. Challenges brought under 8 U.S.C. § 1252(e)(3) (systemic challenges to expedited removal policies) must be filed within 60 days after a policy is first implemented, and the D.C. Circuit has interpreted that deadline as jurisdictional—meaning that it is impossible for any other noncitizen to challenge the Mandatory Bars Rule in the future. See 8 U.S.C. § 1252(e)(3); *M.M.V. v. Garland*, 1 F.4th 1100, 1109 (D.C. Cir. 2021). And though Plaintiffs vigorously dispute the argument, Defendants will likely challenge the standing of the Organizational Plaintiffs to bring this case. *See*, *e.g., OA*, 404 F. Supp. 3d at 141; *CAIR Coalition*, 471 F. Supp. 3d at 38. If they succeed in such a challenge, and if E.Q. is unable to proceed with this case, there will be literally no party who can challenge the Rule at issue here.

### B.    The Mandatory Bars Rule Is Contrary to Law

The APA provides that courts "shall … hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A). The Mandatory Bars Rule—and the derivative EOIR Companion Rule—are contrary to the INA in multiple respects. The Mandatory Bars Rule violates 8 U.S.C. § 1158 by denying noncitizens the right to *apply for* asylum based on the possibility that they may be subject to one of the mandatory bars. The Rule also violates both the asylum and withholding of removal statutes, 8 U.S.C. § 1158(b)(2)(A) and 8 U.S.C. § 1231(b)(3)(B), because it (i) requires the denial of relief based on a finding that one of the mandatory bars "appears" to apply, which is a materially lower standard than the statutorily required determination that a bar actually *does apply*, and (ii) delegates this determination to DHS even though the relevant statutes confer that authority exclusively on "the Attorney General." And

the Mandatory Bars Rule violates the expedited removal statute, 8 U.S.C. § 1225(b)(1)(B)(v), because it runs afoul of the low screening standard contemplated for credible fear interviews.

1.      **The Mandatory Bars Rule Violates the INA by Preventing Eligible Noncitizens from Applying for Asylum**

The Mandatory Bars Rule unlawfully denies noncitizens the right to apply for asylum based on the possibility that one of the bars may apply. Under the INA's plain language:

> *Any [noncitizen] who is physically present in the United States or who arrives in the United States* (whether or not at a designated port of arrival and including a [noncitizen] who is brought to the United States after having been interdicted in international or United States waters), irrespective of such [noncitizen]'s status, *may apply for asylum* in accordance with this section or, where applicable, section 1225(b) of this title.

8 U.S.C. § 1158(a)(1) (emphases added). This broad right to apply for asylum is subject to only three narrow exceptions in § 1158(a)(2), none of which includes the mandatory bars outlined in the subsequent section of the asylum statute. But under the Mandatory Bars Rule, E.Q. and others like him are deprived of even the *opportunity* to seek asylum.

Congress created the mandatory bars as "[e]xceptions" that prevent the *grant* of asylum to someone who showed that they would otherwise be "eligib[le]." 8 U.S.C. § 1158(b)(1)(A) & (2). Congress placed these bars—which are fundamentally different in character than the exceptions in 1158(a)(2)—in a separate provision and worded them differently than the bars to *seeking* asylum outlined in § 1158(a)(2). Congress thus intended that the mandatory bars be applied only at the end of the process, after a full hearing in which the noncitizen established refugee status and had the opportunity to present evidence to rebut the bars. *See, e.g.*, *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803 (1989) ("Words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); *Morton v. Mancari*, 417 U.S. 535 (1974) ("Courts must read statutes (where possible) to avoid conflict between them, and to give meaning to, all relevant provisions."). Congress did *not* allow for the bars to be applied in the context of screening

interviews held before a person even applies for asylum. The result is that the Mandatory Bars Rule violates § 1158.

The credible fear statute, 8 U.S.C. § 1225(b), confirms as much. There, Congress made clear that any noncitizen who shows a "credible fear of persecution" must be allowed to seek relief in full removal proceedings in immigration court. 8 U.S.C. § 1225(b)(1)(B)(ii). And Congress defined a "credible fear of persecution" as "a significant possibility … that the [noncitizen] could establish *eligibility for asylum under section 1158 of this title*." *Id.* § 1225(b)(1)(B)(v) (emphasis added); *see* 8 C.F.R. § 208.30(e)(2)-(3).

