YAAKOV M. ROTH
*Acting Assistant Attorney General*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
ANTHONY P. NICASTRO
*Acting Director*
CHRISTINA P. GREER
*Senior Litigation Counsel*
CARA E. ALSTERBERG
*Senior Litigation Counsel*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 532-4667
Email: Cara.E.Alsterberg@usdoj.gov
TARYN L. ARBEITER
SHELBY WADE
*Trial Attorneys*

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ———————————————— ) | Civil Action No. 1:25-cv-00791 |
| E.Q., *et al.*,                               ) | |
|                                               ) | |
|              Plaintiffs,              ) | |
|                                               ) | |
| v.                                            ) | |
|                                               ) | |
| U.S. Department of Homeland    ) | |
| Security, *et al.*,                         ) | |
|                                               ) | |
|              Defendants.            ) | |
|                                               ) | |

**DEFENDANTS' BRIEF IN OPPOSITION
TO PLAINTIFFS' EMERGENCY MOTION TO STAY REMOVAL**

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

LEGAL AND PROCEDURAL BACKGROUND ..................................................... 3

    I.  Legal Background ......................................................................................... 3

    II. E.Q.'s February 2025 Credible Fear Screening ..................................... 6

    III.E.Q.'s April 2025 Credible Fear Follow-Up Interview ........................... 7

    IV.Procedural Background ........................................................................... 8

STANDARD .............................................................................................................. 9

ARGUMENT ........................................................................................................... 10

    I.  This Court does not have authority to stay E.Q.'s removal ................... 10

    II. E.Q. has not satisfied the stay factors ................................................... 13

        A.  E.Q. has not shown a likelihood of success on the merits of his claims ............ 13

            i.     E.Q. does not have standing to challenge the Rules ............................... 14

            ii.    The Rules are consistent with the INA ...................................... 16

            iii.   The Rules are not arbitrary or capricious................................. 24

            iv.   E.Q.'s challenge to the Rules is moot....................................... 29

        B.  E.Q. has not satisfied the other requirements for a stay ................... 33

CONCLUSION.......................................................................................................... 34

# TABLE OF AUTHORITIES

## CASES

*Alaska v. U.S. Dep't of Agic.*,
  17 F.4th 1224 (D.C. Cir. 2021)...........................................................31

*Allen v. Wright*,
  468 U.S. 737(1984).........................................................................29

*Already, LLC v. Nike, Inc.*,
  568 U.S.85 (2013) ..........................................................................29

*Am. Fed'n of Gov't Emps., Nat'l Council of HUD Locs. Council 222,*
*AFL-CIO v. Fed. Serv. Impasses Panel*,
  2020 WL 6709775 (D.D.C. Nov. 16, 2020) ........................................29

*Am. Immigration Lawyers Ass'n v. Reno*,
  18 F. Supp. 2d 38 (D.D.C. 1998).......................................................17

*Am. Immigration Lawyers Ass'n v. Reno*,
  199 F.3d 1352 (D.C. Cir. 2000).........................................................16

*Arizonans for Official English v. Arizona*,
  520 U.S. 43 (1997).....................................................................29, 30

*Cherokee Nation v. U.S. Dep't of the Interior*,
  634 F. Supp 3d 90 (D.D.C. 2022) ......................................................14

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971).........................................................................24

*City of Mesquite v. Aladdin's Castle*,
  455 U.S. 283 (1982).........................................................................31

*Clark v. Martinez*,
  543 U.S. 371 (2005).........................................................................22

*D.A.M. v. Barr*,
  474 F. Supp. 3d 45 (D.D.C. 2020)......................................................10

*Delta Constr. Co. v. EPA*,
  783 F.3d 1291(D.C. Cir. 2015)..........................................................14

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)..........................................................................28

*FCC v. Prometheus Radio Project*,
   141 S. Ct. 1150 (2021)......................................................................24

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024)..........................................................................14

*Grace v. Barr*,
   965 F.3d 883 (D.C. Cir. 2020)..........................................................11

*Guedes v. Bureau of Alchohol, Tobacco, Firearms & Explosives*,
   920 F.3d 1(D.C. Cir. 2019)...............................................................31

*INS v. Cardoza-Fonseca*,
   480 U.S. 421 (1987)............................................................................3

*Inv. Co. Inst. v. Commodity Futures Trading Comm'n*,
   720 F.3d 370 (D.C. Cir. 2013)..........................................................26

*In re NTE Connecticut, LLC*,
   26 F.4th 980 (D.C. Cir. 2022)..................................................12, 13

*Kiakombua v. Wolf*,
   498 F. Supp. 3d (D.D.C. 2020)...............................................15, 16

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
   511 U.S. 375 (1994)..........................................................................29

*Las Americas Immigrant Advocacy Center v. Wolf*,
   507 F. Supp. 3d (D.D.C. 2020).........................................................15

*Las Americas Immigrant Advocacy Center v. DHS*,
   2025 WL 1403811 (D.D.C. May, 9 2025)..................................32, 33

*Lewis v. Continental Bank Corp.*,
   494 U.S. 472 (1990)..........................................................................29

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1922)....................................................................14, 15

*M.M.V. v. Barr*,
   459 F. Supp. 3d 1 (D.D.C. 2020)......................................................11

*Matter of M-B-C-,*

    27 I. & N. Dec. 31 (BIA 2017)................................................................21

*Moncrieffe v. Holder,*

    568 U.S. 184 (2013)..........................................................................4

*Monk v. Tran,*

    843 F. App'x 275 (Fed. Cir. 2021)..........................................................31

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*

    463 U.S. 29 (1983)......................................................................17, 24

*Nken v. Holder,*

    556 U.S. 418 (2009)....................................................................10, 33

*O.A. v. Trump,*

    404 F. Supp. 3d 109 (D.D.C. 2019).......................................................21

*Reynolds Metals Co. v. FERC,*

    777 F.2d 760, 762 (D.C. Cir. 1985).......................................................12

*S.E.C. v. Vision Commc'ns, Inc.,*

    74 F.3d 387 (D.C. Cir. 1996)..............................................................12

*United States. v. Sanchez-Gomez,*

    138 S. Ct. 1532 (2018)....................................................................29

*Winter v. Nat. Res. Def. Council, Inc.,*

    555 U.S. 7 (2008)..........................................................................33

## STATUTES

6 U.S.C. § 557...............................................................................22

8 U.S.C. § 1101................................................................................3

8 U.S.C. § 1101(a)(42)(B)..................................................................3, 20

8 U.S.C. § 1158(a)...........................................................2, 3, 4, 6, 18, 19, 20, 22

8 U.S.C. § 1158(b)(2)(A)......................................................................23

8 U.S.C. § 1158(b)(2)(A)(i)–(vi) ...........................................................5, 12, 13, 22

8 U.S.C. § 1225(b)...........................................................................1, 4

8 U.S.C. § 1225(b)(1)...........................................................................1

8 U.S.C. § 1225(b)(1)(A)(i) ....................................................................5

8 U.S.C. § 1225(b)(1)(B)(ii)...................................................5, 16, 17, 18, 19, 20, 21, 23, 24

8 U.S.C. § 1225(b)(1)(B)(iii)................................................................2, 4, 6, 20

8 U.S.C. § 1225(b)(1)(B)(v)........................................5, 17, 18, 19, 20, 21, 23, 24

8 U.S.C. § 1231(b)(3)(B)......................................................................2, 4, 6

8 U.S.C. § 1252(a)(1)..............................................................................11

8 U.S.C. § 1252(a)(2)....................................................................10, 11, 13

8 U.S.C. § 1252(b)(3)(B)..........................................................................10

8 U.S.C. § 1252(e)(1).....................................................................10, 11,13

8 U.S.C. § 1252(e)(2)..............................................................................10

8 U.S.C. § 1252(e)(3)....................................................................10, 11, 16, 32

8 U.S.C. § 1252(e)(3)(B)..........................................................................23

28 U.S.C. § 1651.................................................................................12

28 U.S.C. § 754..................................................................................12

HSA of 2002, Public Law 107–296..................................................................6

HSA § 451(b).....................................................................................22

HSA § 1517......................................................................................22

# REGULATIONS

8 C.F.R. § 208.30(e)(2).........................................................................17, 21

8 C.F.R. § 1208.31(g)..............................................................................6

8 C.F.R. § 1240.8...............................................................................21, 22

8 C.F.R. § 208.16–.18..............................................................................3

8 C.F.R. § 208.30(e)(5)(ii)....................................................................21, 25, 26

8 C.F.R. § 208.30(e)(5)(ii)(A)–(B)..................................................................21

8 C.F.R. § 208.31...........................................................................5, 26, 13

8 C.F.R. § 208.33(b)(2)(ii).....................................................................13, 26, 32

87 Fed. Reg. 18,078................................................................................28

88 Fed. Reg. 31,314................................................................................32

89 Fed. Reg. 103,370........................................................................1, 5, 22, 23

89 Fed. Reg. 103,372...............................................................................26

89 Fed. Reg. 103,373...............................................................................27

89 Fed. Reg. 103,385...................................................................................................28

