**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

E.Q. *et al.*,

        Plaintiffs,

        v.

U.S. DEPARTMENT OF HOMELAND
SECURITY *et. al*,

        Defendants.

Case No.: 1:25-cv-00791

**PLAINTIFF E.Q.'S REPLY TO DEFENDANTS OPPOSITION TO HIS
<u>EMERGENCY</u> MOTION TO STAY REMOVAL**

**(Plaintiff E.Q. Faces Removal to Danger as Early as May 23, 2025)**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................. i

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................. 2

    I.     This Court has Authority to Stay E.Q.'s Removal Under the INA and the
           All Writs Act ........................................................................................... 2

    II.    E.Q. has Standing and His Claims Are Not Moot. ................................. 6

          A.    E.Q. Has Standing. ...................................................................... 6

          B.    E.Q.'s Claims Are Not Moot. ....................................................... 9

    III.   E.Q. Is Likely to Succeed on the Merits of His Claim. ......................... 13

          A.    The Mandatory Bars Rule is Arbitrary and Capricious. ........................ 13

          B.    The Mandatory Bars Rule is Contrary to Law ......................................... 16

               1.    The Rule Prevents Refugees from Applying for Asylum in
                    Violation of 8 U.S.C. § 1158. ..................................................... 16

               2.    The Rule Denies Asylum and Withholding of Removal
                    Based on a DHS Determination that a Mandatory Bar
                    "Appears" to Apply ..................................................................... 19

               3.    The Mandatory Bars Rule Undermines the Significant
                      Possibility Standard in the Expedited Removal Statute .............. 22

    IV.   The Other Stay Factors Favor E.Q. ......................................................... 23

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A.R.P. v. Trump*,
Nos. 24A1007, 24-1177, 605 U.S. ---, 2025 WL 1417281 (S. Ct. May 16, 2025) ................................................................................................4, 24

*Abrego Garcia v. Noem*,
No. 25-1404, 2025 WL 1135112 (4th Cir. Apr. 17, 2025) .......................................6

*Alaska v. USDA*,
17 F.4th 1224 (D.C. Cir. 2022) ..............................................................................11

*Aracely v. Nielsen*,
319 F. Supp. 3d 110 (D.D.C. 2018) ........................................................................25

*Capital Area Immigrants' Rights Coal. v. Trump*,
471 F. Supp. 3d 25 (D.D.C. 2020) ..........................................................................20

*Cherokee Nation v. U.S. Dep't of the Interior*,
643 F. Supp. 3d 90 (D.D.C. 2020) ...........................................................................9

*Cigar Ass'n of Am v. FDA*,
132 F.4th 535 (D.C. Cir. 2025) ..............................................................................16

*City & Cnty. of San Francisco v. E.P.A.*,
145 S. Ct. 704 (2025) ..............................................................................................21

*Clinton v. Goldsmith*,
526 U.S. 529 (1999) ...................................................................................................3

*Cnty of Los Angeles v. Davis*,
440 U.S. 625 (1979) ...................................................................................................9

*D.V.D., v. U.S. Dep't of Homeland Sec.*,
No. CV 25-10676-BEM, 2025 WL 1323697 (D. Mass. May 7, 2025) ...................25

*Del Cid Marroquin v. Lynch*,
823 F.3d 933 (9th Cir. 2016) .....................................................................................6

*Delta Constr. Co. v. E.P.A.*,
783 F.3d 1291 (D.C. Cir. 2015) .................................................................................9

*E. Bay Sanctuary Covenant v. Biden*,
683 F. Supp. 3d 1025 (N.D. Cal. 2023) ..................................................................20

*Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs.*,
    528 U.S. 167 (2000)........................................................................................9, 10

*Global Tel\*Link v. FCC*,
    866 F.3d 397 (D.C. Cir. 2017)........................................................................11

*Grace v. Barr*,
    965 F.3d 883 (D.C. Cir. 2020)........................................................................3, 15

*Huisha-Huisha v. Mayorkas*,
    560 F. Supp. 3d 146 (D.D.C. 2021)..................................................................4

*INS v. Elias-Zacarias*,
    502 U.S. 478 (1992).........................................................................................17

*INS v. Stevic*,
    467 U.S. 407 (1984).........................................................................................17

*J.G.G. v. Trump*,
    No. CV 25-766 (JEB), 2025 WL 890401 (D.D.C. Mar. 24, 2025) ...............4

*Judulang v. Holder*,
    565 U.S. 42 (2011)...........................................................................................15

*Kiakombua v. Wolf*,
    498 F. Supp. 3d 1 (D.D.C. 2020).................................................................2, 8, 9

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*,
    567 U.S. 298 .....................................................................................................1

*Las Americas Immigrant Advocacy Ctr. v. DHS*,
    --- F. Supp. 3d ---, 2025 WL 1403811 (D.D.C. May 9, 2025) ......................20

*Las Americas Immigrant Advocacy Ctr. v. Wolf*,
    571 F. Supp. 3d 1 (D.D.C. 2020)....................................................................9

*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011) ...........................................................................4

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024).........................................................................................18

*Louisiana v. Bondi*,
    5th Cir. No. 24-30359, Dkt .............................................................................22

*M.M.V. v. Garland*,
    1 F.4th 1100 (D.C. Cir. 2021).........................................................................1

*Make the Rd. N.Y. v. Wolf*,
  962 F.3d 612 (D.C. Cir. 2020) .......................................................................... 5

*Nat'l Wildlife Fed. v. E.P.A*,
  286 F.3d 554 (D.C. Cir. 2002) ........................................................................ 14

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................. *passim*

*O.A. v. Trump*,
  404 F. Supp. 3d 109 (D.D.C. 2019) ................................................................ 20

*Sugar Cane Growers Co-op. v. Veneman*,
  289 F.3d 89 (D.C. Cir. 2002) ....................................................................... 8, 9

*Ukrainian-Am. Bar Ass'n v. Baker*,
  893 F.2d 1374 (D.C. Cir. 1990) ..................................................................... 10

**Statutes**

8 U.S.C. § 1103(a)(1) ................................................................................... 20

8 U.S.C. § 1158 ....................................................................................... 16, 17

8 U.S.C. § 1225(b) ................................................................................ 8, 16, 19

8 U.S.C. § 1229a(b)(4)(B) ............................................................................. 23

8 U.S.C. § 1231(b)(3) ................................................................................ 16, 20

8 U.S.C. § 1252(e)(1) .................................................................................. 2, 3

8 U.S.C. § 1252(e)(2) .................................................................................... 11

8 U.S.C. § 1252(e)(3) ............................................................................. *passim*

All Writs Act ...................................................................................... *passim*

Homeland Security Act of 2002 ................................................................ 20, 21

INA .............................................................................................. 2, 4, 13, 20

Pub. L. 109-13, 119 Stat. 231 (2005) ............................................................. 21

**Other Authorities**

8 C.F.R. § 208.14 ....................................................................................... 21

8 C.F.R. § 208.16 ....................................................................................... 22

8 C.F.R. § 208.30 ....................................................................................................8

8 C.F.R. §§ 208.33 ..............................................................................................12

8 C.F.R. § 208.35 ................................................................................................12

8 C.F.R. § 1003.42(c) ............................................................................................7

87 Fed. Reg. 18078 (Mar. 29, 2022) ..................................................................22

89 Fed. Reg. 103378 .........................................................................7, 8, 14, 22

CBP One™ App (May 5, 2023), https://www.cbp.gov/newsroom/national-media-
    release/cbp-makes-changes-cbp-one-app .....................................................13

