UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **E.Q., et al.**,<br><br>Plaintiffs,<br><br>v.<br><br>**U.S. DEPARTMENT OF HOMELAND SECURITY, et al.**,<br><br>Defendants. | Case No. 25-cv-791 (CRC) |

## MEMORANDUM OPINION AND ORDER

This case highlights a central tension in U.S. immigration law: balancing the need for efficient removal of individuals who are unlawfully in the country against the obligation to fairly consider claims for humanitarian protection. The process of expedited removal, for example, allows immigration officers to deport certain noncitizens without a full hearing, but if a noncitizen expresses fear of returning to his home country, he must first undergo a screening interview to determine if he has a credible fear of persecution or torture in his home country and therefore qualifies for asylum or related protection.

In a recent attempt to streamline expedited removal even further, the Department of Homeland Security ("DHS") issued a rule that allows immigration officers to consider, during credible-fear screening, whether the noncitizen is subject to certain mandatory bars to eligibility for asylum or related protection. Plaintiff E.Q. is a noncitizen who entered the United States illegally across the southwest border and sought asylum protection. But he received a negative initial determination based on his failure to establish a reasonable probability of persecution and the application of two mandatory bars. Facing removal, he joined with three immigrants' rights organizations to challenge the rule allowing for consideration of mandatory bars during

screening. He then moved to stay his removal while the case is litigated. Because E.Q.'s injury appears neither traceable to the challenged rule nor redressable by an order of this Court, he likely lacks standing. The Court will therefore deny his motion. In so ruling, the Court expresses no opinion on the organizational plaintiffs' standing.

**I.   Background**

  A.  Statutory Background

The Court will begin with a brief overview of the three main protections from removal for noncitizens who fear persecution in their countries of origin: asylum, withholding of removal, and protection under the regulations implementing the United States's obligations under Article 3 of the Convention Against Torture ("CAT"). It will then explain how these claims are adjudicated in expedited-removal proceedings.

  *1. Asylum*

"Asylum . . . permits the executive branch—in its discretion—to provide protection to aliens who meet the international definition of refugees." E. Bay Sanctuary Covenant v. Trump, 932 F.3d 742, 757 (9th Cir. 2018) (citing 8 U.S.C. § 1158). Under the Immigration and Nationality Act ("INA"), Pub. L. No. 82-414, 66 Stat. 163 (codified as amended at 8 U.S.C. §§ 1, et seq.), noncitizens who are physically present in or who arrive in the United States generally may apply for asylum.[1]  8 U.S.C. § 1158(a).

---

[1] There are three exceptions to who may apply for asylum: Noncitizens who (1) may be removed to a safe third country with which the United States has a qualifying agreement, (2) did not apply within one year of arriving in the United States, or (3) have previously been denied asylum cannot apply. 8 U.S.C. § 1158(a). And "there are two exceptions to the exceptions: The one-year and previous-denial exclusions may be waived if an alien demonstrates changed circumstances or extraordinary circumstances, and the safe third country and one-year exclusions do not apply to unaccompanied children." E. Bay Sanctuary Covenant, 932 F.3d at 758 (citation modified) (first quoting 8 U.S.C. § 1158(a)(2)(D); and then quoting 8 U.S.C. § 1158(a)(2)(E)).

To receive asylum, a noncitizen must be a "refugee" within the meaning of the INA and must not be subject to a "mandatory bar." Id. § 1158(b). For purposes of the INA, a "refugee" is an individual who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. § 1101(a)(42)(A). A noncitizen bears the burden of proving that one of these protected grounds "was or will be at least one central reason" for persecuting him. Id. § 1158(b)(1)(B)(i). An asylum applicant can satisfy this burden with testimony alone, "but only if" he "satisfies the trier of fact that [his] testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." Id. § 1158(b)(1)(B)(ii). An asylum applicant who meets the statutory definition of a refugee will still be ineligible if he is subject to any one of six mandatory bars because he: (1) has persecuted others, (2) has been convicted of a particularly serious crime, (3) has committed a serious nonpolitical crime outside the United States, (4) poses a threat to national security, (5) has engaged in terrorist activity, or (6) has already firmly resettled in another country. Id. § 1158(b)(2)(A) (the mandatory bars).

