BRETT A. SCHUMATE
*Assistant Attorney General*
YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*
ANTHONY P. NICASTRO
*Acting Director*
WILLIAM C. SILVIS
*Assistant Director*
CARA E. ALSTERBERG
*Senior Litigation Counsel*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 532-4667
Email: Cara.E.Alsterberg@usdoj.gov
TARYN L. ARBEITER
SHELBY WADE
*Trial Attorneys*

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| E.Q., *et al.*, | Civil Action No. 1:25-cv-00791 |
| Plaintiffs, | |
| v. | |
| U.S. Department of Homeland Security, *et al.*, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

LEGAL AND PROCEDURAL BACKGROUND ........................................................................2

   I.    Legal Background ........................................................................................................2

   II.   Plaintiffs .....................................................................................................................5

   III.  Plaintiffs' Complaint ...............................................................................................10

   IV.  Procedural Background............................................................................................11

LEGAL STANDARDS .......................................................................................................12

     A.  Federal Rule of Civil Procedure 12(b)(1) ..............................................................12

     B.  Federal Rule of Civil Procedure 12(b)(6) ..............................................................12

ARGUMENT .................................................................................................................13

   I.    Plaintiff E.Q. Must Be Dismissed for Lack of Subject-Matter Jurisdiction, and the Remaining Plaintiffs lack Organizational Standing to Challenge or Vacate the Rules .....13

     A.  Plaintiff E.Q. Must be Dismissed for Lack of Subject-Matter Jurisdiction.......................13

        i.    E.Q. Does Not Have Standing to Challenge the Rules. ..........................................13

        ii.   E.Q.'s Claims are Moot. ........................................................................................14

     B.  The Organizational Plaintiffs Have Not Pleaded a Cognizable Injury to their Organizations and Lack Standing to Challenge the Rules. ...............................................15

     C.  The Organizational Plaintiffs Have Not Alleged Associational or Third-Party Standing and Are Outside the Zone of Interests. ...........................................................................21

   II.   The Organizational Plaintiffs Cannot Challenge the Reasonable Fear Provisions of the Rules ...........................................................................................................................25

   III.  Plaintiffs Fail to State a Claim Under Counts I, II, or III Because the Rules are Consistent with the INA ...............................................................................................................27

   IV.  Plaintiffs Fail to State a Claim Under Count IV Because the Rules are Not Arbitrary or Capricious. ...................................................................................................................34

CONCLUSION................................................................................................................38

## <u>TABLE OF AUTHORITIES</u>

*ALIA v. Reno,*
   199 F.3d 1352 (D.C. Cir. 2000) ............................................................................ 22, 23

*Already, LLC v. Nike, Inc.,*
   568 U.S. 85 (2013) .......................................................................................................... 14

*Am. Immigr. Laws. Ass'n v. Reno,*
   18 F. Supp. 2d 38 (D.D.C. 1998) .................................................................................. 28

*Am. Fed'n of Gov't Emps., AFL-CIO v. United States,*
   104 F. Supp. 2d 58 (D.D.C. 2000) ................................................................................ 13

*Animal Legal Def. Fund, Inc. v. Vilsack,*
   111 F.4th 1219 (D.C. Cir. 2024) .................................................................................. 21

*Arizonans for Official English,*
   520 U.S. 43 (1997) .......................................................................................................... 15

*Arpaio v. Obama,*
   797 F.3d 11 (D.C. Cir. 2015) ........................................................................................ 18

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ........................................................................................................ 12

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ........................................................................................................ 12

*Block v. Cmty. Nutrition Inst.,*
   467 U.S. 340 (1984) ............................................................................................ 25, 26, 27

*Cherokee Nation v. U.S. Dep't of the Interior,*
   643 F. Supp. 3d 90 (D.D.C. 2022) ................................................................................ 14

*CHIR v. DHS.,*
   F. Supp. 3d, 2025 WL 1078776 (D.D.C. April 10, 2025) ...................................... 19

*Citizens for Resp. & Ethics in Washington v. U.S. Off. of Special Couns.,*
   480 F. Supp. 3d 118 (D.D.C. 2020) .............................................................................. 18

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971) ........................................................................................................ 34

*Clark v. Martinez,*
   543 U.S. 371 (2005) ........................................................................................................ 33

*Commissioned Officers Ass'n of U.S. Pub. Health Serv. v. Bunch*,
  2022 WL 951271 (D.D.C. Mar. 30, 2022) ............................................................... 17

*Ctr. for Responsible Science v. Gottlieb*,
  346 F Supp. 3d 29 (D.D.C. 2018) ........................................................................... 19

*Curran v. Holder*,
  626 F. Supp. 2d 30 (D.D.C. 2009) .......................................................................... 12

*DaimlerChrysler v. Cuno*,
  547 U.S. 332 (2006) ................................................................................................ 13

*Defs. Of Wildlife v. Zinke*,
  849 F.3d 1077 (D.C. Cir. 2017) .............................................................................. 37

*Delta Constr. Co. v. EPA*,
  783 F.3d 1291 (D.C. Cir. 2015) .............................................................................. 14

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................................................................ 37

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ................................................................................................ 34

*\*FDA v. Alliance for Hippocratic Med.*,
  602 U.S. 367 (2024) .................................................................................... 15, *passim*

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ................................................................... 17, 18, 20

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
  528 U.S. 167 (2000) ................................................................................................ 13

*Garland v. Ming Dai*,
  593 U.S. 357 (2021) ................................................................................................ 34

*Gill v. Whitford*,
  585 U.S. 48 (2018) .................................................................................................. 15

*Guerrero-Lasprilla v. Barr*,
  140 S. Ct. 1062 (2020) ............................................................................................ 26

*Haitian Refugee Ctr. v. Gracey*,
  809 F.2d 794 (D.C. Cir. 1987) ......................................................................... 23, 24

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ................................................................................................ 16

*Hunt v. Wash. State Apple Advert. Comm'n*,
　432 U.S. 333 (1977) ........................................................................................... 21

*INS v. Cardoza-Fonseca*,
　480 U.S. 421 (1987) ............................................................................................. 2

*INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*,
　510 U.S. 1301 (1993) ......................................................................................... 24

*Int'l Acad. of Oral Med. & Toxicology v. FDA*,
　195 F. Supp. 3d 243 (D.D.C. 2016) .................................................................. 20

*Inv. Co. Inst. v. CFTC*,
　720 F.3d 370 (D.C. Cir. 2013) .......................................................................... 36

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
　511 U.S. 375 (1994) ........................................................................................... 12

*Kowalski v. Tesmer*,
　543 U.S. 125 (2004) ..................................................................................... 21, 22

*Las Ams. Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec.*,
　No. CV 24-1702 (RC), 2025 WL 1403811 (D.D.C. May 9, 2025) ................... 8, 38

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
　572 U.S. 118 (2014) ........................................................................................... 23

*Lujan v. Defs. of Wildlife*,
　504 U.S. 555 (1992) ..................................................................................... 13, 15

*Make the Road N.Y. v. McAleenan*,
　405 F. Supp. 3d 1 (D.D.C. 2019) ...................................................................... 24

*Make the Road N.Y. v. Wolf*,
　962 F.3d 612 (2020) ........................................................................................... 23

*Matter of M-B-C-*,
　27 I. & N. Dec. 31 (BIA 2017) .......................................................................... 31

*Moncrieffe v. Holder*,
　569 U.S. 184 (2013) ............................................................................................. 2

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
　463 U.S. 29 (1983) ....................................................................................... 28, 34

*Nat'l Taxpayers Union, Inc. v. U.S.*,
  68 F.3d 1428 (D.C. Cir. 1995) ........................................................ 20

*Nat'l Treasury Emps. Union v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996) ...................................................... 18

*O.A. v. Trump*,
  404 F. Supp. 3d 109 (D.D.C. 2019) ...................................... 20, 24, 31

*Papasan v. Allain*,
  478 U.S. 265 (1986) ...................................................................... 13

*PETA v. USDA*,
  797 F.3d 1087 (D.C. Cir. 2015) ...................................................... 17

*Sessions v. Morales-Santana*,
  582 U.S. 47 (2017) ........................................................................ 22

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ........................................................................ 13

*Sure-Tan, Inc. v. NLRB*,
  467 U.S. 883 (1984) ...................................................................... 26

*Thompson v. N. Am. Stainless*,
  562 U.S. 170 (2011) ...................................................................... 24

*U.S. ex rel. Digital Healthcare, Inc. v. Affiliated Computer*,
  778 F. Supp. 2d 37 (D.D.C. 2011) .................................................. 12

*Vt. Yankee Nuclear Power Corp. v. NRDC, Inc.*,
  435 U.S. 519 (1978) ...................................................................... 28

*Warth v. Seldin*,
  422 U.S. 490 (1975) ...................................................................... 13

## **STATUTES**

5 U.S.C. § 701(a)(1) .............................................................................. 25

5 U.S.C. § 702 .............................................................................. 23, 24

6 U.S.C. § 271(b) .................................................................................. 32

6 U.S.C. § 557 ...................................................................................... 32

8 U.S.C. § 1101 ...................................................................................... 2

8 U.S.C. § 1101(a)(42)(B) ................................................................................................ 30

8 U.S.C. § 1103(a) ........................................................................................................... 32

8 U.S.C. § 1103(g) ........................................................................................................... 32

8 U.S.C. § 1158 ................................................................................................. 23, 24, 27, 29

8 U.S.C. § 1158(a) ............................................................................................................ 29

8 U.S.C. § 1158(a)(2) ....................................................................................................... 10

8 U.S.C. § 1158(b) ............................................................................................................ 29

8 U.S.C. § 1158(b)(2) ....................................................................................................... 10

8 U.S.C. § 1158(b)(2)(A) .................................................................................................. 27

8 U.S.C. § 1158(b)(2)(A)(i) ............................................................................................. 3, 4

8 U.S.C. § 1158(b)(2)(A)(ii) ............................................................................................ 3, 4

8 U.S.C. § 1158(b)(2)(A)(iii) ........................................................................................... 3, 4

8 U.S.C. § 1158(b)(2)(A)(vi) .......................................................................................... 3, 4, 5

8 U.S.C. § 1158(b)(2)(A)(v) ........................................................................................... 3, 4, 5

