**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **E.Q.**, *et al.*, |
| Plaintiffs, |
| v. |
| **UNITED STATES DEPARTMENT OF HOMELAND SECURITY**, *et al.*, |
| Defendants. |

Case No. 25-cv-791 (CRC)

MEMORANDUM OPINION AND ORDER
(Public Version of ECF No. 48)

The year 2025 marked a sea change in federal immigration policy. Among other moves, the new presidential administration has aggressively pursued the removal of noncitizens, revoked protected status for various migrant groups, and even eliminated birthright citizenship. These changes have dominated new cycles and elicited vigorous legal challenges.

The federal immigration policy change at the heart of *this* case, by contrast, has made few headlines—and in fact was finalized a month before President Trump took office for the second time. In December 2024, the Department of Homeland Security ("DHS") promulgated a rule that allows asylum officers ("AOs") to consider whether a noncitizen is subject to certain mandatory bars to eligibility for asylum or other protections during credible fear and reasonable fear screenings (the "Mandatory Bars Rule"). Shortly after DHS issued the rule, the Executive Office for Immigration Review ("EOIR") issued an interim final rule authorizing its immigration judges to review AO determinations as to the potential applicability of a mandatory bar (the "EOIR Companion Rule").

E.Q., an asylum seeker from Afghanistan, and three immigration legal service providers have joined together to challenge the promulgation of both regulations under the Administrative

Procedure Act ("APA"). In a prior ruling, the Court denied E.Q.'s motion to stay his removal pending this litigation. Now, the government has moved to dismiss the case in its entirety on both jurisdictional and merits grounds.

First considering jurisdiction, the Court concludes that the organizational plaintiffs have standing to challenge the Mandatory Bars Rule and the EOIR Companion Rule (together, the "Rules"); fall within the zone of interests of the statute that the Rules purport to implement; and are not statutorily precluded from challenging the application of the Rules. E.Q.'s ability to proceed as a plaintiff is slightly murkier: He just satisfies his pleading burden as to standing, but the parties' briefs largely talk past each other on mootness. As explained below, the Court will defer opining on the mootness of E.Q.'s claims for relief until the summary judgment stage, giving both sides an opportunity to further ventilate their arguments.

On the merits, the government has jumped the gun in seeking dismissal of the plaintiffs' arbitrary-and-capricious claim on Rule 12(b)(6) grounds. The complaint raises plausible questions about the soundness of the Rules, especially because the government's current position seems to mark a complete reversal from its position just a few years ago. It may be that the Rules are "reasonable and reasonably explained." FCC v. Prometheus Radio Proj., 592 U.S. 414, 423 (2021). But without the benefit of the full administrative record, the Court cannot fulsomely assess the reasonableness of the agency action challenged here and will thus deny the government's motion to dismiss the arbitrary-and-capricious claim without passing on its merits. As the case will proceed to summary judgment, in the interest of judicial economy, the Court defers adjudication of the plaintiffs' contrary-to-law claim until that stage, as well.

## I.    Background[1]

### A. Statutory Background

Before reciting the facts in this case, the Court first reviews the three main forms of relief from removal that are available to noncitizens who fear persecution in their home countries: asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). It then explains how claims for such relief are asserted and adjudicated in expedited removal, a process which allows the summary deportation of certain migrants without a full hearing.

### 1. Protections from Removal: Asylum, Withholding and CAT Claims

Asylum is a first form of (discretionary) relief from deportation for noncitizens who are physically present or arrive in the United States. See generally 8 U.S.C. § 1158; see also INS v. Cardoza-Fonseca, 480 U.S. 421, 444 (1987) (explaining that those who qualify for asylum "are not *entitled* to anything, but are *eligible* for the discretionary relief of asylum"). Under the Immigration and Nationality Act ("INA"), "[t]he Secretary of Homeland Security or the Attorney General may grant asylum" to a noncitizen who has applied for asylum in accordance with governing requirements and procedures, so long as the noncitizen "is a refugee." 8 U.S.C. § 1158(b)(1)(A). A refugee, in turn, is an individual who is "unable or unwilling to return" to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. § 1101(a)(42)(A). "The burden of proof is on the applicant to establish that [he] is a refugee," and that one or more of the aforementioned protected grounds "was or will be at least one central reason for persecuting the applicant." Id. § 1158(b)(1)(B)(i). The applicant's testimony "may be

---

[1] This background section is adapted in significant part from the Court's prior Memorandum Opinion and Order on the motion to stay E.Q.'s removal. See ECF No. 40.

sufficient to sustain [his] burden . . ., but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." Id. § 1158(b)(1)(B)(ii).

Not all noncitizens may apply for asylum. If an individual (1) may be removed to a safe third country with which the United States has a qualifying agreement, (2) has not applied for asylum within a year of arriving in the United States, or (3) has previously been denied asylum, he may not apply for asylum relief. Id. § 1158(a)(2).[2] And especially pertinent here, not all noncitizens who qualify as "refugees" may be granted asylum. An otherwise-qualified individual may not receive asylum relief if "the Attorney General determines that" he (1) has persecuted others, (2) has been convicted of a "particularly serious crime," (3) has committed a "serious nonpolitical crime outside the United States," (4) poses a danger to national security, (5) has engaged in terrorist activity, or (6) has already firmly resettled in another country. Id. § 1158(b)(2). These are known as the "mandatory bars" to asylum status.

Withholding from removal is a second form of relief from removal authorized by the INA. A noncitizen may not be removed "to a country if the Attorney General decides that the [noncitizen's] life or freedom would be threatened in that country because of [their] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). "[T]o qualify for this entitlement," which, unlike asylum, is mandatory, a noncitizen "must demonstrate that it is more likely than not that [he] would be subject to persecution in the country to which he would be returned." Cardoza-Fonseca, 480 U.S. at 423

---

[2] There are two exceptions to these restrictions: "The one-year and previous-denial exclusions may be waived if an alien demonstrates changed circumstances or extraordinary circumstances, and the safe third country and one-year exclusions do not apply to unaccompanied children." E. Bay Sanctuary Covenant v. Trump, 932 F.3d 742, 757 (9th Cir. 2018) (quoting sub-sections of 8 U.S.C. § 1158(a)(2)).

(cleaned up). This is a more stringent standard than that for asylum; what results is a "broad class of refugees who are eligible for a discretionary grant of asylum, and a narrow class of [noncitizens] who are given a statutory right not to be deported to the country where they are in danger." Id. at 424. Despite the differences between asylum and statutory withholding, four of the mandatory bars also foreclose access to withholding, namely (1) persecution of others, (2) conviction of a particularly serious crime, (3) commission of a serious nonpolitical crime outside the United States, and (4) threat to national security. See 8 U.S.C. § 1231(b)(3)(B).

Finally, a noncitizen may seek protection from removal under CAT. Like statutory withholding, relief under CAT is non-discretionary and "precludes the removal of [noncitizens] to places where they will likely be tortured." Huisha-Huisha v. Mayorkas, 27 F.4th 718, 731 (D.C. Cir. 2022); see also 8 C.F.R. § 208.16(c)(4).

*2. Expedited Removal; Credible and Reasonable Fear Screening*

When a noncitizen in the United States wishes to seek asylum relief, he may do so in the form of an affirmative application. See 8 C.F.R. § 208.1(a)(1). He may alternatively raise asylum as a defense in full removal proceedings under 8 U.S.C. § 1229 or expedited removal proceedings under 8 U.S.C. § 1225. This case is about the processing of asylum and withholding claims in expedited removal proceedings, so the Court takes a brief detour to explain the history and nature of this process.

"Congress created the process of 'expedited removal' as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ('IIRIRA')." Make the Road N.Y. v. Wolf, 962 F.3d 612, 618 (D.C. Cir. 2020). The idea was to "substantially shorten and speed up the removal process" for those who arriving in the United States without proper documentation, as well as those who have not been admitted or paroled and cannot demonstrate that they have been

5

continuously present in the United States for two years. Id. at 618–19 (citations omitted). "Expedited removal lives up to its name," as an individual subject to the process may be ordered removed without a full hearing or appellate review. Id. at 619.