Congress's use of the phrase "eligibility for asylum under section 1158" refers to Section 1158(b)(1)(A), which is titled "Eligibility," and which provides that asylum may be granted only if the "Attorney General determines that such [noncitizen] is a refugee within the meaning of section 1101(a)(42)(A) of this title." *See Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 38 (D.D.C. 2020), *appeal dismissed*, No. 20-5372, 2021 WL 3716392 (D.C. Cir. July 1, 2021) ("Section 1225(b) defines 'credible fear of persecution'" as "a significant possibility . . . that the [noncitizen] could establish eligibility for asylum under section 1158 of this title . . . As relevant here, a noncitizen is eligible for asylum under section 1158 if she demonstrates that she 'is a refugee[.]'"). The text of § 1225, like the text of § 1158, thus compels the conclusion that Congress intended for the bars to be applied *only* in full removal proceedings.

The legislative history underscores this intent. During debate over H.R. 2022, the bill that provided the language of 8 U.S.C. § 1225(b), opponents raised significant concerns that the new credible fear screening process would lead to the denial of meritorious asylum claims in violation of international obligations. In reporting out H.R. 2022, the Judiciary Committee stated that:

> Under this system, there should be no danger that a [noncitizen] with a genuine asylum claim will be returned to persecution. The initial screening, which should

> take place in the form of a confidential interview, will focus on two questions: is
> the [noncitizen] telling the truth; and does the [noncitizen] have some characteristic
> that would qualify the [noncitizen] as a refugee.

H. Rep. 104-469 – Immigration in the National Interest Act of 1995, p. 158. From 1996 to 2024,

the credible fear determination process remained focused on answering only these "two questions."

*Id*. And as recently as 2022, Defendants themselves acknowledged this Congressional intent,

noting that adjudicating mandatory bars in credible fear interviews would expand screening

interviews "beyond [their] congressionally intended purpose … and would instead become a

decision on the relief or protection itself." 87 Fed. Reg. at 18093.

Congress's statutory scheme makes perfect sense. The mandatory bars in § 1158(b)(2) are

both factually and legally complex, and they can generally be overcome only following the

presentation of nuanced legal arguments and/or rebuttal evidence that may originate abroad. *See*

Compl., ¶¶ 40-67. Congress thus had good reason to create a system that allows for a broad right

to seek asylum and permits application of the bars only after: (i) presentation of evidence and legal

arguments and (ii) an actual determination that the bars do, in fact, apply.

In short, the Mandatory Bars Rule is contrary to the INA because it allows for the

application of bars before a noncitizen has ever applied for asylum, in contravention of § 1158.

> **2.    The Mandatory Bars Rule Violates the INA by Denying Asylum and
> Withholding of Removal Based on a DHS Determination that a
> Mandatory Bar "Appears" to Apply**

The Mandatory Bars Rule also violates the INA in two other ways. Under the statutes

governing asylum and withholding of removal, otherwise-eligible noncitizens will be denied

asylum "if the Attorney General determines that" one of the mandatory bars applies. *See*

§ 1158(b)(2)(A) (asylum); § 1231(b)(3)(B) (withholding of removal).

The Mandatory Bars Rule is contrary to both statutes in two respects. First, the Mandatory

Bars Rule provides for the denial of relief to a noncitizen who "*appears* to be subject to" a

mandatory bar. 89 Fed. Reg. at 103413-14; 8 C.F.R. §§ 208.30(e)(5)(ii), 208.31(c) (emphasis

added). This is a materially lower standard than a determination that the bar *does* apply. *See*, *e.g.*

*Kiakombua*, 498 F. Supp. 3d 1, 41 (D.D.C. 2020) ("Congress' use of a verb tense is significant in

construing statutes . . . and there is no doubt that the word 'is' connotes a more certain

determination than 'could.'") (internal quotations omitted). Thus, for example, the Mandatory Bars

Rule provides for the denial of asylum based solely on a finding that it "appears," 8 C.F.R.

§ 208.30(e)(5)(ii), that the noncitizen "participated in the persecution of an individual," 8 U.S.C.

§ 1158(b)(2)(A)(i). Congress has not authorized Defendants to apply this lower standard to

exclude otherwise-eligible noncitizens from obtaining asylum or withholding of removal.

Application of this standard, therefore, contravenes the INA.

Second, the Mandatory Bars Rule permits asylum officers working in the Department of

Homeland Security to deny relief based on the mandatory bars when the INA expressly reserves

this power for the Attorney General (and thus Immigration Judges under her supervision). In

contrast to 8 U.S.C. § 1158(b)(1), which was specifically amended to allow for a grant of asylum

"if the *Secretary of Homeland Security or the Attorney General* determines that such [noncitizen]

is a refugee," § 1158(b)(2)(A) provides for the denial of relief only "if the *Attorney General*

determines that" a mandatory bar applies (emphases added). Likewise, § 1231(b)(3)(B) provides

for the denial of relief only "if the *Attorney General* determines that" a mandatory bar applies

(emphasis added). The Mandatory Bars rule thus contravenes the INA by delegating to DHS

authority that has not been authorized by Congress.