89 Fed. Reg. 103,386...................................................................................................28

89 Fed. Reg. 103,396...................................................................................................26

89 Fed. Reg. 105,392...............................................................................................1, 6

89 Fed. Reg. 41,347.................................................................................................1, 5

89 Fed. Reg. 41,351.......................................................................................17, 25, 26

## INTRODUCTION

Plaintiff E.Q. asks this Court to stay his removal while he and three legal service organizations challenge two important rules that safeguard U.S. national security: (1) a final rule issued by the Department of Homeland Security ("DHS"), *Application of Certain Mandatory Bars in Fear Screenings*, 89 Fed. Reg. 103,370 (Dec. 18, 2024) ("DHS Bars final Rule"), which was issued after DHS provided notice and an opportunity to comment in *Application of Certain Mandatory Bars in Fear Screenings*, 89 Fed. Reg. 41,347 (May 13, 2024) ("DHS Bars NPRM"); and (2) an interim final rule issued by the Executive Office for Immigration Review ("EOIR"), *Clarification Regarding Bars to Eligibility During Credible Fear and Reasonable Fear Review*, 89 Fed. Reg. 105,392 (Dec. 27, 2024) ("EOIR Bars IFR") (collectively, the "Rules"). These Rules strengthen the integrity of the expedited removal process and safeguard our national security by allowing DHS to more expeditiously remove aliens who are determined not to have the requisite fear of torture and are clearly ineligible for asylum and withholding of removal because they pose safety and security threats to the American people. Without these Rules, such aliens may remain in the United States to pursue their doomed asylum applications in potentially lengthy removal proceedings, thereby further exacerbating the significant immigration court backlog and larger illegal immigration crisis the President has prioritized ending.

When an alien subject to expedited removal expresses a fear of persecution or torture, indicates an intention to apply for asylum, or expresses a fear of return to their country, the alien must be referred for an interview with an asylum officer. *See* 8 U.S.C. § 1225(b)(1)(A)(i), (B)(v). If the alien receives a positive credible fear determination, he is then allowed to remain in the United States to await the adjudication of his asylum application. *Id.* § 1225(b)(1)(B)(ii). Prior to the Rules at issue here, asylum officers and immigration judges had their hands tied when faced

with terrorists, persecutors, or others whose applications for asylum and related protection were sure to be denied for security-related reasons; they could not enter or affirm a negative screening determination based on security-related mandatory denial grounds alone and instead, if the alien would receive a positive credible fear determination but for those grounds, were required to place them into lengthy removal proceedings to pursue their doomed claims while in the United States, placing the public at risk and potentially providing those aliens work authorization and other benefits notwithstanding their certain ineligibility for asylum.

The Departments fixed this problem in January 2025 when the DHS Bars final Rule became effective. DHS's regulations now allow asylum officers conducting screening interviews to consider the security-related bars to asylum and related forms of protection. And after the EOIR Bars IFR, the regulations clearly allow immigration judges to review the consideration of those bars. Asylum officers may now enter a negative credible fear determination as to asylum and withholding of removal eligibility where an alien would be barred from asylum and withholding of removal protection for participating in the persecution of others, being a member of a terrorist organization or engaging in terrorist activities, having been convicted of a particularly serious crime, having committed a serious non-political crime outside the United States, or being a danger to the United States. *See* 8 U.S.C. § 1158(b)(2)(A)(i)–(v) (listing the security-related bars to asylum); 8 U.S.C. § 1231(b)(3)(B) (listing similarly worded bars to withholding of removal).

In the instant motion, the lone individual plaintiff in this suit, E.Q., a native and citizen of Afghanistan, asks the Court to stay his removal pending the Court's review of these important Rules. ECF No. 23 ("Mot."). However, E.Q. has failed to establish entitlement to this extraordinary relief. At the outset, the Immigration and Nationality Act's ("INA") reticulated jurisdictional provisions prohibit the granting of a stay of removal here. *See infra* at 10–13. The Court lacks the

authority to grant a stay, but even if the Court were to have such authority, E.Q. has not established that a stay is warranted because he is not likely to succeed on the merits of his claims that the Rules are contrary to law, *see infra* at 16–24, and arbitrary and capricious, *see infra* at 24–29, and the balance of equities tip in the Government's favor, *see infra* at 33–34. Accordingly, the Court should deny E.Q.'s emergency motion to stay removal.

## LEGAL AND PROCEDURAL BACKGROUND

### I.    Legal Background

Asylum and Withholding of Removal. Asylum is a form of discretionary relief under the INA, 8 U.S.C. § 1101 *et seq. See id.* § 1158; *INS v. Cardoza-Fonseca*, 480 U.S. 421, 444 (1987). Generally, a grant of asylum protects aliens from removal, creates a path to lawful permanent residence and citizenship, authorizes aliens to work, and enables certain members of their immediate family to seek asylum derivatively. *See* 8 U.S.C. §§ 1158–1159. To obtain asylum, aliens must show that they: (1) qualify as a "refugee"—that is, that they are unable or unwilling to return to their home country "because of persecution or a well-founded fear of persecution on account of" a protected ground, *id.* §§ 1101(a)(42), 1158(b)(1)(A); (2) are not subject to an exception or mandatory condition or bar that precludes applying for or receiving asylum, *id.* § 1158(a)(2), (b)(2); and (3) merit a favorable exercise of discretion, *id.* § 1158(b)(1)(A).

In addition to asylum, aliens processed under Title 8 authorities may apply for withholding of removal under 8 U.S.C. § 1231(b)(3) and protection under the regulations implementing the United States' obligations under Article 3 of the Convention Against Torture ("CAT"),[1] 8 C.F.R. §§ 208.16–.18, 1208.16–.18. Unlike asylum, which is discretionary, these provisions prohibit

---

[1] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85 (entered into force for United States Nov. 20, 1994).

removal to a country where an alien more likely than not would be persecuted on account of a protected ground or tortured, respectively. *See Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013).

Although there is a broad right to *apply* for asylum, § 1158(b)(2) limits an individual's eligibility to *receive* asylum. Similarly, although a grant of withholding is required where an alien establishes eligibility, the withholding statute also includes limits on that eligibility. Pursuant to § 1158(b)(2)(A), asylum must be denied where an alien: (1) participated in the persecution of others on account of a protected ground; (2) has a conviction for a particularly serious crime; (3) committed a serious nonpolitical crime outside of the United States; (4) is a danger to the security of the United States; (5) has engaged in terrorist activity; or (6) was firmly resettled in another country prior to arriving in the United States. 8 U.S.C. § 1158(b)(2)(A)(i)–(vi). These mandatory bars to asylum also generally apply to an individual's eligibility for withholding of removal. 8 U.S.C. § 1231(b)(3)(B).

Screening Processes. Depending on their circumstances, aliens may be subject to certain summary removal procedures. Certain arriving aliens and certain aliens apprehended within two years of their unlawful entry may be subject to expedited removal. 8 U.S.C. § 1225(b)(1)(A)(i), (iii)(II). Aliens who have not been admitted for permanent residence and are convicted of an aggravated felony may be subject to what is often referred to as "administrative removal." *Id.* § 1228(b). And aliens who have a prior removal order and have reentered the United States illegally may have those orders reinstated. *See id.* § 1231(a)(5). In all three instances, aliens who indicate a fear of persecution or returning to the country of removal receive screening interviews to determine whether they should be allowed to remain in the United States pending an application for asylum or related protection from removal, or both.

An alien in expedited removal proceedings under 8 U.S.C. § 1225(b)(1) who indicates an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to their country, *id.* § 1225(b)(1)(A)(ii), will receive a "credible fear interview." In that interview, an asylum officer will determine whether the alien has established a credible fear, which the statute defines as a "significant possibility" that the alien "could establish eligibility for asylum."[2] *Id.* § 1225(b)(1)(B)(v). If the alien receives a positive credible fear determination, his asylum claim may be heard by another asylum officer or he may be placed in removal proceedings before an immigration judge, where he may apply for asylum and protection, including withholding of removal and related protection under the CAT regulations. If the alien receives a negative credible fear determination, an immigration judge may review that determination. *Id.* § 1225(b)(1)(B)(iii)(III). If the immigration judge affirms the determination, or the alien declines immigration judge review, the alien is ordered removed without further review. *See id.* § 1225(b)(1).