U.S. Department of State, Human Rights Report: Afghanistan (2023),
    https://www.state.gov/reports/2023-country-reports-on-human-rights-
    practices/afghanistan/ ..................................................................................24

## INTRODUCTION

Recognizing that the Mandatory Bars Rule cannot survive judicial scrutiny, Defendants have gone to great lengths to prevent this Court from reviewing it. After E.Q. filed this litigation and moved to stay his removal, Defendants unilaterally decided to provide him with a second Credible Fear Interview ("CFI") that conveniently reaches the same conclusion as the first (a negative determination) on grounds unrelated to the Mandatory Bars Rule. And despite purporting to have submitted a "Certified Administrative Record of E.Q.'s Credible Fear Review Proceedings" for the Court's review, Defendants have conspicuously declined to provide the Court with a copy of the decision from E.Q.'s first CFI or the Immigration Judge decision affirming it. To the extent that Defendants believe that these actions can insulate the Mandatory Bars Rule from review, they are mistaken.

As Defendants concede, the Court has jurisdiction over E.Q.'s claims because his timely challenge to the Mandatory Bars Rule is "a challenge on the validity of the [expedited-removal] system" under 8 U.S.C. § 1252(e)(3). The jurisdictional limitations of this statute are unique and, as a result, E.Q. is no ordinary litigant. His case is not a challenge to the merits of his individual removal order, but rather a claim for systemic relief: he seeks vacatur of unlawful regulations. And because challenges under 8 U.S.C. § 1252(e)(3) must be filed within 60 days after a policy is first implemented, *M.M.V. v. Garland*, 1 F.4th 1100, 1109 (D.C. Cir. 2021), no other noncitizen will ever be able to challenge the Mandatory Bars Rule while meeting the statutory mandate.

Given E.Q.'s unique position, this Court should be especially mindful of the Supreme Court's admonition that post-litigation "maneuvers designed to insulate a decision from review by [the] Court must be viewed with a critical eye." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307(2012). And as then-Judge Jackson noted, "[i]n the immigration context, courts have consistently recognized the compelling concern that an agency whose removal practices are

1

challenged in court can effectively insulate itself from judicial review by" issuing new decisions "and then arguing that the court thereby lacks jurisdiction over those plaintiffs' legal claims." *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 29 (D.D.C. 2020).

Defendants have not come close to showing that the Court lacks authority to stay E.Q.'s removal to avoid the irreparable harm that will result if he is removed to Afghanistan, where the ruling Taliban has already targeted him and his family. Nor have they demonstrated that E.Q. either lacked standing to bring this case, that he is otherwise unlikely to succeed on the merits, or that the other stay factors weigh in their favor.

Finally, this Court should not be swayed by Defendants' erroneous contention that, absent the Mandatory Bars Rule, Defendants will be required to place dangerous noncitizens "into lengthy removal proceedings to pursue their doomed claims while in the United States, placing the public at risk and potentially providing those [noncitizens] work authorization and other benefits notwithstanding their certain ineligibility for asylum." Opp. 2. Whether or not a person's asylum claim is "doomed" on mandatory-bar grounds is something that requires a full and fair process to determine, as the agency's reassessment of E.Q.'s own claim illustrates. Moreover, the Mandatory Bars Rule has nothing to do with detention or work authorization. Defendants have always had authority to detain individuals during removal proceedings before an Immigration Judge. Neither vacating the Rule nor staying E.Q.'s removal would change that.

## ARGUMENT

### I. This Court has Authority to Stay E.Q.'s Removal Under the INA and the All Writs Act.

Although Defendants concede that the Court has jurisdiction over this case under 8 U.S.C. § 1252(e)(3) (Opp. 10-11), they contend that 8 U.S.C. § 1252(e)(1)(A) bars this Court from entering a stay of removal (Opp. 11-12). That argument flies in the face of binding precedent. As

the D.C. Circuit has held, Section 1252(e)(1)(A) applies only to "action[s] pertaining to an order to exclude [a noncitizen] in accordance with" the expedited-removal statute, not to "a challenge on the validity of the expedited-removal system" brought under Section 1252(e)(3). *Grace v. Barr*, 965 F.3d 883, 907 (D.C. Cir. 2020) (cleaned up).[1] Because it is undisputed that this case is properly brought under Section 1252(e)(3), the limitation in § 1252(e)(1)(A) does not apply.

As the D.C. Circuit further held, "[t]his reading of section 1252(e)(1)(A) is confirmed by section 1252(e)(3)." *Id.* Section 1252(e)(3) does not "specifically authorize any relief," meaning that "were the government correct," Congress "would have expressly authorized the district court to review expedited-removal policies yet simultaneously prohibited it from issuing any remedies." *Id.* The D.C. Circuit also expressly rejected Defendants' contrary argument—that § 1252(e)(3) permits relief in the form of a "determination," Opp. 11—because a determination is "a decision, not a remedy." *Grace*, 965 F.3d at 907 (addressing and rejecting the government's attempt to distinguish between a determination and remedies as Defendants argue here).

Defendants argue that the All Writs Act cannot support a stay because (i) E.Q. is invoking the Act to expand this Court's jurisdiction; and (ii) a stay is available only where the existing statutory remedy is "clearly inadequate." Opp. 12-13. Both arguments fail.

Defendants are correct that the Act "confines the authority to the issuance of process 'in aid of' the issuing court's jurisdiction" and "the Act does not enlarge that jurisdiction." *Clinton v. Goldsmith*, 526 U.S. 529, 534-35 (1999). But this principle is irrelevant. As Defendants admit (Opp. 10), E.Q. challenges rules implementing expedited removal, and Section 1252(e)(3) explicitly provides the Court with jurisdiction. *See* Dkt. 23, Stay Mot. at 11-12 (collecting cases).

---

[1] Contrary to Defendants' contention (Opp. 11), nothing in the D.C. Circuit's opinion turns on the type of relief at issue; the court held that § 1252(e)(1)(A) does not apply "to the kind of challenge we face here," *Grace*, 965 F.3d at 907—a case under § 1252(e)(3).

E.Q. therefore does not rely on the All Writs Act as an independent basis for jurisdiction.

Rather, E.Q. seeks a stay of removal to preserve his practical ability to press this case and avoid irreparable harm. This remedy has routinely been granted in immigration cases. *See Nken v. Holder*, 556 U.S. 418, 434 (2009); *Leiva-Perez v. Holder*, 640 F.3d 962, 971-72 (9th Cir. 2011); *J.G.G. v. Trump*, No. CV 25-766 (JEB), 2025 WL 890401, at *16 (D.D.C. Mar. 24, 2025); *Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 174 (D.D.C. 2021), *aff'd in part, rev'd in part and remanded*, 27 F.4th 718 (D.C. Cir. 2022). Indeed, just days ago, the Supreme Court cited the All Writs Act in a case staying the removal of certain noncitizens, noting that Courts have "the power to issue injunctive relief to prevent irreparable harm to the applicants and to preserve our jurisdiction over the matter." *A.A.R.P. v. Trump*, Nos. 24A1007, 24-1177, 605 U.S. ---, 2025 WL 1417281, at *3 (S. Ct. May 16, 2025) (citing 28 U.S.C. § 1651).