Even for those who establish refugee status and are not subject to a mandatory bar, there is no entitlement to asylum relief. Asylum is discretionary, and the decision to grant it is left to the Attorney General. Id. § 1158(b)(1)(A); INS v. Cardoza-Fonseca, 480 U.S. 421, 444 (1987) ("[T]hose who can only show a well-founded fear of persecution are not *entitled* to anything, but are *eligible* for the discretionary relief of asylum.").

### 2. *Withholding of Removal*

Next, withholding of removal. The applicable statute prevents an alien's removal to a country if "the Attorney General decides that the alien's life or freedom would be threatened in

that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A)). "The bar for withholding of removal is higher [than for asylum]; an applicant must demonstrate that it is more likely than not that he would be subject to persecution on one of the grounds." Ling Huang v. Holder, 744 F.3d 1149, 1152 (9th Cir. 2014) (citation modified). Once that higher threshold is met, however, withholding of removal is mandatory.

Withholding of removal is subject to the same mandatory bars as asylum, except for the firm-settlement bar.

### 3. *CAT Protection*

Finally, an alien is eligible for CAT protection if "the alien is more likely than not to be tortured in the country of removal." 8 C.F.R. § 208.16(c)(4). A noncitizen who meets this standard may either be granted withholding of removal, which is analogous to statutory withholding of removal (and therefore subject to the same mandatory bars), or deferral of removal. Id.

### 4. *Expedited Removal and Credible-Fear Screening*

An asylum claim may be raised in three contexts: in an affirmative application for asylum, see id. § 208.1(a)(1); 8 U.S.C. § 1158(a)(1); as a defense in full removal proceedings conducted pursuant to 8 U.S.C. § 1229(a), see 8 U.S.C. § 1229a(c)(4); 8 C.F.R. § 208.2(b); and as a defense in expedited-removal proceedings, see 8 U.S.C. § 1225(b)(1)(A)(i); 8 C.F.R. § 208.30(f). This case involves the processing of an asylum claim in expedited-removal proceedings.

Congress created the expedited-removal process in 1996 as part of the Illegal Immigration Reform and Immigrant Responsibility Act "to substantially shorten and speed up

the removal process." Make The Rd. N.Y. v. Wolf, 962 F.3d 612, 618 (D.C. Cir. 2020). Under the expedited-removal statute, noncitizens without proper documentation who arrive in the United States or have been in the United States continuously for less than two years are removable "without further hearing or review"—unless they indicate an intent to apply for asylum. 8 U.S.C. § 1225(b)(1)(A)(i),(iii)(II). Once a noncitizen expresses such an intent or fear, he must receive a "credible fear interview" with an asylum officer, who screens for asylum, withholding of removal, and CAT eligibility. Id. § 1225(b)(1)(A)(ii); Las Americas Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec., No. CV 24-1702 (RC), 2025 WL 1403811, at *2 (D.D.C. May 9, 2025)

If the asylum officer determines that the alien has a "credible fear of persecution," defined as "a significant possibility . . . that the alien could establish eligibility for asylum under section 1158[,]" the alien is taken out of the expedited-removal process and placed into full removal proceedings for adjudication of his claims for asylum and other forms of protection from removal. 8 U.S.C. § 1225(b)(1)(B)(ii),(v). If the officer determines that the noncitizen does not have a credible fear of persecution, the noncitizen may seek review of that decision by an immigration judge. Id. § 1225(b)(1)(B)(iii)(III). If the immigration judge affirms the determination, the noncitizen may be removed from the United States without further hearing or review. Id. § 1225(b)(1)(B)(iii)(I).