8 U.S.C. § 1225 ................................................................................................................. 23

8 U.S.C. § 1225(b) ............................................................................................................ 33

8 U.S.C. § 1225(b)(1) ..................................................................................................... 3, 32

8 U.S.C. § 1225(b)(1)(A) ............................................................................................... 24, 28

8 U.S.C. § 1225(b)(1)(A)(i) .............................................................................................. 3

8 U.S.C. § 1225(b)(1)(A)(iii)(II) ...................................................................................... 3

8 U.S.C. § 1225(b)(1)(B) .................................................................................................. 28

8 U.S.C. § 1225(b)(1)(B)(ii) ............................................................................................. 10

8 U.S.C. § 1225(b)(1)(B)(v) ................................................................................... 10, *passim*

8 U.S.C. § 1228(b) ........................................................................................... 25

8 U.S.C. § 1229a ............................................................................................... 9

8 U.S.C. §1231 ............................................................................................ 23, 24

8 U.S.C. § 1231(b)(2)(B) .................................................................................. 5

8 U.S.C. § 1231(b)(2)(B)(i) .............................................................................. 4

8 U.S.C. § 1231(b)(2)(B)(iii) ........................................................................... 5

8 U.S.C. § 1231(b)(2)(B)(iv) ........................................................................... 5

8 U.S.C. § 1231(b)(3) ....................................................................................... 2

8 U.S.C. § 1231(b)(3)(B) ......................................................................... 3, 4, 10

8 U.S.C. § 1252(a)(5) ................................................................................. 26, 27

8 U.S.C. § 1252(b)(9) ..................................................................................... 26

8 U.S.C. § 1252(e)(3) ........................................................................ 22, 23, 26, 27

8 U.S.C. § 1252(e)(3)(B) ................................................................................. 33

Homeland Security Act of 2002, Public Law 107–296 .................................... 32

## FEDERAL RULES OF CIVIL PROCEDURES

Fed. R. Civ. P. 12(b)(1) ........................................................................ 2, passim

Fed. R. Civ. P. 12(b)(6) ................................................................................ 2, 38

## REGULATIONS

8 C.F.R. § 208.16–.18 ....................................................................................... 2

8 C.F.R. § 208.30(3)(ii)(A) ............................................................................ 33

8 C.F.R. § 208.30(e)(2) ............................................................................. 28, 31

8 C.F.R. § 208.30(e)(5)(ii) ............................................................... 4, 31, 35, 36

8 C.F.R. § 208.30(e)(5)(ii)(A) ........................................................................ 31

8 C.F.R. § 208.30(e)(5)(ii)(B) ........................................................................ 31

8 C.F.R. § 208.31 ................................................................................................ 25

8 C.F.R. § 208.31(c) ....................................................................................... 4, 36

8 C.F.R. § 208.33(b)(2)(ii) .................................................................................. 36

8 C.F.R. § 1003.42(d) ........................................................................................... 5

8 C.F.R. § 1208.16–.18 ......................................................................................... 2

8 C.F.R. § 1208.31 .............................................................................................. 25

8 C.F.R. § 1208.31(g) ............................................................................................ 5

8 C.F.R. § 1208.33(a)(1) ........................................................................................ 8

8 C.F.R. § 1208.33(a)(2) ........................................................................................ 8

8 C.F.R. § 1240.8 .......................................................................................... 31, 32

87 Fed. Reg. 18,078 ( Mar. 29, 2022) ................................................................. 38

88 Fed. Reg. 31314 (May 16, 2023) ..................................................................... 8

89 Fed. Reg. 41,347 (May 13, 2024) ........................................................ 1, *passim*

89 Fed. Reg. 103,370 (Dec. 18, 2024) ...................................................... 1, *passim*

89 Fed. Reg. 105,392 (Dec. 27, 2024) ............................................................... 1, 5

*Asylum Procedures*, 62 Fed. Reg. 444 (Jan. 3, 1997) ....................................... 29

*Asylum Procedures*, 65 Fed. Reg. 76,121 (Dec. 6, 2000) ............................ 29, 30

## INTRODUCTION

Plaintiffs consist of a single alien, E.Q., and three legal service organizations who challenge two important rules that safeguard U.S. national security: (1) a final rule issued by the Department of Homeland Security ("DHS"), *Application of Certain Mandatory Bars in Fear Screenings*, 89 Fed. Reg. 103,370 (Dec. 18, 2024) ("DHS Bars final Rule"), which was issued after DHS provided notice and an opportunity to comment in *Application of Certain Mandatory Bars in Fear Screenings*, 89 Fed. Reg. 41,347 (May 13, 2024) ("DHS Bars NPRM"); and (2) an interim final rule issued by the Executive Office for Immigration Review ("EOIR"), *Clarification Regarding Bars to Eligibility During Credible Fear and Reasonable Fear Review*, 89 Fed. Reg. 105,392 (Dec. 27, 2024) ("EOIR Bars IFR") (collectively, the "Rules"). These Rules strengthen the integrity of the expedited removal process and safeguard our national security by allowing DHS to more expeditiously remove aliens who are determined not to have the requisite fear of torture and are clearly ineligible for asylum and withholding of removal because they pose safety and security threats to the American people. Without these Rules, such aliens may remain in the United States to pursue their doomed asylum applications in potentially lengthy removal proceedings, thereby further exacerbating the significant immigration court backlog and larger illegal immigration crisis the President has prioritized ending.

After briefing regarding Plaintiff E.Q.'s emergency motion to stay his removal, this Court determined that E.Q. likely lacked standing because his alleged injury of a negative credible fear determination during his first interview was "not fairly traceable" to the Rules and would not be redressable. ECF 40 at 13. Defendants agree, E.Q. does not have standing and should be dismissed. Additionally, E.Q. received a second credible fear interview wherein the Rules were not applied. Thus, his claims are also moot. Likewise, the three Organizational Plaintiffs should also be dismissed for lack of subject-matter jurisdiction because they do not have standing to challenge

the Rules. Assuming *arguendo* that any Plaintiff can demonstrate standing, the Complaint still must fail for failure to state a claim upon which relief can be granted.

Accordingly, this Court should deny Plaintiffs' Complaint, ECF 1, for lack of subject matter jurisdiction, *see* Fed. R. Civ. P. 12(b)(1), and for failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6).

## LEGAL AND PROCEDURAL BACKGROUND

### I.    Legal Background

Asylum and Withholding of Removal. Asylum is a form of discretionary relief under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq. See id.* § 1158; *INS v. Cardoza-Fonseca*, 480 U.S. 421, 444 (1987). To obtain asylum, aliens must show that they: (1) qualify as a "refugee"—that is, that they are unable or unwilling to return to their home country "because of persecution or a well-founded fear of persecution on account of" one of five enumerated protected grounds, *id.* §§ 1101(a)(42), 1158(b)(1)(A); (2) are not subject to an exception or mandatory condition or bar that precludes applying for or receiving asylum, *id.* § 1158(a)(2), (b)(2); and (3) merit a favorable exercise of discretion, *id.* § 1158(b)(1)(A).

In addition to asylum, aliens processed under Title 8 authorities may apply for withholding of removal under 8 U.S.C. § 1231(b)(3) and protection under the regulations implementing the United States' obligations under Article 3 of the Convention Against Torture ("CAT"),[1] 8 C.F.R. §§ 208.16–.18, 1208.16–.18. Unlike asylum, which is discretionary, these provisions prohibit removal to a country where an alien more likely than not would be persecuted on account of a protected ground or tortured, respectively. *See Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013).

---

[1]    Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85 (entered into force for United States Nov. 20, 1994).

Although there is generally a right to *apply* for asylum, § 1158(b)(2) limits an individual's eligibility to *receive* asylum. Similarly, although a grant of withholding is required where an alien establishes eligibility, the withholding statute also includes limits on that eligibility. Pursuant to § 1158(b)(2)(A), asylum must be denied where an alien: (1) participated in the persecution of others on account of a protected ground; (2) has a conviction for a particularly serious crime; (3) committed a serious nonpolitical crime outside of the United States; (4) is a danger to the security of the United States; (5) has engaged in terrorist activity; or (6) was firmly resettled in another country prior to arriving in the United States. 8 U.S.C. § 1158(b)(2)(A)(i)–(vi). Other than the firm resettlement bar, similar mandatory bars also generally apply to an individual's eligibility for withholding of removal. *See* 8 U.S.C. § 1231(b)(3)(B).

<u>Screening Processes.</u> Depending on their circumstances, aliens may be subject to certain summary removal procedures. Certain arriving aliens and certain aliens determined to be inadmissible within two years of their entry may be subject to expedited removal. 8 U.S.C. § 1225(b)(1)(A)(i), (iii)(II). Aliens who have not been admitted for permanent residence and are convicted of an aggravated felony may be subject to what is often referred to as "administrative removal." *Id.* § 1228(b). And aliens who have a prior removal order and have reentered the United States illegally may have those orders reinstated. *See id.* § 1231(a)(5). In all three instances, aliens who indicate a fear of persecution or returning to the country of removal receive screening interviews to determine whether they should be allowed to remain in the United States pending an application for asylum or related protection from removal, as applicable.

An alien in expedited removal proceedings under 8 U.S.C. § 1225(b)(1) who indicates an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to their country or the country of removal, *id.* § 1225(b)(1)(A)(ii), will receive a "credible

fear interview." In that interview, an asylum officer will determine whether the alien has established a credible fear, which the statute defines as a "significant possibility" that the alien "could establish eligibility for asylum." *Id.* § 1225(b)(1)(B)(v). If the alien receives a positive credible fear determination, his asylum claim may be heard by another asylum officer or he may be placed in removal proceedings before an Immigration Judge, where he may apply for asylum, withholding of removal, and protection under the CAT regulations. If the alien receives a negative credible fear determination, an Immigration Judge may review that determination. *Id.* § 1225(b)(1)(B)(iii)(III). If the Immigration Judge affirms the determination, or the alien declines Immigration Judge review, the alien is ordered removed without further review. *See id.* § 1225(b)(1).