If, however, a noncitizen in removal expresses an intent to apply for asylum or a fear of persecution, there is a temporary reprieve: He is afforded a "credible fear interview" with an AO, who screens him for asylum, withholding, and CAT eligibility. See 8 U.S.C. § 1225(b)(1)(A)(i), (ii); see also Las Americas Immigrant Advoc. Ctr. v. DHS, 783 F. Supp. 3d 200, 207 (D.D.C. 2025) ("Las Americas"). Thus, even as the expedited removal scheme speeds up the removal process for certain individuals who enter the country unlawfully, it "distinguish[es] between [noncitizens] with potentially valid asylum claims and those who indisputably have no authorization to be admitted into the United States." Grace v. Barr, 965 F.3d 883, 887 (D.C. Cir. 2020) (cleaned up).

The credible fear interview itself is a "nonadversarial" proceeding, 8 C.F.R. § 208.30(d), in which an AO determines whether the noncitizen has a "credible fear of persecution," defined as a "significant possibility, taking into account the credibility of the statements made by the [individual] in support of [his] claim and such other facts as are known to the officer, that [he] could establish eligibility for asylum under section 1158," 8 U.S.C. § 1225(b)(1)(B)(v). If the AO is persuaded that the standard is satisfied, the noncitizen is taken out of expedited removal and placed into full removal proceedings. 8 C.F.R. § 208.30(f). If the AO instead determines that the noncitizen lacks a credible fear, he issues a negative credible fear determination, which the noncitizen may request to have reviewed by an immigration judge ("IJ"). Id. § 208.30(g). Should the IJ affirm that determination, expedited removal proceeds apace, and the noncitizen is ordered removed from the United States. 8 U.S.C. § 1225(b)(1)(B)(iii).

Given the nature of the screening process, time is of the essence. For instance, while noncitizens have the right to "consult with a person or persons" of their "choosing prior to the interview or any review thereof," the consultation "shall not unreasonably delay the process." Id. § 1225(b)(1)(B)(iv). And IJ review of an AO's credible fear determination "shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination[.]" Id. § 1225(b)(1)(B)(iii)(III).

As if this array of protections and proceedings is not dizzying enough, there are two groups of migrants who are not covered by the credible fear process, but are nevertheless subject to rapid removal. Noncitizens who have not been admitted for permanent residence and have been convicted of an aggravated felony are subject to what is called "administrative removal," pursuant to 8 U.S.C. § 1228. And individuals who have a prior removal order on the books and reenter the United States illegally will have their orders reinstated, pursuant to 8 U.S.C. § 1231. Noncitizens in either of these groups are not eligible for asylum. But if such an individual expresses a fear of returning to his country of origin, he undergoes a "reasonable fear" screening process, which involves a non-statutory interview resembling the credible fear interview that aims to prevent the individual's wrongful return to a country where he faces the likelihood of persecution or torture. In a reasonable fear interview, an applicant must establish a "reasonable possibility" of persecution or torture in the country of removal. 8 C.F.R. § 208.31(c). If he succeeds in doing so, he is referred to withholding-only removal proceedings. Id. § 208.31(e). If the AO instead issues a negative reasonable fear determination, the noncitizen may request IJ review, and if the IJ affirms the AO's determination, the individual is subject to immediate removal. Id. § 208.31(f), (g). The resulting final order of removal is subject to judicial review in a federal court of appeals, pursuant to 8 U.S.C. § 1252(a), (e).

B. Regulatory Background

Historically, immigration officials have assessed the potential applicability of a mandatory bar only after a noncitizen has been transferred into full removal proceedings. Cf. Asylum Procedures, 65 Fed. Reg. 76121, 76129 (Dec. 6, 2000) (explaining that referral for credible fear interview "should be made regardless of any apparent statutory ineligibility" under the mandatory bar provisions). In 2020, DHS promulgated a rule that would have, among other things, permitted the consideration of the mandatory bars during the screening process. See Proc. For Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 80274, 80391 (Dec. 11, 2020). The rule was short-lived and never took effect. See Pangea Legal Servs. v. DHS, 512 F. Supp. 3d 966 (N.D. Cal. 2021) (preliminarily enjoining implementation of rule). In 2022, DHS explained that it had returned to its prior, longstanding position because "[r]equiring asylum officers to broadly apply mandatory bars during credible fear screenings would have made these screenings less efficient, undermining congressional intent that the expedited removal process be truly expeditious, and would further limit DHS's ability to use expedited removal to an extent that is operationally advantageous." See Proc. For Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18078, 18093–94 (Mar. 29, 2022).

In the waning months of the Biden Administration, however, DHS again changed course, issuing a new rule—the Mandatory Bars Rule—which allows AOs to consider the applicability of the mandatory bars to asylum and withholding of removal during an initial screening interview. See generally Application of Certain Mandatory Bars in Fear Screenings, 89 Fed. Reg. 103370 (Dec. 18, 2024). More specifically, the rule provides:

> An alien will be found to have a credible fear of persecution if there is a
> significant possibility, taking into account the credibility of the statements made

8

by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act, *including that the alien is not subject to a mandatory bar, if considered under paragraph (e)(5)(ii) of this section.*

8 C.F.R. § 208.30(e)(2) (emphasis added).  Subsection (e)(5)(ii) further explains:

If an alien, who is unable to establish a credible fear of torture, is able to establish a credible fear of persecution but *appears to be subject to one or more of the mandatory bars to being granted either asylum or withholding of removal*, as set forth in section 208(b)(2)(A)(i) through (v) of the Act or section 241(b)(3)(B) of the Act, respectively, *the asylum officer may consider the applicability of such bar(s) as part of the asylum officer's credible fear determination.*

(A) The asylum officer *shall issue a negative credible fear finding* with regard to the alien's eligibility for asylum or withholding of removal under the Act *if the asylum officer determines there is not a significant possibility that, in a proceeding on the merits, the alien would be able to establish by a preponderance of the evidence that such bar(s) do not apply.*

(B) The asylum officer *shall issue a Notice to Appear or retain jurisdiction over the alien's case* for further consideration of the alien's claim pursuant to paragraph (f) of this section, *if the asylum officer finds that there is a significant possibility that, in a proceeding on the merits, the alien would be able to establish by a preponderance of the evidence that such bar(s) do not apply.*

Id. § 208.30(e)(5)(ii) (emphases added).

The Mandatory Bars Rule makes a similar adjustment to the reasonable fear screening process.  It provides that a noncitizen "shall be determined have a reasonable fear of persecution" if he "establishes a reasonable possibility that he or she would be persecuted on account of" a protected ground, "unless [he] appears to be subject to one or more of the mandatory bars to being granted withholding of removal under the Act[,]" and he "fails to show that there is a reasonable possibility that no mandatory bar applies, if the asylum officer considers such bars." 8 C.F.R. § 208.31(c).

A few days after DHS promulgated the Mandatory Bars Rule, EOIR issued an interim final rule making a "technical amendment" to DOJ's regulations. See generally Clarification Regarding Bars to Eligibility During Credible Fear and Reasonable Fear Review, 89 Fed. Reg. 105392 (Dec. 27, 2024). This EOIR Companion Rule clarifies that an IJ's *de novo* review of an AO's credible or reasonable fear determination "shall, where relevant, include review of" the application of the mandatory bars. Id. at 105402.

C. Factual Background

E.Q. and three organizational plaintiffs—the Amica Center for Immigrant Rights ("Amica Center"), the Florence Immigrant and Refugee Rights Project ("Florence Project"), and the Refugee and Immigrant Center for Education and Legal Services ("RAICES")—challenge the validity of the Mandatory Bars Rule and EOIR Companion Rule under the APA.

1. *E.Q.*

E.Q. is a native and citizen of Afghanistan who entered the United States unlawfully and was detained in Arizona in early 2025. Compl. ¶ 132. He expressed a fear of persecution or torture in Afghanistan and was therefore referred for a credible fear interview on February 4, 2025. Id. At that interview, before AO Desiree Driscoll, E.Q. stated that he fled his home country in ██ after the Taliban raided his home and accused him of being an "American spy." Id. ¶ 134. E.Q. believed he was targeted because one of his relatives worked with the U.S. military. See ECF No. 24-1 at 37. He also testified that, before leaving Afghanistan, he had worked at a ██████████ that served members of the Taliban, though he disclaimed having ever served them himself. Compl. ¶ 135; see also ECF No. 24-1 at 37.