### 3.    The Mandatory Bars Rule Is Contrary to the INA Because It Undermines the Significant Possibility Standard in the Expedited Removal Statute

Finally, the Mandatory Bars Rule is contrary to the expedited removal statute, 8 U.S.C.

§ 1225(b), because it applies a standard inconsistent with the "significant possibility" standard that Congress imposed. To establish a credible fear of persecution, a noncitizen must demonstrate that there is "a significant possibility, taking into account the credibility of the statements made by the [noncitizen] in support of the [noncitizen]'s claim and such other facts as are known to the officer, that the [noncitizen] could establish eligibility for asylum under section 1158 of this title." 8 U.S.C. § 1225(b)(1)(B)(v). The Mandatory Bars Rule undermines this provision in two respects.

First, the statute contemplates that the outcome of a credible fear interview should be based on "the credibility of the statements made by the [noncitizen]" and "such other facts as are known to the officer." 8 U.S.C. § 1225(b)(1)(B)(v). In other words, the statute *does not* contemplate the possibility that applicants would need to produce rebuttal evidence to overcome the application of a bar or make complex factual and legal arguments about the validity of any accusation levied in their case. E.Q.'s first CFI clearly illustrates this problem. In full removal proceedings, he could rebut Defendants' allegations with evidence, including testimony from his U.S. citizen family member, evidence from Afghanistan, and reports demonstrating the unreliability of the government database on which the asylum officer relied. But the expedited removal process and the credible fear interview do not contemplate that kind of opportunity.

Second, as mentioned above, the significant possibility standard was always meant to represent a low screening standard. *Grace v. Barr*, 965 F.3d at 902-03; *see* H.R. Rep. No. 104-469, pt. 1, at 158 (1995). The Mandatory Bars Rule undermines the purpose of this standard by requiring asylum seekers to establish a "significant possibility" (or, worse, a "reasonable possibility" or "reasonable probability") that they are not "subject to a mandatory bar." *See* Compl. ¶¶ 111-12. This approach requires a noncitizen to affirmatively offer evidence that they did *not* persecute others, or that they have *not* committed certain crimes or supported terrorism. The Rule

thus substantially changes the credible fear inquiry because "as a practical matter it is never easy to prove a negative." *Elkins v. United States*, 364 U.S. 206, 218 (1960). In short, both the text of § 1225(b) and the congressional intent behind that statute make clear that Congress did not intend for the credible fear process to serve as an unreviewable means to deny relief to refugees based on untested allegations that a mandatory bar *may potentially* apply. Yet that is precisely what the Mandatory Bars Rule does, as E.Q.'s case aptly illustrates.

### C.    The Mandatory Bars Rule Is Arbitrary and Capricious

Even if the Mandatory Bars Rule did not violate the INA (which it does), it would remain unlawful under the APA because it is arbitrary and capricious. Agency action is arbitrary and capricious if it "relied on factors which Congress has not intended it to consider, entirely failed to consider [] important aspect[s] of the problem, [and] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In assessing agency action, the Court's underlying "task involves examining the reasons for [the] agency decision[]—or, as the case may be, the absence of such reasons." *Judulang v. Holder*, 565 U.S. 42, 53 (2011).

The Mandatory Bars Rule fails to meet the APA's reasoned decision-making standard for at least two reasons. First, Defendants' reasoning in support of the rule relies extensively "on a false factual premise," *Cigar Ass'n of Am. v. United States Food & Drug Admin.*, 132 F.4th 535, 540 (D.C. Cir. 2025)—namely, that the rule limits review of mandatory bars to circumstances where there is "easily verifiable evidence" that a bar applies. Second, the Mandatory Bars Rule fails to meaningfully address record evidence and public comments and represents a radical departure from Defendants' prior policy determinations without "display[ing] awareness that [they

are] changing position" or "show[ing] that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

> **1.** **Defendants' Reasoning Relies on the False Factual Premise that Asylum Officers Will Assess Mandatory Bars Only Where There is "Easily Verifiable Evidence" That They Apply.**

Agency action is arbitrary if the agency's rationale "rested on a false factual premise." *Cigar Ass'n*, 132 F.4th at 540; *see also Genuine Parts Co. v. Env't Prot. Agency*, 890 F.3d 304, 346 (D.C. Cir. 2018) (internal quotation omitted) ("An agency action is arbitrary and capricious if it rests upon a factual premise that is unsupported by substantial evidence.").