The Rules. On May 13, 2024, DHS issued the DHS Bars NPRM. *See* 89 Fed. Reg. 41,347. After receiving and considering public comments, on December 18, 2024, DHS issued the DHS Bars final Rule, which went into effect on January 17, 2025. 89 Fed. Reg. at 103,370. As relevant here, the DHS Bars final Rule provides asylum officers conducting credible fear interviews the discretion to "consider the applicability" of certain security-related bars to asylum and withholding eligibility if an alien appears to be subject to such a bar. *Id.*; 8 C.F.R. §§ 208.30(e)(5)(ii), 208.31(c).

---

[2] In the background and argument sections of his motion, E.Q. cites a report from the House of Representatives to claim that the screening interview focuses on the credibility of the alien and whether the alien has a characteristic that would qualify him or her as a refugee, but does not acknowledge that this is not the statutory standard Congress actually adopted and does not state the statutory standard. *Compare* Mot. at 10, 24–25, citing H. Rep. 104-469 - Immigration in the National Interest Act of 1995, p. 158, *with* 8 U.S.C. § 1225(b)(1)(B)(v).

Specifically, the Rule allows asylum officers to consider the bars to asylum codified at 8 U.S.C. § 1158(b)(2)(A)(i) through (v), and to eligibility for withholding of removal at 8 U.S.C. § 1231(b)(3)(B) for: (1) those who "ordered, incited, assisted, or otherwise participated in the persecution of any person" "on account of" or "because of" a protected ground, 8 U.S.C. §§ 1158(b)(2)(A)(i), 1231(b)(2)(B)(i); (2) those convicted of a "particularly serious crime," 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1231(b)(2)(B)(ii); (3) where "there are serious reasons to believe that the alien committed a serious nonpolitical crime outside the United States," 8 U.S.C. §§ 1158(b)(2)(A)(iii), 1231(b)(2)(B)(iii); (4) where "there are reasonable grounds to believe that the alien is a danger to the security of the United States," 8 U.S.C. §§ 1158(b)(2)(A)(iv), 1231(b)(2)(B)(iv); and (5) those described in certain terrorism-related provisions, 8 U.S.C. §§ 1158(b)(2)(A)(v), 1231(b)(2)(B).

The EOIR Bars IFR, issued on December 27, 2024, made a technical amendment to EOIR's regulations, clarifying that an immigration judge's *de novo* review of an asylum officer's credible fear determination shall also include review of the asylum officer's determination of the applicability of any mandatory bar to asylum and withholding of removal. *See generally* 89 Fed. Reg. 105,392; 8 C.F.R. §§ 1003.42(d), 1208.31(g).

## II.    E.Q.'s February 2025 Credible Fear Screening

E.Q. illegally entered the United States on January 16, 2025. *See* E.Q.'s February 2025 Credible Fear Review Proceeding, ECF No. 24-1 at 7 (filed under seal). After he was apprehended, an immigration officer issued E.Q. a "Notice and Order of Expedited Removal" notifying E.Q. that DHS had determined that he was inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i)(I) as an immigrant not in possession of a valid entry document. *Id*. E.Q. was subsequently referred to an asylum officer for a credible fear interview. *Id*. at 11–35.

At the end of the interview, the asylum officer concluded that E.Q. did not establish a credible fear of persecution or torture. *Id*. at 12. For asylum purposes, the asylum officer determined that E.Q. did not have a credible fear of persecution or torture because he did not establish that there is a significant possibility he would not be subject to the regulatory bar to asylum eligibility at 8 C.F.R. § 208.35(a)(1). *Id*. For purposes of withholding of removal and CAT protection, the asylum officer considered whether E.Q. established a reasonable probability of persecution or torture. *Id*. at 12, 37; 8 C.F.R. § 208.35(b)(2)(i) (where an alien does not have a credible fear of persecution for asylum purposes because of the bar on eligibility in § 208.35(a)(1), the asylum officer screens the alien for potential eligibility for withholding of removal and CAT protection under a "reasonable probability" standard). Regarding withholding of removal, the asylum officer checked a box indicating that E.Q. did not establish nexus, *id*. at 12, and in the officer's explanation stated that "the applicant was not able to establish by a reasonable probability that [he] would be harmed in the future due to a protected characteristic that he possesses," *id*. at 37. As for CAT protection, the asylum officer concluded that there was not a reasonable probability that E.Q. could "establish in a full hearing that . . . Taliban would harm [him] in the future." *Id*. at 38. In addition to those findings, the asylum officer determined that, for withholding of removal and CAT protection purposes, E.Q. also "failed to establish a reasonable probability of persecution or torture because he is subject to a mandatory bar." *Id*. at 37. E.Q. sought review of an Immigration Judge, *id*. at 2, who affirmed the asylum officer's determination, ECF No. 23-1 at 1.

## III.    E.Q.'s April 2025 Credible Fear Follow-Up Interview

On April 14, 2025, an asylum officer conducted a credible fear follow-up interview with E.Q. *See* E.Q.'s April 2025 Credible Fear Review Proceeding, ECF No. 24-2 at 15 (filed under seal). On April 30, 2025, the USCIS Asylum Division served a negative credible fear determination on E.Q. *Id*. at 5. In its decision, USCIS found that E.Q. was not credible, due to

inconsistent testimony at his initial and follow-up credible fear interview, and because his testimony lacked detail in certain important aspects. *Id.* at 14, 63–65. As a result, USCIS found that E.Q. did not establish a credible fear of persecution or torture. *Id.* USCIS further noted that it did not appear that E.Q. was subject to a bar to asylum or withholding of removal. *Id.* at 15. E.Q. sought review of this subsequent finding by an immigration judge. *Id.* at 2. After a hearing on May 9, 2025, the Immigration Judge affirmed the asylum officer's negative credible fear determination. *See* ECF No. 23-1; *see also* May 16, 2025 Declaration of Casey L. Martinez, attached hereto as Exhibit A.

## IV.    Procedural Background

On March 17, 2025, three organizations that provide services to asylum seekers and one alien, E.Q., filed this suit challenging the DHS Bars final Rule and the EOIR Bars IFR. Compl. at ¶¶ 12–15. The Plaintiffs argue that the Rules violate various provisions of the INA, and that they are contrary to law and arbitrary and capricious under the Administrative Procedure Act ("APA"). *Id.* at ¶¶ 168–87.

On March 19, 2025, Plaintiffs filed their first emergency motion to stay E.Q.'s removal. *See* ECF No. 8. Plaintiffs allege that E.Q. is a native of Afghanistan who received a credible fear interview on February 4, 2025. Compl. ¶ 132. They further allege that during his credible fear interview, E.Q. testified that a close family member worked for an international organization that "cooperated with the previous Afghan government." *Id.* at ¶ 133. Plaintiffs state that E.Q. worked at a business in Afghanistan that served the public but was patroned by members of the Taliban; however, E.Q. testified that he never served Taliban members. *Id.* at ¶ 135. According to E.Q.'s testimony, in spring 2024, the Taliban raided his home and accused him of being an "American spy"; soon after this encounter, he fled Afghanistan and eventually traveled to the United States. *Id.* at ¶ 134. After his credible fear interview, an asylum officer issued a decision finding E.Q.'s

testimony credible but, they allege, issued a negative credible fear determination under the DHS Bars final Rule. *Id*. at ¶ 136. In particular, the asylum officer determined that E.Q. not only worked at a business that provided support to members of the Taliban—a group which is designated as a Foreign Terrorist Organization by the U.S. Department of State—but further security checks through a government database confirmed that E.Q. is a member of the Taliban and a suspected terrorist. *Id*. at ¶¶ 137–38.

On March 27, 2025, the parties filed a joint stipulation to hold the briefing in abeyance pending USCIS conducting a credible fear follow-up interview. ECF No. 18. Following the entry of a new negative credible fear determination, on May 9, 2025, Plaintiffs filed their second emergency motion to stay removal, ECF No. 23, on May 13, 2025. Plaintiffs assert that while E.Q. was deemed ineligible for humanitarian protection under the DHS Bars final Rule at his first credible fear interview; at his credible fear follow-up interview, "Defendants conceded that E.Q. is not subject to a mandatory bar[,]" but still denied E.Q. the opportunity to apply for relief on other grounds. *Id*. at 1. Plaintiffs also argue that USCIS conducted E.Q.'s credible fear follow-up interview pursuant to the "Securing the Border" rule, "which was vacated by a judge in this district before E.Q.'s negative-fear determination became final." *Id*. at 9. As such, Plaintiffs assert that the credible fear follow-up interview determination and the associated removal order are "legal nullities issued in violation of that Court's order." *Id*.