With respect to the argument that the All Writs Act offers an "extraordinary" remedy, the parties agree that the Act comes into play only where other statutory remedies are "clearly inadequate." For the reasons discussed above, Plaintiffs' position is that nothing in the INA prevents this Court from issuing a stay of removal, and thus the Court can grant a stay of removal under the INA. Defendants, however, argue that "[Section] 1252 only recognizes the possibility of a stay of removal when issued by a court of appeals in the petition for review process provided for in § 1252(a)(1)." Opp. 11. Defendants' reading of Section 1252 is wrong. Nothing in Section 1252 outlines a scheme for stays of removal. Indeed, before the decision in *Nken*, the government's position had been that stays of removal were governed by Section 1252(f)(2). *Nken*, 556 U.S. at 426. The Supreme Court disagreed, finding that Section 1252(f)(2) did not apply to stay motions and instead looked to the "inherent authority" of courts and the All Writs Act. *Id.* That same logic applies here. Thus, even if the Court believes the traditional stay factors do not favor E.Q., a stay

under the All Writs Act—which does not turn on those factors—is appropriate.

Finally, as to the extraordinary nature of the stay of removal that E.Q. now seeks, Plaintiffs posit that the injury at issue here is at least as compelling as the "loss of millions of dollars" that prompted the D.C. Circuit to invoke the All Writs Act in the single case that Defendants cite. Opp. 12 (citing *In re NTE Conn., LLC,* 26 F.4th 980, 987 (D.C. Cir. 2022)). While removal to Afghanistan would not formally eliminate this Court's jurisdiction to consider E.Q.'s case, his removal will prevent E.Q. from participating in the litigation or benefiting from a positive decision in it. E.Q. has expressed a fear of harm at the hands of the Taliban, who would likely target him because —as Defendants have confirmed—his family member worked with the U.S. military and subsequently fled to the United States and obtained U.S. citizenship. Cowgill Decl. Ex. B (Dkt. 24-2) at 65. If E.Q. is returned to Afghanistan, it is likely that he will be arrested upon arrival or soon thereafter. If he is arrested by the Taliban, he faces torture and possible death. E.Q. cannot litigate this case in those circumstances. And given the jurisdictional limits in 8 U.S.C. § 1252(e)(3) and Defendants' likely position on the standing of the Organizational Plaintiffs,[2] if E.Q. cannot press this case, there may be no one else who can.

It is also unlikely that E.Q. would be able to benefit from a positive outcome in this case if he is removed to Afghanistan. Though the Supreme Court has recognized that a prevailing party in an immigration-related case can be returned to the United States following a successful appeal, *see Nken*, 556 U.S. at 435, that process is frequently unavailable. *See* ICE Policy Directive 11061.1 (Feb. 24, 2012) (setting forth ICE's policy to facilitate a noncitizen's return in certain limited

---

[2] Defendants' contention that only individuals may bring suits under Section 1252(e)(3), Opp. 16, is contrary to binding D.C. Circuit precedent. *See Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 627-28 (D.C. Cir. 2020) (associational standing). Plaintiffs do not discuss organizational standing further here because this motion involves only E.Q., not the Organizational Plaintiffs.

circumstances);[3] *Del Cid Marroquin v. Lynch*, 823 F.3d 933, 941 (9th Cir. 2016) (interpreting ICE's Return Directive). And, if E.Q. is alive but in the custody of the Taliban, the U.S. government will no doubt declare itself powerless to facilitate his return. *Cf. Abrego Garcia v. Noem,* No. 25-1404, 2025 WL 1135112, at *2 (4th Cir. Apr. 17, 2025) (U.S. government "disclaim[s] any authority and/or responsibility to return Abrego Garcia" despite Supreme Court affirmance of district court order directing the government to facilitate his return).

## II. E.Q. has Standing and His Claims Are Not Moot.

Defendants' contentions that E.Q. lacks standing, and that they have succeeded in mooting his claims, are baseless and simply confirm their objective to divest this Court of jurisdiction. Although Defendants rely heavily on the notion that E.Q.'s first CFI turned in part on a nexus-based denial, that notion cannot be squared with the record or with the plain text of the Rule. In any event, Defendants' arguments are irrelevant; E.Q. would have standing to challenge the procedural injury of having a CFI conducted under the auspices of the Rule even if Defendants were correct that the outcome of the CFI might not have been different. As to mootness, meanwhile, Defendants ignore binding D.C. Circuit precedent, concede that they continue to apply their unlawful policy, and in any event do not come close to meeting their burden of showing that E.Q. no longer has a live claim.

### A. E.Q. Has Standing.

Defendants contend that E.Q. lacks standing to challenge the Rule because he was supposedly denied relief in his first CFI based on *both* the Rule *and* an "independent finding[]" that his claim lacks the required nexus to a protected ground. Opp. 15. This argument fails because:

---

[3] Facilitating the Return to the United States of Certain Lawfully Removed Aliens, U.S. Immigration & Customs Enforcement (Fe. 24, 2012), https://www.ice.gov/doclib/foia/dro_policy_memos/11061.1_current_policy_facilitating_return. pdf.

(i) Defendants only communicated a single ground for denial of his first CFI (the mandatory bars), (ii) the Rule itself prohibits Defendants from denying on both grounds, and (iii) in any event, E.Q. would retain standing even if the asylum officer had denied relief on both grounds.

First, when issuing the decision denying E.Q.'s CFI, Defendants provided E.Q. with Form I-869SB, which contains multiple options for an asylum officer to check as the grounds for their determination. Here, the asylum officer checked a single box: "[t]here is no reasonable probability that you are not subject to one or more mandatory bars." Cowgill Decl., Ex. A (Dkt. 24-1), at 1. The officer did not check the box for negative nexus findings, which says "there is no reasonable probability the harm you experienced and/or the harm you fear is on account of" a protected ground. *Id.* And while the asylum officer's notes on the separate form I-870 discuss nexus concerns, (i) Defendants' own regulations confirm that "the asylum officer's negative credible fear determination [is] issued on the Form I-869, Record of Negative Credible Fear Finding and Request for Review" (8 C.F.R. § 1003.42(e)) and (ii) Defendants concede that Form I-869SB provided the summary of decision that the officer read to E.Q. at the conclusion of his CFI. Opp. 15 n.4; *accord* 89 Fed. Reg. 103378. This form is the only formal written notification E.Q. received of the CFI result, and it contained the basis for the adverse decision that he subsequently challenged before the Immigration Judge. *See* 89 Fed. Reg. 103378; Cowgill Decl., Ex. A (Dkt. 24-1), at 2.

While Defendants now claim that E.Q. failed his first CFI on multiple grounds, E.Q. would have had no reason to know of any nexus finding—or any possible way to challenge such a finding—during review before the Immigration Judge. To the extent Defendants truly intended to deny E.Q. on both grounds, their contrary representations to E.Q. nullified his ability to seek guidance before Immigration Judge review and to gather contrary evidence. *See* 8 C.F.R. § 1003.42(c). Having taken those actions, Defendants may not now evade review of the Mandatory

Bars Rule by disavowing the sole ground expressed to E.Q. as the basis for his denial.