B. Regulatory Background

In the waning months of the Biden Administration, DHS issued a new rule applicable to credible-fear interviews ("the Mandatory Bars Rule"). The Mandatory Bars Rule was issued after notice and comment, 89 Fed. Reg. 41,347, and took effect on January 17, 2025, id. at

5

103,370.  In short, it allows asylum officers to consider the applicability of the mandatory bars to asylum and withholding of removal during credible-fear screening interviews.

More specifically, it provides:

> An alien will be found to have a credible fear of persecution if there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act, including that the alien is not subject to a mandatory bar, if considered under paragraph (e)(5)(ii) of this section.

8 C.F.R. § 208.30(e)(2).  Paragraph (e)(5)(ii) further explains:

> If an alien, who is unable to establish a credible fear of torture, is able to establish a credible fear of persecution but appears to be subject to one or more of the mandatory bars to being granted either asylum or withholding of removal, as set forth in section 208(b)(2)(A)(i) through (v) of the Act or section 241(b)(3)(B) of the Act, respectively, the asylum officer may consider the applicability of such bar(s) as part of the asylum officer's credible fear determination.
>
>> (A) The asylum officer shall issue a negative credible fear finding with regard to the alien's eligibility for asylum or withholding of removal under the Act if the asylum officer determines there is not a significant possibility that, in a proceeding on the merits, the alien would be able to establish by a preponderance of the evidence that such bar(s) do not apply.
>>
>> (B) The asylum officer shall issue a Notice to Appear or retain jurisdiction over the alien's case for further consideration of the alien's claim pursuant to paragraph (f) of this section, if the asylum officer finds that there is a significant possibility that, in a proceeding on the merits, the alien would be able to establish by a preponderance of the evidence that such bar(s) do not apply.

Id. § 208.30(e)(5)(ii).  A companion rule ("EOIR Companion Rule") clarified that an immigration judge's de novo review of an asylum officer's credible-fear determination extends to review of a mandatory bar's application.  89 Fed. Reg. 105,392, 105,402.

C.  Factual and Procedural Background

Plaintiff E.Q. is a native and citizen of Afghanistan who entered the United States illegally across the southwest border on January 16, 2025.  Compl. ¶ 11; ECF 23 ("Renewed

6

Mot.") at 1.; ECF 25 ("Opp'n") at 6; ECF 24-1 (First Credible-Fear Interview Record ("First CFI Record")) at 21 (page numbers designated by CM/ECF). He was apprehended, determined inadmissible because he did not possess a valid entry document, and, after requesting asylum, referred for a credible-fear interview. Opp'n at 6; First CFI Record at 2, 7.

    *1. E.Q.'s First Negative Credible-Fear Determination*

E.Q. underwent an initial credible-fear interview on February 4, 2025. Renewed Mot. at 4. During that interview, E.Q. stated that he fled Afghanistan in 2024 after the Taliban raided his home and accused him of being an "American spy." Renewed Mot. at 4. E.Q. believed he was targeted because one of his relatives worked with the U.S. military. Id. He also testified that, before leaving Afghanistan, he had worked for ▮▮▮▮▮▮ that served members of the Taliban, though he claimed he had never personally worked ▮▮▮▮▮▮. Id. at 5; First CFI Record at 33.

The asylum officer found E.Q. credible but issued him a negative credible-fear determination. First CFI Record at 2, 12. The officer made findings as to asylum, withholding of removal, and CAT protection. First, as to asylum, the officer found that E.Q. was likely subject to a limitation on asylum eligibility under a rule not challenged here, the "Securing the Border Rule." Id. at 1, 14–15. The Securing the Border Rule provided that, once the number of southwest border crossings over a period reached a certain threshold, noncitizens who arrived at the border could not apply for asylum unless they qualified for an exception. See 8 C.F.R. § 208.35(a). Because E.Q. entered the United States from Mexico when that Rule's limit was in effect, and he did not fall into an exception, he was ineligible for asylum. First CFI Record at 14–15.