_The Rules._ On May 13, 2024, DHS issued the DHS Bars NPRM. *See* 89 Fed. Reg. 41,347. After receiving and considering public comments, on December 18, 2024, DHS issued the DHS Bars final Rule, which went into effect on January 17, 2025. 89 Fed. Reg. at 103,370. As relevant here, the DHS Bars final Rule provides asylum officers conducting credible fear interviews the discretion to "consider the applicability" of certain security-related bars to asylum and withholding eligibility if an alien appears to be subject to such a bar. *Id.*; 8 C.F.R. §§ 208.30(e)(5)(ii), 208.31(c). Specifically, the Rule allows asylum officers to consider the bars to asylum codified at 8 U.S.C. § 1158(b)(2)(A)(i) through (v), and to withholding of removal at 8 U.S.C. § 1231(b)(3)(B) for: (1) those who "ordered, incited, assisted, or otherwise participated in the persecution of any person" "on account of" or "because of" a protected ground, 8 U.S.C. §§ 1158(b)(2)(A)(i), 1231(b)(2)(B)(i); (2) those convicted of a "particularly serious crime," 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1231(b)(2)(B)(ii); (3) where "there are serious reasons to believe that the alien committed a serious nonpolitical crime outside the United States," 8 U.S.C.

§§ 1158(b)(2)(A)(iii), 1231(b)(2)(B)(iii); (4) where "there are reasonable grounds to believe that the alien is a danger to the security of the United States," 8 U.S.C. §§ 1158(b)(2)(A)(iv), 1231(b)(2)(B)(iv); and (5) those described in certain terrorism-related provisions, 8 U.S.C. §§ 1158(b)(2)(A)(v), 1231(b)(2)(B).

The EOIR Bars IFR, issued on December 27, 2024, made a technical amendment to EOIR's regulations, clarifying that an Immigration Judge's *de novo* review of an asylum officer's credible fear determination shall also include review of the asylum officer's determination of the applicability of any mandatory bar to asylum and withholding of removal. *See generally* 89 Fed. Reg. 105,392; 8 C.F.R. §§ 1003.42(d), 1208.31(g).

## II.    Plaintiffs

On March 17, 2025, a single alien plaintiff, E.Q., and three organizations that provide services to asylum seekers filed this suit challenging the DHS Bars final Rule and the EOIR Bars IFR. ECF 1, Complaint ("Compl.") at ¶¶ 12–16.

Plaintiff E.Q. The sole alien plaintiff is E.Q., a native of Afghanistan who received his first credible fear interview on February 4, 2025. Compl. ¶ 132. During his credible fear interview, E.Q. testified that a close family member worked for an international organization that "cooperated with the previous Afghan government." *Id*. at ¶ 133. E.Q. worked at a business in Afghanistan that served the public but was patroned by members of the Taliban; however, E.Q. testified that he never served Taliban members. *Id*. at ¶ 135. According to E.Q.'s testimony, in spring 2024, the Taliban raided his home and accused him of being an "American spy"; soon after this encounter, he fled Afghanistan and eventually traveled to the United States. *Id*. at ¶ 134.

In his first interview, the asylum officer found E.Q. credible but issued him a negative credible fear determination. *First CFI Record*, ECF 37-1 at 5, 16, 40. The officer made findings as to asylum, withholding of removal, and CAT protection. First, as to asylum, the officer found

that E.Q. was likely subject to a limitation on asylum eligibility under the "Securing the Border Rule." *Id*. at 18–19, 25. Because E.Q. entered the United States from Mexico when that Rule's limit was in effect, and he did not fall into an exception, he was ineligible for asylum. *Id*. at 18–19.

Next, as to withholding of removal, the officer determined that E.Q. had not established a reasonable probability of persecution. *Id.* at 40–41. The officer found no nexus between any feared persecution and a protected ground of race, religion, nationality, membership in a particular social group, or political opinion, as necessary to make out a withholding-of-removal claim. *Id.* at 16. The officer's written analysis explained that E.Q. had not suffered past persecution because he had not been harmed or directly threatened in Afghanistan. *Id.* at 41. And E.Q. had failed to establish that he "would be harmed in the future due to a protected characteristic that he possesses." *Id*. While E.Q. expressed that he feared "possible death or imprisonment" because a relative had worked for the U.S. government, he did not claim that this relative had been harmed or threatened by the Taliban. *Id*. Nor did E.Q. indicate that any of his other relatives would be harmed or investigated. *Id*. "Without more," the officer concluded, E.Q. had not established a "reasonable probability" of future persecution based on a protected ground. *Id*. The officer also found E.Q. subject to two mandatory bars to withholding of removal— namely, the security-risk and terrorist bars. *Id*. at 5, 16. The officer explained that "there [were] reasonable grounds to believe" E.Q. was "a danger to the security of the United States" and "a person described in the Terrorism-Related Inadmissibility Grounds." *Id.* at 41. The officer pointed to E.Q.'s testimony about working for a business that served and therefore "gave material support to the Taliban." *Id.* Finally, as to CAT, the officer determined that E.Q. had not established a reasonable probability that he would more likely than not be tortured by the Taliban because he had not demonstrated a reasonable probability

that he would suffer severe physical or mental pain or suffering if removed to Afghanistan. *Id.* at 5, 16. In sum, the officer concluded E.Q.'s testimony did not establish a credible fear that the Taliban would persecute or torture him. *Id.* at 42. And an Immigration Judge affirmed this negative credible fear determination. *Id.* at 1–4.

E.Q.'s second credible fear interview took place on April 14, 2025. *Second CFI Record*, ECF 24-2 at 11. This time, E.Q. testified that, while still in Afghanistan, he had been summoned for questioning by the head of law enforcement in his neighborhood. *Id.* at 47. E.Q. told the asylum officer that he had forgotten to mention this summons during his first credible fear interview because he was "stressed" and "confused." *Id.* at 54–55. E.Q. could not remember when he had received the summons but testified that it led him to fear for his life and go into hiding. *Id.* at 47–48. In this interview, E.Q. clarified that he was already in hiding—and thus not present—when the Taliban raided his home. *Id.* at 53.

This interview also resulted in a negative credible fear determination, though on a different basis: the asylum officer determined that E.Q. was not credible based on inconsistencies between statements in his first and second interviews. *Id.* at 2, 14–15. The asylum officer noted E.Q.'s failure to mention the summons in his first interview and the contradiction between his initial suggestion that he had been present when the Taliban came to his home and his subsequent admission that, by that time, he had already gone into hiding. *Id.* at 63–65. The asylum officer also found concerning that E.Q. was able to testify with detail as to some topics but not others, including the summons and his work history in Afghanistan. *See id.* The asylum officer again concluded that the Securing the Border limitation on asylum ineligibility applied but did not find that E.Q. was subject to a mandatory bar. *Id.* at 1, 16–17.

On May 9, 2025, an Immigration Judge affirmed E.Q.'s second negative credible fear determination. ECF 30 at 4. In the period between the asylum officer's decision and the Immigration Judge's affirmance, parts of the Securing the Border Rule, including the limitation on asylum eligibility, had been vacated by another court in this district. *See Las Americas Immigr. Advoc. Ctr. v. DHS*, --- F. Supp. 3d ----, No. CV 24-1702 (RC), 2025 WL 1403811, at *21 (D.D.C. May 9, 2025). The Immigration Judge, however, found that E.Q. had failed to rebut the presumption of asylum ineligibility established by a different rule, the Circumvention of Lawful Pathways Rule at 8 C.F.R. § 1208.33(a)(1)–(2).[2] ECF 30 at 4. And, as to withholding of removal and CAT, the Immigration Judge affirmed that E.Q. had not established a reasonable possibility of persecution or torture. *Id*. at 5. The Immigration Judge thus returned the case to DHS for E.Q.'s removal. *Id.*

Organizational Plaintiffs. Plaintiff Amica Center for Immigrant Rights ("Amica") provides "direct legal services to migrant adults and children at risk of deportation . . . in the Washington, D.C. metropolitan area and beyond." Compl. at ¶ 13. It directly represents individuals in credible and reasonable fear interviews, applying for asylum, and in § 1229a removal proceedings. *Id*. Amica's staff also provide "*pro se* legal assistance" to individuals detained in two Immigration and Customs Enforcement ("ICE") facilities located in Virginia, including running "Know Your Rights" trainings. *Id*. Amica asserts it will be harmed by the rule because it will divert resources from its services to *pro se* individuals; the staff providing these services will be forced to spend additional time and resources to explain the Rules and reduce the number of individuals to whom they can provide services. *Id*. ¶¶ 146–48. Amica also asserts the Rules will require them to commence representation earlier in a case, file more petitions for review (in reasonable fear cases),

---

[2]        *See Circumvention of Lawful Pathways*, 88 Fed. Reg. 31314 (May 16, 2023).

and ultimately reduce the number of clients they can represent, forcing them to reject more cases. *Id*. ¶¶ 149–51. Amica finally asserts it will be required to reallocate its resources to train its own staff and pro bono attorneys, forcing it to serve fewer clients and receive less funding, as funding is based on the number of clients served. *Id*. ¶¶ 152–54.

Plaintiff Florence Immigration and Refugee Rights Project ("Florence") is a nonprofit organization headquartered in Tucson, Arizona that "provides free legal and social services to people in immigration custody in Arizona and strives to ensure that noncitizens facing removal have access to counsel, understand their rights, and are treated fairly and humanely." *Id*. ¶ 14. It provides both "pro se services," such as "Know Your Rights" trainings, and directly represents individuals who are in or have been through the credible or reasonable fear process, as well as in removal proceedings under 8 U.S.C. § 1229a. *Id*. Florence alleges that the Rules will impair its core mission of providing legal services to detained adults and children in Arizona. *Id*. ¶ 155. The Mandatory Bars Rule, Florence alleges, will also "increase the pressure [it] faces to reach people in threshold screening interviews," rather than waiting until clients enter § 1229a proceedings. *Id*. ¶ 157. Florence alleges the Rules will harm its ability to be appointed by Immigration Judges during § 1229a proceedings to handle mandatory bars cases, as the bars will be applied before adversarial proceedings begin. *Id*. ¶ 158. Florence also asserts it will incur costs updating its materials, educating its staff, helping clients prepare for credible fear interviews, including gathering evidence, and representing a greater number of clients in immigration judge credible fear reviews. *Id*. ¶¶ 160–61.