AO Driscoll found that E.Q. had testified truthfully but issued a negative credible fear determination. Compl. ¶ 136; see also ECF No. 24-1 at 36. Driscoll's credible fear analysis

explained that E.Q. was subject to a mandatory bar, and also concluded that he had not suffered sufficient past harm in his home country that would "rise" to the "level" of persecution; did not "establish by a reasonable probability that [he] would be harmed in the future due to a protected characteristic that he possesses"; and, based on his testimony, would not "be able to establish in a full hearing that there is a reasonable probability" that he would face a future risk of torture by the Taliban. ECF No. 24-1 at 37–38.[3]

Upon reaching her determination, Driscoll completed two forms. Form I-870, the "Record of Determination" worksheet, indicated there was "[n]o [n]exus" between E.Q.'s fear of persecution and a protected ground. ECF No. 24-1 at 12. The form separately indicated that there were "reasonable grounds to believe" that E.Q. was subject to the security-risk and terrorist-activity mandatory bars. Id. Driscoll's Form I-870 concluded that E.Q. had "not established a significant possibility of establishing eligibility for asylum" and "received a negative credible fear determination." Id. A supervisory AO reviewed the form and approved it on February 9, 2025. Id. at 13.

A few days later, Driscoll completed Form I-869, the "Record of Negative Credible Fear and Reasonable Probability Finding and Request for Review by Immigration Judge[.]" Id. at 1–2. On that form, she checked a box indicating that E.Q. had not established the requisite

---

[3] Driscoll's analysis also indicated that E.Q. was likely subject to a limitation on asylum eligibility under the "Securing the Border Rule," see ECF No. 24-1 at 14–15; see also Securing the Border, 89 Fed. Reg. 48710 (June 7, 2024). That finding is tangential in this case, both because the Rules challenged here apply in credible fearing screenings even "where the Securing the Border" Rule used to "apply," see Application of Certain Mandatory Bars, 89 Fed. Reg. at 103370, and because "[a] noncitizen presumed ineligible for asylum" under the Securing the Border Rule "may still apply for statutory withholding of removal or CAT protection," see Securing the Border, 89 Fed. Reg. at 48720. The Court further notes that parts of the Securing the Border Rule, including the limitation on asylum eligibility, were vacated in May 2025, see Las Americas, 783 F. Supp. 3d at 222–24, before E.Q.'s second negative credible fear determination, which the Court discusses below, was affirmed by an IJ, see ECF No. 30 at 4–5.

11

likelihood of persecution or torture in his home country because he had not sufficiently demonstrated that he was "not subject to one or more mandatory bars to a grant of withholding of removal." Id. The I-869 also indicated that E.Q. had not established a reasonable probability of torture, specifically, because he had not established a reasonable probability that he would "suffer severe physical or mental pain or suffering" if returned to Afghanistan. Id. No other boxes on the I-869 were checked.

AO Driscoll's negative credible fear determination was reviewed by an IJ, who, on February 25, 2025, affirmed the determination. The IJ's decision indicated that E.Q. had not established a reasonable possibility of persecution or torture upon return to Afghanistan, but did not specifically articulate whether that conclusion was based on Driscoll's no-nexus or mandatory bars finding. See ECF No. 36-1 at 4–5.

After this lawsuit was filed in March 2025, the plaintiffs moved for an emergency stay of E.Q.'s removal. See ECF No. 8. The government subsequently notified the plaintiffs and the Court that it planned to reconsider E.Q.'s credible fear determination and conduct a second credible fear interview. See ECF No. 18. That interview took place on April 14, 2025 before AO James Fagan and also resulted in a negative credible fear determination, but on a different basis: Fagan concluded that E.Q. had not testified credibly for four reasons.

*First*, E.Q. stated in his first fear interview that the only reason he left Afghanistan was that members of the Taliban went to his home and ███████████████████████. See ECF No. 30 at 79. In his second interview, he testified, for the first time, that he left the country because of a summons that the Taliban sent to his home, ordering him to report to local law enforcement for questioning. Id. E.Q. attempted to resolve the discrepancy by noting that he was "stressed" during the first interview, but Fagan found this explanation unconvincing. Id.

*Second,* Fagan noted that E.Q.'s testimony about receiving a summons lacked detail in a way that "call[ed] into question" whether he ever received such a summons. Id. *Third,* Fagan observed that E.Q.'s testimony during the second interview about his time working at the ███████████ ████ was also lacking in detail—for instance, E.Q. could not recall the date or even the month that he stopped working there. Id. at 80. Fagan found that the lack of detail called into question E.Q.'s candor, especially because he had been able to provide specific dates of other events during his first interview. Id. *Fourth,* Fagan pointed out that E.Q. testified during his second interview that he was not present when the Taliban went to his home, as he went into hiding as soon as he received the summons from them—but in his first interview, E.Q. had described what happened during that visit as if he had personally been there. Id. Fagan found E.Q.'s explanation for the discrepancy in the testimony unpersuasive. Id.

When Fagan filled out the Form I-870, he indicated that E.Q. was not credible and also did "not appear to be subject to" a mandatory bar. Id. at 30–31. Fagan's Form I-869 likewise indicated that the ground for the negative determination was E.Q.'s lack of credibility. Id. at 24. An IJ affirmed Fagan's decision. Id. at 4–5.

### 2. Organizational Plaintiffs

Three organizational plaintiffs have joined with E.Q. to mount an APA challenge to the Rules: the Amica Center, the Florence Project, and RAICES. As the Court details below in its organizational standing analysis, all three groups provide legal services to detained immigrants— in the Washington, D.C. area, Arizona, and Texas, respectively. The Amica Center and RAICES assist detained individuals who are proceeding *pro se* in the screening process by providing them with legal information and gathering and submitting evidence on their behalf. See Compl. ¶¶ 146, 164–66. These organizations allege that the new Rules will force them to increase the time

and resources they must expend on each client, thereby reducing the number of total clients they can serve. Id. ¶¶ 147–48, 167. The Amica Center and the Florence Project also represent noncitizens in full removal proceedings, which is where the mandatory bars have historically been litigated. Id. ¶¶ 149–51, 155–60. As a result of the Rules, these groups allege that they will have to intervene earlier in the screening process to preserve clients' eligibility for relief and file additional petitions for review in federal court, and this shift will likely force the groups to represent fewer clients in full immigration proceedings. Id. Finally, the Florence Project serves as appointed counsel for those who are deemed mentally incompetent to represent themselves in removal proceedings. Id. ¶ 156. Because appointment only occurs after the credible fear or reasonable fear process has been completed, the Florence Project expects that the Rules will jeopardize their ability to represent such individuals. Id. ¶ 158.

## II.    Legal Standards

The government has moved to dismiss the complaint for lack of subject matter jurisdiction, see Fed. R. Civ. P. 12(b)(1), and failure to state a claim upon which relief can be granted, see Fed. R. Civ. P. 12(b)(6). Under Rule 12(b)(1), the plaintiff "bears the burden of invoking the court's subject matter jurisdiction, including establishing the elements of standing." Arpaio v. Obama, 797 F.3d 11, 19 (D.C. Cir. 2015). When standing is challenged, the plaintiff "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" Murthy v. Missouri, 603 U.S. 43, 58 (2024) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)). At the pleading stage, "plaintiffs are required only to state a *plausible* claim that each of the standing elements is present." Jibril v. Mayorkas, 20 F.4th 804, 814 (D.C. Cir. 2021) (cleaned up) (emphasis in original). In other words, the complaint "must state a plausible claim that the plaintiff has suffered an injury in fact fairly

14

traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." Humane Soc'y of the U.S. v. Vilsack, 797 F.3d 4, 8 (D.C. Cir. 2015). In evaluating standing, courts are to assume that plaintiffs will succeed on the merits. See Sandpiper Residents Ass'n v. HUD, 106 F.4th 1134, 1141 (D.C. Cir. 2024).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (cleaned up). The court "must accept all the non-movant's factual allegations as true when reviewing a motion to dismiss" under Rules 12(b)(1) and 12(b)(6), "but such allegations will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion[.]" Brady Campaign to Prevent Gun Violence United with the Million Mom March v. Ashcroft, 339 F. Supp. 2d 68, 72–73 (D.D.C. 2004) (cleaned up).