Here, the Mandatory Bars Rule squarely rests on such a premise. In the rule's preamble, Defendants assert at least thirty times that the rule limits review of mandatory bars to circumstances where there is "easily verifiable evidence" that a bar applies. 89 Fed. Reg. at 103373, 103376, 103378, 103383-89, 103391, 103394-97, 103403, 103411. The preamble even asserts that the Mandatory Bars Rule "instructs" asylum officers to consider mandatory bars "only" in such situations. *Id*. at 103385. The text of the rule itself, however, includes no such limitation; indeed, the phrase "easily verifiable" appears nowhere in the text of the new regulations. Rather, the regulations instruct asylum officers to consider mandatory bars whenever it "appears" that one might apply. 8 C.F.R. §§ 208.30(e)(5)(ii), 208.31(c), 208.33(b)(2)(i).

When the text of a rule conflicts with the rule's preamble, there can be no doubt which controls. "A preamble does not create law; that is what a regulation's text is for." *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 237 (D.D.C. 2014). It is "the language of the regulatory text, and not the preamble, that controls." *Nat'l Wildlife Fed. v. EPA*, 286 F.3d 554, 570 (D.C. Cir. 2002), *supplementing opinion, In re Kagan*, 351 F.3d 1157 (D.C. Cir. 2003).[7] Here, the regulatory

---

[7] *Accord, e.g.*, *Mejia-Velasquez v. Garland*, 26 F.4th 193, 202 (4th Cir. 2022); *Sierra Club v. EPA*,

text forecloses any claim that the rule applies only where "easily verifiable" evidence exists.

In any event, the inconsistency between the preamble text and the regulation undoes the Rule. The Mandatory Bars Rule rests on an efficiency rationale (*see*, *e.g.*, 89 Fed. Reg. at 103381-82), and that rationale rests in turn on the view that it can be applied only to a small number of cases with easily verifiable evidence, *id.* at 103381. Stripped of this false premise, the efficiency rationale cannot be sustained. As Defendants explained in 2022, "[a]pplying a mandatory bar often involves a complex legal and factual inquiry," and, as a result, "[r]equiring asylum officers to broadly apply mandatory bars during credible fear screenings would [make] these screenings less efficient, undermining congressional intent that the expedited removal process be truly expeditious[.]" 87 Fed. Reg. at 18092-93.

Furthermore, Defendants repeatedly rely on the "easily verifiable" incantation in defending the rule against critical comments. To take one example, Defendants reject comments that "the inability to compile evidence" about a bar before a screening interview "would adversely impact noncitizens" by asserting that "evidence gathering" is unnecessary because asylum officers "will only consider a bar in those cases where there is easily verifiable (as opposed to unverified or difficult-to-verify) evidence" that a bar applies. 89 Fed. Reg. at 103375-75. Defendants also cite the (nonexistent) "easily verifiable evidence" limitation as their chief basis for rejecting concerns that the Mandatory Bars Rule would be open to "abuse" by an "overtly hostile anti-immigrant administration." *Id*. at 103383 (quotation omitted). And Defendants rely on the same fictional limitation to dispute comments that "consideration of the mandatory bars at the screening stage is inconsistent with congressional intent that the 'significant possibility' standard be a low threshold to avoid the risk that people would erroneously be screened out." 89 Fed. Reg. at 103385. This

---

964 F.3d 882, 893 (10th Cir. 2020); *Gustavsen v. Alcorn Labs., Inc.*, 903 F.3d 1, 13 (1st Cir. 2018) (citing *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000)).

repeated, critical reliance on a false factual premise, standing alone, compels the conclusion that the rule "constitute[s] arbitrary agency action." *Cigar Ass'n*, 132 F.4th at 540.

## 2. Defendants Fail to Consider Important Aspects of the Problem or Explain Departures from Prior Policy Judgments

The preamble to the Mandatory Bars Rule also justifies its positions by repeatedly insisting that the mandatory bars are not too complex to be decided in screening interviews. *See* 89 Fed. Reg. at 103375-82, 103385-86, 103390-91. As detailed above (Section I.C.1), that justification is arbitrary and capricious because it is based on the erroneous premise that the rule applies only in situations with easily verifiable evidence. But it is also arbitrary and capricious on its own terms because commenters showed that the mandatory bars are not amenable to adjudication in screening interviews. Specifically, commenters showed, and Defendants do not dispute, that noncitizens affected by the Rule carry the burden of proof whenever an asylum officer determines a bar might apply and must meet that burden without the benefit of evidence, counsel, or the procedural protections available in immigration court proceedings. 89 Fed. Reg. at 103395-96.

Commenters also showed, and Defendants cannot dispute, that the bars are both legally and factually complex and often lead to erroneous decisions even after full merits hearings conducted *with* the benefit of evidence and counsel. *See, e.g.*, Comment of Amica Center for Immigrant Rights 8-17;[8] Comment of Center for Gender and Refugee Studies ("CGRS Comment") 20-30;[9] Comment of National Immigrant Justice Center 22-29.[10] And commenters showed, and Defendants cannot dispute, that noncitizens in screening interviews will often not even be told the asylum officer's basis for speculating that a bar applies. *See, e.g.*, Amica Center Comment 16; CGRS Comment 35.