## STANDARD

The determination of whether to grant an emergency stay of removal, akin to a Temporary Restraining Order ("TRO"), consists of four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other

parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). "There is substantial overlap between these and the factors governing preliminary injunctions." *See id.* "The first two factors of the traditional standard are the most critical," and a plaintiff must establish more than the "mere possibility" of success on the merits or irreparable harm, but rather that both are "likely." *Id.* at 434–35 (internal citations omitted). The final two factors merge when the government is the defendant. *Id.* at 435.

## ARGUMENT

The Court should deny Plaintiffs' motion for an emergency stay of E.Q.'s removal because the Court lacks authority to grant such relief under the INA, and E.Q. does not make the necessary showing such relief. Specifically, he has not shown a likelihood of success on the merits, and the balance of the equities favor the government.

## I.    This Court does not have authority to stay E.Q.'s removal.

"No court may . . . enter declaratory, injunctive, or other equitable relief" to aliens, such as E.Q., challenging their expedited removal orders. 8 U.S.C. § 1252(e)(1). As this Court has noted, 8 U.S.C. § 1252 "is one of the most comprehensive jurisdiction-stripping statutes in the United States Code." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 62 (D.D.C. 2020). Although § 1252(a)(2)(A) generally bars jurisdiction to review "any [] cause or claim arising from or relating to the implementation or operation of an order of" expedited removal under § 1225(b)(1), in paragraph (e) it allows for narrow review of certain types of claims and similarly narrow relief. *See id.* at 57 & n.13. Specifically, paragraph (e) allows for two types of claims arising from an expedited removal order: (1) a habeas claim limited to three specific questions, 8 U.S.C. § 1252(e)(2), which E.Q. has not brought; and (2) a challenge to the validity of regulations and written policies (but nothing else) in an action instituted in D.D.C. within 60 days after the regulation's or policy's first implementation, *id.* § 1252(e)(3). E.Q.'s suit appears to qualify for the second type of allowable

claim as he challenges a regulation relating to the expedited removal system, has brought his suit within 60 days of the rule's effective date, and has brought suit in D.D.C. *See generally* Compl.

But even if the Court has jurisdiction to consider his challenges to the Rules, the Court cannot stay his removal. Section 1252(e)(1) clearly states that "[w]ithout regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may . . . enter declaratory, injunctive, or other equitable relief in any action pertaining to an [expedited removal] order except as specifically authorized in a subsequent paragraph of" § 1252(e). No subsequent paragraph of § 1252(e) allows for stays of removal. Indeed, the only relief arguably available to E.Q. according to § 1252(e)(3) is a "determination" of the constitutionality and legality of the challenged Rules—the subsequent paragraphs speak of no relief available to E.Q. Indeed, even outside of paragraph (e), § 1252 only recognizes the possibility of a stay of removal when issued by a court of appeals in the petition for review process provided for in § 1252(a)(1), which E.Q. as the recipient of an expedited removal order cannot avail himself of. 8 U.S.C. § 1252(b)(3)(B); *cf. M.M.V. v. Barr*, 459 F. Supp. 3d 1, 7 (D.D.C. 2020) (denying stay where, although otherwise inclined to grant it, the court determined that "there is no statutory provision 'specifically authoriz[ing]' the Court to stay removal orders" in the circumstances presented in that case (quoting 8 U.S.C. § 1252(e)(1)(A)). Although the D.C. Circuit has held that § 1252(e)(1)(A) does not prohibit a district court from enjoining an expedited removal policy reviewed under § 1252(e)(3), *see Grace v. Barr*, 965 F.3d 883, 907–08 (D.C. Cir. 2020), it has not so held for interim relief to a plaintiff seeking to stop the execution of their expedited removal order—which is outside of (e)(3)'s scope.

In short, § 1252(e) clearly delineates the limits of this Court's authority to issue relief as it relates to expedited removal orders under § 1225(b)(1). Under the statute's plain language, this Court cannot stay E.Q.'s removal.

Plaintiffs' invocation of the All Writs Act to restore jurisdiction to issue a stay of removal fails. *See* Mot. at 33–34; 28 U.S.C. § 1651. The All Writs Act is an "extraordinary remedy that may be invoked only if the statutorily prescribed remedy" is "clearly inadequate." *Reynolds Metals Co. v. FERC*, 777 F.2d 760, 762 (D.C. Cir. 1985). In *In re NTE Connecticut, LLC*, for example, the D.C. Circuit held it necessary to invoke the All Writs Act to issue emergency relief in a Federal Energy Regulatory Commission case where it would have had jurisdiction under the applicable statute in thirty days' time but the equities in the case, loss of millions of dollars, required a quicker review of the agency decision. 26 F.4th 980, 987 (D.C. Cir. 2022). The court explained that the statutory remedy—which allowed for review but not until thirty days had passed (for the agency to respond to a rehearing application)—was inadequate. *Id.*

Furthermore, the All Writs Act cannot "protect[] jurisdiction the district court [does] not have." *S.E.C. v. Vision Commc'ns, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996). In *S.E.C.*, for example, the district court in a securities enforcement case enjoined a third party located outside the District of Columbia from interfering with a receiver's sale of assets claimed by that third party. *Id.* at 289. The D.C. Circuit vacated the injunction, explaining that the All Writs Act could not be invoked by the appellees to defend the district court's jurisdiction over claims to property involving a third party located in another jurisdiction. *Id.* at 291. Rather, to properly establish jurisdiction concerning the property, the receiver had to follow the applicable statute, 28 U.S.C. § 754, and file a copy of a complaint and his appointment order in the state where the property was located. *Id.*

12

Plaintiffs, going a step further than the appellees in *S.E.C.*, attempt to invoke the All Writs Act to protect jurisdiction which not only does not exist, s*ee S.E.C.*, 74 F.3d at 29, but is explicitly barred by 8 U.S.C. § 1252(e)(1). But the All Writs Act cannot "protect[] jurisdiction the district court [does] not have." *Id*. Furthermore, this is not remotely a case where jurisdiction is available but the statutory remedy is inadequate, as was the case in *NTE Connecticut*; rather, 8 U.S.C. § 1252(e)(1) explicitly bars the judicial authority Plaintiffs attempt to conjure up from the All Writs Act. *See contra In re NTE Connecticut*, 26 F.4th at 987. Accordingly, the All Writs Act does not restore this court's jurisdiction to issue a stay of removal as it relates to expedited removal orders under § 1225(b)(1).

## II.    E.Q. has not satisfied the stay factors.

Even if the statute allowed the Court to stay E.Q.'s removal (it does not), he has not established the requisite showing for a stay.

### A.    E.Q. has not shown a likelihood of success on the merits of his claims.

At the outset, E.Q. does not have standing because the challenged Rules were not a "but for" cause of his initial negative credible fear determination. Even if he were to have standing, he has not otherwise established a likelihood of success on the merits of his claims. E.Q. alleges that DHS's decision to consider the security-related mandatory bars during his credible fear screenings is contrary to the INA and arbitrary and capricious.[3] *See* Mot. at 22–34. Not so. As explained below, the DHS Bars final Rule is consistent with the plain meaning of the INA and represents reasonable policy decisions that are reasonably explained.

---

[3] E.Q. does not challenge the DHS Bars final Rule's reasonable fear provisions. Mot. at 11 ("Noncitizens in reasonable fear interviews (which are also at issue in this case, but not in E.Q.'s particular situation) likewise must prove "a reasonable possibility that no mandatory bar applies." 89 Fed. Reg. at 103413-14; 8 C.F.R. §§ 208.31(c) & 208.33(b)(2)(ii)."). Accordingly, he has waived any argument on these scores for purposes of his stay motion.

1.      *E.Q. does not have standing to challenge the Rules.*

"To establish standing, . . . a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). To satisfy the second requirement, the plaintiff must show a "causal connection between the injury and the conduct complained of," meaning that the injury is "fairly traceable to the challenged action of the defendant." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). "Generally, this is a 'but for' test—if some part of the alleged injury would not have occurred but for the challenged action, then the injury is fairly traceable to the challenged action." *Cherokee Nation v. U.S. Dep't of the Interior*, 643 F. Supp. 3d 90, 106 (D.D.C. 2022). "This test is met even if the challenged action is not the most immediate cause, or even a proximate cause, of the injury." *Id.* (internal quotation marks omitted). "But if the injury would occur regardless of the challenged action—say, because some separate action would independently cause it in full—then the fair-traceability test is not met." *Id.*; *see Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1297 (D.C. Cir. 2015). At the pleading stage, a plaintiff's standing to pursue a claim typically turns on "the theory of injury presented in the complaint and the facts alleged in support of the claim." *Cherokee Nation*, 643 F. Supp. 3d at 107 (internal quotation marks omitted). The court's redressability analysis is "virtually always the reciprocal of the second, fair-traceability element." *Id.* at 106 (internal quotation marks omitted).