Defendants' insistence that E.Q. was denied on both grounds is also not credible because the Mandatory Bar Rule prohibits asylum officers from issuing a denial on both nexus and mandatory bar grounds. The Mandatory Bars Rule provides that an asylum officer "may consider the applicability of [the mandatory] bar(s)" only "if [the noncitizen] is able to establish a credible fear of persecution." 89 Fed. Reg. at 103413; 8 C.F.R. § 208.30(e)(5)(ii) (2024). To show a credible fear of persecution, meanwhile, a noncitizen must show a significant possibility that the required nexus exists. 8 U.S.C. § 1225(b)(1)(B)(v); *see id.* §§ 1101(a)(42)(A) & 1158(b)(1)(A)). In other words, to reach the mandatory bars at all, the officer was required to make a positive finding as to nexus. Here, Defendants do not dispute that the asylum officer did reach the bars, which forecloses their post-hoc reliance on an alternative nexus finding.

But even if Defendants could establish denial on both grounds, E.Q. would still have standing to contest the Mandatory Bars Rule. Defendants concede that this case involves a procedural injury, Opp. 15-16, and under binding D.C. Circuit precedent, "[a] plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he received the [proper] procedure the substantive result would have been altered." *Sugar Cane Growers Co-op. v. Veneman*, 289 F.3d 89, 94 (D.C. Cir. 2002). Instead, "all that is necessary is to show that the procedural step *was connected to* the substantive result." *Id.* at 95. Plaintiffs who allege procedural harms "are not asking [the] Court to require DHS to reach any particular decision" but instead are "merely requesting that [the] Court order that the agency afford" them proper procedures. *Kiakombua,* 498 F. Supp. 3d at 26.

*Kiakombua*, in which then-Judge Jackson held that asylum seekers had standing to challenge policies applied in CFIs, is closely analogous. In both cases, an individual noncitizen

suffered the procedural injury of having an unlawful policy applied during a CFI. *See Kiakombua*, 498 F. Supp. 3d at 25. In both cases, the unlawful policy "was binding" at the time of the CFI. *Id.* at 26. And in both cases, the procedural harm "would be fully redressed by a court order" vacating the Rule and requiring new credible fear interviews in which the unlawful policy is not applied. *Id.* at 25. E.Q. thus satisfies the required connection for standing, as in *Kiakombua*.

Relying on the nexus finding, Defendants argue that the outcome of E.Q.'s CFI would not have changed absent the Mandatory Bars Rule. But Defendants have no factual basis to argue that the asylum officer's mistaken belief that E.Q. was a known terrorist played no role in his analysis of other facts. Moreover, Defendants' argument—*i.e.*, that the substantive result would not have been altered—is the precise argument foreclosed by the D.C. Circuit's opinion in *Sugar Cane Growers*. And while Defendants seek to overcome *Sugar Cane Growers* with language from other cases, those cases did not involve a procedural injury. *See Delta Constr. Co. v. E.P.A.*, 783 F.3d 1291, 1296-97 (D.C. Cir. 2015) (claimed injury of higher prices); *Cherokee Nation v. U.S. Dep't of the Interior*, 643 F. Supp. 3d 90 (D.D.C. 2020) (economic injuries from illegal competition). Defendants' entire argument thus "misconstrue[s] the relevant injury, which is *not* the substantive determination regarding [E.Q.'s] lack of a credible fear, but the asylum officer's application of the allegedly unlawful" procedure. *Kiakombua*, 498 F. Supp. 3d at 25; *accord Las Americas Immigrant Advocacy Ctr. v. Wolf*, 571 F. Supp. 3d 1, 22 (D.D.C. 2020) (K.B. Jackson, J.), *appeal dismissed*, No. 20-5386, 2024 WL 3632500 (D.C. Cir. Aug. 1, 2024) (Where there is an "alleged *procedural* violation," standing does not turn on "whether any of the individual Plaintiffs could have successfully established that they had a credible fear").

**B.  E.Q.'s Claims Are Not Moot.**

Defendants' burden of proving mootness "is a heavy one." *Cnty of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *accord Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs.*, 528 U.S.

167, 190 (2000) (describing mootness as a "formidable burden"). As Plaintiffs showed, E.Q.'s claims are not moot for three independent reasons: (1) he is subject to ongoing injury inflicted by the Mandatory Bars Rule, (2) his challenges are programmatic, and (3) the voluntary cessation exception to mootness applies. Stay Mot. 12-15.[4]

Defendants do not respond to the second of these arguments—that, under binding case law, a case that "challenges the Government's policy [and] not merely the Government's handling of" a particular individual does not become moot even if "the particular situation that precipitated" the challenge "is no longer 'live.'" *Ukrainian-Am. Bar Ass'n v. Baker*, 893 F.2d 1374, 1377 (D.C. Cir. 1990). That principle has particular force here because the statutory restrictions on claims under 8 U.S.C. § 1252(e)(3) mean that Plaintiffs' challenge is necessarily systemic and thus brought for the benefit of noncitizens who would otherwise be subject to the Rule in the future. This Court need go no further to conclude that this case is not moot.

The arguments that Defendants do make lack merit. As to voluntary cessation, Defendants' sole argument (aside from a repetition of their flawed claims about standing) is that they "have not ceased the challenged conduct because Defendants continue to utilize the Rules at issue in this case." Opp. 31. That simply proves that E.Q.'s claim is *not* moot.

Defendants argue that this Court lacks jurisdiction because in the second CFI, they did not find E.Q. subject to a mandatory bar. Opp. 30. That is a voluntary cessation argument that E.Q.'s claims are moot because they chose not to subject him to the Mandatory Bars Rule. But to show mootness on that basis, Defendants must "ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 189 (quotation omitted).

---

[4] Defendants' argument concerning the supposed "nexus" denial at the first CFI, Opp. 30, goes to standing rather than mootness and is addressed in section II.A above.

Far from doing so, Defendants have expressly stated that their wrongful behavior of using the Mandatory Bars Rule during CFIs continues. *See Global Tel*Link v. FCC*, 866 F.3d 397, 407 (D.C. Cir. 2017) (Where there is no evidence that the agency abandoned its policy, "[t]here is absolutely no basis for dismissing [the claims] as moot."). And although Defendants rely on *Alaska v. USDA*, 17 F.4th 1224 (D.C. Cir. 2022), that case involved a situation where the agency had unquestionably ceased its conduct: it had issued a new rule expressly reversing course. *Id.* at 1226.

Furthermore, *both* of E.Q.'s CFIs took place at times when the Mandatory Bars Rule governed. E.Q.'s procedural injury of being subjected to interviews governed by an unlawful rule therefore was not remedied by the second CFI. To be sure, Defendants used forms that *exclude* mandatory bars questions in the second CFI, *See* Cowgill Decl., Ex. B (Dkt. 24-2), at 1-2 (Form I-869SB that has no box for application of the mandatory bars). But Defendants' use of outdated forms—an act that violates their own governing regulations—merely informs Plaintiffs' contention that E.Q.'s second CFI was conducted for the purposes of generating an independent basis for his removal to facilitate arguments in this Court regarding jurisdiction and mootness. Defendants cannot have it both ways: If E.Q.'s claim does not remain live, it is because Defendants have manipulated the process to create that result.