Next, as to withholding of removal, the officer determined that E.Q. had not established a reasonable probability of persecution. Id. at 1, 12. The officer found no nexus between any feared persecution and a protected ground of race, religion, nationality, membership in a particular social group, or political opinion, as necessary to make out a withholding-of-removal claim. Id. at 12. The officer's written analysis explained that E.Q. had not suffered past persecution because he had not been harmed or directly threatened in Afghanistan. Id. at 37. And E.Q. had failed to establish that he "would be harmed in the future due to a protected characteristic that he possesses." Id. While E.Q. expressed that he feared "possible death or imprisonment" because a relative had worked for the U.S. government, he did not claim that this relative had been harmed or threatened by the Taliban. Id. Nor did E.Q. indicate that any of his other relatives would be harmed or investigated. Id. "Without more," the officer concluded, E.Q. had not established a "reasonable probability" of future persecution based on a protected ground. Id.

The officer also found E.Q. subject to two mandatory bars to withholding of removal—namely, the security-risk and terrorist bars. Id. at 1, 12. The officer explained that "there [were] reasonable grounds to believe" E.Q. was "a danger to the security of the United States" and "a person described in the Terrorism-Related Inadmissibility Grounds." Id. at 37. The officer pointed to E.Q.'s testimony about working for a business that served and therefore "gave material support to the Taliban." Id. Moreover, ███████████████████████████
████████████████████████████████████████ Id.

Finally, as to CAT, the officer determined that E.Q. had not established a reasonable probability of torture because he had not demonstrated a reasonable probability that he would suffer severe physical or mental pain or suffering if removed. Id. at 1, 12. The officer concluded

8

E.Q.'s testimony did not support a finding that the Taliban would harm him in the future. Id. at 38.

An Immigration Judge affirmed this negative credible-fear determination.[2] Renewed Mot. at 5.

### 2. *This Lawsuit*

On March 17, 2025, E.Q., then facing removal, joined with three organizations to sue DHS, U.S. Citizenship and Immigration Services ("USCIS"), and DHS Secretary Kristi Noem and the Senior Official Performing the Duties of the USCIS Director Kika Scott in their official capacities, challenging the Mandatory Bars Rule and the EOIR Companion Rule (collectively, "the Rules"). The organizational plaintiffs—the Amica Center for Immigrant Rights, the Florence Immigrant and Refugee Rights Project, and the Refugee and Immigrant Center for Education and Legal Services —are legal-services providers that regularly assist asylum seekers in the credible-fear interview process. Compl. ¶¶ 12–15.

Plaintiffs sought vacatur of the Rules under the Administrative Procedure Act ("APA") on the grounds that they violated the INA and were arbitrary and capricious. Id. ¶¶ 168–87. Two days after filing the complaint, they moved for an emergency stay of E.Q.'s removal. Renewed Mot. at 6.

The government subsequently notified Plaintiffs and the Court that it planned to reconsider E.Q.'s first credible-fear determination and conduct a second credible-fear interview. ECF 18 ("Joint Stip. to Hold Briefing in Abeyance"). Accordingly, the parties agreed to hold briefing on the emergency stay motion in abeyance. Id.

---

[2] The first Immigration Judge decision was not among the record materials provided to the Court.

9

### 3. E.Q.'s Second Negative Credible-Fear Determination

E.Q.'s second credible-fear interview took place on April 14, 2025. Renewed Mot. at 6. This time, E.Q. testified that, while still in Afghanistan, he had been summoned for questioning by the head of law enforcement in his neighborhood. ECF 24-2 (Second Credible-Fear Interview Record ("Second CFI Record")) at 47 (page numbers designated by CM/ECF). E.Q. told the asylum officer that he had forgotten to mention this summons during his first credible-fear interview because he was "stressed" and "confused." Id. at 54–55. E.Q. could not remember when he had received the summons but testified that it led him to fear for his life and go into hiding. Id. at 47–48. In this interview, E.Q. clarified that he was already in hiding—and thus not present—when the Taliban raided his home. Id. at 53.