Plaintiff Refugee and Immigrant Center for Education and Legal Services ("RAICES") is a nonprofit headquartered in San Antonio, Texas. *Id*. ¶ 15. As the "largest immigration legal services provider in Texas," it provides "free and low-cost immigration legal services" to

"migrants seeking asylum and other statutory protections upon crossing the border," including individuals in expedited removal, "social services," and bond assistance to individuals seeking release from DHS custody. *Id*. RAICES alleges it will have to update its Know Your Rights presentations and interview protocols for prospective clients, spend more time with prospective clients, reduce the number of intake interviews and Know Your Rights presentations it can make, and generally either serve fewer clients or provide fewer services, all of which will reduce its funding tied to the number of clients served and services provided. *Id*. ¶¶ 163–67.

## III.    Plaintiffs' Complaint

Plaintiffs submit four causes of action alleging that the Rules violate various provisions of the INA, and that they are contrary to law and arbitrary and capricious under the Administrative Procedure Act ("APA"). *Id*. at ¶¶ 168–87. First, they claim that the Rules violate the INA's asylum provisions, 8 U.S.C. § 1158(a)(2), (b)(2), which, they allege, permit those subject to the mandatory bars to still apply for asylum, and which, they allege, entrust mandatory bars determinations only to the Attorney General (not the Secretary of Homeland Security). *Id*. at ¶¶ 168–74. Second, they similarly claim that the Rules violate the INA's withholding provisions at 8 U.S.C. § 1231(b)(3)(B) because they allege the Rules prevent aliens from "applying for" withholding of removal when the mandatory bar "appears to" apply, "even though there is no determination" made "that a mandatory bar does apply." *Id*. at ¶¶ 175–78. Third, Plaintiffs complain that the Rules are contrary to the expedited removal provisions at 8 U.S.C. § 1225(b)(1)(B)(ii), (v), because the Rules "impermissibly transform the bars into eligibility requirements," shifting "the burden of proof to the noncitizen," and thereby "heightening the 'significant possibility' standard" for determining whether someone has a credible fear of persecution. *Id*. at ¶¶ 179–84. Finally, Plaintiffs allege that the Rules are arbitrary and capricious for various reasons related to the sufficiency of their explanations, consideration—or lack thereof—of certain factors (including the effects of related

policies), failure to respond to certain comments, and lack of consistency with the record evidence, and the fact that the Rules rely on the "false assumption" memorialized in the DHS Rule's preamble that asylum officers will only apply the mandatory bars when there is "easily verifiable evidence" that it applies. *Id*. at ¶¶ 185–87, 116–20.

## IV.    Procedural Background

On March 19, 2025, Plaintiffs filed their first emergency motion to stay E.Q.'s removal. *See* ECF 8. On March 27, 2025, the parties filed a joint stipulation to hold the briefing in abeyance pending U.S. Citizenship and Immigration Services ("USCIS") conducting a follow-up credible fear interview. ECF 18. Following the entry of a new negative credible fear determination on May 9, 2025, Plaintiffs filed their second emergency motion to stay removal, ECF 23, on May 13, 2025. Plaintiffs attached to their motion various records of E.Q.'s credible fear proceedings, including the I-870 "Record of Determination" for E.Q.'s initial credible fear proceedings in which the asylum officer's negative credible fear determination rested not only on the mandatory bars, but also on entirely separate bases unrelated to the mandatory bars, namely, that he had established neither a credible fear of torture nor "nexus," *i.e.*, a reasonable probability "that [he] would be harmed in the future due to a protected characteristic he possesses." *See* ECF 24-1 at 37; *see id.* at 12. On June 12, 2025, the Court denied E.Q.'s stay motion, ruling that E.Q. likely lacked standing because his injury—his first negative credible fear determination and associated removal order—was neither fairly traceable to the challenged Rules nor redressable by the Court in this suit. ECF 40. The Court reasoned that, "while the Rules were one justification for his first negative credible fear determination, they were not a but-for cause of it: E.Q.'s failure [to] establish future persecution because of a protected ground (the 'no-nexus finding') provided an independent and sufficient legal basis to support the determination." *Id*. at 13. Likewise, the Court reasoned that "[h]olding the Rules unlawful would not remedy E.Q.'s injury because, even without the Rules,

he could still be removed based on his failure to establish nexus." *Id.* Plaintiff E.Q. filed a motion for reconsideration, ECF 36, which the Court denied, ECF 41.

## LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(1)

A motion to dismiss under Rule 12(b)(1) "presents a threshold challenge to the Court's jurisdiction," and thus "the Court is obligated to determine whether it has subject-matter jurisdiction in the first instance." *Curran v. Holder*, 626 F. Supp. 2d 30, 32 (D.D.C. 2009) (internal citation and quotation marks omitted). "[I]t is presumed that a cause lies outside [the federal courts'] limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), unless the plaintiff can establish by a preponderance of the evidence that the Court possesses jurisdiction. *See, e.g.*, *U.S. ex rel. Digital Healthcare, Inc. v. Affiliated Computer*, 778 F. Supp. 2d 37, 43 (D.D.C. 2011). Thus, the "plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Id.* (internal citation and quotation marks omitted)).

### B. Federal Rule of Civil Procedure 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint where a plaintiff fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When resolving a Rule 12(b)(6) motion to dismiss, the pleadings are construed broadly so that all facts pleaded therein are accepted as true, and all inferences are viewed in a light most favorable to plaintiff. *See Iqbal*, 556 U.S. at 678. However, courts are not required to accept as true conclusory allegations or unwarranted factual deductions. *Id.* "Threadbare recitals

of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Courts also need not "accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Ultimately, the focus is on the language in the complaint and whether it sets forth sufficient factual allegations to support a plaintiff's claims for relief.

## ARGUMENT

I.    **Plaintiff E.Q. Must Be Dismissed for Lack of Subject-Matter Jurisdiction, and the Remaining Plaintiffs Lack Organizational Standing to Challenge or Vacate the Rules.**

A.    **Plaintiff E.Q. Must Be Dismissed for Lack of Subject-Matter Jurisdiction.**

Plaintiff E.Q. should be dismissed for the same reasons he was denied a stay of removal: he has failed to show that his negative credible fear determination and subsequent removal order are traceable to the Rules or redressable by this Court. *See* ECFs 40, 41. Plaintiffs must establish standing for each claim and each form of relief they seek. *DaimlerChrysler v. Cuno*, 547 U.S. 332, 352 (2006) ("a plaintiff must demonstrate standing for each claim he seeks to press"); *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 185 (2000) (same). For each particular form of relief, a Plaintiff must show that the requested relief will redress his or her injury. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).

i.    **E.Q. Does Not Have Standing to Challenge the Rules.**

A plaintiff seeking to establish standing must show that he has (1) suffered a concrete and particularized injury in fact that is (2) fairly traceable to the defendant's challenged conduct and (3) likely to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "To show that the alleged injury is 'fairly traceable' to the challenged action, the plaintiffs must make a 'reasonable showing that "but for" defendants' action the alleged injury' will not occur." *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 104 F. Supp. 2d 58, 63 (D.D.C. 2000) (quoting *Warth v. Seldin*, 422 U.S. 490, 504 (1975)). "If the injury would occur

regardless of the challenged action—say, because some separate action would independently cause it in full—then the fair-traceability test is not met." *Cherokee Nation v. U.S. Dep't of the Interior*, 643 F. Supp. 3d 90, 106 (D.D.C. 2022) (citing *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1297 (D.C. Cir. 2015)).

E.Q. has failed to demonstrate standing. *See* ECFs 40, 41; *see also* ECF 25 at 14–16. Here, E.Q.'s alleged injury is tied to his first negative credible fear determination and associated removal order. He lacks standing because that injury is not fairly traceable to the subject of his challenge, the Rules. While the Rules were one justification for his first negative credible fear determination, they were not a "but-for cause" of it: E.Q.'s failure to establish future persecution because of a protected ground (the "no-nexus finding") provided an independent and sufficient legal basis to support the determination. *See* ECF 40 at 13. And E.Q. cannot point to any part of the no-nexus finding that turned on or was influenced by the Rules. Accordingly, even absent application of the Rules, the outcome of E.Q.'s first credible fear interview—and therefore his associated removal order and the injury underlying his claim—would have been the same. Therefore, his injury is not traceable to the Rules. Likewise, as this Court has acknowledged, his alleged injury is also not redressable because, even if this Court were to hold the Rules unlawful, E.Q. would still have a negative credible fear determination based on his failure to establish nexus. *See id*. Therefore, E.Q. does not have standing and must be dismissed for lack of subject-matter jurisdiction.

### ii. E.Q.'s Claims are Moot.

Likewise, E.Q. has already received the relief of having a second credible fear interview where the Rules were not applied to him, therefore, his claims are also moot. *See* ECF 25 at 29–33. "A case becomes moot—and therefore no longer a Case or Controversy for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quotation marks omitted).

Thus, even if there is a live controversy when the case is originally filed, courts should refrain from deciding claims if "the requisite personal interest that must exist at the commencement of the litigation" is no longer present. *Arizonans for Official English*, 520 U.S. 43, 68 n.22 (1997) (internal citations omitted). In his follow-up credible fear interview, the asylum officer declined to apply the Rules to his case at all. ECF 24-2 at 14–15. Instead, the asylum officer simply found E.Q. to not be credible, and that E.Q. had not established a credible fear of persecution and torture. *Id*. at 14–15, 63–65. In fact, in the written decision, the box an asylum officer would check to demonstrate that an applicant does not appear to be subject to a bar to asylum or withholding of review is checked. *Id*. at 15. In short, E.Q. has not been harmed by the Rules in either his first or his follow-up credible fear interviews, and therefore, there is no ongoing case or controversy. Therefore, he must be dismissed for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

### B.     The Organizational Plaintiffs Have Not Pleaded a Cognizable Injury to their Organizations and Lack Standing to Challenge the Rules.