## III. Analysis

### A. Threshold Issues

The government raises several threshold issues—Article III standing, mootness, statutory standing, and preclusion—that, in its view, justify dismissal before reaching the underlying merits of this case. The Court addresses each of these issues in turn, first as to E.Q. and then as to the organizational plaintiffs. It concludes that, with the benefit of a newly-filed declaration that plausibly controverts the grounds on which E.Q.'s initial negative credible fear determination was based, E.Q. has managed to overcome his modest pleading burden as to standing at this early stage of the case. However, there remain unresolved mootness questions that would seem to benefit from further briefing. Rather than further delay forward movement in the case, the Court will therefore strike the portion of the government's motion to dismiss that pertains to mootness and defer a ruling on the issue until the summary judgment phase.

By contrast, the Court straightforwardly concludes that the organizational plaintiffs have made the requisite showing of Article III standing at this stage; fall within the zone of interests of the INA; and are not statutorily precluded from challenging the application of the Rules in the reasonable fear screening process. The Court is therefore reassured, at least at this early juncture, that it has jurisdiction over all the claims in this case and that the organizations are otherwise proper plaintiffs to lodge this administrative challenge.

### 1. E.Q.

#### a. Article III Standing

The government's opening jurisdictional salvo is that E.Q., the sole individual plaintiff in this case, lacks Article III standing to contest the recently-promulgated Rules. The parties have already litigated this issue twice over, first in the form of a motion to stay E.Q.'s removal and then through a motion to reconsider the Court's decision to deny that motion. The Court concluded both times that E.Q. likely lacked standing because there was an independent and sufficient ground for his negative credible fear determination: the no-nexus finding on the Form I-870, as substantiated by AO Driscoll's notes and written analysis. And even though the subsequent Form I-869 indicated the mandatory bars as the sole ground for the negative determination, the mismatch between the forms was not dispositive because "[n]othing in the statutes, regulations, or caselaw indicates that Form I-869 has special force." Mem Op. & Order, ECF No. 40 at 14; see also Op. & Order, ECF No. 41.

As noted above, to establish standing at the motion-to-dismiss stage, the complaint "must state a plausible claim that the plaintiff has suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." Humane Soc'y, 797 F.3d at 8. Traceability requires a showing "that the [alleged] injury was

16

likely caused by the defendant." TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021). And redressability requires a showing that the injury would "likely" be rectified "by the requested judicial relief." FDA v. Alliance for Hippocratic Med., 602 U.S. 367, 380 (2024) ("Alliance").

Although the parties focus their briefing on the latter two elements of the standing inquiry, the Court first considers the nature of the injury itself. E.Q.'s alleged injury is the application of the mandatory bars during his first credible fear interview because "standing is based on upon the facts as they exist at the time the complaint is filed." Nat. L. Party of U.S. v. FEC, 111 F. Supp. 2d 33, 41 (D.D.C. 2000) (citation omitted). The Court does not doubt that this is an injury-in-fact—but what kind? The plaintiffs take the position that E.Q.'s injury is procedural in nature—in other words, the mere application of the Mandatory Bars Rule was enough to injure E.Q., whether or not the outcome of his interview was predicated on the rule— and thus Article III's redressability requirement is relaxed. See, e.g., WildEarth Guardians v. Jewell, 738 F.3d 298, 305 (D.C. Cir. 2013)). The government does not engage this point.

The application of a specific, substantive rule during an agency adjudication is not self-evidently a procedural injury, especially in light of the D.C. Circuit's recent decision in Citizens for Const. Integrity v. Census Bureau, 115 F.4th 618 (D.C. Cir. 2024). There, the Circuit acknowledged that there is "no established test . . . for determining whether a claimed right is procedural or not," but suggested that where the "heart" of a "challenge is substantive" in nature—i.e., where it focuses less on the agency's conduct from an "operational standpoint" and more on the impact of the agency's conduct on the "rights and interests" of particular beneficiaries or constituencies—the challenge does not implicate a strictly procedural right. Id. at 625–26 (cleaned up). Under this analytical framework, E.Q.'s injury appears substantive,

17

rather than procedural, because the gravamen of his alleged harm goes directly to his rights and interests as an asylum seeker.

Next, the Court turns to the traceability and redressability considerations, which are often "flip sides of the same coin." Sprint Commc'ns Co v. APCC Servs., Inc., 554 U.S. 269, 288 (2008). The dispute surrounding these elements turns on whether the IJ's summary affirmance of AO Driscoll's negative credible fear determination could have been based on her no-nexus finding, as indicated on the Form I-870, or was based solely on her mandatory bars finding, as indicated on the Form I-869.

On this issue, the Court stands by its prior conclusion that there is "[n]othing in the statutes, regulations, or caselaw [that] indicates that Form I-869 has special force." Mem Op. & Order, ECF No. 40 at 14. The expedited removal statute requires the AO to prepare a "written record of a determination," which includes a "summary of the material facts as stated by the applicants," along with the officer's "analysis of why, in light of such facts, the alien has not established a credible fear of persecution." 8 U.S.C. § 1225(B)(iii)(II). The officer's interview notes and fear worksheet are to be included in that packet. Id. Although regulations provide that an IJ reviewing the AO's decision "shall conclude the review . . . no later than 7 days after the date the supervisory asylum officer has concurred with the asylum officer's . . . determination issued on the Form I-869," 8 C.F.R. § 1003.42(e), that same regulation also provides that the IJ's jurisdiction over the appeal of the AO's decision "commence[s]" when a "complete copy of the record of determination as defined in section [1225](b)(1)(iii)(II)" is provided to the immigration court, id. at § 1003.42(a). In other words, the Court has no reason to believe that the IJ does not receive and review the entirety of the AO's "record of determination." As a matter of statute and regulation alone, then, the Court is still not persuaded of Form I-869's primacy.

18

This time around, however, the plaintiffs have submitted a declaration from a former AO, Amanda Meadow, who attests that, as a matter of operational reality, officers do not necessarily input information on Form I-870 that they intend to be legally conclusive. See generally Amanda C. Meadow Decl., ECF No. 44-1. "'No nexus' is frequently checked on the I-870 in cases in which there is a negative decision, but the failure to establish nexus is not the actual reason for the denial," Meadow explains. Id. ¶ 9. "For instance, in a case in which the [AO] makes an adverse credibility determination, 'no nexus' would be checked on the I-870 because the applicant's failure to testify credibly means that the Asylum Officer cannot make a finding on nexus. That does not mean that the applicant's failure to establish nexus was the reason for the denial." Id. Meadow also more generally asserts that the AO's "checking of the 'no nexus' box on the I-870 does not necessarily mean that there is a legally sufficient denial based on a lack of nexus. Rather, the I-869, which is supported by the checklist, indicates the *actual* reason for the denial and the legal sufficiency of that determination." Id. ¶ 10.

With this declaration, the plaintiffs' argument that the agency's negative credible fear decision here was based on the mandatory bars and *not* the no-nexus finding strikes the Court as at least plausible. The declaration calls into question whether the AO understood the no-nexus finding to serve as the legal justification for her initial determination. Although the IJ's review was silent as to the specific ground on which he or she affirmed, the Court notes that DHS regulations provide that the IJ's *de novo* review of the AO's determination "*shall*, where relevant, include review of the asylum officer's application of any bars to asylum and withholding of removal." 8 C.F.R. § 1003.42(d) (emphasis added). So the IJ reviewing AO Driscoll's decision would have been required to review her mandatory bars decision. While it is fair to presume that the IJ would have also looked at Driscoll's recitation of the facts, analysis,

19

and notes, <u>see</u> 8 C.F.R. §§ 208.30(e)(1), 1003.42(a), the newly-filed declaration suggests the I-869 may have special force among those materials, as a factual matter. If that is true, the plaintiffs have at least stated a plausible claim that E.Q. suffered an injury "fairly traceable" to the application of the Rules that would have been "likely to be redressed by" the vacatur of those Rules at the time of the complaint's filing. <u>Humane Soc'y</u>, 797 F.3d at 8.