---

[8] https://www.regulations.gov/comment/USCIS-2024-0005-4196.
[9] https://www.regulations.gov/comment/USCIS-2024-0005-4260.
[10] https://www.regulations.gov/comment/USCIS-2024-0005-2345.

E.Q.'s situation is illustrative. When applying the terrorism bar in removal proceedings, Defendants must first make "a threshold showing of particularized evidence of the bar's applicability before placing on the applicant the burden to rebut it." *Budiono v. Lynch*, 837 F.3d 1042, 1048 (9th Cir. 2016). But under the Mandatory Bars Rule, Defendants shifted the burden onto E.Q. because, on the basis of an expansive reading of "material support" and secret factual evidence of questionable reliability, *see supra* n.5, it "appear[ed]" to the asylum officer that E.Q. was subject to a mandatory bar. And Defendants themselves have since conceded that, contrary to their determination at the first CFI, E.Q. is *not* subject to a mandatory bar which only serves to illustrate the problem of having such bars applied in a screening interview that is shielded from full judicial review. Whatever evidence was deemed sufficiently "verifiable" to conclude that there was "no reasonable probability" that E.Q. was not a terrorist after his first CFI was apparently erroneous and unreliable enough to cause Defendants to abandon investigation of that issue after E.Q. filed this litigation.

Moreover, in the first CFI, Defendants never provided E.Q. with any meaningful opportunity to respond. Defendants did not tell E.Q. that they believed a bar applied or that they believed he was a member of the Taliban, much less why they believed so. E.Q. could present only his general testimony—and, indeed, E.Q. testified that he was opposed to the Taliban and faced persecution by that group. The asylum officer credited that testimony. Yet the asylum officer held that E.Q. failed to sufficiently rebut bars that E.Q. had no idea the officer thought might apply. In short, the officer reached an unfounded conclusion that there was no reasonable probability E.Q. could rebut a finding that he is a member of the Taliban even though his own credible testimony shows that he is likely to be persecuted by the Taliban. This conclusion is all the more remarkable given that Defendants accepted as credible all of E.Q.'s testimony, including that he had never (i)

"been a member of an armed group or a group that uses violence to achieve its goals" or (ii) "provided any type of support, like food, housing, money, or transportation, to an armed group or any group or person that uses violence to achieve their goals." Cowgill Decl., Ex. A at 32.

Rather than respond to comments making clear that such situations could and would occur routinely under the Mandatory Bars Rule, Defendants chose to bury their heads in the sand. Aside from the erroneous claim that bars will be considered only where there is easily verifiable evidence, Defendants never directly addressed the comments that the bars are too complex to be addressed fairly in screening interviews without evidence or counsel. They instead sidestepped those issues in favor of assertions about credible fear procedures generally and the nonsequitur that asylum officers decide other complex questions. 89 Fed. Reg. at 103375. And Defendants nakedly asserted that noncitizens *would* be given an opportunity to rebut the bars in interviews; in doing so, however, they blinded themselves to significant contrary evidence in the record, *see supra* p. 24— evidence underscored by E.Q.'s first CFI and by the fact that E.Q. received a second CFI only because he filed this lawsuit. Defendants' failure to meaningfully engage with these comments provides an independent ground for vacatur of the rules. *E.g.*, *Tesoro Alaska Petroleum Co. v. FERC*, 234 F.3d 1286, 1294 (D.C. Cir. 2000) ("unless an agency answers objections that on their face appear legitimate, its decision can hardly be said to be reasoned").

Defendants' failure to respond to these comments is unsurprising since Defendants themselves agreed with commenters as recently as 2022, finding "that considerations of procedural fairness counsel against applying mandatory bars that entail extensive fact-finding during the credible fear screening process." 89 Fed. Reg. at 18093. Given the "intricacies of the fact-finding and legal analysis often required to apply mandatory bars," Defendants concluded that people with a credible fear of persecution "generally should be afforded the additional time, procedural

protections, and opportunity to further consult with counsel" that come with proceedings on the merits. *Id*. at 18094.

Defendants specifically stated in 2022 that the particularly serious crime bar requires "fact-intensive" and "complex" "case-by-case adjudication" that make it unsuited for adjudication in screening interviews. *Id.* And in addition to these procedural considerations, Defendants concluded that applying the mandatory bars in screening interviews would make those interviews "less efficient" and that, while asylum officers could always ask questions about potential bars in screening interviews, those questions did not reflect the level of "detail that would be necessary if the issue of a mandatory bar was outcome-determinative for a credible-fear determination." *Id*.