Here, E.Q.'s injury is not "fairly traceable" to the Rules. *Lujan*, 504 U.S. at 560. To the contrary, the February 2025 credible fear determination establishes that E.Q. has not been harmed by the Rules because the asylum officer denied his withholding of removal claim (the only claim potentially impacted by the Rules) on independent grounds that have nothing to do with the Rules' mandatory bars: namely, E.Q. failed to establish a reasonable probability of persecution because

he could not establish the requisite nexus between his alleged and feared mistreatment in Afghanistan and a protected ground, a dispositive ground for finding a negative fear. *See* ECF No. 24-1 at 12, 25–26 (indicating that E.Q. failed to establish the requisite nexus to qualify for withholding of removal); *id.* at 37 (explaining the asylum officer's reasoning).[4] The immigration judge affirmed this finding. ECF No. 23-1 at 1 (affirming the asylum officer's finding that E.Q. had not established a reasonable probability of persecution or torture). *Contra* Mot. at 5 ("In the Absence of the . . . Rule, E.Q. would have received a positive credible-fear determination and been referred for full removal proceedings."); *id.* at 20 (claiming that E.Q. received a negative fear determination "solely" because of the Rule). The asylum officer's negative credible fear determination on nexus grounds constituted a separate action that independently caused E.Q.'s injury (a negative credible fear determination resulting in his expedited removal order) in full. *See Cherokee Nation*, 643 F. Supp. 3d at 106. As such, "the fair-traceability test is not met." *Id*. Unlike other cases where courts in this district have found standing because of procedural violations, *see, e.g.*, *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 24 (D.D.C. 2020) (holding that plaintiffs alleging procedural violation had to show only that their injury was "connected to" allegedly improper procedure); *Las Americas Immigrant Advocacy Center v. Wolf*, 507 F. Supp. 3d 1, 21–23 (D.D.C. 2020) (similar), the application of the Rules to find E.Q. subject to mandatory bars had no bearing on the entirely independent no-nexus conclusion.

E.Q. likewise lacks any injury that would be redressed by a favorable decision in this case. *See id*. Because the agency made independent findings that E.Q. could not establish a reasonable

---

[4] On the Form I-869SB, the AO indicated only the mandatory bar ground for the negative credible fear finding with respect to withholding. *See* ECF No. 24-1 at 1. That form is merely a summary of the underlying findings for the AO to read to the alien. The underlying findings are memorialized on the Form I-870SB, which show that the AO faulted E.Q.'s claim for lack of nexus. *See id.* at 12, 37.

probability of prevailing on his claim for withholding of removal, and because these findings had nothing to do with the mandatory bars covered by the Rules, E.Q. cannot show that the agency's application of the Rules to his case was "connected to the substantive result." *Cf. Sugar Cane Growers Co-op. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002) (holding that a plaintiff need only show that a challenged procedural step was connected to the substantive result); *Kiakombua*, 498 F. Supp. 3d at 26 (noting Plaintiffs' alleged procedural injury would be fully redressed by new credible fear interviews with proper procedures). Accordingly, E.Q. cannot establish Article III standing.

While Article III's case-or-controversy requirement may be satisfied if one plaintiff can establish injury and standing, *see J.D. v. Azar*, 925 F.3d 1291, 1323–24 (D.C. Cir. 2019), E.Q. is the *only individual plaintiff* in this suit who can maintain an action challenging written credible fear policies under § 1252(e)(3), and the immigrant assistance organizations do not have third-party standing to raise E.Q.'s claims. *See Am. Immigr. Laws. Ass'n v. Reno*, 199 F.3d 1352, 1359 (D.C. Cir. 2000) ("Congress must have contemplated that lawsuits challenging [the expedited removal system] would be brought, if at all, by individual aliens"). Consequently, E.Q. has not shown a likelihood of success on his claims because he is the only plaintiff in this suit who can maintain any challenge to the credible fear aspects of the Rules. *See* Mot. at 15 (acknowledging that if the organizational plaintiffs cannot maintain the suit and "if E.Q. is unable to proceed with this case, there will be literally no party who can challenge the Rule at issue here").

### 2.    The Rules are consistent with the INA.

DHS's decision to consider the security-related bars to asylum and withholding of removal during credible fear screenings is consistent with the INA. The expedited removal statute at 8 U.S.C. § 1225(b)(1)(B)(v) defines "credible fear of persecution" to mean "a significant possibility . . . that the alien could establish eligibility for asylum" under 8 U.S.C. § 1158. On its

face, the statute allows for the consideration of the mandatory asylum bars found at 8 U.S.C. § 1158(b)(2)(A). The absence of the mandatory asylum bars is an element that must be met for an individual to be eligible for asylum. In the sub-paragraph entitled "Eligibility" at § 1158(b)(1)(A), the statute provides that an alien may be granted asylum if the alien "is a refugee." Then later in the same paragraph the statute provides that the "Eligibility" paragraph "shall not apply" to an alien who is barred from asylum under the mandatory bars to eligibility. 8 U.S.C. § 1158(b)(2)(A). Accordingly, whether an alien is subject to the mandatory bars to asylum listed in § 1158(b)(2)(A) is a question of eligibility that easily falls within the purview of a credible fear screening. That is, if there is no "significant possibility" an alien can show he is not ineligible for asylum based on a mandatory bar, 8 C.F.R. §§ 208.30(e)(2), (5), by definition he cannot demonstrate a "significant possibility" that he can establish eligibility for asylum, *See* 8 U.S.C. § 1225(b)(1)(B)(v).

As for withholding and CAT eligibility, the expedited removal statute is silent regarding the nature and availability of any screening. *See generally* 8 U.S.C. § 1225(b)(1)(A)–(B). This silence within the statute affords the Departments discretion in how to best implement their obligations in the expedited removal context. *See* 89 Fed. Reg. at 41,351 n.9; *see also Am. Immigr. Laws. Ass'n v. Reno*, 18 F. Supp. 2d 38, 56 (D.D.C. 1998) (observing that because the INA is "silent" regarding certain expedited removal procedures, the court "cannot impose upon the [agency] any obligation to afford more procedures than the governing statute explicitly requires or that [it] has chosen to afford in [its] discretion"), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000); *cf. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) (emphasizing that agencies "must be given ample latitude to adapt their rules and policies to the demands of changing circumstances" (quotation marks omitted)); *Vt. Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435 U.S. 519, 543 (1978) (underscoring that "administrative agencies should be

free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties" (quotation marks omitted)).

Indeed, the Executive has always viewed the credible fear definition as allowing for consideration of statutory bars. After the passage of IIRIRA when the former Immigration and Naturalization Service ("INS") first issued regulations implementing the credible fear screening process in 1996, it did not exempt the mandatory bars from consideration. *See Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 FR 444, 468–69 (Jan. 3, 1997) (asylum officer provision); *id.* at 460 (immigration judge review provision). INS did not add language requiring referral to removal proceedings despite potential bar applicability until 2000 in the rule *Asylum Procedures*, 65 Fed. Reg. 76,121, 76,129 (Dec. 6, 2000). Even there, the reasoning provided related entirely to public feedback without any question as to the ability to consider them. *See id.* ("Likewise, there were also suggestions that such a referral should be made regardless of any apparent statutory ineligibility under section 208(a)(2) or 208(b)(2)(A) of the Act. The Department has adopted that suggestion and has so amended the regulation.").

Plaintiffs' textual arguments concerning 8 U.S.C. §§ 1158 and 1231, *see* Mot. at 22–28, do not overcome the statute's plain language allowing for consideration of mandatory bars when considering whether there is a "significant possibility" that an alien "*could* establish eligibility for asylum," 8 U.S.C. § 1225(b)(1)(B)(v) (emphasis added).