For all these reasons, this Court need not engage with the details of E.Q.'s second CFI. But Defendants' arguments on that score are also unavailing. Defendants argue that this Court "cannot consider the legality" of the second CFI interview based on the jurisdiction-stripping provisions in 8 U.S.C. § 1252(e)(2) and (e)(5). Opp. at 32. However, as Defendants acknowledge, those provisions only prohibit the court from addressing the *merits* of an expedited removal order. *Id.* That is not what E.Q. is asking this Court to do. Although the adverse credibility finding in E.Q.'s second CFI is so baseless as to raise an inference that Defendants are proceeding in bad faith, *see*

Stay Mot. 30-31, E.Q. does not ask the Court to overturn that finding or even engage with it as a substantive matter at all. Rather, E.Q. argues that his second CFI determination is a legal nullity because it was made under a rule that was no longer in effect. Furthermore, E.Q. does so not to receive a holding invalidating the CFI, but to demonstrate one of many reasons why this Court continues to have jurisdiction over his claims. Nothing in Section 1252(e) bars the Court from reaching that jurisdictional determination.

Defendants also suggest that the vacatur of key provisions of the Securing the Borders Rule ("STB Rule") makes no difference because the Immigration Judge may have applied another rule, like the Circumvention of Lawful Pathways Rule ("CLP Rule"). Opp. 32. The record proves otherwise. The asylum officer inarguably applied the STB Rule to determine that E.Q. is ineligible for asylum. *See* Cowgill Decl., Ex. B (Dkt. 24-2), at 1 (informing E.Q. that he was barred by the STB rule); *id.* at 16-17 ("Securing the Border (SB) Limitation on Asylum Eligibility Worksheet" reflecting that E.Q. is subject to the asylum ban in the STB rule). The Immigration Judge purported to apply the CLP Rule instead but did not actually do so. Both the CLP Rule and the STB Rule bar most people from asylum unless they entered the United States pursuant to an appointment made using the CBP One app. The CLP Rule, however, contains various exceptions that are not present in the STB Rule. Neither the asylum officer nor the Immigration Judge considered those exceptions. *See* Cowgill Decl., Mot. Ex. B (Dkt. 24-2); Dkt. 26-1, at 3–4; 8 C.F.R. §§ 208.33(a)(1)-(2) & 208.35(a)(1)-(2).

That failure is significant because at least one of the exceptions present only in the CLP Rule could have made E.Q. eligible for asylum. Specifically, the CLP rule allows people who can demonstrate "that it was not possible to access or use the [CBP One app] due to *language barrier*, illiteracy, significant technical failure, or other ongoing and serious obstacle" to seek asylum. 8

C.F.R. § 208.33(a)(2)(ii)(B) (emphasis added). E.Q. does not speak, read, or write any of the five languages CBP One used (English, Spanish, Haitian Creole, Portuguese, or Russian).[5] But neither the asylum officer nor the Immigration Judge ever inquired about this exception, demonstrating that—regardless of which form order was used to affirm the asylum officer's fear determination—the Immigration Judge actually applied the vacated STB Rule. Opp. at 32. The result is that the second CFI determination is a legal nullity, and the first CFI determination—which turned on the application of the Mandatory Bars Rule—remains in place. E.Q.'s dispute with Defendants over the Mandatory Bars Rule therefore remains very much alive.

### III.    E.Q. Is Likely to Succeed on the Merits of His Claim.

E.Q. is likely to succeed on both his claim that the Mandatory Bars Rule is arbitrary and capricious and his claim that the Rule is contrary to various provisions of the INA.

#### A.    The Mandatory Bars Rule is Arbitrary and Capricious.

Plaintiffs showed that the Mandatory Bars Rule is arbitrary and capricious because it rests on the false factual premise that the Rule permits application of the mandatory bars only where "easily verifiable evidence" exists to show that a bar applies. The plain text of the Rule contains no such limitation. *See* Stay Mot. 22-24. Defendants do not dispute that the text of the Rule provides discretion to consider the mandatory bars in almost every case where they would be dispositive. Nor do they dispute that the "easily verifiable evidence" incantation is so central to the Rule's justifications that any such inconsistency would render the entire Rule arbitrary.

Instead, Defendants argue only that no inconsistency exists because the "preamble explains how DHS expects the discretion [provided by the Rule] to be exercised." Opp. 26. That argument

---

[5]    *See* CBP Makes Changes to CBP One™ App (May 5, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-makes-changes-cbp-one-app (listing languages available on CBP One).

mischaracterizes the preamble. The preamble says that "[t]his rule will allow [asylum officers] to, in their discretion, consider bars in the issuance of negative fear determinations *only where there is sufficient, easily verifiable evidence that a bar applies to a noncitizen*." 89 Fed. Reg. at 103378 (emphasis added). The preamble further says: "*the Rule instructs that* the [asylum officer] should only consider any possible mandatory bar … when there is easily verifiable evidence." *Id.* at 103385 (emphasis added). And the preamble says that, under its provisions, asylum officers "would determine whether there is easily verifiable information." *Id.* at 103387. The preamble even dismisses concerns that the Rule would be abused by "an overtly hostile anti-immigrant administration" by claiming not only that asylum officers "should" apply the Rule in limited circumstances but also that "discretion provided by the Rule is not unbounded." 89 Fed. Reg. at 1033830-84. These statements made in justifying the Rule address the scope of the Rule's text, not guidance concerning its application. The Rule is thus arbitrary and capricious because the Rule's justifications depend on a reading of the Rule that contradicts its plain text.[6]

The same conclusion would hold even if Defendants' characterization were correct. Statements in a preamble, even if construed as guidance on the application of the rule, are not binding and cannot narrow the plain text of the Rule itself. *See Nat'l Wildlife Fed. v. E.P.A*, 286 F.3d 554, 570 (D.C. Cir. 2002). Defendants therefore could not permissibly seek to justify the Rule, and dismiss concerns about the Rule's operation, based on the assumption that statements in the preamble mean that the Rule will consistently and forever be applied in only a subset of the situations authorized by its text.

This Court need go no further to hold that E.Q. is likely to succeed on the merits of his

---

[6] Defendants' argument is also inconsistent with their own practice. Defendants issue a variety of regular publications to provide training and guidance to asylum officers. Defendants cannot credibly suggest that they have, in this instance, provided guidance through the preamble instead.

claims. But the Rule is also arbitrary and capricious for at least three other reasons. *First*, it is undisputed that large parts of the preamble are contrary to the evidence before the agency because "commenters showed that the mandatory bars are not amenable to adjudications in screening interviews." Stay Mot. 24.[7]

*Second*, it is undisputed that Defendants were required to "address[ ] the comments that the bars *are too complex to be addressed fairly* in screening interviews without evidence or counsel." Stay Mot. 26 (emphasis added). Defendants failed to do so except by invoking the nonexistent "easily verifiable evidence" limitation, and their scattershot citation to discussions of other topics in the preamble, Opp. 27-28, cannot show otherwise. In particular, the paragraph stating that CFIs involve other complex issues, Opp. 28 (quoting 89 Fed. Reg. 103385), is unresponsive to the concern that considering *this* complex issue in CFIs would implicate serious fairness concerns.[8]

*Finally*, Defendants have not even begun to show that they complied with the APA's requirements when they reversed their position, most recently articulated in 2022, that CFIs should

---

[7] Contrary to Defendants' contention, Opp. 27, Plaintiffs' characterization of E.Q.'s CFIs, Stay Mot. 25-26, is accurate. Indeed, it is undisputed that Defendants conducted a second CFI in which no reference to the mandatory bars was made. It is also undisputed that, in the first CFI, Defendants placed the burden on E.Q. to negate the application of bars without providing any explanation of why they believed that bars applied. The fact that E.Q. was asked questions about the Taliban (i.e. the Afghan government), Opp. 27, simply highlights the problems with the Rule. A recently arrived, *pro se* noncitizen dealing with an interpreter who does not speak his language cannot be expected to connect questions about his work in Afghanistan with the nuances of the "material support" bar in U.S. immigration law.