This interview also resulted in a negative credible-fear determination, though on a different basis: The asylum officer determined that E.Q. was not credible based on inconsistencies between statements in his first and second interviews. Id. at 2, 14–15. The asylum officer noted E.Q.'s failure to mention the summons in his first interview and the contradiction between his initial suggestion that he had been present when the Taliban came to his home and his subsequent admission that, by that time, he had already gone into hiding. Id. at 63–65. The asylum officer also found concerning that E.Q. was able to testify with detail as to some topics but not others, including the summons and his work history in Afghanistan. See id. The asylum officer again concluded the Securing the Border limitation on asylum ineligibility applied but did not find that E.Q. was subject to a mandatory bar. Id. at 1, 16–17.

On May 9, 2025, an immigration judge affirmed E.Q.'s second negative credible-fear determination. ECF 30 at 4 (page numbers designated by CM/ECF). In the period between the asylum officer's decision and the IJ affirmance, parts of the Securing the Border Rule, including

the limitation on asylum eligibility, had been vacated by another judge in this district. See Las Ams. Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec., No. CV 24-1702 (RC), 2025 WL 1403811, at *21 (D.D.C. May 9, 2025). The IJ, however, found that E.Q. had failed to rebut the presumption of asylum ineligibility established by a different rule, the Circumvention of Lawful Pathways Rule at 8 C.F.R. § 1208.33(a)(1)–(2). ECF 30 at 4. And, as to withholding of removal and CAT, the IJ affirmed that E.Q. had not established a reasonable possibility of persecution or torture. ECF 30 at 5. The IJ thus returned the case to DHS for E.Q.'s removal. Id.

    *4. This Motion*

Pursuant to the IJ's decision, E.Q., who is currently detained in Arizona, may be removed as soon as June 30, 2025. See ECF 34. Plaintiffs thus returned to this Court to file a second emergency motion to stay E.Q.'s removal, which is the subject of this decision.

## II. Legal Standards

Four factors govern the issuance of a stay of removal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Nken v. Holder, 556 U.S. 418, 434 (2009) (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)). "The first two factors of the traditional standard are the most critical," and the latter two "merge when the Government is the opposing party." Id. at 434–35.

**III. Analysis**

E.Q. has not shown a likelihood of success on the merits because he appears to lack standing. The Court will therefore deny his motion.[3]

A plaintiff seeking to establish standing must show that he has (1) suffered a concrete and particularized injury in fact that is (2) fairly traceable to the defendant's challenged conduct and (3) likely to be redressed by a favorable judicial decision. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992). "To show that the alleged injury is 'fairly traceable' to the challenged action, the plaintiffs must make a 'reasonable showing that "but for" defendants' action the alleged injury' will not occur." Am. Fed'n of Gov't Emps., AFL-CIO v. United States, 104 F. Supp. 2d 58, 63 (D.D.C. 2000) (quoting Warth v. Seldin, 422 U.S. 490, 504 (1975)). "If the injury would occur regardless of the challenged action—say, because some separate action would independently cause it in full—then the fair-traceability test is not met." Cherokee Nation v. U.S. Dep't of the Interior, 643 F. Supp. 3d 90, 106 (D.D.C. 2022) (citing Delta Constr. Co. v. EPA, 783 F.3d 1291, 1297 (D.C. Cir. 2015)).