The remaining Plaintiffs are three organizations that provide legal assistance and representation to aliens who claim asylum or other forms of protection from removal. Plaintiffs ask the Court for vacatur of the Rules and a declaratory judgement that the Rules are contrary to law and are arbitrary and capricious. Compl. at 46 (Prayer for Relief). However, nothing in the Rules directly regulates the Organizations or implicates their legally protected interests in any way. At most, Plaintiffs claim an indirect impact from the Rules' effect on aliens to whom Plaintiffs provide information and guidance. That is not the type of "invasion of a legally protected interest" sufficient to support Article III standing. *Gill v. Whitford*, 585 U.S. 48, 65 (2018); *see Lujan*, 504 U.S. at 562. And the recent Supreme Court case in *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367 (2024), makes it clear that Plaintiffs lack standing to challenge the Rules and their implementation.

In *Alliance*, the Supreme Court held that an organization lacked standing to challenge the FDA's approval of an abortion-inducing drug. 602 U.S. at 393–94. The Court explained that organizations "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Id*. (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). To allege a concrete injury, an unregulated organizational plaintiff must allege "far more than simply a setback to the organization's abstract social interests." *Havens*, 455 U.S. at 379. As *Alliance* made clear, it is not enough that "an organization diverts its resources in response to defendant's actions" even if it will "expend considerable time, energy, and resources" in response to a policy change. 602 U.S. at 394–95. An unregulated organization must allege sufficient facts to show that the challenged action "perceptibly impair[s]" or "interferes with" its activities by imposing an affirmative "impediment" to performing those activities. *See id*. Plaintiffs' allegations do not satisfy this standard.

Plaintiffs primarily claim that the Rules will impair their ability to provide direct legal services to detained aliens. Compl. at ¶¶ 145, 155, 163–64. "Like an individual, an organization may not establish standing simply based on the intensity of the litigant's interest, no matter how longstanding the interest and no matter how qualified the organization." *Alliance*, 602 U.S. at 394 (cleaned up). Yet, at base, this is all the Plaintiff organizations have alleged—an injury to their interest in asylum-seekers obtaining protection in the United States. Plaintiffs' theory is that, because the Rules will result in a more thorough review at the credible fear or reasonable fear interview, the demand for certain of Plaintiffs' core services will accelerate, causing them to divert resources from other programs to cover these needs. *See* Compl. ¶¶ 150, 157, 165. While Plaintiffs assert that the Rules will require them to alter their current procedures for representation, resulting in reallocation of funds and time (Compl. ¶¶ 149, 157, 165), this does not impair or interfere with

their existing activities; it only makes them update current procedures to best serve their clients. Nor does amending their procedures constitute injury to Plaintiffs' ability to carry out their activities.

For example, "[t]he D.C. Circuit has repeatedly held that an organization cannot show injury-in-fact just by alleging that agency action will make *future* lobbying or educational efforts more difficult." *Commissioned Officers Ass'n of U.S. Pub. Health Serv. v. Bunch*, 2022 WL 951271, at *7 (D.D.C. Mar. 30, 2022) (emphasis added). And "[i]n *Food & Water Watch, Inc. v. Vilsack*, the court held that an organization dedicated 'to educat[ing] the public about food systems that guarantee safe, wholesome food produced in a sustainable manner,' 808 F.3d 905, 920 (D.C. Cir. 2015) (citation omitted), lacked standing to challenge a Department of Agriculture rule modifying the agency's poultry slaughterhouse inspections." *See id*. at 911–12, 920–21. "The D.C. Circuit reached this conclusion even though the new rule would force the organization to 'increas[e] its efforts to educate members of the public' about the inadequate inspection regime and to "increase the amount of resources that it spends encouraging its members . . . to purchase poultry at farmers' markets or direct from producers.'" *Id.* at 920 (citations omitted). The Court held that "[s]ince the new rule neither 'limit[ed] its ability to seek redress for a violation of law' nor 'restrict[ed] the flow of information that [the plaintiff] uses to educate its members,' the organization had not shown that its 'organizational activities have been perceptibly impaired in any way.'" *Id.* at 921. The Court concluded that the organization had presented "nothing more than an abstract injury to its interests that is insufficient to support standing." *Id.*

The issues raised here by the organizational Plaintiffs are akin to those in *Food & Water Watch*. There is no allegation that the Rules cause an "inhibition of [Plaintiffs'] daily operations." *PETA v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015). Plaintiffs do not claim that the Rules

17

interfere with their ability to provide services to those who are detained and given credible fear or reasonable fear interviews. Nor do they claim it interferes with their ability to provide other forms of immigration-related guidance to aliens. At its core, Plaintiffs' complaint is that the Rules make it more difficult for aliens to obtain asylum or other forms of protection in the United States by allowing the review of mandatory bars for relief and protection at the credible fear and reasonable fear interviews. This boils down to an abstract disagreement with the implementation of the Rules, not an impairment of Plaintiffs' ability to provide services. Even assuming that the Rules have an incidental effect of temporarily frustrating Plaintiffs' organizational missions of helping aliens obtain asylum and other protection in the United States (they do not), such "frustration of an organization's objective" alone cannot constitute a cognizable Article III injury. *Food & Water Watch*, 808 F.3d at 919; *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) ("[T]he presence of a direct conflict between the defendant's conduct and the organization's mission is . . . not alone sufficient . . . to establish standing."); *Citizens for Resp. & Ethics in Washington v. U.S. Off. of Special Couns.*, 480 F. Supp. 3d 118, 128 (D.D.C. 2020) ("[A]n organization seeking to bring a case in its own right must first allege that the challenged conduct perceptibly impairs its activities, as opposed to merely frustrating its mission.").

The fact that Plaintiffs claim a potential future loss of funding from a potential future diminishment of a particular client base, Compl. ¶¶ 165, 167, does not alter this analysis. The Complaint does not contain sufficient factual matter to support this allegation, as it does not identify the parameters of any particular funding sources or the particular projected impact of the Rules on Plaintiffs' ability to receive that funding. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) ("[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim of standing that is plausible on its face.") (cleaned up).

Accordingly, this alleged loss of funding is too vague, speculative, and distant to support standing. At most, Plaintiffs' claim of injury from alleged future loss of funding due to a diminishment of their client base is circular. They claim the funding they receive is tied directly to the provision of certain services to certain aliens, and if the Rules result in them reducing their services or serving fewer clients, their funding will be proportionally reduced. Compl. ¶ 167. That claim incorrectly assumes the conclusion that a reduction in the number of aliens they can serve is a cognizable injury in the first place; if it is not, then Plaintiffs cannot claim any cognizable injury from not receiving funding for services they are no longer providing.

Plaintiffs also assert that the Rules will cause them to "divert resources" to learning about the Rules, training staff, and revising "Know Your Rights" materials or otherwise educating aliens and relevant communities. Compl. ¶¶ 146, 148, 159, 160, 165, 166. But these alleged actions and related expenditures are ones Plaintiffs have chosen to undertake in response to the Rules as a continuation of Plaintiffs' core activities. They do not represent any separate impairment of Plaintiffs' pre-existing activities. An organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Alliance*, 602 U.S. at 394. "[S]omething about the challenged action itself—rather than the organization's response to it—[must] make[] the organization's task more difficult." *Ctr. for Responsible Science v. Gottlieb*, 346 F Supp. 3d 29, 41 (D.D.C. 2018). This rule is not limited to pure issue-advocacy organizations but applies equally to direct services organizations who spend money in response to the policy. As the Supreme Court's reasoning in *Alliance* made clear, courts may not allow the diversion of resources in response to a policy to confer standing—instead, the organization must show that the new policy directly harms its already existing core activities. *See Alliance*, 602 U.S. at 395; *see CHIR v. DHS*, F. Supp. 3d, 2025 WL 1078776, at *5 (D.D.C. April 10, 2025). ("[S]elf-

serving observation[s]" that an organization will "have to increase the resources that it spends on educating the general public and its members" about the consequences of government regulation are "insufficient to support standing."). To hold otherwise would impermissibly allow organizations to manufacture standing to challenge any policy that touches on their mission. *See id.* at 394. As the Supreme Court explained, its prior decision in *Havens Realty*—an "unusual case"—did not establish such a broad standing rule. *Id.* at 395–96. To the extent that any D.C. Circuit or district court authority suggests that it would be enough for an organization to plead a frustration of mission and some action taken in response to that frustration—without any showing of an impairment to its pre-existing activities—such precedent conflicts with *Alliance*.

Moreover, Plaintiffs' alleged resource expenditures on educational efforts are insufficient to allege standing, even under pre-*Alliance* precedent. "[A]n organization does not suffer an injury in fact where it 'expend[s] resources to educate its members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.'" *Food & Water Watch*, 808 F.3d at 920 (quoting *Nat'l Taxpayers Union, Inc. v. U.S.*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)); *see also Int'l Acad. of Oral Med. & Toxicology v. FDA*, 195 F. Supp. 3d 243, 258 (D.D.C. 2016); *O.A. v. Trump*, 404 F. Supp. 3d 109, 142–43 (D.D.C. 2019) (finding organizational injury where challenged rule imposed "additional demands" on the organizational plaintiff that made it more difficult to serve its client base). Here, Plaintiffs have not alleged an actual or projected overall increase in expenditure due to the Rules or any added operational costs. Instead, the research and educational activities Plaintiffs claim represent a "continuation" of the "core set of activities" (providing guidance to asylum-seekers) that the organizations were already conducting in furtherance of their mission. *See Int'l Acad. of Oral Med. & Toxicology*, 195 F. Supp. 3d at 258; *see* Compl. ¶¶ 148, 152, 159, 160, 162, 165.

Such an "attenuated" theory of standing, the Court reasoned, would improperly allow doctors to challenge virtually any change in policy that might indirectly affect the health or safety of potential patients because it might affect the number of patients they serve, or the time involved in helping those patients. *Alliance*, 602 U.S. at 391–92. There "would be no principled way to cabin such a sweeping doctrinal change" that would allow various groups to challenge policies affecting their potential clients, such as "[t]eachers in border states" "su[ing] to challenge" changes to "immigration policies" that would affect the number of students in their classrooms. *Id.* at 392. The "Court has consistently rejected" such an "approach to standing" "as flatly inconsistent with Article III." *Id.* Plaintiffs' theory would also, as a practical matter, nullify the principle that a lawyer has no independent litigable interest in the legal rules applicable to the lawyer's clients. *See, e.*g., *Kowalski v. Tesmer*, 543 U.S. 125, 130–34 (2004). Thus, the three organizational Plaintiffs have failed to demonstrate standing. Without a plaintiff remaining, this Court should dismiss the Complaint in its entirety. *See* Fed. R. Civ. P. 12(b)(1).