In response, the government engages little with the Meadow declaration, other than to point out that it rests on her "personal knowledge," rather than citing to a "specific statute, regulation, or any case law to support her assertions." Reply Br. at 2. But the government does not dispute the possibility of a factual, rather than strictly legal, dispute as to the force of Form I-869—though it was presumably not able to submit its own declaration(s) to contest Meadow's because "the plaintiff is protected from an evidentiary attack on his asserted theory [of standing] by defendant" at the Rule 12(b)(1) stage. <u>Settles v. U.S. Parole Comm'n</u>, 429 F.3d 1098, 1107 (D.C. Cir. 2005) (citation omitted).

While the Meadow declaration is enough to get the plaintiffs over the modest motion-to-dismiss hurdle, a defendant wishing to attack a plaintiff's theory of standing with evidence of its own is free to do so at the summary judgment stage. <u>See Cherokee Nation v. U.S. Dep't of the Interior</u>, 643 F. Supp. 3d 90, 104 (D.D.C. 2022). It may be that the factual dispute here is illusory; that Meadow's representations are contested; or that her general observations about the relative weight of Forms I-869 and I-870 did not apply in E.Q.'s case, for whatever reason. All this is to say that the Meadow declaration may or may not hold its own down the line.

b. <u>Mootness</u>

Even if the plaintiffs have stated a plausible claim that E.Q. had Article III standing when this suit was initially filed, they have not yet reached the finish line. "The doctrine of standing

generally assesses whether" a plaintiff has a constitutionally adequate interest in the legal dispute "at the outset" of a case, whereas "the doctrine of mootness considers whether [such an interest] exists throughout the proceedings." Uzuegbunam v. Preczewski, 592 U.S. 279, 282 (2021). "[I]f in the course of litigation a court finds that it can no longer provide a plaintiff with any effectual relief, the case generally is moot." Id. Said another way, "[a] case is moot if a decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." Pub. Citizen v. FERC, 92 F.4th 1124, 1127–28 (D.C. Cir. 2024).

Mootness has a "flexible character" and is often described as a "pragmatic doctrine meant to limit judicial power to disputes capable of judicial resolution." D.L. v. District of Columbia, 860 F.3d 713, 722 (D.C. Cir. 2017) (cleaned up). In this spirit, "[a]n otherwise moot case may be salvaged if one of the exceptions to mootness applies." Atlas Brew Works, LLC v. Barr, 391 F. Supp. 3d 6, 14 (D.D.C. 2019) (Cooper, J.). "The party seeking jurisdictional dismissal bears the initial heavy burden of establishing mootness, but the opposing party bears the burden of proving an exception applies." J.D. v. Azar, 925 F.3d 1291, 1307 (D.C. Cir. 2019) (cleaned up).

The government contends that E.Q.'s claims for relief were mooted by his second negative fear determination, which was based on his lack of credibility and not any mandatory bar. All else equal, the Court would tend to agree. To be sure, E.Q.'s second interview did not entirely supersede the first, insofar as AO Fagan's adverse credibility ruling rested on inconsistencies between the answers given at the first and second interviews. But Fagan's determination did not purport to rest on the consideration of the mandatory bars in E.Q.'s first interview. As such, the Court is not convinced that the information unearthed in the first interview is somehow tainted by the Rules or AO Driscoll's findings in the first interview. Nor

is the Court persuaded that, if removed due to his second negative credible fear determination, E.Q. is likely to enter the United States again.

The wrinkle here is that the plaintiffs have raised the voluntary cessation exception to the mootness doctrine. Once a plaintiff makes a threshold showing that this exception applies, see Mehneh v. Rubio, 164 F.4th 928, 931 n.* (D.C. Cir. 2026); Samma v. DOD, 136 F.4th 1108, 1114 (D.C. Cir. 2025), the onus then shifts back to the defendant, who "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur," Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., 528 U.S. 167, 190 (2000); see also FBI v. Fikre, 601 U.S. 234, 241 (2024). This standard is "heightened" compared to the customary mootness standard because the voluntary cessation doctrine "is grounded in concerns that a party may be manipulating 'the judicial process through the false pretense of singlehandedly ending a dispute.'" Pub. Citizen, 92 F.4th at 1128.

The parties' briefs largely talk past each other as to whether the voluntary cessation exception applies. It is true, as the plaintiffs point out, that the government voluntarily reconsidered E.Q.'s initial credible fear determination after this lawsuit was filed. But it is also true, as the government emphasizes, that it has not ceased applying the challenged Rules. Neither side fully explains why the voluntary cessation exception is or is not triggered under the particular factual circumstances of this case, nor do they engage governing D.C. Circuit law on this threshold question. See, e.g., Pub. Citizen, 92 F.4th at 1128–29 (summarizing relevant considerations in determining whether the voluntary cessation exception applies); see also Mehneh, 164 F.4th at 931 n.*; Samma, 136 F.4th at 1114.

If the doctrine does apply, the government is hard-pressed to argue that it has carried its "formidable burden" of establishing that it is "absolutely clear the allegedly wrongful behavior

22

could not reasonably be expected to recur." Friends of the Earth, Inc., 528 U.S. at 190. Indeed, the government's reply brief neglects to address the likelihood that E.Q. may try to return to the United States after deportation, in which case he could arguably be subject to the reasonable fear screening process.

Given that the parties argue at cross-purposes as to the applicability and satisfaction of the heightened voluntary cessation standard, the Court might have ordered supplemental briefing on the issue to clarify the parties' respective positions. But as explained below, the Court has jurisdiction over the case as a whole in light of the organizational plaintiffs' Article III standing, see infra Section III.A.2, and the case is bound for summary judgment, see infra at Section III.B. In the interest of judicial efficiency, then, the Court will defer a ruling on mootness until the summary judgment phase.[4] Accordingly, it will strike that portion of the pending motion to dismiss concerning mootness, without prejudice.[5]

### 2. Organizational Plaintiffs

#### a. Article III Standing

Though E.Q.'s standing to challenge the Rules is a close question, the organizational plaintiffs' standing is far more straightforward. The parties appear to agree, as does the Court, that the organizational plaintiffs' injuries—if sufficiently concrete—satisfy the traceability and

---

[4] Given this circumstance, the Court does not address the plaintiffs' argument that "E.Q.'s claims cannot be moot because they arise under 8 U.S.C. § 1252(e)(3)," and E.Q. "stands in the shoes of all noncitizens who would be subject to the Rules in the future." Opp. to Mot. to Dismiss at 17. The plaintiffs may renew this argument at the summary judgment briefing stage.

[5] The Court's analysis of standing and mootness are not inconsistent with its orders on E.Q.'s Motion to Stay Removal. In those rulings, the Court concluded that E.Q. was unlikely to establish standing on the merits. Here, the Court merely reasons that he has plausibly alleged standing at this early stage based on a newly-filed, but contestable, declaration. As for mootness, the Court did not find it necessary to weigh in at those earlier junctures.

redressability requirements.[6]  The outstanding question is instead whether these plaintiffs have established a cognizable injury-in-fact.

"An organization demonstrates a sufficient injury in fact by alleging a concrete and demonstrable injury to the organization's activities that is more than simply a setback to the organization's abstract societal interests." Ctr. for Bio. Diversity v. U.S. Dep't of the Interior, 144 F.4th 296, 314 (D.C. Cir. 2025) (cleaned up).  As the Supreme Court recently reiterated, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." Alliance, 602 U.S. at 394.

Here, the complaint "state[s] a plausible claim" that the organizational plaintiffs have each "suffered an injury in fact." Humane Soc'y, 797 F.3d at 8.  According to the complaint, all three groups are legal services providers who will be forced to reconfigure their programing and the representation they provide to clients as a result of the new Rules.  Based on the allegations at this early stage, the government's "actions" are "directly" poised to "affect[] and interfere[] with" the organizations' "core business activities." Alliance, 602 U.S. at 395.