Defendants are, of course, free to alter the position they took in 2022—but when they do so, the APA requires that they acknowledge and reasonably explain that change. *See, e.g.*, *Encino Motorcars,* 579 U.S. at 221; *Grace v. Barr*, 965 F.3d at 900. Defendants did not do so here. The Mandatory Bars Rule does not even mention all these prior positions. And while it does acknowledge the existence of some of Defendants' prior positions, *see* 89 Fed. Reg. at 103386, the rule does *not* acknowledge that its provisions represent a change in position. Rather, Defendants asserted that the Mandatory Bars Rule is "not inconsistent with" their earlier positions. *Id.* That assertion, like so much in the rule, rests solely on the indefensible assumption that the rule applies only "where the evidence is clear." *Id.* Defendants have failed to either acknowledge or reasonably explain their change in position from 2022, and the rule at issue is therefore arbitrary and capricious. *See, e.g.,* Mem. Op.*, Las Americas Immigrant Advoc. Ctr. v. United States Dep't of Homeland Sec.*, No. 1:24-cv-1702, (D.D.C. May 9, 2025), Dkt. 92  ("DHS failed to take into account the purpose and people the [statutory provision] serves. ... That is 'an important aspect of the problem' that the agency was obligated to consider." (citing *State Farm*, 463 U.S. at 43)).

## II.      E.Q. WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A STAY

Although "[d]eportation pursuant to a removal order is 'not categorically irreparable,'" *D.A.M.*, 486 F. Supp. 3d at 421 (quoting *Nken*, 556 U.S. at 435), removal would inflict irreparable harm on E.Q. under the circumstances of this case.

E.Q. is nearly certain to face persecution if removed to Afghanistan. As Defendants themselves initially accepted, the Taliban threatened E.Q. and accused him of working as an "American spy." E.Q. testified that he was threatened because a close family member had worked for an international organization that cooperated with the previous Afghan government and the U.S. military. And Defendants have confirmed through documentary evidence that E.Q.'s family member "worked with/for the prior Afghan government and with/for members of the U.S. government who were working in Afghanistan" and that "[r]eliable reports also indicate that the Taliban has harmed the family members of those whom they seek to harm," including that "members of [the] Taliban have been going door to door and arresting or threatening family members of targeted individuals." Cowgill Decl., Ex. B at 65.  Consistent with these reports, E.Q. credibly testified that he is afraid the Taliban will find and kill him if he is removed. The Taliban's intolerance, including arbitrary arrest, detention, and unlawful killings, of those perceived as aiding the United States or the previous government is well-established.[11] Because E.Q. has already been targeted by the Taliban and accused of working with the United States, he will likely suffer worse harm if he is returned. This undisputed physical danger constitutes irreparable harm. *See Nken*, 556 U.S. at 436.

Furthermore, if E.Q. were to prevail in this case—and even if he were, by some miracle, alive and free in Afghanistan at the time—he would "find [himself] unable to return" to the United

---

[11]   *See e.g.*, U.S. Department of State, Human Rights Report: Afghanistan (2023), https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/afghanistan/.

States. *D.A.M.*, 486 F. Supp. 3d at 421. It is nearly impossible for a person to flee an entrenched authoritarian regime that is actually searching for them, especially without the ability to communicate with counsel. *See Desta v. Ashcroft,* 365 F.3d 741, 748 (9th Cir. 2004) ("If [petitioner] or others like him are required to return to their countries of origin while they petition for review by this court, they may not be able to return to this country even if they are eventually successful on the merits of their petitions."). And even if E.Q. could leave Afghanistan again, under current law, he would be unable to return to the United States thanks to Defendants' attempt—challenged as illegal in a different case pending in this District, *see RAICES v. Noem*, No. 1:25-cv-306 (D.D.C. filed Feb. 3, 2025)—to close the border to all people seeking asylum.

## III.    THE BALANCE OF HARMS AND THE PUBLIC INTEREST BOTH FAVOR A STAY OF REMOVAL

A stay of removal will not substantially injure the government and would further the public interest. It is in both the public interest and the government's interest—and consistent with the government's domestic and international obligations—to ensure that the government does not remove asylum seekers like Plaintiff E.Q. to a place where they risk persecution or death. *See Nken*, 556 U.S. at 436 ("Of course there is a public interest in preventing [applicants] from being wrongfully removed, particularly to countries where they are likely to face substantial harm.").