*First*, E.Q. is wrong in claiming that the DHS Bars final Rule violates § 1158(a)(1)'s "broad right" to apply for asylum subject to "only" three exceptions in § 1158(a)(2). Mot. at 23–25. By focusing on § 1158, this argument fails to grapple with the broad authority afforded DHS in the expedited removal statute to determine whether there is a "significant possibility" that an

18

alien "could" establish eligibility for asylum. 8 U.S.C. § 1225(b)(1)(B)(v). Furthermore, this argument skips over the portion of the statute, subsection (b)(2), that plainly supports the opposite view. True enough, subsection (a) of § 1158 generally allows that all aliens may apply for asylum unless they can be removed to a third country pursuant to an international agreement, have not applied within one year of entry, or have previously been denied asylum. And subsection (b)(1) generally describes those aliens to whom the Secretary of Homeland Security and Attorney General may actually grant asylum. 8 U.S.C. § 1158(a), (b). But critically, subsection (b)(2) says that "[p]aragraph (1) [criteria for eligibility] shall not apply" in the case of the mandatory bars, set forth at § 1158(b)(2)(i)–(vi). A plain reading of § 1158 is that paragraph (b)(1)(A) does not apply at all to aliens described in (b)(2), whether they are prospective applicants or have already applied. In the case of mandatory bars, only subsection (a) applies. Because the Rule is consistent with the plain language of § 1225(b) and § 1158, this Court need not further examine the statutory structure or legislative history Plaintiffs cite in an attempt to bolster their argument. *See contra* Mot. at 23–25.

E.Q.'s argument asserts that if an alien does not pass a credible fear screening because of a mandatory bar, he has thus been "deprived of even the *opportunity* to seek asylum." Mot. at 23. But this proves too much. Such is the nature of a screening, which is how an alien in expedited removal begins the process of applying for asylum. If an alien does not pass the screening, the alien cannot further *apply* for asylum. Under Plaintiffs' theory, the statutory credible fear screening process is inconsistent with § 1158(a)(1). But it is not because that paragraph itself allows for an application for asylum "in accordance with" § 1225(b), which includes the credible fear provisions. In other words, at its core, E.Q.'s argument would require the Court to invalidate the entire expedited removal process because any alien found to have a negative credible fear would

be "deprived of even the *opportunity* to seek asylum." Mot at 23. That is not the system Congress designed and lacks any support in the clear statutory text.

E.Q.'s claim that the statute requires a positive credible fear finding where an alien establishes that he is a "refugee," Mot. at 24, is also contrary to the plain text of the statute. The statute defines "credible fear of persecution" in reference to whether the alien could establish eligibility for asylum, not that he is a "refugee." *See* 8 U.S.C. § 1225(b)(1)(B)(v). The legislative history E.Q. identifies to support this claim (Mot. at 24–25) similarly cannot overcome the statute's plain language, which does not incorporate the two-question approach the House Report identifies but rather includes entirely different language asking whether there is a "significant possibility" that the alien could establish "eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v). Had Congress intended to adopt the two-question approach E.Q. propounds, it could have done so. It did not. To the extent the legislative history has any bearing at all, it is consistent with consideration of the bars during credible fear screening interviews as one of the bars—the so-called "persecutor bar"— is part of the definition of "refugee." *Compare* 8 U.S.C. § 1101(a)(42)(B) ("The term 'refugee' does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of" a protected ground.) *with id.* § 1158(b)(2)(A)(i) (barring from asylum eligibility an alien who "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of" a protected ground) *and id.* § 1231(b)(3)(B)(i) (same bar for withholding).

*Second*, E.Q. is wrong that the regulation is contrary to statute because it "provides for the denial of relief to a noncitizen who '*appears* to be subject to' a mandatory bar." *See* Mot. at 25–26. The Rule instead provides that an alien will be found to have a "credible fear of persecution" if there is a significant possibility of eligibility for asylum or withholding of removal, "including

that the alien is not subject to a mandatory bar, if considered." 8 C.F.R. § 208.30(e)(2). The mandatory bars will only be considered if the alien "appears to be subject" to one of them and, if the alien does so appear, then the asylum officer will determine whether there is a sufficient likelihood that "in a proceeding on the merits, the alien would be able to establish by a preponderance of the evidence that such bar(s) do not apply." *Id.* § 208.30(e)(5)(ii). Thus E.Q.'s claim that an alien may be found not to have a credible fear of persecution based on appearing subject to a mandatory bar is a straw man. Indeed, E.Q. fundamentally misunderstands the already existing interplay between the mandatory bars and the asylum applicant's ultimate burden of proof in immigration proceedings. In § 1229a proceedings, "[i]f the evidence indicates that one or more grounds for mandatory denial of the application for relief *may* apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply." 8 C.F.R. § 1240.8 (emphasis added); *accord Matter of M-B-C-*, 27 I. & N. Dec. 31, 37 (BIA 2017). The DHS Bars final Rule merely guides the asylum officer through the existing burden-shifting framework in a manner suited to the credible fear screening context, which "affords considerably less process" than formal removal proceedings, *O.A. v. Trump*, 404 F. Supp. 3d 109, 119 (D.D.C. 2019). Consistently, the Rule instructs that, if an alien "appears to be subject to one or more of the mandatory bars," the asylum officer must determine whether or not there is a "significant possibility" that "the alien would be able to establish by a preponderance of the evidence that such bar(s) do not apply." *See* 8 C.F.R. § 208.30(e)(5)(ii)(A)–(B). This is sufficient for § 1225(b)'s credible fear-screening process, as it is fully consistent with the expedited removal statute's instruction that asylum officers determine whether an alien "*could* establish eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v) (emphasis added). In other words, the Rule merely requires aliens to establish that they could establish their eligibility for asylum or withholding of removal, to the

relevant screening standard. 89 Fed. Reg. at 103,370. That process places the ultimate burden of proof on the alien, where it always resides in applications for relief and protection from removal. *See* 8 C.F.R. § 1240.8. The Rule does not lower or raise any standard; it adopts the merits hearing framework while applying the credible fear standard. 8 U.S.C. § 1225(b)(1).

*Third*, E.Q.'s claim that only the Attorney General may consider the application of the mandatory bars, and thus an asylum officer cannot, Mot. at 26, is unavailing. This peculiar reading of the statute would allow either the Secretary of Homeland Security or the Attorney General to grant asylum but allow only the Attorney General to deny relief based on the statutory bars. Such a reading is illogical. Indeed, under this reading, an alien who applies for asylum affirmatively before USCIS could never be denied asylum on a security-related ground. Additionally, DHS would not have to provide notice to aliens of the privilege of counsel and consequences of filing a frivolous asylum application as required of the Attorney General at § 1158(d)(4), and only the Attorney General could establish procedures for adjudicating asylum applications per § 1158(d)(1), which would explicitly contradict the statute's allowing the Secretary to grant asylum under § 1158(b)(1)(A). In any event, E.Q.'s argument ignores that the Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to it most functions related to the administration and enforcement of the immigration laws and that by operation of the HSA, certain references to the "Attorney General" in the INA are understood to refer to the Secretary of Homeland Security. HSA § 1517, 6 U.S.C. § 557; *see* 8 U.S.C. § 1103(a), (g); HSA § 451(b), 6 U.S.C. § 271(b); *see also Clark v. Martinez*, 543 U.S. 371, 375 n.1 (2005) (explaining that the Attorney General once exercised the sole authority to administer and enforce the INA, but that much of that authority has been transferred to the Secretary of Homeland Security).

*Fourth*, the DHS Bars final Rule's instruction for asylum officers to make negative credible fear determinations if there is "not a significant possibility" that an alien would be able to establish "by a preponderance of the evidence" that the mandatory bars do not apply, 89 Fed. Reg. at 103,370, is consistent with the standard in the expedited removal statute, 8 U.S.C. § 1225(b). *Contra* Mot. at 26–28. For example, contrary to E.Q.'s arguments, the rule does not require aliens to prove a negative. Mot. at 28. Instead, it requires asylum officers to consider the testimony and other evidence available to them to determine whether "there is not a significant possibility that, in a proceeding on the merits, the alien would be able to establish by a preponderance of the evidence that such bar(s) do not apply." 8 C.F.R. § 208.30(3)(ii)(A). This means, considering all the information provided, the asylum officer determines whether the alien has overcome that hurdle. This analysis is the same for all other aspects of potential asylum, withholding of removal, and CAT eligibility an alien must establish during a congressionally created credible fear screening interview. To the extent E.Q. is challenging the fact that the statutorily created screening interview is not as fulsome as a merits adjudication, his suit is almost three decades too late. *See* 8 U.S.C. § 1252(e)(3)(B) (requiring that suit be brought within 60 days of the statute's first implementation).