[8] For example, Defendants may not create a situation where a noncitizen "appearing before one official may suffer deportation" and "an identically situated [noncitizen] appearing before another may gain the right to stay into the country." *Judulang v. Holder*, 565 U.S. 42, 58 (2011). That, "the Supreme Court has warned, is precisely 'what the APA's arbitrary and capricious standard is designed to thwart.'" *Grace v. Barr*, 965 F.3d 883, 900 (D.C. Cir. 2020) (quoting *Judulang*, 565 U.S. at 59). And pointing to the existence of other complicated questions does nothing whatsoever to address that concern.

not include consideration of mandatory bars. Stay Mot. 27. Although Defendants correctly flag

that they acknowledged this change in position, they do not and cannot dispute that the preamble

to the Rule fails to engage with several of the reasons underpinning their earlier position, much

less explain why those reasons no longer hold sway. *See id.* Similarly, although Defendants argue

that the preamble "reasonably explained" that their current policy is "not inconsistent with" their

position in 2022, Opp. 29, Defendants do not and cannot dispute that this supposed explanation

rests on the indefensible assumption that the Rule will be applied "only 'where the evidence is

clear.'" Stay Mot. 27 (quoting 89 Fed. Reg. at 103386). Nor do they argue that their claim of

consistency across time may reasonably be based on a false assumption. It may not, *Cigar Ass'n*

*of Am v. FDA*, 132 F.4th 535, 540 (D.C. Cir. 2025), and the Rule is arbitrary and capricious for

that reason as well.

### B.    The Mandatory Bars Rule is Contrary to Law

E.Q. is likely to show that the Mandatory Bars Rule is contrary to the asylum statute (8

U.S.C. § 1158), the withholding of removal statute (8 U.S.C. § 1231(b)(3)), and the significant

possibility standard for credible fear findings in expedited removal (8 U.S.C. § 1225(b)).

#### 1.    The Rule Prevents Refugees from Applying for Asylum in Violation of 8 U.S.C. § 1158.

Plaintiffs showed that the text and structure of the asylum statute, 8 U.S.C. § 1158, prohibit

consideration of the mandatory bars during screening interviews. Stay Mot. 16-18. Defendants

concede the key point: Section 1158(a) "generally allows that all [noncitizens] may apply for

asylum unless they" fall within one of the exceptions in § 1158(a)(2). Opp. 19. The Mandatory

Bars Rule, of course, prevents noncitizens from applying for asylum on grounds *not* listed in

Section 1158(a)(2) and not authorized by the statute. That is the end of the analysis.

Defendants argue that honoring the statutory distinction between the exceptions to the

16

ability to *apply for* asylum in Section 1158(a)(2) and the bars to *grants* of asylum in Section 1158(b)(2) "would require the Court to invalidate the entire expedited removal process." Opp. 19. Not so. Plaintiffs' argument is that credible fear interviews may consider only the specific topic specified in § 1225(b)(1)—"eligibility for asylum," *i.e.*, whether a person is a refugee—and, given that CFIs come before an asylum application, potentially the other exceptions to the right to apply for asylum enumerated in § 1158(a)(2).

Defendants' remaining argument turns on the fact that the expedited-removal statute defines "credible fear of persecution" by reference to eligibility for asylum. Defendants claim that is relevant because, in their view, the mandatory bars are part of asylum eligibility under Section 1158. But the Mandatory Bars Rule itself is to the contrary: it makes clear that the question whether a noncitizen has a "credible fear of persecution" is separate from the mandatory bars. *See* 8 C.F.R. § 208.30(e)(5)(i)-(ii). Furthermore, as Plaintiffs explained, the statutory term "eligibility for asylum" also does not incorporate the bars. Section 1158(b) concerns the "conditions for granting asylum." Eligibility for asylum is defined by § 1158(b)(1)(A) (the subsection titled "Eligibility"), which requires only that a noncitizen satisfy the definition of "refugee." Section 1158(b)(2), which contains the mandatory bars, is not part of that definition of eligibility. They are instead a set of "exception[s]" that prevent the grant of asylum to people who satisfy the eligibility criteria.

This is consistent with the Supreme Court's reading of Section 1158. In *INS v. Cardoza-Fonseca*, the Court said that "eligibility for asylum depends entirely on the Attorney General's determination that [a noncitizen] is a 'refugee.'" 480 U.S. 421, 427-28 (1987); *accord INS v. Stevic,* 467 U.S. 407, 423 n.18 (1984); *INS v. Elias-Zacarias*, 502 U.S. 478, 485 (1992). And although Congress has since amended the statute, it has not changed the definition of eligibility. Rather, as the statutory language indicates, Congress added the mandatory bars as ways "to

17

determine which, if any, eligible refugees should be denied asylum," a decision previously left entirely to the discretion of the executive branch. *Cardoza-Fonseca,* 480 U.S. at 444–45.

At a minimum, the statutory text is ambiguous on this point. Defendants' proposed reading of the statute, of course, receives no deference. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). And Plaintiffs have provided the best reading of the statute because only Plaintiffs' reading makes sense of the statutory structure. Defendants' view, on which the mandatory bars can be used to eliminate the right to apply for asylum, renders Congress's distinction between exceptions to the right to *apply* for asylum and bars to asylum *grants* entirely meaningless. Moreover, as Plaintiffs showed, Stay Mot. 17-18, the legislative history is anything but ambiguous: it makes entirely clear that a CFI is to focus on whether a noncitizen is a refugee.

The fact that Defendants never applied the mandatory bars in CFIs over the 29 years following Congress's passage of the expedited-removal statute similarly favors of Plaintiffs' reading of the statute and undermines Defendants' contention that "the Executive has always viewed the credible fear definition as allowing for consideration of statutory bars." Opp. 18. Although Defendants note that the government did not issue regulations explicitly clarifying that asylum officers could not apply the bars in CFIs "until 2000," that fact underscores Plaintiffs' point. Opp. 18. For the vast majority of the time since the mandatory bars were added in 1996, the government has formally taken the position that it may *not* consider the bars in CFIs. Indeed, the government took that position in less formal guidance even before 2000. On December 30, 1997, the Executive Associate Commissioner for Field Operations issued "Expedited Removal: Additional Policy Guidance," which specified that "[if] there is some evidence or concern that [a noncitizen] who meets the credible fear standard may be a security risk or subject to a terrorist bar," the noncitizen's "case should" nonetheless "be referred for a [full] removal hearing" in

immigration court. 75 NO. 7 Interpreter Releases 255 (available on Westlaw).