"The traceability and redressability requirements are closely related;" both "focus on the question of causation." Haitian Refugee Ctr. v. Gracey, 809 F.2d 794, 801 (D.C. Cir. 1987) (citation modified) (quoting Von Aulock v. Smith, 720 F.2d 176, 180 (D.C. Cir. 1983)). "To the extent that there is a difference, it is that the former examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter examines the causal

---

[3] The government challenges E.Q.'s motion and underlying claim on various grounds: the Court's statutory authority to grant the relief sought, standing, mootness, and the merits. Because courts "can address jurisdictional issues in any order [they] choose," and the lack of standing is dispositive, the Court need not reach these other issues. Acheson Hotels, LLC v. Laufer, 601 U.S. 1, 4 (2023) (citing Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 431 (2007)).

connection between the alleged injury and the judicial relief requested." Id. (quoting Allen v. Wright, 468 U.S. 737, 753 n. 19 (1984)).

Here, E.Q.'s alleged injury is his first negative credible-fear determination and associated removal order.[4]  He likely lacks standing because that injury is not fairly traceable to the subject of his challenge, the Rules.  While the Rules were one justification for his first negative credible-fear determination, they were not a but-for cause of it:  E.Q.'s failure establish future persecution because of a protected ground (the "no-nexus finding") provided an independent and sufficient legal basis to support the determination.  And E.Q. does not point to any part of the no-nexus finding that turned on or was influenced by the Rules.  Accordingly, even absent application of the Rules, the outcome of E.Q.'s first credible-fear interview—and therefore his associated removal order and the injury underlying his claim—would have been the same.  His injury thus does not appear traceable to the Rules.

Nor, for similar reasons, is it likely to be redressable.  Holding the Rules unlawful would not remedy E.Q.'s injury because, even without the Rules, he could still be removed based on his failure to establish nexus.  Plaintiffs offer several rebuttals to this conclusion, but none are persuasive.

Plaintiffs' principal responses are factual.  They first claim that the asylum officer did not base the negative credible-fear determination on the no-nexus finding because the officer did not check the "no-nexus" box on one of the forms she completed after E.Q.'s first negative credible-

---

[4] E.Q.'s injury is his first negative credible-fear determination because "standing is based upon the facts as they exist at the time the complaint is filed." Nat. L. Party of U.S. v. Fed. Election Comm'n, 111 F. Supp. 2d 33, 41 (D.D.C. 2000) (citing Lujan, 504 U.S. at 561).  E.Q. does not bring a claim based on his second credible-fear interview and negative determination. And the Court does not reach the government's argument that this second determination mooted E.Q.'s claim because he likely never had standing in the first place.

fear determination. But Plaintiffs' narrow emphasis on one form ignores the record as a whole. Cf. Henderson v. Saul, 2019 WL 5549907, at *12 (D.D.C. 2019) (acknowledging that administrative decisions must be "read as a whole").

The record of E.Q.'s first negative credible-fear determination includes, among other documents:

- Form I-869SB, titled "Record of Negative Credible Fear and Reasonable Probability Finding and Request for Review by Immigration Judge for Noncitizens Subject to the Limitation on Asylum Eligibility Pursuant to 8 CFR 208.35(a)," see First CFI at 1–2;

- Form I-870SB, titled "Record of Determination/SB Fear Worksheet," see id. at 9–15; and

- the asylum officer's notes, see id. at 16–38.

As Plaintiffs point out, the asylum officer did not check the "no-nexus" box on Form I-869. But the asylum officer *did* check the "no-nexus" box on Form I-870 and went on to explain that finding in her notes.