### C. The Organizational Plaintiffs Have Not Alleged Associational or Third-Party Standing and Are Outside the Zone of Interests.

Plaintiffs' Complaint does not provide any factual basis to support other theories of standing. Although an organization may be able to demonstrate associational standing to sue on behalf of its members, Plaintiffs have not even alleged that they are membership organizations, let alone identified a single member who has suffered, or will imminently suffer, a concrete injury from the Rules. *See generally* Compl.; *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) ("[A]n association has standing to bring suit on behalf of its members when . . . its members would otherwise have standing to sue in their own right[.]"); *Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219, 1225 (D.C. Cir. 2024) (same).

Plaintiffs likewise do not purport to—and cannot—assert third-party standing to bring suit on behalf of unidentified aliens impacted by the Rules. "Ordinarily, a party must assert his own legal rights and cannot rest his claim to relief on the legal rights of third parties." *Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017) (cleaned up). Generally, courts will not recognize standing to assert others' rights unless the third-party plaintiff has "a close relationship with the person who possesses the right [and] there is a hindrance to the possessor's ability to protect his own interests." *Id.* (alteration in original); *see also Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004); *AILA v. Reno*, 199 F.3d 1352, 1364 (D.C. Cir. 2000).

Indeed, this case presents the exact issue of third-party standing raised in *AILA*, 199 F.3d at 1358. There, AILA and other organizational plaintiffs challenged DHS's regulations implementing expedited removal on behalf of unnamed aliens who had been or would be processed pursuant to the new regulations implementing expedited removal and unnamed lawyer members who represented them. *Id.* at 1357. Addressing third-party standing *sua sponte*, as an aspect of prudential standing, the D.C. Circuit first addressed whether Congress had granted via 8 U.S.C. § 1252(e)(3) an express right of action to challenge the implementation of the expedited removal statute to persons who would otherwise be barred by the principles of third-party standing. *Id.* at 1358. The Court concluded that nothing in § 1252 allowed litigants—whether individuals or organizations—to raise claims on behalf of those not party to the lawsuit. *Id.* ("Congress meant to allow actions only by aliens who have been subjected to the summary procedures contained in § 1225(b) and its implementing regulations."); *see also id.* ("Congress meant to allow litigation challenging the new system by, and only by, aliens against whom the new procedures had been applied."). Having found no Congressionally created exception, the Court concluded that the

organizational plaintiffs could not establish third-party standing because no hindrance existed preventing the aliens subject to the rule from protecting their own interests. *Id.* at 1362–63.

Here, none of the organizational Plaintiffs are natural persons subject to or potentially subject to expedited removal from the United States or potentially eligible for any form of relief or protection from removal. As discussed *supra*, E.Q., the sole alien party to this matter, does not have standing. And Plaintiffs have failed to identify any covered alien on behalf of whom they could bring their claims; thus they cannot possibly show the requisite close relationship. Plaintiffs have further failed to allege any hindrance to any alien's ability to bring his or her own claim to assert any purported rights to apply for asylum or other forms of protection within the United States. *See AILA*, 199 F.3d at 1357 (rejecting third-party standing claims where the organizational plaintiffs alleged that the challenged rule violated "not their rights or the rights of their members, but the constitutional and statutory rights of unnamed aliens who were or might be subject to the statute and regulations"); *cf. Make the Road N.Y. v. Wolf*, 962 F.3d 612, 628 (2020) (holding that litigation can be brought by affected individuals themselves). And as the D.C. Circuit ruled in *AILA*, Congress did not create an exception to the rule of third-party standing when it passed 8 U.S.C. § 1252(e)(3).

The organizational Plaintiffs also cannot show that they are within the zone of interests protected by the statutes they claim Defendants have violated: 8 U.S.C. §§ 1158, 1231, 1225. "The zone of interests test requires that the plaintiff's complaint fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 811 (D.C. Cir. 1987) (quotation marks omitted). *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). A plaintiff must be "adversely affected or aggrieved by agency action within the meaning of a relevant statute" to sue under the APA. 5

U.S.C. § 702. A plaintiff "may not sue unless he falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Thompson v. N. Am. Stainless*, 562 U.S. 170, 177 (2011). Having failed to establish third-party standing, the organizational Plaintiffs would need to show that the interests they allege were injured by the Rules fall within the respective zones of interests intended to be protected or regulated by the statutory provisions they allege are violated. *See Haitian Refugee Ctr.*, 809 F.2d at 812. They cannot.

With respect to expedited removal, neither section 1225 nor section 1252 evinces any concern with organizations or their interest in representing aliens subject to expedited removal. *See* 8 U.S.C. § 1225(b)(1)(A). These provisions do not regulate the organizational Plaintiffs' conduct or create any benefits for which the organizations may be eligible. For example, section 1252(e)(3) is a jurisdiction-conferring statute and does not "provid[e] plaintiffs with a cause of action to challenge the government's implementation of the expedited removal system." *Make the Road N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 36 (D.D.C. 2019); *see also O.A.*, 404 F. Supp. 3d at 140 (finding no "feature of § 1252(e)(3) suggesting that it provides a cause of action, much less an exclusive cause of action for claims brought challenging implementation of the expedited removal statute"). Plaintiffs point to no provision in the asylum or withholding of removal statutes intended to protect or regulate organizations' interests in providing social and legal services to aliens. 8 U.S.C. §§ 1158, 1231; *see generally* Compl. Rather, on their face, these statutes regulate or protect only the interest of aliens in applying for relief or protection from removal. 8 U.S.C. §§ 1158, 1231; *see Haitian Refugee Ctr.*, 809 F.2d at 813. Indeed, organizations that "provide legal help to immigrants" do not satisfy the zone-of-interests test in this context. *INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1302 (1993). Federal immigration

law was "clearly meant to protect the interests of undocumented aliens, not the interests of organizations." *Id.* at 1305. The fact that an immigration regulation "may affect the way an organization allocates its resources" for representing aliens accordingly does not bring the organization "within the zone of interests" that the asylum and withholding statutes protect. *Id.*

## II.     The Organizational Plaintiffs Cannot Challenge the Reasonable Fear Provisions of the Rules.

Even if Plaintiffs passed the threshold of Article III and prudential standing (they do not), no Plaintiff could challenge the "reasonable fear" provisions of the Rules—their amendments to 8 C.F.R. §§ 208.31 and 1208.31—which are applicable only to aliens ordered removed under 8 U.S.C. § 1228(b) (non-lawful permanent resident aggravated felons) and whose prior orders of removal have been reinstated under § 1231(a)(5) who receive a fear screening before removal. E.Q. does not allege that he was subject to the Rules' reasonable fear procedures at all. And, as explained below, the INA precludes review in suits brought under the APA by Plaintiff organizations.

A plaintiff may not seek review under the APA if "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). The Supreme Court has accordingly recognized that, by providing a detailed scheme for administrative and judicial review, Congress can displace the APA's default cause of action. *See, e.g.*, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). Preclusion of review is determined "not only from [the statute's] express language, but also from the structure of the statutory scheme." *Id.*

In particular, Congress may impliedly preclude some parties from seeking judicial review of administrative action by constructing a detailed scheme that provides for review only by other parties. For example, in *Block*, Congress provided for dairy "[h]andlers and producers—but not consumers"—to "participate in the adoption and retention of" certain agency orders related to milk

prices and for handlers, at least, to pursue administrative remedies and obtain judicial review of agency orders with which they disagreed. 467 U.S. at 346. In holding that the statutory structure precluded consumers' attempt to challenge those orders through the APA, the Supreme Court explained that there was no "express provision for participation by consumers in any" administrative or judicial proceeding related to the orders and that, "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* at 347.

The same is true here with respect to the Rules' reasonable fear provisions. The INA provides for administrative and judicial review at the behest of aliens, *see* 8 U.S.C. § 1252(a)(5), (b)(9), (e)(3), but its comprehensive scheme provides no role for third parties like the Plaintiff organizations to play in that process in their own right (rather than as counsel for their clients).[3] The omission of any such right to review is itself sufficient to conclude that Congress intended to preclude Plaintiff organizations from challenging the Rule through the APA.

The conclusion conforms to the principle that a person does not have Article III standing to challenge the government's enforcement decisions affecting third parties—that is, an individual has "no judicially cognizable interest in procuring" or preventing "enforcement of the immigration laws" against someone else. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984). Even with respect

---

[3]     Specifically, the "zipper clauses" of § 1252, subsections (a)(5) and (b)(9), provide that "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal . . . except as provided in subsection (e)" and, again, that "[j]udicial review of all questions of law and fact" arising from removal proceedings must be consolidated into judicial review of a final removal order. 8 U.S.C. § 1252(a)(5), (b)(9). The exceptions in subsection (e), including (e)(3)'s provision allowing challenges on the "validity of the system" only apply to "orders under section 1225(b)(1)," not the §§ 1228(b) and 1231(a)(5) orders associated with reasonable fear proceedings. Thus, all challenges to administrative removal orders under § 1228(b) and § 1231(b), and associated reasonable fear proceedings, must be brought by individual aliens in petitions for review.

to aliens, the INA imposes careful limitations on the mechanisms for that review. For example, an alien may obtain judicial review only of questions arising out of removal proceedings through a challenge to a final removal order. *See* 8 U.S.C. § 1252(b)(9); *see also Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1070 (2020) (explaining that "Congress intended th[is] zipper clause to consolidate judicial review of immigration proceedings into one action" (quotation omitted)). And, as discussed above, challenges to regulations implementing the expedited removal process may be brought only in certain actions in the U.S. District Court for the District of Columbia subject to defined restrictions on the court's review. *See* 8 U.S.C. § 1252(a)(5), (e)(3). Permitting Plaintiff organizations to challenge the reasonable fear portions of the Rules through an APA suit would "severely disrupt" the INA's "complex and delicate administrative scheme," including by providing plaintiffs' alien clients "a convenient device for evading the statutory" restrictions on review. *Block*, 467 U.S. at 348. It is thus "clear that Congress intended that judicial review" of regulations implementing the INA "ordinarily be confined to suits brought by" aliens "in accordance with" the INA's scheme. *Id.*

### III.  Plaintiffs Fail to State a Claim Under Counts I, II, or III Because the Rules are Consistent with the INA.

DHS's decision to consider the security-related bars to asylum and withholding of removal during credible fear screenings is consistent with the INA. The expedited removal statute at 8 U.S.C. § 1225(b)(1)(B)(v) defines "credible fear of persecution" to mean "a significant possibility . . . that the alien could establish eligibility for asylum" under 8 U.S.C. § 1158. On its face, the statute allows for the consideration of the mandatory asylum bars found at 8 U.S.C. § 1158(b)(2)(A). In the sub-paragraph entitled "Eligibility" at § 1158(b)(1)(A), the statute provides that an alien may be granted asylum if the alien "is a refugee." Then later in the same paragraph the statute provides that the "Eligibility" paragraph "shall not apply" to an alien who is

barred from asylum under the mandatory bars to eligibility. 8 U.S.C. § 1158(b)(2)(A). Accordingly, whether an alien is subject to the mandatory bars to asylum listed in § 1158(b)(2)(A) is a question of eligibility that easily falls within the purview of a credible fear screening. That is, if there is no "significant possibility" an alien can show a mandatory bar to asylum does not apply to him, 8 C.F.R. §§ 208.30(e)(2), (5), by definition he cannot demonstrate a "significant possibility" that he can establish eligibility for asylum, *see* 8 U.S.C. § 1225(b)(1)(B)(v).