Let's start with Amica Center, which provides "direct legal services to migrant adults and children at risk of detention and deportation" in and around Washington, D.C.  Compl. ¶ 13.  The complaint alleges that the Rules "impose significant burdens on and divert already-limited resources from" the Center's Legal Orientation Program, which assists detained noncitizens in Virginia who are proceeding *pro se* in the screening process by providing them with legal

---

[6] According to the complaint, the implementation of the Rules has or is poised to cause significant structural changes in the groups' provision of legal services, making the injury traceable to the government's action.  And assuming the plaintiffs prevail on the merits and the Court vacates the Rules, the groups could return to their normal allocation of resources and provision of services to detained clients, making the injury redressable by the relief sought.

information and "gathering and submitting evidence" on their behalf. Id. ¶ 146. The Center asserts that the "additional time and resources" it must expend on each client will "reduce the number of individuals" it can serve, as staff will have to work with clients to help them "understand whether the [mandatory] bars might come up in their fear interviews and potentially impact their eligibility for relief." Id. ¶ 147.

In addition, the Rules allegedly "hinder the work" of the Center's Detained Adult Program, "which provides merits representation to detained adult noncitizens in removal proceedings." Id. ¶ 149. In the normal course, the Center's attorneys can assist clients in addressing the mandatory bars once they get to merits proceedings in immigration court, "where they can present and respond to relevant evidence and complex legal arguments" about the applicability of the bars. Id. ¶ 149. Under the new Rules, staff must intervene earlier in the process to preserve clients' eligibility for relief and file additional petitions for review in federal court. To provide that depth of representation so early, the Center asserts that it "will likely be forced to reduce" the number of represented clients. Id. ¶¶ 150–51.

The same goes for the Florence Project, whose "core mission" is to provide "legal services to detained adults and children" in Arizona. Id. ¶ 155. The Project has "[h]istorically" focused on "serving detained noncitizens once their cases complete threshold screening interviews and arrive in the immigration court system." Id. ¶ 157. As a result of the Mandatory Bars Rule, the Project maintains that its staff will have to find other ways of reaching people earlier in the process and "spend significant additional time and resources helping applicants" in the screening process "collect documentary evidence that could be used to dispute allegations that a mandatory bar applies." Id. ¶¶ 157, 160. What's more, the Florence Project "serves as appointed counsel for individuals deemed mentally incompetent to represent themselves in

25

removal proceedings." Id. ¶ 156. The Project "gets appointed in these cases by immigration judges only after the credible fear or reasonable fear process has been completed." Id. ¶ 158. Thus, "[b]ecause the Mandatory Bars Rule will result in the application of the bars to people in this category before they have an opportunity to receive appointed counsel, the Florence Project's ability to be appointed to represent these individuals will be jeopardized." Id.

RAICES is also a legal services provider, assisting noncitizens who are detained in Texas. Alongside other services, RAICES "work[s] with detained people . . . helping them prepare for their screening interviews." Id. ¶ 164. According to the complaint, as with Amica Center and Florence Project, the new Rules compel RAICES to increase the time and complexity of its support for prospective clients, requiring additional procedures and staffing. Id. ¶¶ 165–66. And as a result, the complaint alleges that "RAICES will be forced either to serve fewer clients or to provide fewer services, which will undermine funding sources" that are tied to client and service volume. Id. ¶ 167.

In short, the complaint conveys that the organizations' core activities—providing legal services to detained noncitizens—will be materially impaired by the government's new regulations. Amica Center, the Florence Project, and RAICES have not alleged a mere "diver[sion]" of "resources in response to [the government's] actions." Alliance, 602 U.S. at 395. Nor do the new Rules require them simply to "work harder" to lobby, educate, or advance their preferred policy objectives. Ctr. for Bio. Diversity, 144 F.4th at 315. Instead, the groups have plausibly alleged the need to make new "programmatic expenditures" to alleviate the Rules' direct interference with the legal services they offer to current and prospective clients. Id. This injury is "analogous to the paradigmatic organizational standing injury described by the Supreme Court" in Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982). Las Americas, 783

26

F. Supp. 3d at 217. And it resembles other organizational injuries that courts in this district have held to be sufficiently concrete for Article III purposes, even after Alliance. See, e.g., id.; League of United Latin Am. Citizens v. Exec. Off. of Pres., 808 F. Supp. 3d 29, 57–63 (D.D.C. 2025) (civic organizations concretely injured by executive order that would interfere with their ability to provide voter registration services); Ctr. for Taxpayer Rights v. IRS, -- F. Supp. 3d --, 2025 WL 3251044, at *8–11 (D.D.C. Nov. 21, 2025) (taxpayer counseling service concretely injured by the IRS's adoption of a new "data policy" that permitted sharing of confidential taxpayer information with immigration enforcement).

The government's arguments to the contrary are unavailing. For starters, DHS tries to recast the organizations' injury as either pure issue advocacy or an attempt to litigate the interests of their clients, rather their own. See, e.g., Mot. to Dismiss at 16 ("[A]t base, . . . all the Plaintiff organizations have alleged [is] an injury to their interest in asylum-seekers obtaining protection in the United States.").[7] But according to the complaint, the Rules do not just generically frustrate organizational objectives, which is "the type of abstract concern that does not impart standing." NTEU v. United States, 101 F.3d 1423, 1429 (D.C. Cir. 1996) (quoting Nat'l Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1433 (D.C. Cir. 1995)). Instead, the Rules are alleged to have a direct impact on day-to-day operations, including the reallocation of resources from certain core activities to others. The direct injury alleged also undercuts the notion that the organizational plaintiffs have only brought this case to vindicate their clients' rights. Indeed, the plaintiffs have disavowed any third-party theory of standing, see Opp. to Mot.

---

[7] The government somewhat muddied the waters on this point at the motion-to-dismiss hearing, during which it conceded that the plaintiffs are "direct services organizations" and not "simply issue advocates." See Mot. to Dismiss Hearing Rough Tr. at 14:6–8.

27

to Dismiss at 21, so this case does not implicate the "principle that a lawyer has no independent litigable interest in the legal rules applicable to the lawyer's clients," see Mot. to Dismiss at 21.[8]

The government also maintains that the injuries the organizational plaintiffs identify are overly vague and speculative. More specifically, it argues that the complaint "does not identify the parameters of any particular funding sources or the particular projected impact of the [r]ules on [the organizations'] ability to receive that funding" and insists that the plaintiffs "have not alleged an actual or projected overall increase in expenditure due to the Rules or any added operational costs..." Mot. to Dismiss at 18–20. It is a surprise to no one that a "complaint must contain sufficient factual matter, accepted as true, to state a claim of standing that is plausible on its face." Id. at 18 (quoting Arpaio, 797 F.3d at 19). Yet at the motion-to-dismiss stage, it suffices for an organizational plaintiff to describe how the defendant's conduct will interfere with its core business activity, without pinpointing the precise monetary cost of that interference. Although further detail as to the magnitude of the injury would be welcome—and warranted—as the litigation progresses, the organizations need not allege their projected expenditures with such granularity as the government requests here.[9] The government also seems to imply that the

_____

[8] The plaintiffs' disclaimer of third-party standing also renders the government's reliance on Am. Imm. Lawyers Ass'n v. Reno, 199 F.3d 1352 (D.C. Cir. 2000) ("AILA") misplaced.