Moreover, the public interest is served when the government complies with its obligations under the INA and the APA. The "public also has an interest in ensuring that its government respects the rights of immigrants[.]" *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 124 (D.D.C. 2018) (preventing immigration authorities from removing Plaintiffs pursuant to expedited removal orders)*; see also O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992) (stating that preliminary relief "would serve the public's interest in maintaining a system of laws" where the government must comply with its legal obligations); *Damus v. Nielsen*, 313

F. Supp. 3d 317, 342 (D.D.C. 2018) ("The public interest is served when administrative agencies comply with their obligations under the APA.") (citation and quotation marks omitted); *R.I.L-R. v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (explaining that the public interest is served by relief that "ends an unlawful practice" and ensures compliance with the APA) (citation and quotation marks omitted). Far from undermining the public interest, treating asylum seekers with basic fairness and dignity is among our nation's most time-honored traditions. *See*, *e.g.*, Refugee Act of 1980, Pub. L. No. 96- 212, § 101(a), 94 Stat. 102 ("[I]t is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including . . . admission to this country of refugees of special humanitarian concern[.]").

Moreover, if E.Q. were to be removed from the United States, he would have no clear way to litigate this case from abroad. His ability to communicate with counsel, stay informed about the case, and participate in decision making will be at best sharply diminished if he is in hiding in Afghanistan—or, worse, imprisoned or killed by the Taliban. That issue is of particular significance in systemic challenges to expedited removal policies because, as discussed above, those challenges must be brought within 60 days, and the D.C. Circuit has interpreted that deadline as jurisdictional—meaning that other noncitizens cannot challenge the Rule. *See infra* Part I.A (addressing jurisdiction). And though Plaintiffs certainly do not agree with Defendants on the subject, Defendants will surely challenge the standing of the Organizational Plaintiffs to bring this case. *See id.* If they succeed in such a challenge and if E.Q. is unable to proceed, there will be no party who can challenge the Rule at issue here. That is not in the public interest.

Finally, as discussed above (*see* pp. 14-15), Defendants' actions in this case carry more than a whiff of gamesmanship. Defendants have disavowed the decision that gave rise to this case and now seek to deny E.Q. a chance at relief on different grounds, based on reasoning so strained

as to raise the inference that the result of the second CFI was a predetermined outcome. And in any event, Defendants' new CFI determination is a legal nullity. *See* Section IV, *infra*. In these circumstances, the public interest heavily favors a stay.

## IV.    THE NEW CFI RESULTS ARE A LEGAL NULLITY.

Plaintiffs anticipate that Defendants will oppose a stay because the second CFI denies E.Q. a chance to apply for relief on a basis other than the application of the Mandatory Bars Rule. But any such argument would lack merit because the second CFI determination, and the resulting expedited removal order, rest on regulations vacated by a federal court before the results and order became final.

In the second CFI, the asylum officer determined that E.Q. was ineligible for asylum because of the operation of the asylum ban in the so-called "Securing the Border" rule, 89 Fed. Reg. 48710, 48769 (June 7, 2024); 8 C.F.R. § 208.35(a) (2024); Cowgill Decl., Ex. B at 16. Just before noon Eastern Daylight Time on Friday, May 9, 2025, a judge in this district vacated that ban as contrary to the plain text of the INA. *See* Order, *Las Americas Immigrant Advoc. Ctr. v. United States Dep't of Homeland Sec.* No. 1:24-cv-1702 (D.D.C. May 9, 2025), Dkt. 91 (order issued at 11:55 a.m.); *id*. Mem. Op., Dkt. 92 (memorandum opinion issued at 11:57 a.m.). It was not until later the same day, around 2:30 p.m. EDT, that the Immigration Judge affirmed E.Q.'s negative fear determination, rendering that determination final. 8 C.F.R. § 208.35(b)(2)(v)(B); Cowgill Decl. ¶17.[12] In other words, by the time the CFI determination became final and resulted in the issuance of a removal order, the determination rested on regulations lacking legal force. The Immigration Judge was procedurally required to vacate and remand the negative fear

---

[12] Even though counsel at E.Q.'s Immigration Judge review hearing had learned of the decision in *Las Americas*, she could not have solved this problem during the hearing because the judge expressly prohibited her from making any arguments. See Cowgill Dec. at ¶ 17.

determination. Instead, the Immigration Judge impermissibly finalized a finding—and thus issued a removal order—on the basis of regulations that had already been vacated. Because Defendants' new decision has no legal effect the findings in the first CFI, including the finding that E.Q. is subject to a mandatory bar, remain in place.