Relatedly, E.Q. claims there is an inconsistency between a perceived need to provide rebuttal evidence relating to the potential applicability of a mandatory bar and § 1225(b)(1)(B)(v)'s instruction to consider only "the credibility of the statements made by the [noncitizen]" and "such other facts as are known to the officer." Mot. at 27. But there is no inconsistency. So-called "rebuttal evidence" can be the alien's oral testimony. *See* 89 Fed. Reg. at 103,375 (explaining that "[w]here an [asylum officer (AO)] exercises discretion to consider a mandatory bar in a fear screening, the AO will provide the noncitizen with an opportunity to present evidence that the bar

does not apply, and credible testimony alone may be sufficient evidence to make that showing"). In this case, for example, the asylum officer did not hide the ball. E.Q. was questioned about his "connections to the Taliban." E.Q. Decl. ¶ 9. In response to these questions, E.Q. had the opportunity to provide testimony rebutting any such connection, though he failed to do so. *See Garland v. Ming Dai*, 593 U.S. 357, 371 (2021) (explaining that the INA expressly distinguishes between credibility, persuasiveness, and the burden of proof). Additionally, asylum officers can certainly assess whether a "significant possibility" of eligibility exists based on "the credibility of the statements made by the alien" and "such other facts as are known to the officer." 8 U.S.C. § 1225(b)(1)(B)(v). As here, if the evidence available to the asylum officer is specific and reliable, and not rebutted by the alien's testimony upon questioning, it may be very difficult to rebut, reducing the possibility to less than "significant" that the alien would be able to produce outside rebuttal evidence of the strength required to prevail on his claim for relief.

### 3.    The Rules are not arbitrary or capricious.

"[T]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43. A reviewing court must be satisfied that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 43. The agency's decisions are entitled to a "presumption of regularity," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one," *id.* at 416. At bottom, arbitrary-and-capricious review asks only whether "the agency has acted within a zone of reasonableness." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

24

The DHS Bars final Rule easily meets that deferential standard. The Rule was promulgated based on several urgent and compelling considerations, including: (1) the need for DHS to more quickly remove aliens who represent national security or public safety threats; (2) the need for increased operational flexibility to allow asylum officers, whose hands were previously tied, to use their judgment to apply the bars in cases where the government's evidence is available at the credible fear or reasonable fear interview, instead of wastefully sending such cases to full adjudication; and (3) the need to unburden U.S. Immigration and Customs Enforcement ("ICE") and EOIR in cases where a negative fear determination can be made at the screening stage for an individual who would otherwise need to traverse the entire immigration court process. 89 Fed. Reg. at 41,351–55. To meet these goals, the DHS Bars final Rule allows asylum officers to consider certain security-related mandatory bars during credible fear screening interviews where it appears that such bars may be applicable to an alien. 8 C.F.R. § 208.30(e)(5)(ii). Such permissive consideration of these specific bars is rationally related to the goals set forth above and in the NPRM and final Rule. It allows for the removal of aliens who represent significant threats, allows for operational flexibility where asylum officers' hands were previously tied, and unburdens ICE and EOIR from having to process for removal proceedings aliens whose claims will ultimately be denied.

E.Q. does not argue that the DHS Bars final Rule fails to meet these goals or that it is not rationally related to them. Instead, he identifies what he calls an "incantation" he perceives to be a "false factual premise" that brings the entire Rule down. Mot. at 30. Specifically, he claims that DHS's reliance on the fact that in some cases there is "easily verifiable evidence" that an alien is subject to a bar is faulty because that specific phrase is not used in the regulatory text. *See* Mot. at 29–31. But his own argument is based on a faulty premise—that "the regulations instruct asylum

officers to consider mandatory bars whenever it 'appears' that one might apply." Mot. at 29 (quoting 8 C.F.R. §§ 208.30(e)(5)(ii), 208.31(c), 208.33(b)(2)(ii)). Not so. The Rule, as stated above, states that asylum officers "*may* consider the applicability of such bar(s)," thus providing asylum officers discretion. 8 C.F.R. § 208.30(e)(5)(ii). The preamble explains how DHS expects this discretion to be exercised—that is, where there is "easily verifiable evidence." 89 Fed. Reg. at 41,351. Thus, the Rule text does not in any way "conflict[]" with the preamble, as E.Q. claims. Mot. at 29.

E.Q.'s further assertions of problems with the DHS Bars final Rule's reasoning are likewise unavailing as they boil down to nothing more than disagreement with DHS's policy choices. *See Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 380 (D.C. Cir. 2013) ("This argument amounts to nothing more than another policy disagreement with CFTC, so we must reject it."). He claims that the security-related mandatory bars are not amenable to "adjudication in screening interviews" because aliens do not have "the benefit of evidence, counsel, or the procedural protections available in immigration court proceedings" and that "the bars are both legally and factually complex and have often lead to erroneous decisions even after full merits hearings conducted *with* the benefit of evidence and counsel." Mot. at 31. However, in making this claim, E.Q. ignores the lengthy and detailed responses to comments that the Defendants provided on these points in publishing the DHS Bars final Rule. *See* 89 Fed. Reg. at 103,372–404. Specifically, the DHS Bars final Rule addresses the concerns regarding aliens carrying the burden of proof, as well as E.Q.'s concerns regarding lack of legal representation or the ability to provide evidence, as provided in removal proceedings. *Id.* at 103,396, 103,374, 103,377–379. Further reading of the final Rule addresses concerns about erroneous denials by asylum officers, and states that asylum officers are instructed to develop the record and "ensure" an alien has a chance to

explain why a given bar does not apply. *Id.* at 103,373, 103,374–375. Here, E.Q.'s argument is less that DHS did not consider relevant evidence or provide adequate responses to concerns in developing the Rule than that E.Q. would have come to a different conclusion based on that evidence.

Regarding E.Q.'s circumstances, Defendants first note that he cannot challenge his own determination, as discussed previously, *see supra* at 10–11. Even if considered as illustrative, his discussion of his own screening determination mischaracterizes the facts. As he notes earlier in his motion, the asylum officer did not merely rely on database checks that identified him as a member of the Taliban but also the fact that he "worked for a place of work that gave material support to the Taliban." Mot. at 12. Membership in a terrorist organization and material support to a terrorist organization are two independent grounds for being ineligible under the terrorism provisions. *Compare* 8 U.S.C. § 1182(a)(3)(B)(i)(V) (membership in a terrorist organization), *with id.* § 1182(a)(3)(B)(i)(I) (has engaged in terrorist activity) *and id.* § 1182(a)(3)(B)(iv)(VI) (defining "engage in terrorist activity" to include providing material support). And far from not putting him on notice of concerns about his connections to the Taliban, *see* Mot. at 18, E.Q. states in his declaration that the asylum officer in his first interview asked him about his connections with the Taliban, E.Q. Decl. at ¶ 8.

Contrary to E.Q.'s claims, Mot. at 33, DHS did not "bury [its] head[] in the sand"—in its initial interview, the agency addressed head-on E.Q.'s cited concerns relating to the complexity of the security-related mandatory bars and whether that complexity made their consideration inappropriate. Indeed, DHS specifically rejected the assertion, based on the agency's experience and expertise in conducting screening interviews, stating:

> DHS rejects the assertion that the mandatory bars present issues that are inherently more complex than other issues that are regularly

> considered in screening interviews. While the Department acknowledges that certain issues in the consideration of mandatory bars can present complex factual and legal issues, it also believes that other issues routinely considered by AOs as part of a credible fear or reasonable fear determination, including, for example, the viability of certain particular social groups, whether certain types of harm rise to the level of persecution, complex issues surrounding the motivation of the persecutor, whether the noncitizen has provided credible testimony, and whether certain types of feared harm would constitute torture if carried out, also involve complex legal and factual determinations.

89 Fed. Reg. at 103,385. E.Q.'s disagreement based on argument does not compel this Court to rule against DHS's policy choice, which is supported by decades of experience conducting screening interviews as well as merits adjudications.

Finally, E.Q. is wrong in claiming that DHS did not "acknowledge and reasonably explain" its decision to change tack on whether to consider mandatory bars during credible fear screening interviews. Mot. at 34; *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (when an agency changes policy is must "display awareness that it is changing position" and "show that there are good reasons for the new policy"). In 2022, the Departments adopted a rule that declined to allow for the application of mandatory bars during credible fear screenings.[5] Contrary to E.Q.'s claim, the DHS Bars final Rule clearly acknowledges the departure from the 2022 policy: "DHS acknowledges that this rule implements a policy choice that is different from its position in 2022[.]" 89 Fed. Reg. at 103,386. The Rule also explains the reasoning behind DHS's deviation from the 2022 policy. *Id*. at 103,386–87. For example, DHS explains that, although the policy has changed, the reasoning for it is not inconsistent with its 2022 position and does not significantly

---

[5] *See Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 87 Fed. Reg. 18,078 (Mar. 29, 2022) (reversing regulations adopted by 2020 rule to consider mandatory bars during credible fear screenings) ("Asylum Processing IFR").

change the prior policy but now helps preserve the government's resources. *Id.* Because DHS acknowledged and reasonably explained the change in position, the Rule is neither arbitrary nor capricious.