**2.**      **The Rule Denies Asylum and Withholding of Removal Based on a DHS Determination that a Mandatory Bar "Appears" to Apply.**

Plaintiffs showed that the Mandatory Bars Rule violates the asylum and withholding-of-removal statutes in two additional ways: by allowing claims to be denied on the basis of predictions that the bars *might* apply, and by allowing DHS employees to make those predictions. Stay Mot. 18-19. Defendants' responses on both points are unavailing.

*First*, *b*y allowing negative fear findings based on predictions that the mandatory bars *might* apply, the Mandatory Bars Rule violates the statutory language permitting denials of relief only "if the Attorney General *determines* that" a bar applies. 8 U.S.C. § 1158(b)(2)(A) (asylum) (emphasis added); *id*. § 1231(b)(3)(B) (withholding of removal); *see* Stay Mot. 18-19. Defendants' opposition effectively concedes this point: Defendants admit that denials under the Mandatory Bars Rule are based on a finding of "a sufficient likelihood that" a bar would apply rather than a determination that a bar *actually* applies. Opp. 21. And Defendants' reliance on procedures in full removal proceedings, *id.*, misses the point. No matter the process that leads up to a decision in those proceedings and no matter who bears the burden, an Immigration Judge then makes a determination that a bar does or does not apply. That, unlike the predictive determination in the Mandatory Bars Rule, is precisely what the statutes require. Defendants' remaining argument, that the "screening standard" in 8 U.S.C. § 1225(b) somehow trumps the plain language of the asylum and withholding-of-removal statute, Opp. 21-22, simply rehashes their erroneous contention that Congress intended the consideration of "eligibility for asylum" in CFIs to include the mandatory bars. *See supra* pp. 16-17.

Importantly, Defendants' contention that § 1225(b) "is silent regarding the nature and availability of" withholding of removal, Opp. 17, is better understood to reflect Congress' view

that these screening interviews were entirely irrelevant to the assessment of withholding of removal, which is a form of mandatory protection available whenever a judge determines that a person qualifies. *See* 8 U.S.C. § 1231(b)(3); *INS v. Aguirre-Aguirre*, 526 U.S. 415, 419 (1999). The fact that claims for withholding of removal have recently been addressed in the credible fear process, which was intended to cover *only* asylum, is a reflection of administrative efforts beginning in 2018 to narrow asylum access in ways that are contrary to Congressional intent and that have been repeatedly invalidated by Courts. *See, e.g.*, *Las Americas Immigrant Advocacy Ctr. v. DHS*, --- F. Supp. 3d ---, 2025 WL 1403811 (D.D.C. May 9, 2025); *E. Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025 (N.D. Cal. 2023), *vac'd for consideration of new developments,* 15 F.4th 545 (9th Cir. Apr. 10, 2025); *Capital Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020); *O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019)*.*

*Second*, the Mandatory Bars Rule permits these predictive judgments to be made by DHS employees even though the asylum and withholding statutes expressly place determinations about the bars in the sole purview of the Attorney General. *See* Stay Mot. 22. Defendants' contrary contention is based on the Homeland Security Act of 2002 ("HSA"), under which some references to the Attorney General in the INA are now read to also refer to the Secretary of Homeland Security. *See* Opp. 22. But the HSA did not transfer *all* powers to DHS. Instead, the Secretary was charged with implementing the INA "except insofar as [the immigration laws] relate to the powers, functions, and duties conferred upon" other officials, including "the Attorney General." 8 U.S.C. § 1103(a)(1). And the HSA retained for the Attorney General any "authorities and functions . . . relating to the immigration and naturalization of [noncitizens] as were exercised by the Executive Office for Immigration Review" in 2002. *Id.* § 1103(g)(1).

That carve-out is dispositive. In 2002, when DHS was created, asylum officers were

prohibited from applying the mandatory bars to noncitizens in removal proceedings. This authority was exercised at that time exclusively by Immigration Judges in the Department of Justice. Accordingly, that authority did not transfer to, and cannot be exercised by, DHS.

In any event, three years after it passed the HSA, Congress passed the Real ID Act. *See* Pub. L. 109-13, 119 Stat. 231 (2005). That statute amended § 1158(b)(1)(A), the paragraph on eligibility for asylum, by "striking 'the Attorney General' . . . and inserting "the Secretary of Homeland Security or the Attorney General." At the same time, Congress also amended Section 1158(b)(2), the paragraph on the mandatory bars, but did *not* add the Secretary of Homeland Security to the list of those able to make determinations about the mandatory bars. And where, as here, "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *City & Cnty. of San Francisco v. E.P.A.*, 145 S. Ct. 704, 713–14 (2025) (quotation omitted).

Defendants argue Plaintiffs' reading of the statute is "illogical" because it would mean that, while either asylum officers or Immigration Judges could grant asylum, an asylum seeker "who applies for asylum affirmatively before asylum officers could never be denied asylum on a security ground." Opp. at 22. But that is precisely how the affirmative asylum application process works. There, a person not in removal proceedings applies for asylum with the Asylum Office in the first instance, and the officer may grant asylum but *may not* deny the claim on any basis, including the mandatory bars. Rather, the asylum officer must refer the case to the immigration court for *de novo* adjudication. 8 C.F.R. § 208.14(c)(1). The only scenario where the Asylum Office may deny an affirmative asylum claim on any ground is when the applicant has some form of lawful immigration status when the Asylum Office makes its decision, such that the immigration court

would not be able to exercise jurisdiction over the applicant. 8 C.F.R. § 208.14(c)(2). In every case that begins in the affirmative asylum process, then, it is DOJ rather than DHS that makes the final determination that a mandatory bar applies. Thus, far from being "illogical," Plaintiffs' reading of the statute reflects Defendants' own longstanding practice. The same is true of withholding of removal. Asylum officers generally may not consider the merits of those claims at all. *See* 8 C.F.R. § 208.16.[9]

### 3.    The Mandatory Bars Rule Undermines the Significant Possibility Standard in the Expedited Removal Statute.

The Mandatory Bars Rule permits asylum officers to "consider the applicability" of bars to eligibility for asylum or withholding of removal if a person "appears to be subject to" such a bar. See 89 Fed. Reg. at 103413-14. Based on that "appearance" alone, the Rule then shifts the burden to the applicant—who is very likely to be detained and lack counsel or access to documents—to prove a negative: that the bar does not apply. This violates the expedited-removal statute by creating a situation where documentary evidence is necessary and by implicitly raising the low screening standard Congress intended to apply in CFIs. Stay Mot. 19-21. And while Defendants contend that "the rule does not require [noncitizens] to prove a negative," Opp. 23, it clearly does. In Defendants' own words, the burden shifts to the noncitizen to demonstrate "a significant possibility that, in a proceeding on the merits, the [noncitizen] would be able to establish by a preponderance of the evidence that such bar(s) do not apply." *Id*.

Defendants contend that this burden-shifting framework is not problematic because, *in full removal hearings*, the government can shift the burden to the noncitizen "[i]f the evidence

---

[9] Defendants promulgated a rule in 2022 that changed this practice in limited circumstances not relevant here. *See* 87 Fed. Reg. 18078 (Mar. 29, 2022). That Rule was challenged by two groups of states and is not currently in use. *See Louisiana v. Bondi*, 5th Cir. No. 24-30359, Dkt .71, at 2; *see id. D*kt. 78 (order granting stay because Defendants are "actively considering rescinding or modifying" the rule in question).

indicates that one or more grounds for mandatory denial of the application for relief *may* apply." Opp. 21. This is true, but Defendants' argument misses the point completely. In a full removal hearing, the applicant has access to counsel and the opportunity to collect rebuttal evidence *before* the burden ever shifts. Applicants also have a procedural right "to examine the evidence" used against them and "cross-examine witnesses presented by the Government" before a judge makes an *actual determination* as to whether the mandatory bars apply. 8 U.S.C. § 1229a(b)(4)(B).