Plaintiffs' suggestion that Form I-869 somehow overrides the findings and explanation in the rest of the record finds no support. Nothing in the statutes, regulations, or caselaw indicates that Form I-869 has special force. The expedited-removal statute requires the asylum officer to "prepare a written record of a determination," which "shall include a summary of the material facts as stated by the applicant, such additional facts (if any) relied upon by the officer, and the officer's analysis of why, in the light of such facts, the alien has not established a credible fear of persecution." 8 U.S.C. § 1225(B)(iii)(II). And it further requires "[a] copy of the officer's interview notes" to "be attached to the written summary." Id. Likewise, under 8 C.F.R. § 208.30(e)(1), "[t]he asylum officer shall create a written record of the officer's determination, including a summary of the material facts as stated by the applicant, any additional facts relied

14

on by the officer, and the officer's determination of whether, in light of such facts, the alien has established a credible fear of persecution or torture." And the asylum officer's "determination shall not become final until reviewed by a supervisory asylum officer." 8 C.F.R. § 208.30(e)(8). Form I-689, however, does not contain a summary of material facts, the officer's analysis, the officer's notes, or the supervisory officer's signature—it is merely a checklist of the officer's findings. Indeed, Form I-869 does not even indicate which mandatory bars the asylum officer found applicable.

Plaintiffs counter that Form I-869 reflects the asylum officer's "official determination" because (1) a DHS regulation describes "the asylum officer's negative credible fear determination issued on the Form I–869, Record of Negative Credible Fear Finding and Request for Review," 8 C.F.R. § 1003.42, and (2) Form I-869 is read to the applicant. The Court disagrees. That regulation does not provide that Form I-869 is the exclusive or definitive record of the negative credible-fear determination. Nor could it, given that the other applicable statutory and regulatory provisions dictate that the record of determination include a more detailed explanation. And while that regulation may contemplate that "the supervisory asylum officer" will "concur[] with the asylum officer's negative credible fear determination issued on the Form I–869," 8 C.F.R. § 1003.42, Form I-870 is the form that is physically signed by the supervisory officer. See First CFI Record at 13; Second CFI Record at 15.

Nor is the fact that Form I-869 is read to the applicant dispositive. First, as noted, Form I-869 does not identify which mandatory bars applied, so reading the form to E.Q. would not tell him, without access to the rest of the record, the precise basis for his negative credible fear determination. Second, the Court finds no support for weighing Form I-869 disproportionately just because it is read to the applicant. Singh v. United States Department of Homeland Security,

15

No. 19-1224, 2020 WL 420589, (W.D. Wash. Jan. 3, 2020), where a petitioner challenged his negative credible-fear determination as unreasoned and arbitrary, is illustrative. Id. at *4. There, the asylum officer had recorded his findings on a "Credible Fear Determination Checklist," which was "an internal document" provided to USCIS supervisors and the immigration judge, but not to the petitioner, before the petitioner's credible-fear review hearing. Id. Although the petitioner had received other forms, they did not include the explanatory detail of the Credible Fear Determination Checklist. See id. The petitioner also argued that the asylum officer had not checked all their relevant boxes. Id. at *5. The court nevertheless found that the Checklist provided a sufficient basis for the negative determination and did not address the fact that petitioner never received it. Id. at *9. Here, where E.Q. was provided the form with the no-nexus finding—even if it was not read aloud to him—his argument is even weaker. Therefore, neither of Plaintiffs' arguments justifies fixating on Form I-869 without regard to the record as a whole. A wider lens reveals that the no-nexus finding was a basis for the negative credible-fear determination.

Plaintiffs also maintain that the Mandatory Bars Rule itself requires the Court to eschew this more plausible reading of the record in favor of their interpretation. They rely on its sequencing—"[i]f an alien . . . is able to establish a credible fear of persecution but appears to be subject to one or more of the mandatory bars . . . the asylum officer may consider the applicability of such bar(s) as part of the asylum officer's credible fear determination"—to contend that the asylum officer must have found a credible fear of persecution (and thus the required nexus) *before* reaching the bars. 8 C.F.R. § 208.30. But this language is not phrased as a jurisdictional threshold that prevents the asylum officer from considering the bars until she determines there is a credible fear, and nothing in the regulation explicitly precludes the asylum

16

officer from considering both issues simultaneously. To the contrary, evaluating all the facts at once is an approach more consistent with the streamlined nature of these expedited-removal proceedings.