As for withholding and CAT eligibility, the expedited removal statute is silent regarding the nature and availability of any screening. *See generally* 8 U.S.C. § 1225(b)(1)(A)–(B). This silence within the statute affords the Departments discretion in how to best implement their obligations in the expedited removal context. *See* 89 Fed. Reg. at 41,351 n.9; *see also Am. Immigr. Laws. Ass'n v. Reno*, 18 F. Supp. 2d 38, 56 (D.D.C. 1998) (observing that because the INA is "silent" regarding certain expedited removal procedures, the court "cannot impose upon the [agency] any obligation to afford more procedures than the governing statute explicitly requires or that [it] has chosen to afford in [its] discretion"), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000); *cf. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) (emphasizing that agencies "must be given ample latitude to adapt their rules and policies to the demands of changing circumstances" (quotation marks omitted)); *Vt. Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435 U.S. 519, 543 (1978) (underscoring that "administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties" (quotation marks omitted)).

Indeed, the Executive has always viewed the credible fear definition as allowing for consideration of statutory bars. After the passage of the Illegal Immigration Reform and Immigration Responsibility Act when the former Immigration and Naturalization Service ("INS")

first issued regulations implementing the credible fear screening process in 1996, it did not exempt the mandatory bars from consideration. *See Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 Fed. Reg. 444, 468–69 (Jan. 3, 1997) (asylum officer provision); *id.* at 460 (Immigration Judge review provision). INS did not add language requiring referral to removal proceedings despite potential bar applicability until 2000 in the rule *Asylum Procedures*, 65 Fed. Reg. 76,121, 76,129 (Dec. 6, 2000). Even there, the reasoning provided related entirely to public feedback without any question as to the ability to consider them. *See id.* ("Likewise, there were also suggestions that such a referral should be made regardless of any apparent statutory ineligibility under section 208(a)(2) or 208(b)(2)(A) of the Act. The Department has adopted that suggestion and has so amended the regulation.").

Plaintiffs' textual arguments concerning 8 U.S.C. §§ 1158 and 1231, *see* Compl. ¶¶ 168–78, do not overcome the statute's plain language allowing for consideration of mandatory bars when considering whether there is a "significant possibility" that an alien "*could* establish eligibility for asylum," 8 U.S.C. § 1225(b)(1)(B)(v) (emphasis added).

*First*, Plaintiffs are wrong in claiming that the DHS Bars final Rule violates § 1158(a)(1)'s "right" to apply for asylum subject to the exceptions in § 1158(a)(2). Compl. ¶¶ 26, 168–74. By focusing on § 1158, this argument fails to grapple with the broad authority afforded DHS in the expedited removal statute to determine whether there is a "significant possibility" that an alien "could" establish eligibility for asylum. 8 U.S.C. § 1225(b)(1)(B)(v). Furthermore, this argument skips over the portion of the statute, subsection (b)(2), that plainly supports the opposite view. True enough, subsection (a) of § 1158 generally allows that all aliens may apply for asylum unless they can be removed to a third country pursuant to an international agreement, have not applied

within one year of entry, or have previously been denied asylum. And subsection (b)(1) generally describes those aliens to whom the Secretary of Homeland Security and Attorney General may actually grant asylum. 8 U.S.C. § 1158(a), (b). But critically, subsection (b)(2) says that "[p]aragraph (1) [criteria for eligibility] shall not apply" in the case of the mandatory bars, set forth at § 1158(b)(2)(i)–(vi). A plain reading of § 1158 is that paragraph (b)(1)(A) does not apply at all to aliens described in (b)(2), whether they are prospective applicants or have already applied. In the case of mandatory bars, only subsection (a) applies. In short, the Rules are consistent with the plain language of § 1225(b) and § 1158.

Plaintiffs' claim that the statute requires a positive credible fear finding where an alien establishes that he is a "refugee"—without regard to the mandatory bars—is also contrary to the plain text of the statute. *See* Compl. at ¶¶ 179–84. The statute defines "credible fear of persecution" in reference to whether the alien could demonstrate a significant possibility he could establish eligibility for asylum, not whether he is a "refugee." *See* 8 U.S.C. § 1225(b)(1)(B)(v). The legislative history Plaintiffs identify to support this claim (Compl. ¶ 94) similarly cannot overcome the statute's plain language, which does not incorporate the two-question approach the House Report identifies but rather includes entirely different language asking whether there is a "significant possibility" that the alien could establish "eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v). Had Congress intended to adopt the two-question approach Plaintiffs propound, it could have done so. It did not. To the extent the legislative history has any bearing at all, it is consistent with consideration of the bars during credible fear screening interviews as one of the bars—the so-called "persecutor bar"—is part of the definition of "refugee." *Compare* 8 U.S.C. § 1101(a)(42)(B) ("The term 'refugee' does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of" a protected

ground.), *with id.* § 1158(b)(2)(A)(i) (barring from asylum eligibility an alien who "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of" a protected ground) *and id.* § 1231(b)(3)(B)(i) (same bar for withholding).

*Second*, Plaintiffs are wrong that the regulation is contrary to statute because it "requires the denial of relief to otherwise-eligible applicants following a decision on the merits." Compl. ¶ 171. The Rule instead provides that an alien will be found to have a "credible fear of persecution" if there is a significant possibility of eligibility for asylum or withholding of removal, "including that the alien is not subject to a mandatory bar, if considered." 8 C.F.R. § 208.30(e)(2). The mandatory bars will only be considered if the alien "appears to be subject" to one of them and, if the alien does so appear, then the asylum officer will determine whether there is a sufficient likelihood that "in a proceeding on the merits, the alien would be able to establish by a preponderance of the evidence that such bar(s) do not apply." *Id.* § 208.30(e)(5)(ii). Thus, Plaintiffs' claim that an alien may be found not to have a credible fear of persecution based on appearing subject to a mandatory bar is a straw man. Indeed, Plaintiffs fundamentally misunderstand the already existing interplay between the mandatory bars and the asylum applicant's ultimate burden of proof in immigration proceedings. In § 1229a proceedings, "[i]f the evidence indicates that one or more grounds for mandatory denial of the application for relief *may* apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply." 8 C.F.R. § 1240.8 (emphasis added); *accord Matter of M-B-C-*, 27 I. & N. Dec. 31, 37 (BIA 2017). The DHS Bars final Rule merely guides the asylum officer through the existing burden-shifting framework in a manner suited to the credible fear screening context, which "affords considerably less process" than § 1229a removal proceedings, *O.A.*, 404 F. Supp. 3d at 119. Consistently, the Rule instructs that, if an alien "appears to be subject to one or more of

31

the mandatory bars," the asylum officer must determine whether or not there is a "significant possibility" that "the alien would be able to establish by a preponderance of the evidence that such bar(s) do not apply." *See* 8 C.F.R. § 208.30(e)(5)(ii)(A)–(B). This is sufficient for § 1225(b)'s credible fear-screening process, as it is fully consistent with the expedited removal statute's instruction that asylum officers determine whether an alien "*could* establish eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v) (emphasis added). In other words, the Rules merely require aliens to establish that they could establish their eligibility for asylum or withholding of removal, to the relevant screening standard. 89 Fed. Reg. at 103,370. That process places the ultimate burden of proof on the alien, where it always resides in applications for relief and protection from removal. *See* 8 C.F.R. § 1240.8. The Rule does not lower or raise any standard; it adopts the merits hearing framework while applying the credible fear standard. 8 U.S.C. § 1225(b)(1).

*Third*, Plaintiffs' claim that only the Attorney General may consider the application of the mandatory bars, and thus an asylum officer cannot, Compl. ¶¶ 176–78, is unavailing. This peculiar reading of the statute would allow either the Secretary of Homeland Security or the Attorney General to grant asylum but allow only the Attorney General to deny relief based on the statutory bars. Such a reading is illogical. Indeed, under this reading, an alien who applies for asylum affirmatively before USCIS could never be denied asylum on a security-related ground. Additionally, DHS would not have to provide notice to aliens of the privilege of counsel and consequences of filing a frivolous asylum application as required of the Attorney General at § 1158(d)(4), and only the Attorney General could establish procedures for adjudicating asylum applications per § 1158(d)(1), which would explicitly contradict the statute's allowing the Secretary to grant asylum under § 1158(b)(1)(A). In any event, Plaintiffs' argument ignores that the Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended,

created DHS and transferred to it most functions related to the administration and enforcement of the immigration laws and that by operation of the HSA, certain references to the "Attorney General" in the INA are understood to refer to the Secretary of Homeland Security. HSA § 1517, 6 U.S.C. § 557; *see* 8 U.S.C. § 1103(a), (g); HSA § 451(b), 6 U.S.C. § 271(b); *see also Clark v. Martinez*, 543 U.S. 371, 375 n.1 (2005) (explaining that the Attorney General once exercised the sole authority to administer and enforce the INA, but that much of that authority has been transferred to the Secretary of Homeland Security).