[9] Other courts in this district have concluded that Amica Center, Florence Project, and RAICES have suffered concrete injury based on actions by DHS that interfered with their provision of legal services. See O.A. v. Trump, 404 F. Supp. 3d 109 (D.D.C. 2019); Refugee and Immigrant Ctr. for Educ. and Legal Serv. v. Noem, 793 F. Supp. 3d 19 (D.D.C. 2025); Las Americas, 783 F. Supp. 3d at 216–18. In its reply brief, the government insists that this case is unlike those because the plaintiffs here "have failed to submit declarations regarding harm or specific ways in which they will be impacted other than mere speculation," as they have done elsewhere. Reply Br. at 10. But the government overlooks that those decisions were rendered at the summary judgment stage, at which point plaintiffs often include affidavits that shore up initial allegations of injury with further evidence. Again, the plaintiff "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" Murthy, 603 U.S. at 58 (quoting Lujan, 504 U.S. at 561). At the motion-to-dismiss stage, the complaint need only provide sufficient factual material to "state a _plausible_

Rules must cause a *total* "inhibition" of operations. See Reply Br. at 8 (quoting PETA v. USDA, 797 F.3d 1087, 1094 (D.C. Cir. 2015)); see also Mot. to Dismiss Hearing Rough Tr. at 21:4–9 ("[T]he organizational plaintiffs here are not alleging that they're completely stopped from providing any type of services . . . [and] that's just simply not enough to show a concrete injury in fact."). If so, that position is misguided. "[A]n organization need not be 'entirely hamstrung' by an action to have standing to challenge it." AFL-CIO v. DOL, 778 F. Supp. 3d 56, 75 (D.D.C. 2025) (citation omitted). "Its activities need only be 'perceptibly impaired.'" Id. (citing PETA, 797 F.3d at 1093).

Furthermore, the government insists that any injury to the organizational plaintiffs is self-inflicted. See Mot. to Dismiss at 19–20. Alliance made abundantly clear that an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." 602 U.S. at 394. But that is not what the groups have alleged here. Per the complaint, the new Rules plausibly compel a change in how the organizations provide legal services to detained noncitizens, which in turn necessitates a diversion of resources away from full asylum, withholding, and CAT proceedings in immigration court and, as to the Florence Project, will likely jeopardize its ability to serve as appointed counsel for a particular clientele. At the risk of repetition, these are not "mere self-serving observations that an organization will have to increase the resources that it spends on educating the general public and its members about the consequences of government regulation," nor do the groups' allegations reflect the "mere[] expan[sion of] operations to address increased demands in the communities it serves." Coal. for Humane Immigrant Rights v. DHS, 780 F.

---

claim that each of the standing elements is present," Jibril, 20 F.4th at 814 (cleaned up), and the organizational plaintiffs have done so here.

Supp. 3d 79, 90 (D.D.C. 2025) (cleaned up). The Rules threaten to impair the groups' normal operations and reduce the volume of services available to their target clients.

Finally, the government submits that the organizations' "alleged resource expenditures on educational efforts are insufficient to allege standing, even under pre-Alliance precedent." Mot. to Dismiss at 20. To be sure, public education initiatives designed to spread awareness about the impacts of a defendant's conduct generally do not support a determination of Article III injury. Cf. Ctr. for Bio. Diversity, 144 F.4th at 315 (explaining, in the animal welfare context, that education programs can support organizational standing where directly aimed at filling programmatic gaps left by government agencies); see also Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 919–21 (D.C. Cir. 2015). But as the plaintiffs point out, education is just one piece of the puzzle; all three organizations provide full legal representation to clients or assist clients in representing themselves *pro se* during the screening process, including by collecting information and documents that individuals may need. To establish concrete injury, the groups rely not only on the need to educate individuals about the impacts of the Rules, but also on the "perceptibl[e] impair[ment]" of their "ability to provide [legal] services." Food & Water Watch, Inc., 808 F.3d at 919; see also PETA, 797 F.3d at 1093–97.

In sum, at this early stage in the case, the organizational plaintiffs have carried their standing burden: The complaint "state[s] a plausible claim" that each group has "suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." Humane Soc'y, 797 F.3d at 8.

### b. Zone of Interests

The government next contends that the organizations lie outside the "zone of interests" protected by pertinent provisions of the INA. See Mot. to Dismiss at 23–25. Non-jurisdictional

in nature, the zone-of-interests test asks whether a particular "statute grants the plaintiff the cause of action that he asserts." Bank of America Corp. v. City of Miami, 581 U.S. 189, 196–97 (2017) (citing Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014)). "In answering that question," courts "presume that a statute ordinarily provides a cause of action 'only to plaintiffs whose interests fall within the zone of interests protected by the law invoked.'" Id. at 197 (quoting Lexmark, 572 U.S. at 129). Framed another way, this analysis requires courts "to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." Lexmark, 572 U.S. at 127.

"[I]n the APA context," the zone-of-interests test "is not especially demanding." Id. at 130 (cleaned up). "[T]he test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." Id. (cleaned up). "That lenient approach is an appropriate means of preserving the flexibility of the APA's omnibus judicial-review provision[.]" Id.

Like other courts that have handled challenges to immigration rules brought by legal services providers, this Court has "no trouble" finding that the organizational plaintiffs "readily surpass" this "low bar." Cath. Legal Immigr. Network, Inc. v. EOIR, 513 F. Supp. 3d 154, 171 (D.D.C. 2021); see also Refugee and Immigr. Ctr. for Educ. and Legal Serv. v. Noem, 793 F. Supp. 3d 19, 28–29 (D.D.C. 2025); Las Americas, 783 F. Supp. 3d at 217–18; Cap. Area Immigrants' Rights Coal. v. Trump, 471 F. Supp. 3d 25, 42–44 (D.D.C. 2020). "Congress plainly had as an objective under the INA to optimize the availability of pro bono or low-cost counsel to persons subject to removal." See Cath. Legal, 513 F. Supp. 3d at 171; see also 8 U.S.C. § 1158(d)(4) (requiring that asylum applicants be "advise[d] . . . of the privilege of being

represented by counsel" and "provide[d]" with "a list of persons . . . who have indicated their availability to represent" asylum seekers "on a pro bono basis"); id. at § 1229a(b)(4)(A) (explaining that a noncitizen in full removal proceedings "shall have the privilege of being represented . . . by counsel of [their] choosing"). The statute expressly provides noncitizens subject to AO screening with the right to "consult with a person or persons of [their] choosing prior to the [credible fear] interview or any review thereof." 8 U.S.C. § 1225(b)(1)(B)(iv).

Against this statutory backdrop, the Court easily concludes that Amica Center, Florence Project, and RAICES's interests are "neither inconsistent with nor marginally related to the INA." Cap. Area, 471 F. Supp. 3d at 43. To the contrary, access to legal services is a key feature of the asylum and withholding regimes, and "statutory requirements exist throughout the INA to ensure that [noncitizens] in both expedited and regular removal proceedings can be represented by counsel." Id. The zone-of-interests test thus poses no barrier to suit for the organizational plaintiffs.

### c.   APA Preclusion

The government makes one final attempt to prevent this case from getting off the ground. Even if the organizational plaintiffs have standing and pass the zone-of-interests test, it argues, they are precluded from challenging the reasonable fear provisions of the Rules under the APA.

"The APA confers a general cause of action upon persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute,' 5 U.S.C. § 702, but withdraws that cause of action to the extent the relevant statute 'preclude[s] judicial review,' 5 U.S.C. § 701(a)(1)." Block v. Cmty. Nutrition Inst., 467 U.S. 340, 345 (1984). "There is a strong presumption that Congress intends judicial review of administrative action[.]" Steele v. United States, 144 F.4th 316, 322 (D.C. Cir. 2025) (cleaned up). But that presumption may be

rebutted, and "[w]hether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." Block, 467 U.S. at 345.