## V.    A STAY IS INDEPENDENTLY APPROPRIATE TO PRESERVE THIS COURT'S JURISDICTION

"[T]he All Writs Act, 28 U.S.C. § 1651(a), empowers a district court to issue injunctions to protect its jurisdiction." *SEC v. Vision Commc's, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996). This includes the power "to stay agency action in order to preserve its prospective jurisdiction." *In re NTE Conn., LLC*, 26 F.4th 980, 987 (D.C. Cir. 2022) (internal quotation omitted). Using that authority, courts routinely issue writs "in aid of jurisdiction" to enjoin conduct that, if "'left unchecked, would have . . . the practical effect of diminishing the court's power to bring the litigation to a natural conclusion.'" *Klay v. United Healthgroup, Inc*., 376 F.3d 1092, 1102 (11th Cir. 2004). This includes the government's physical removal of a plaintiff or other obstructions of the court's jurisdiction. *E.g. Kurnaz v. Bush*, Nos. 04-cv-1135(ESH), 05-cv-0392(ESH), 2005 WL 839542, at *2 (D.D.C. 2005) (invoking the All Writs Act to limit the government's ability to transfer Guantánamo detainees to foreign countries due to likelihood that "once such a transfer is effected, the court would lose its jurisdiction" over the detainee's underlying challenge to his detention); *Lindstrom v. Graber*, 203 F.3d 470, 474-76 (7th Cir. 2000) (stating that the All Writs Act would justify an order staying a man's extradition, since extradition would terminate the district court's jurisdiction over his habeas challenge to the extradition).

When plaintiffs seek an injunction under the All Writs Act to preserve the court's jurisdiction, they do not need to show a likelihood of success on the merits. There need be only a "proceeding . . . the integrity of which is being threatened by someone else's action or behavior."

*Klay*, 376 F.3d at 1100; *accord United States v. N.Y. Tel. Co.*, 434 U.S. 159, 174 (1977) (affirming the grant of an injunction under the AWA without discussing the traditional preliminary injunction factors).

That is the case here. The Court's ability to continue this proceeding would be threatened by E.Q.'s removal. As noted above, in the event E.Q. is removed from the United States, he will at best have to live in hiding—and, at worst, would be imprisoned, disappeared, or killed by the Taliban. In any of those situations, his ability to communicate with counsel, stay informed about the case, and participate in decision making would be sharply diminished at best. Again, that fact is especially significant given the 60-day deadline and the likely challenges to Organizational Plaintiffs' standing. *See infra* Part I.A.

The threat to this proceeding also stems from Defendants' actions. Defendants unilaterally decided to: (i) provide E.Q. with a new CFI, (ii) find E.Q. not credible in that new CFI on the basis of highly questionable reasoning, and (iii) affirm that adverse credibility finding without hearing any argument from counsel. Defendants have thus, unilaterally brought about the situation that threatens the integrity of these proceedings. Under the All Writs Act, this Court may—and should—forestall that threat by issuing a stay of E.Q.'s removal during the pendency of this case.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion should be GRANTED, and E.Q.'s removal from the United States should be stayed during the pendency of this case.

Dated: May 13, 2025               Respectfully Submitted,

*/s/ Jared A. Levine*                Keren Zwick (D.D.C. Bar. No. IL0055)
Jared A. Levine (admitted *pro hac*)      Colleen Cowgill*
Joachim Steinberg*                 Fizza Davwa*
CROWELL & MORING LLP        NATIONAL IMMIGRANT JUSTICE CENTER
375 9th Ave, 44th Floor            111 W. Jackson Blvd., Suite 800
New York, NY 10001             Chicago, IL 60604

(212) 223-4000
JLevine@crowell.com
JSteinberg@crowell.com

Judy He (admitted *pro hac*)
Jeremy Iloulian*
Jung Shin (admitted pro hac)
CROWELL & MORING LLP
455 N Cityfront Plaza Dr #3600,
Chicago, IL 60611
(312) 321-4200
JHe@crowell.com
JIloulian@crowell.com
JShin@crowell.com

Robert Pauw
CENTER FOR GENDER & REFUGEE STUDIES
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
(206) 682-1080
rpauw@ghp-law.net

Richard Caldarone (D.C. Bar No. 989575)
REFUGEE & IMMIGRANT CENTER FOR
EDUCATION AND LEGAL SERVICES
P.O. Box 786100
San Antonio, TX 78278
(210) 960-3206
richard.caldarone@raicestexas.org

(312) 660-1370
kzwick@immigrantjustice.org
ccowgill@immigrantjustice.org
fdavwa@immigrantjustice.org

Melissa Crow (D.C. Bar No. 453487)
CENTER FOR GENDER & REFUGEE STUDIES
1121 14th Street, NW, Suite 200
Washington, D.C. 20005
(202) 355-4471
crowmelissa@uclawsf.edu

Anne Peterson
Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, California 94102
T: 415.610.5729
petersonanne@uclawsf.edu

Anwen Hughes*
Human Rights First
75 Broad St., 31st Fl.
New York, NY 10004
(212) 845-5244
HughesA@humanrightsfirst.org

Peter Alfredson (D.C. Bar No. 1780258)
AMICA CENTER FOR IMMIGRANT RIGHTS
1025 Connecticut Ave. NW, Suite 701
Washington, DC 20036
(202) 899-1415
peter@amicacenter.org

*Certificate of pro bono representation or pro hac vice forthcoming*