### 4.    *E.Q.'s challenge to the Rules is moot.*

As the Supreme Court has stated, "[f]ederal courts are courts of limited jurisdiction. . . . It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). "Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990). The "'case or controversy' requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded." *Allen v. Wright*, 468 U.S. 737, 750 (1984). "To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (quotation marks omitted). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quotation marks omitted); *see also Am. Fed'n of Gov't Emps., Nat'l Council of HUD Locs. Council 222, AFL-CIO v. Fed. Serv. Impasses Panel*, 2020 WL 6709775, at *4 (D.D.C. Nov. 16, 2020) (explaining that a controversy must be in existence at all stages of review, and that a case must be dismissed as moot if an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the matter). A case that becomes moot at any point during the proceedings is no longer a 'Case' or 'Controversy' for purposes of Article III, and is outside the jurisdiction of the federal courts." *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018) (quotation marks omitted).

Thus, even if there is a live controversy when the case is originally filed, courts should refrain from deciding claims if "the requisite personal interest that must exist at the commencement of the litigation" is no longer present. *Arizonans for Official English*, 520 U.S. at 68 & n.22 (1997) (internal citations omitted).

First, as noted *supra* at 14–16, E.Q. has not been harmed by the Rules because the asylum officer in his credible fear interview denied his withholding of removal claim (the only claim potentially impacted by the Rules) on independent grounds that have nothing to do with the Rules' mandatory bars: namely, E.Q. failed to establish a reasonable probability of persecution because he could not establish the requisite nexus between his alleged and feared mistreatment in Afghanistan and a protected ground. *See* ECF No. 24-1 at 12, 25, 26 (indicating that E.Q. failed to establish the requisite nexus to qualify for withholding of removal); *id.* at 37 (explaining the asylum officer's reasoning). Thus, even from the moment this case was filed, there has not been an actual, ongoing case or controversy related to E.Q. and the Rules.

Second, if there was any doubt, in his credible fear follow-up interview, the asylum officer declined to apply the Rules to his case at all. ECF No. 24-2 at 14–15. Instead, the asylum officer simply found E.Q. to not be credible, and that E.Q. had not established a credible fear of persecution and torture. *Id.* 14–15, 63–65. In fact, in the written decision, the box an asylum officer would check to demonstrate that an applicant does not appear to be subject to a bar to asylum or withholding of review is checked. *Id.* at 15. Therefore, E.Q. has not been harmed by the Rules in his first or his latest credible fear interview, and there is no ongoing case or controversy.

Plaintiffs allege that the voluntary cessation exception to mootness applies and accuse Defendants of purposefully attempting to moot the case. Mot. at 21 ("Defendants' apparent attempt to generate mootness raises significant questions as to whether Defendants provided E.Q. with a

new CFI in good faith."). Of course, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle*, 455 U.S. 283, 289 (1982); *see Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 15 (D.C. Cir. 2019) (per curiam) (discussing the rationale for voluntary cessation as when a party decides to cease the challenged conduct and then argues the case is moot, the party may be trying to avoid judicial review only to restart that conduct once the case has been dismissed). But this exception to mootness does not apply here.

First, Defendants have not ceased the challenged conduct because Defendants continue to utilize the Rules at issue in this case.

Second, as established *supra* at 14–16, E.Q.'s first credible fear interview's result was not impacted by the Rules. In E.Q.'s first interview, the asylum officer denied his withholding of removal claim because he did not establish the requisite nexus between his alleged feared mistreatment and a protected ground. *See* ECF No. 24-1 at 12, 25–26. Therefore, E.Q.'s follow-up interview, which he alleges was performed to moot the case, does not moot his claims any more than his first interview already did. *See Alaska v. U.S. Dep't of Agric.*, 17 F.4th 1224, 1229 (D.C. Cir. 2021) (declining to apply the voluntary cessation exception when a federal agency granted a plaintiff an exemption from a challenged regulation and there was no plausible argument the agency had done so "to manipulate the judicial process"); *Monk v. Tran*, 843 F. App'x 275, 280 (Fed. Cir. 2021) (same where "[a]ppellants have made no claim […] of reasonable fear that the [defendant agency] is manipulating the system"). As such, E.Q. cannot demonstrate that the voluntary cessation doctrine applies, and his request for a stay based on the application of the Rules to his case are moot.

E.Q. fails to show that the May 2025 credible fear interview and review is a "legal nullity." *See* Mot. at 38–39. First, the Court cannot consider the legality of E.Q.'s follow-up credible fear determination or his expedited removal order on the ground he asserts. As explained, *see supra* at 10–11, there are only two types of challenges allowed in the context of expedited removal: (1) narrow habeas challenges where "the court's inquiry [is] limited to whether such an order in fact was issued and whether it relates to the petitioner" and not allowing "review of whether the alien is actually inadmissible or entitled to any relief from removal," 8 U.S.C. § 1252(e)(5); and (2) a challenge to the validity of regulations and written policies (but nothing else) in an action instituted in D.D.C. within 60 days after the regulation's or policy's first implementation, 8 U.S.C. § 1252(e)(3). Accordingly, even if E.Q.'s claims in his motion are factually correct, the Court cannot conclude that his removal order is a "legal nullity."

Second, regardless of the timing of the immigration judge's decision with respect to the vacatur of portions of the Securing the Border rule by *Las Americas Immigrant Advocacy Center. v. DHS*, — F. Supp. 3d —, 2025 WL 1403811 (D.D.C. May 9, 2025), E.Q. has not submitted any evidence showing that the immigration judge applied the Securing the Border rule's limitation on asylum eligibility as opposed to the presumption of asylum eligibility adopted by a different rule that is not currently enjoined or otherwise rendered invalid by court order—such as the rule Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2023) (codified at 8 C.F.R. § 1208.33). *See* 8 C.F.R. § 1208.35(b)(4) (providing that if the Securing the Border limitation is rendered inoperative by court order, the "reasonable probability" standard shall be applied to aliens screened under the Lawful Pathways provisions at 8 C.F.R. § 1208.33(b)(2)(ii)). Although he submitted the asylum officer's follow-up determination and related paperwork, *see* ECF No. 24-2, he did not submit the immigration judge's decision. And his attorney's declaration, *see* ECF No.

23-1, does not state that the immigration judge applied the Securing the Border rule's limitation on asylum eligibility. Accordingly, E.Q. has not established a necessary fact for his argument that the follow-up interview is a "legal nullity"—that is, that the Securing the Border limitation on asylum eligibility was applied to him after it was vacated in *Las Americas*.[6]

**B.    E.Q. has not satisfied the other requirements for a stay.**

The balance of harm and the public interest also weigh against injunctive relief here. A party seeking temporary injunctive relief (here a stay of removal) must demonstrate that "the balance of equities tilts in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). These factors merge here since the Government is the opposing party. *Nken*, 556 U.S. at 435.

When balancing the equities, the court should consider the government's interest in the aggregate, rather than with respect to each alien asserting harm. *Id.* at 435–36. That is because the government has an overarching interest in the prompt removal of aliens deemed to be here unlawfully. *Id.* Notably, delayed removal may be removal denied. Removal operations, especially to countries such as Afghanistan, entail delicate international negotiations, and those operations, once halted, have the significant potential of never resuming.

On the other hand, as the Supreme Court has explained, "[a]lthough removal is a serious burden for many aliens, it is not categorically irreparable, as some courts have said." *Id.* at 435. The Supreme Court reached that conclusion in a case where an alien argued he would face persecution if removed. *Id.* at 422–23 ("Nken claimed he had been persecuted in the past" and "would be subject to further persecution if he returns").

---

[6] EOIR is currently compiling the record for E.Q.'s May 9, 2025 credible fear review, *see* Exh. A (Decl. of Casey L. Martinez), and Defendants will submit the record once it is available on Monday, May 19, 2025.

In sum, the balance of harms thus favors denying Plaintiffs' stay motion.

## CONCLUSION

For these reasons, this Court should deny the request for an emergency stay of removal.

Dated: May 16, 2025

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

DREW C. ENSIGN
*Acting Deputy Attorney General*

ANTHONY P. NICASTRO
*Acting Director*

CHRISTINA P. GREER
*Senior Litigation Counsel*

*/s/ Cara E. Alsterberg*
CARA E. ALSTERBERG
*Senior Litigation Counsel*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
General Litigation & Appeals Section
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 532-4667
Email: Cara.E.Alsterberg@usdoj.gov

TARYN L. ARBEITER
SHELBY WADE
*Trial Attorneys*

*Counsel for Defendants*