In the CFI context, in contrast, the applicant has no opportunity to consult with counsel or obtain evidence necessary to rebut a mandatory bar, and indeed no opportunity to know and confront the evidence that will be used against them before it is actually used. E.Q.'s own hearing illustrates this reality. Asking E.Q. questions about the Taliban (through an interpreter speaking the wrong language) could not tell E.Q. that the asylum officer had concerns about the application of specific bars foreign to E.Q. It also could not tell E.Q. that the asylum officer had found someone with the same or a similar name in an opaque government database. And the asylum officer did not even pretend to ask E.Q. questions that might have elicited testimony showing that E.Q. was *not* subject to the bar.[10]

The credible fear interview is meant to be a threshold screening tool and not a final assessment on the merits of an individual's application for asylum or withholding of removal. E.Q.'s case itself is an apt demonstration of how the Rule runs contrary to the Congressional intent behind the credible fear process.

### IV. The Other Stay Factors Favor E.Q.

Defendants' responses on the remaining *Nken* stay factors—irreparable harm, the balance

---

[10] In light of Defendants' complete retreat from the mandatory bars finding in the CFI, their unsupported claim that the evidence on which the asylum officer relied was "specific and reliable," Opp. 24, is farcical. *See also* Stay Mot. 5 n.4.

of harms, and public interest—are unpersuasive. Opp. at 33–34. On the question of irreparable harm, E.Q.—who previously fled for his life after the Taliban threatened him—faces a serious risk of persecution or death if removed to Afghanistan, where the Taliban-controlled government and its forces have regularly "killed persons in retaliation for their association with the pre-August 2021 government."[11]

Defendants' response fails to address these concerns at all, instead merely repeating the statement that, while "removal is a serious burden for many [noncitizens], it is not categorically irreparable." Opp. at 33 (citing *Nken*, 556 U.S. at 435). Regardless of whether removal in and of itself is categorically irreparable for *many* noncitizens, E.Q. has demonstrated why upon *his* removal to Afghanistan, *he* faces immediate and catastrophic imprisonment, torture, or death at the hands of the Taliban that would constitute irreparable harm. Similarly, Defendants also fail to respond to E.Q.'s showing that he will be unable to return to the United States even if he is eventually successful in this litigation and survives his removal to Afghanistan. *See* Stay Mot. at 28–29; *see also A.A.R.P. v. Trump*, 2025 WL 1417281, at *2 (noting that "detainees' interests at stake are accordingly particularly weighty" where the "Government has represented elsewhere that it is unable to provide for the return of an individual deported in error to a prison . . . where it is alleged that detainees face indefinite detention"). These omissions reflect Defendants' wholesale inability to seriously engage with the life-or-death, irreparable harm that E.Q. faces upon his removal to Afghanistan. E.Q., meanwhile, merely seeks to preserve the status quo by staying his removal and preventing this irreparable harm while the Court considers the merits of his claims.

Defendants likewise miss the mark in their arguments on the public interest and the balance of harms. Defendants speculate that "delayed removal may be removal denied" because "[r]emoval

---

[11]    U.S. Department of State, Human Rights Report: Afghanistan (2023), https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/afghanistan/.

operations, especially to countries such as Afghanistan, entail delicate international negotiations, [which] . . . once halted, have the significant potential of never resuming." Opp. at 33. This Court should not treat seriously Defendants' factually unsupported suggestion that they will never be able to remove E.Q. at all if they do not remove him now. Additionally, given Defendants' increasingly aggressive attempts to remove noncitizens, including unlawful removals to third countries, it is difficult to imagine that Defendants would simply abandon their efforts to remove E.Q. if they ultimately prevailed in this litigation. *See e.g.*, *D.V.D., v. U.S. Dep't of Homeland Sec.*, No. CV 25-10676-BEM, 2025 WL 1323697, at *1 (D. Mass. May 7, 2025) (blocking the Government's attempted removal of noncitizens to third countries, including Libya and Saudi Arabia).

The public interest, meanwhile, is served "when administrative agencies comply with their obligations" to follow the law, as E.Q. is seeking through this litigation. *Aracely v. Nielsen*, 319 F. Supp. 3d 110, 156 (D.D.C. 2018). All of the *Nken* factors therefore favor a stay, and this Court should stay E.Q.'s removal pending the outcome of this litigation.

## CONCLUSION

For the foregoing reasons and the reasons stated in the original motion, E.Q.'s removal from the United States should be stayed during the pendency of this case.

Dated: May 20, 2025                               Respectfully Submitted,

*/s/ Jared A. Levine*                                  Keren Zwick (D.D.C. Bar. No. IL0055)
Jared A. Levine (admitted *pro hac*)          Colleen Cowgill*
Joachim Steinberg*                                    Fizza Davwa*
CROWELL & MORING LLP                        NATIONAL IMMIGRANT JUSTICE CENTER
375 9th Ave, 44th Floor                             111 W. Jackson Blvd., Suite 800
New York, NY 10001                                 Chicago, IL 60604
(212) 223-4000                                         (312) 660-1370
JLevine@crowell.com                               kzwick@immigrantjustice.org
JSteinberg@crowell.com                           ccowgill@immigrantjustice.org

Judy He (admitted *pro hac*)
Jeremy Iloulian*
Jung Shin (admitted pro hac)
CROWELL & MORING LLP
455 N Cityfront Plaza Dr #3600,
Chicago, IL 60611
(312) 321-4200
JHe@crowell.com
JIloulian@crowell.com
JShin@crowell.com

Richard Caldarone (D.C. Bar No. 989575)
REFUGEE & IMMIGRANT CENTER FOR
EDUCATION AND LEGAL SERVICES
P.O. Box 786100
San Antonio, TX 78278
(210) 960-3206
richard.caldarone@raicestexas.org

Peter Alfredson (D.C. Bar No. 1780258)
AMICA CENTER FOR IMMIGRANT RIGHTS
1025 Connecticut Ave. NW, Suite 701
Washington, DC 20036
(202) 899-1415
peter@amicacenter.org

Anwen Hughes*
Human Rights First
75 Broad St., 31st Fl.
New York, NY 10004
(212) 845-5244
HughesA@humanrightsfirst.org

fdavwa@immigrantjustice.org

Melissa Crow (D.C. Bar. No. 453487)
CENTER FOR GENDER & REFUGEE STUDIES
1121 14th Street, NW, Suite 200
Washington, D.C. 20005
(202) 355-4471
crowmelissa@uclawsf.edu

Anne Peterson
 CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister Street
San Francisco, California 94102
T: 415.610.5729
petersonanne@uclawsf.edu

Robert Pauw
CENTER FOR GENDER & REFUGEE STUDIES
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
(206) 682-1080
rpauw@ghp-law.net

*Certificate of pro bono representation or pro hac vice forthcoming