Accordingly, the Court concludes that Form I-870's no-nexus finding and the asylum officer's explanatory notes sufficiently establish that E.Q.'s first negative credible-fear determination was based on the no-nexus finding *and* the mandatory bars.

Moving past the facts of what the asylum officer found, Plaintiffs insist that E.Q. has standing even if the record establishes denial on both grounds. They contend he may pursue his claim based on the "procedural injury" of application of the allegedly unlawful Rules. As support, they cite Sugar Cane Growers Co-op of Florida v. Veneman, 289 F.3d 89 (D.C. Cir. 2002), and Kiakombua v. Wolf, 498 F. Supp. 3d 1 (D.D.C. 2020). But both cases are distinguishable.

In Sugar Cane, a group of sugar cane producers challenged the Department of Agriculture's implementation of a payment-in-kind ("PIK") subsidy program for sugar without going through notice and comment. 289 F.3d at 91–92. The plaintiffs' alleged injury-in-fact was depressed sugar prices. Id. at 93–94. And that injury was traceable to the lack of notice and comment, in the plaintiffs' view, because the government may not have adopted the PIK program (or may have designed it differently) had it been subject to public comment. Id. The district court concluded that the plaintiffs lacked standing, however, because it was not clear whether the government would have foregone or changed the PIK program had it gone through notice and comment. Id. at 94–95. The D.C. Circuit reversed, concluding that the district court had erroneously applied a type of harmless-error analysis to standing. Id. As the Circuit noted, "if a party claiming the deprivation of a procedural right to notice-and-comment rulemaking

under the APA had to show that its comment would have altered the agency's rule, [APA] section 553 would be a dead letter." Id. at 95.

Kiakombua is similar. There, as here, the plaintiffs' alleged injuries were their negative credible-fear determinations, which the district court found were fairly traceable to a challenged training plan for officers who conducted credible-fear interviews. 498 F. Supp. 3d at 25. Adopting the Circuit's reasoning in Sugar Cane, the court declined to require the Plaintiffs to show that the result of the interviews would have been different absent the training plan: It was enough to show that the training plan was "connected to the substantive result" to establish traceability. Id. at 25 (quoting Sugar Cane, 289 F.3d at 95).

This case is different. As explained above, E.Q.'s negative credible-fear determination rested on two independent grounds, only one of which is tied to the challenged Rules. In Sugar Cane and Kiakombua, there was just one asserted cause of the plaintiffs' injuries—the lack of notice and comment in Sugar Cane and the training plan in Kiakombua—and the question was whether the plaintiffs had shown a sufficient causal connection to establish traceability. Therefore, these cases do not solve E.Q.'s standing problem. They stand only for the proposition that a plaintiff alleging deprivation of a procedural protection need not prove the outcome would have been different if the protection were afforded. That proposition does not apply in situations where, as here, there is an independent and sufficient ground for the injury that remains unchallenged and the outcome would *not* have been different *even if* the protection were afforded. Therefore, E.Q.'s injury appears neither traceable to the Rules nor redressable by this Court. Vacating the challenged Rules would leave it intact.

\* \* \*

In sum, because at this stage E.Q. has not demonstrated that he has standing to challenge the Rules, he cannot show a likelihood of success on the merits. The Court will therefore deny his motion for a stay of his removal.

## IV. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that [ECF 23] Plaintiffs' Motion to Stay E.Q.'s Removal is DENIED. It is further

**ORDERED** that the parties shall, by June 26, 2025, submit a notice as to whether any portion of this memorandum opinion, which has been filed under seal because it references certain parts of the sealed administrative record, shall remain sealed. It is further

**ORDERED** that Defendants shall answer or otherwise respond to Plaintiffs' complaint by July 14, 2025.

**SO ORDERED**.

CHRISTOPHER R. COOPER
United States District Judge

Date: June 12, 2025