*Fourth*, the DHS Bars final Rule's instruction for asylum officers to make negative credible fear determinations if there is "not a significant possibility" that an alien would be able to establish "by a preponderance of the evidence" that the mandatory bars do not apply, 89 Fed. Reg. at 103,370, is consistent with the standard in the expedited removal statute, 8 U.S.C. § 1225(b). For example, contrary to Plaintiffs' arguments, the Rule does not require aliens to prove a negative. Compl. ¶ 184. Instead, it requires asylum officers to consider the testimony and other evidence available to them to determine whether "there is not a significant possibility that, in a proceeding on the merits, the alien would be able to establish by a preponderance of the evidence that such bar(s) do not apply." 8 C.F.R. § 208.30(3)(ii)(A). This means, considering all the information provided, the asylum officer determines whether the alien has overcome that hurdle. To the extent Plaintiffs are challenging the fact that the statutorily created screening interview is not as fulsome as a merits adjudication, their suit is almost three decades too late. *See* 8 U.S.C. § 1252(e)(3)(B) (requiring that suit be brought within 60 days of the statute's first implementation).

Relatedly, Plaintiffs' claim that the Rules require documentary evidence as opposed to only testimonial evidence. Compl. ¶ 184. However, this is not true. The evidence needed may include the alien's oral testimony alone. *See* 89 Fed. Reg. at 103,375 (explaining that "[w]here an [asylum

officer (AO)] exercises discretion to consider a mandatory bar in a fear screening, the AO will provide the noncitizen with an opportunity to present evidence that the bar does not apply, and credible testimony alone may be sufficient evidence to make that showing"). In this case, for example, the asylum officer did not hide the ball. E.Q. was questioned about his "connections to the Taliban." E.Q. Decl. ¶ 9. In response to these questions, E.Q. had the opportunity to provide testimony rebutting any such connection, though he failed to do so. *See Garland v. Ming Dai*, 593 U.S. 357, 371 (2021) (explaining that the INA expressly distinguishes between credibility, persuasiveness, and the burden of proof). Additionally, asylum officers can certainly assess whether a "significant possibility" of eligibility exists based on "the credibility of the statements made by the alien" and "such other facts as are known to the officer." 8 U.S.C. § 1225(b)(1)(B)(v). As here, if the evidence available to the asylum officer is specific and reliable, and not rebutted by the alien's testimony upon questioning, such evidence may be very difficult to rebut, reducing the possibility to less than "significant" that the alien would be able to produce outside rebuttal evidence of the strength required to prevail in demonstrating a credible fear of persecution or torture.

## IV.    Plaintiffs Fail to State a Claim Under Count IV Because the Rules are Not Arbitrary or Capricious.

"[T]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs.*, 463 U.S. at 43. A reviewing court must be satisfied that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 43. The agency's decisions are entitled to a "presumption of regularity," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a

narrow one," *id.* at 416. At bottom, arbitrary-and-capricious review asks only whether "the agency has acted within a zone of reasonableness." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

The DHS Bars final Rule easily meets that deferential standard. The Rule was promulgated based on several urgent and compelling considerations, including: (1) the need for DHS to more quickly remove aliens who represent national security or public safety threats; (2) the need for increased operational flexibility to allow asylum officers, whose hands were previously tied, to use their judgment to apply the bars in cases where the government's evidence is available at the credible fear or reasonable fear interview, instead of wastefully sending such cases to full adjudication; and (3) the need to unburden ICE and EOIR in cases where a negative fear determination can be made at the screening stage for an individual who would otherwise need to traverse the entire immigration court process. 89 Fed. Reg. at 41,351–55. To meet these goals, the DHS Bars final Rule allows asylum officers to consider certain security-related mandatory bars during credible fear screening interviews where it appears that such bars may be applicable to an alien. 8 C.F.R. § 208.30(e)(5)(ii). Such permissive consideration of these specific bars is rationally related to the goals set forth above and in the NPRM and final Rule. It allows for the removal of aliens who represent significant threats, allows for operational flexibility where asylum officers' hands were previously tied, and unburdens ICE and EOIR from having to process for § 1229a proceedings aliens whose claims will ultimately be denied.

Plaintiffs do not argue that the DHS Bars final Rule fails to meet these goals or that it is not rationally related to them. Specifically, Plaintiffs claim that DHS's reliance on the fact that in some cases there is "easily verifiable evidence" that an alien is subject to a bar is faulty because that specific phrase is not used in the regulatory text. *See* Compl. ¶¶ 116–19. But that argument is

based on a faulty premise—that "the regulations instruct asylum officers to consider mandatory bars whenever it 'appears' that one might apply." Compl. ¶ 117 (quoting 8 C.F.R. §§ 208.30(e)(5)(ii), 208.31(c), 208.33(b)(2)(ii)). Not so. The Rule, as stated above, states that asylum officers "*may* consider the applicability of such bar(s)," thus providing asylum officers discretion. 8 C.F.R. § 208.30(e)(5)(ii). The preamble explains how DHS expects this discretion to be exercised—that is, where there is "easily verifiable evidence." 89 Fed. Reg. at 41,351. Thus, the Rule text does not conflict with the preamble.

Plaintiffs' further assertions of problems with the DHS Bars final Rule's reasoning are likewise unavailing as they boil down to nothing more than disagreement with DHS's policy choices. *See Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 380 (D.C. Cir. 2013) ("This argument amounts to nothing more than another policy disagreement with CFTC, so we must reject it."). Plaintiffs claim that "[t]he legal and factual complexity of the bars means that applying them in the context of screening interviews conducted on rushed timetables—without counsel or the opportunity to present documentary evidence—will inevitably result in the return to persecution (*refoulement*) of many people who could show eligibility for asylum or withholding of removal on the merits." Compl. ¶ 90. However, in making this claim, Plaintiffs ignore the lengthy and detailed responses to comments that the Defendants provided on these points in publishing the DHS Bars final Rule. *See* 89 Fed. Reg. at 103,372–404. Specifically, the DHS Bars final Rule addresses the concerns regarding aliens carrying the burden of proof, as well as Plaintiffs' concerns regarding lack of legal representation or the ability to provide evidence, as provided in § 1229a proceedings. *Id.* at 103,396; 103,374; 103,377–79. Further reading of the final Rule addresses concerns about erroneous denials by asylum officers, and states that asylum officers are instructed to develop the record and "ensure" an alien has a chance to explain why a given bar does not apply. *Id.* at 103,373;

103, 374–75. Here, Plaintiffs' argument is less that DHS did not consider relevant evidence or provide adequate responses to concerns in developing the Rule than that Plaintiffs would have come to a different conclusion based on that evidence.

Indeed, the agency addressed Plaintiffs' cited concerns relating to the complexity of the security-related mandatory bars and whether that complexity made their consideration inappropriate. DHS specifically rejected that assertion, based on the agency's experience and expertise in conducting screening interviews, stating:

> DHS rejects the assertion that the mandatory bars present issues that are inherently more complex than other issues that are regularly considered in screening interviews. While the Department acknowledges that certain issues in the consideration of mandatory bars can present complex factual and legal issues, it also believes that other issues routinely considered by AOs as part of a credible fear or reasonable fear determination, including, for example, the viability of certain particular social groups, whether certain types of harm rise to the level of persecution, complex issues surrounding the motivation of the persecutor, whether the noncitizen has provided credible testimony, and whether certain types of feared harm would constitute torture if carried out, also involve complex legal and factual determinations.

89 Fed. Reg. at 103,385. Competing views about policy do not render an agency's action arbitrary and capricious. *Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1089 (D.C. Cir. 2017). And Plaintiffs' disagreement does not compel this Court to rule against DHS's policy choice, which is supported by decades of experience conducting screening interviews as well as merits adjudications.

Finally, Plaintiffs incorrectly assert that DHS failed to acknowledge or explain departures from prior policy judgments. Compl. ¶¶ 121–31; *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (when an agency changes policy is must "display awareness that it is changing position" and "show that there are good reasons for the new policy"). In 2022, the Departments adopted a rule that declined to allow for the application of mandatory bars during

credible fear screenings.[4] Contrary to Plaintiffs' claim, the DHS Bars final Rule clearly acknowledges the departure from the 2022 policy: "DHS acknowledges that this rule implements a policy choice that is different from its position in 2022[.]" 89 Fed. Reg. at 103,386. The Rule also explains the reasoning behind DHS's deviation from the 2022 policy. *Id*. at 103,386–87. For example, DHS explains that, although the policy has changed, the reasoning for it is not inconsistent with its 2022 position and does not significantly change the prior policy but now helps preserve the government's resources. *Id*. Because DHS acknowledged and reasonably explained the change in position, the Rule is neither arbitrary nor capricious. *See Las Americas Immigr. Advoc. Ctr.*, 2025 WL 1403811, at *18 (D.D.C. May 9, 2025) (upholding the government's adoption of a higher screening standard for some claims in the Securing the Border Rule, concluding that the government's rejection of a higher screening standard in the Asylum Processing IFR "is not enough, on its own, to render this Rule's standard arbitrary and capricious" and determining that the government "reasonably explained why changed circumstances compelled them to depart from" their prior policy).

## <u>CONCLUSION</u>

For these reasons, this Court should deny Plaintiffs' Complaint for lack of subject-matter jurisdiction, Fed. R. Civ. P. 12(b)(1) and failure to state a claim, Fed. R. Civ. P. 12(b)(6).

---

[4]     *See Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 87 Fed. Reg. 18,078 (Mar. 29, 2022) (reversing regulations adopted by 2020 rule to consider mandatory bars during credible fear screenings) ("Asylum Processing IFR").

Dated: July 14, 2025

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*

ANTHONY P. NICASTRO
*Acting Director*

WILLIAM C. SILVIS
*Assistant Director*

*/s/ Cara E. Alsterberg*
CARA E. ALSTERBERG
*Senior Litigation Counsel*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 532-4667
Email: Cara.E.Alsterberg@usdoj.gov

TARYN L. ARBEITER
SHELBY WADE
*Trial Attorneys*

*Counsel for Defendants*