The Court is not persuaded that the Rules' reasonable fear provisions are insulated from review by the INA for two principal reasons. *First*, as the organizational plaintiffs rightly point out, the reasonable fear screening process is a creature of regulation, not statute. While this fact is not necessarily dispositive, it suggests, as a baseline, that Congress did not intend to legislate a "complex and delicate" scheme of reasonable fear screening. Id. at 348. To the extent such a scheme exists, it was brought into being by the Executive Branch itself. *Second*, the judicial review provisions of the INA do not change the calculus. It is true that, with some exceptions, "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal" entered under the statute. 8 U.S.C. §§ 1252(a)(5), (b)(9). But "the specific channeling provisions cited by [the government] apply to challenges that either seek review of a removal order or involve questions arising from a removal action or proceeding[;]" otherwise, "the text of Section 1252 provides no support for the proposition that organizations may not facially challenge under the APA immigration-related regulations that harm their own interests." Cap. Area, 471 F. Supp. 3d at 40.[10]

---

[10] This observation also dispenses with a sweeping argument that the government advanced for the first time at the motion-to-dismiss hearing—*i.e.*, that this Court lacks jurisdiction to consider *any* organization's facial challenge to *any* expedited removal-related rule under 8 U.S.C. §§ 1252(a)(2)(A), (e)(3). See, e.g., Mot. to Dismiss Hearing Rough Tr. at 9:25–10:3. As Judge Kelly noted, both the text of Section 1252 and case law in this circuit undercut the notion that an organization is somehow categorically "precluded . . . from challenging an immigration-related rule under the APA[.]" Cap. Area, 471 F. Supp. 3d at 39. The government suggests that Make the Road N.Y., which concerns associational standing in the context of a challenge to an expedited removal policy, and AILA, which concerns third-party standing in the

The government has furnished little, if any, support for its argument that Congress intended for either the "zipper clauses" of § 1252 or any other provision or structural feature of the INA to preclude the organizational plaintiffs' facial regulatory challenge to the reasonable fear provisions of the new Rules. Given the APA's strong presumption of judicial review, the Court concludes that the organizational plaintiffs may proceed with this aspect of their challenge.

B. Merits

Having confirmed that the organizational plaintiffs have adequately pled Article III standing and are not barred from suit on other threshold grounds, the Court turns finally to the merits of the case and, for the reasons laid out below, concludes that the government has jumped the gun in moving to dismiss the plaintiffs' arbitrary-and-capricious claim. Because the case will necessarily proceed to summary judgment, the Court defers adjudication of the plaintiffs' contrary-to-law claim until that stage as well. Cf. Nat'l Ass'n for Home Care & Hospice, Inc. v. Burwell, 77 F. Supp. 3d 103, 112–13 (D.D.C. 2015) (Cooper, J.) (deferring resolution of "complex" statutory arguments until summary judgment "to give the parties a greater opportunity to brief" the issues).

The APA's arbitrary-and-capricious standard is "deferential." Jackson v. Mabus, 808 F.3d 933, 936 (D.C. Cir. 2015). "The question is not what [the Court] would have done, nor whether [it] agree[s] with the agency action. Rather, the question is whether the agency action was reasonable and reasonably explained." Id.

---

same context, stand for the proposition that only individuals can ever bring facial regulatory challenges under Section 1252. See Mot. to Dismiss Hearing Rough Tr. at 8–10. But those opinions are inapt because they do not speak to a court's jurisdiction over a directly-injured organization's facial regulatory challenge to an aspect of the expedited removal process.

The complaint asserts that the challenged Rules are arbitrary and capricious in several respects, including that the government "failed to consider or respond to significant comments," "ignored record evidence," and "offered explanations for their decisions that run counter to" the record. Compl. ¶ 187. The plaintiffs also take issue with two specific aspects of the Rules. *First*, they submit that there is an unexplained discrepancy between the quasi-mandatory text of the Mandatory Bars Rule and the government's repeated suggestion, in the Federal Register, that that Rule is fundamentally discretionary in nature and applies only in limited cases.[11] *Second*, they contend that the government has not adequately justified its reversal in position from 2022, when DHS firmly rejected the application of mandatory bars during the screening process due to concerns about efficiency and procedural fairness.

At this early stage, the plaintiffs have generated enough question marks to get them past the government's Rule 12(b)(6) motion to dismiss. They have alleged that DHS sidelined record evidence and more generally failed to consider important aspects of the problem, see Compl. ¶¶ 129–31, 187, and the government does not definitively rebut these assertions in its briefing. Furthermore, the plaintiffs have plausibly suggested discrepancies *between* the text of the Rules and the agency's explanations for them, which, contrary to the government's suggestion, are not patently reconcilable based "solely on the language and information within the Rules

---

[11] To put a finer point on this argument, the text of the Mandatory Bars Rule states that an AO has discretion to decide whether a mandatory bar applies, but once he does so, he *must* factor the mandatory bars into his credible fear finding. See 8 C.F.R. §§ 208.30(e)(2), 208.30(e)(5)(ii)(A). Meanwhile, the nonbinding preamble to the Rule, published in the Federal Register, states that "AOs will only consider a bar in those cases where there is easily verifiable (as opposed to unverified or difficult-to-verify) evidence . . . that warrants an inquiry into a bar." Application of Certain Mandatory Bars, 89 Fed. Reg. at 103376. The government leaned heavily on the latter characterization of the Rule in defending it against critical comments, but the "easily verifiable" standard does not actually appear in the Rule's text. In the plaintiffs' view, there is thus an inconsistency between the text of the Rule and the agency's justification for the Rule during the notice-and-comment process.

themselves[.]" Reply Br. at 21.[12] That the government did not "rely on any type of external documentation" or "present any new evidence into the record" in lodging its motion to dismiss, see Mot. to Dismiss Hearing Rough Tr. at 29:11–25, is somewhat beside the point. The question is instead whether the court can assess the reasonableness of agency action based on the information before it—and at the motion-to-dismiss stage, record evidence is typically limited.

Of course, it may well be that the challenged Rules *are*, in fact, reasonable and reasonably explained. The point is that given the threshold plausibility of the plaintiffs' challenge, "it would be premature [for the Court] to declare that the agency acted reasonably" here "without fully reviewing the entire administrative record[.]" Hamal v. DHS, No. 19-cv-2534 (RC), 2020 WL 2934954, at *4 (D.D.C. June 3, 2020); see also Vassiliades v. Rubio, 792 F. Supp. 3d 1, 21 (D.D.C. 2025) (holding that the Court could not "properly evaluate" plaintiff's arbitrary-and-capricious claim without seeing the full administrative record (quoting Farrell v. Tillerson, 315 F. Supp. 3d 47, 69 (D.D.C. 2018)). In order to assess the government's decision and justification for its action here, the Court must have "before it neither more nor less information than did the agency when it made its decision." Vargus v. McHugh, 87 F. Supp. 3d 298, 301 (D.D.C. 2015) (quoting Boswell Mem. Hosp. v. Heckler, 749 F.2d 788, 792 (D.C. Cir. 1984)). Although the Court presumes the government has acted with regularity, "[t]o review less than the full administrative record might allow a party to withhold evidence unfavorable to its

---

[12] As the plaintiffs suggested at the hearing on the motion to dismiss, the full administrative record may contain—for instance—data or agency analyses that strengthen or undercut the government's proffered justifications for the Rules. See Mot. to Dismiss Hearing Rough Tr. at 50:7–51:10. And to the extent the administrative record lacks certain materials, at summary judgment, the plaintiffs may at least argue that the government "acted arbitrarily and capriciously by not considering" materials that would have shed light on "an important aspect of the problem" the Rules were "designed to fix." ASPCA v. APHIS, -- F. Supp. 3d --, No. 21-cv-1600 (CRC), 2025 WL 3028670, at *21–22 (D.D.C. Oct. 29, 2025).

case," which is why arbitrary-and-capricious review typically necessitates a consideration of the "whole record." Id. (cleaned up).

In sum, the Court will deny the Rule 12(b)(6) motion to dismiss as to the plaintiffs' arbitrary-and-capricious claim. And because the case will proceed to the summary judgment phase one way or another, the Court will defer adjudication of the contrary-to-law question until that time. The Court will therefore strike that portion of the Rule 12(b)(6) motion that addresses the contrary-to-law claim; the government is free to renew its arguments as to that claim at summary judgment.

## IV.  Conclusion and Order

For the foregoing reasons, it is hereby

**ORDERED** that Defendant's [42] Motion to Dismiss for Lack of Jurisdiction is DENIED in part and STRICKEN in part. It is further

**ORDERED** that Defendant's [42] Motion to Dismiss for Failure to State a Claim is DENIED in part and STRICKEN in part. It is further

**ORDERED** that, within 7 days of this ruling, the parties shall propose redactions to this sealed Memorandum Opinion so that a public version may promptly be filed. It is further

**ORDERED** that, within 14 days of this ruling, the parties shall meet and confer and file a joint status report that proposes a schedule for the production of the administrative record and summary judgment briefing.

**SO ORDERED**.

CHRISTOPHER R. COOPER
United States District Judge

Date:  April 8, 2026

37