# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| E.Q. *et al*.,<br><br>　　　　Plaintiffs,<br><br>　　　　v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY *et al.*,<br><br>　　　　Defendants. | Case No.: 1:25-cv-00791 |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION..................................................................................................1

BACKGROUND ..................................................................................................2

    A.    Asylum and Related Relief...................................................................2

    B.    Full and Expedited Removal Proceedings ...........................................4

    C.    The Mandatory Bars to Asylum and Withholding of Removal............7

    D.    The Rules .............................................................................................9

    E.    The Plaintiffs and Their Injuries .......................................................11

LEGAL STANDARD .........................................................................................13

ARGUMENT......................................................................................................13

I.    THIS COURT HAS JURISDICTION OVER PLAINTIFFS'
CLAIMS......................................................................................................13

    A.    The Court Has Jurisdiction Over E.Q.'s Claims.................................13

        1.    E.Q. has standing to sue..........................................................13

            a.    E.Q. satisfies general standing requirements ..............13

            b.    E.Q.'s procedural injury is subject to relaxed
standing requirements .................................................16

        2.    Defendants' voluntary actions cannot moot E.Q.'s claims....18

    B.    The Organizational Plaintiffs Have Standing .....................................22

II.    THE RULES ARE CONTRARY TO LAW................................................25

    A.    The Rules Impermissibly Prevent Noncitizens with a Credible Fear
of Persecution from Applying for Relief............................................25

    B.    The Rules Impermissibly Allow Denials on the Basis that a Bar
Might Apply.......................................................................................29

    C.    The Rules Impermissibly Allow DHS to Make Bars
Determinations...................................................................................30

III.    THE RULES ARE ARBITRARY AND CAPRICIOUS ...........................32

    A.    The DHS Rule Rests on a False Premise............................................32

    B.    Defendants Failed to Acknowledge or Reasonably Explain Their
Changed Position ...............................................................................34

    C.    The Rule Rests on Assertions That Are Contrary to the Record ........37

    D.    Defendants Failed to Consider Important Aspects of the Problem......41

    E.       Defendants Failed to Consider the Effects of Interrelated, Contemporaneous Policies......................................................................43

    F.       The EOIR Companion Rule Is Arbitrary and Capricious..................................45

**CONCLUSION** ...............................................................................................................**45**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Clinical Lab. Ass'n v. Becerra*,
    40 F.4th 616 (D.C. Cir. 2022)....................................................................................20

*Am. Whitewater v. FERC*,
    125 F.4th 1139 (D.C. Cir. 2025)..............................................................................18

*Am. Wild Horse Pres. Campaign v. Perdue*,
    873 F.3d 914 (D.C. Cir. 2017)..................................................................................34

*Amerijet Int'l, Inc. v. Pistole*,
    753 F.3d 1343 (D.C. Cir. 2014)................................................................................35

*Annor v. Garland*,
    95 F.4th 820 (4th Cir. 2024) ......................................................................................9

*Aref v. Lynch*,
    833 F.3d 242 (D.C. Cir. 2016)............................................................................20, 21

*AT&T Corp. v. FCC*,
    970 F.3d 344 (D.C. Cir. 2020)..................................................................................34

*Berhane v. Holder*,
    606 F.3d 819 (6th Cir. 2010) ......................................................................................8

*Blandino-Medina v. Holder*,
    712 F. 3d 1338 (9th Cir. 2013) ...................................................................................7

*Budiano v. Lynch*,
    837 F.3d 1042 (9th Cir. 2016) ..................................................................................30

*Catholic Legal Immigration Network, Inc. v. EOIR*,
    513 F. Supp. 3d 154 (D.D.C. 2021).........................................................................25

*Chen v. U.S. Att'y Gen.*,
    513 F.3d 1255 (11th Cir. 2008) ..................................................................................7

*Cigar Ass'n of Am. v. FDA*,
    132 F.4th 535 (D.C. Cir. 2025)............................................................................32, 34

*Citizens for Constitutional Integrity v. Census Bureau*,
    115 F.4th 618 (D.C. Cir. 2024)............................................................................17, 18

iii

*City & Cnty. of San Francisco v. EPA*,
  604 U.S. 334 (2025)..................................................................................................31

*City of N.Y. v. Baker*,
  878 F.2d 507 (D.C. Cir. 1989) ................................................................................22

*Colo. Wild Pub. Lands v. U.S. Forest Serv.*,
  691 F. Supp. 3d 149 (D.D.C. 2023).........................................................................20

*Council of Parent Att'ys & Advocs., Inc. v. DeVos*,
  365 F. Supp. 3d 28 (D.D.C. 2019) ..........................................................................13

*Ctr. for Biological Diversity v. Zeldin*,
  171 F.4th 356 (D.C. Cir. 2026)................................................................................18

*Ctr. for Energy & Econ. Dev. v. EPA*,
  398 F.3d 653 (D.C. Cir. 2005).................................................................................16

*Davis v. Federal Election Commission*,
  554 U.S. 724 (2008).................................................................................................16

*Del. Dep't of Nat. Res. & Env't Control v. EPA*,
  785 F.3d 1 (D.C. Cir. 2015).....................................................................................42

*Doe v. Gonzales*,
  484 F.3d 445 (7th Cir. 2007) ....................................................................................7

*Dominguez Ojeda v. Garland*,
  112 F.4th 1241 (9th Cir. 2024) .................................................................................6

*Dor v. Garland*,
  46 F.4th 38 (1st Cir. 2022).......................................................................................9

*E.Q. v. McGregor*,
  D. Ariz. No. 2:26-cv-00628, Dkt. 7 (Apr. 23, 2026) .............................................21

*Elevance Health, Inc. v. Becerra*,
  736 F. Supp. 3d 1 (D.D.C. 2024).............................................................................34

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016).................................................................................................35

*FBI v. Fikre*,
  601 U.S. 234 (2024).................................................................................................22

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)............................................................................................22, 24

iv

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*,
  528 U.S. 167 (2000)....................................................................................19, 20

*Grace v. Barr*,
  965 F.3d 883 (D.C. Cir. 2020) ......................................................................4, 5

*Grace v. Whitaker*,
  344 F. Supp. 3d 96 (D.D.C. 2018)..............................................................17, 26

*Growth Energy v. EPA*,
  5 F.4th 1 (D.C. Cir. 2021)................................................................................18

*Guarascio v. FBI*,
  No. 18-cv-2791, 2023 WL 7182057 (D.D.C. Nov. 1, 2023)............................20, 21

*Guerra-Castañeda v. United States*,
  656 F. Supp. 3d 356 (D. Mass. 2023) .................................................................9

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982)...................................................................................22, 24

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987).....................................................................................2, 29

*INS v. Chadha*,
  462 U.S. 919 (1983)........................................................................................16

*INS v. Elias-Zacarias*,
  502 U.S. 478 (1992).........................................................................................29

*INS v. Stevic*,
  467 U.S. 407 (1984)......................................................................................3, 28

*Int'l Dark Sky Ass'n v. FCC*,
  106 F.4th 1206 (D.C. Cir. 2024)......................................................................18

*Kiakombua v. Wolf*,
  498 F. Supp. 3d 1 (D.D.C. 2020)....................................................................17

*Knox v. Serv. Emps. Int'l Union, Local 1000*,
  567 U.S. 298 (2012)........................................................................................19

*Las Americas Immigrant Advoc. Ctr. v. DHS*,
  783 F. Supp. 3d 200 (D.D.C. 2025).........................................................17, 18, 25

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)........................................................................................17

*M.M.V. v. Garland,*
    1 F.4th 1100 (D.C. Cir. 2021) ..................................................................................18

*Make the Rd. N.Y. v. McAleenan,*
    405 F. Supp. 3d 1 (D.D.C. 2019) ............................................................................41

*Make the Rd. N.Y. v. Wolf,*
    962 F.3d 612 (D.C. Cir. 2020) ..................................................................................4

*Matter of A-C-M-,*
    27 I & N Dec. 303 (B.I.A. 2018) ..............................................................................8

*Matter of B-Z-R-,*
    28 I & N Dec. 563 (A.G. 2022) ................................................................................8

*Matter of E-A-,*
    26 I & N Dec. 1 (B.I.A. 2012) ............................................................................8, 30

*Matter of N-A-M-,*
    24 I & N Dec. 336 (B.I.A. 2007) ........................................................................39, 40

*Mellouli v. Lynch,*
    575 U.S. 798 (2015) ..................................................................................................7

*Molzof v. United States,*
    502 U.S. 301 (1992) ................................................................................................29

*Moncrieffe v. Holder,*
    569 U.S. 184 (2013) ..................................................................................................7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ............................................................................................37, 41

*N. Am. Butterfly Ass'n v. Wolf,*
    977 F.3d 1244 (D.C. Cir. 2020) ..............................................................................20

*Nat'l Parks Conservation Ass'n v. Manson,*
    414 F.3d 1 (D.C. Cir. 2005) ....................................................................................14

*Nat'l Wildlife Fed'n v. EPA,*
    286 F.3d 554 (D.C. Cir. 2002) ................................................................................34

*Nat'l Women's L. Ctr. v. OMB,*
    358 F. Supp. 3d 66 (D.D.C. 2019) ....................................................................35, 41

*Nationwide Mut. Ins. Co. v. Darden,*
    503 U.S. 318 (1992) ................................................................................................29

*NDRC v. EPA*,
   559 F.3d 561 (D.C. Cir. 2009) .................................................................................34

*O.A. v. Trump*,
   404 F. Supp. 3d 109 (D.D.C. 2019) .................................................................20, 25

*Ojo v. Garland*,
   25 F.4th 152 (2d Cir. 2022) ......................................................................................9

*Pangea Legal Servs. v. DHS*,
   512 F. Supp. 3d 966 (N.D. Cal. 2021) .....................................................................10

*Pereida v. Wilkinson*,
   592 U.S. 224 (2021).................................................................................................7

*Petroleum Commc'ns, Inc. v. FCC*,
   22 F.3d 1164 (D.C. Cir. 1994)................................................................................44

*Pietersen v. Dep't of State*,
   138 F.4th 552 (D.C. Cir. 2025).........................................................................16, 18

*Portland Cement Ass'n v. EPA*,
   665 F.3d 177 (D.C. Cir. 2011).........................................................................43, 44

*Pub. Citizen, Inc. v. FERC*,
   92 F.4th 1124 (D.C. Cir. 2024)...............................................................................19

*RAICES v. Noem*,
   793 F. Supp. 3d 19 (D.D.C. 2025).....................................................................23, 25

*Ranjan v. DHS*,
   747 F. Supp. 3d 192 (D.D.C. 2024).........................................................................16

*Samma v. U.S. Dep't of Defense*,
   136 F.4th 1108 (D.C. Cir. 2025)..............................................................................20

*Sierra Club v. U.S. Dep't of Transp.*,
   125 F.4th 1170 (D.C. Cir. 2025)..............................................................................20

*Singh v. DHS*,
   2020 WL 420589 (W.D. Wash. Jan. 3, 2020)...........................................................15

*Solondz v. FAA*,
   141 F.4th 268 (D.C. Cir. 2025)...............................................................................41

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002)..................................................................................18

*U.S. Sugar Corp. v. EPA*,
    830 F.3d 579 (D.C. Cir. 2016) .................................................................................45

*WildEarth Guardians v. Jewell*,
    738 F.3d 298 (D.C. Cir. 2013) .............................................................................17, 18

*Yan Yan Lin v. Holder*,
    584 F.3d 75 (2d Cir. 2009) .......................................................................................9

*Yusupov v. Att'y Gen.*,
    650 F.3d 968 (3d Cir. 2011) ......................................................................................9

**Statutes**

5 U.S.C. § 706(2)(A) ...............................................................................18, 25, 32

8 U.S.C. § 1101(a)(42)(A) .......................................................................15, 26, 27

8 U.S.C. § 1103(a)(1) ...........................................................................................32

8 U.S.C. § 1158 ..........................................................................................2, 27, 31

8 U.S.C. § 1158(a)(1) ......................................................................................2, 27

8 U.S.C. § 1158(a)(2) ..............................................................................................2

8 U.S.C. § 1158(b)(1) ....................................................3, 15, 26, 27, 30, 31

8 U.S.C. § 1158(b)(2) .........................3, 7, 8, 9, 15, 26, 27, 29, 30, 31, 39, 40

8 U.S.C. § 1158(b)(3) .............................................................................................3

8 U.S.C. § 1158(c)(1)(C) ........................................................................................3

8 U.S.C. § 1159(b) .................................................................................................3

8 U.S.C. § 1182 ...................................................................................................8, 9

8 U.S.C. § 1225(b) ................................................5, 15, 25, 26, 27, 28, 29

8 U.S.C. § 1228 ......................................................................................................5

8 U.S.C. § 1229 ......................................................................................................4

8 U.S.C. § 1231 ..............................................................................................2, 3, 5

8 U.S.C. § 1252 ....................................................................4, 5, 11, 17, 18, 20

Pub. L. 96-212, 94 Stat. 102 (1980) .....................................................................2

Pub. L. No. 105-277, Div. G, Title XXII, 112 Stat. 2681-822 (1998)............................................2

Pub. L. No. 107-296, 116 Stat. 2135 (2002)................................................................31

Pub. L. No. 109-13, Div. B, 119 Stat. 231, 302 (2005) ...............................................30

8 U.S.C. § 1101.............................................................................................................3

8 U.S.C. § 1103(g)(1) ...................................................................................................32

**Regulations**

8 C.F.R. § 208.30.............................................................................................5, 10, 30, 36

8 C.F.R. § 208.30(e)(2)-(3)..........................................................................................27

8 C.F.R. § 208.31.......................................................................................................5, 10

8 C.F.R. § 208.33.............................................................................................................10

8 C.F.R. § 208.35.............................................................................................................5

8 C.F.R. § 1003.10.........................................................................................................4

8 C.F.R. § 1003.42....................................................................................................11, 30

8 C.F.R. § 1208.14.........................................................................................................31

8 C.F.R. § 1208.16-17...............................................................................................2, 3

8 C.F.R. § 1208.30.........................................................................................................5

8 C.F.R. § 1208.31..........................................................................................6, 11, 22, 30

8 C.F.R. § 1208.33....................................................................................................11, 30

8 C.F.R. § 1003.42.........................................................................................................14

8 C.F.R. § 1003.42(e).....................................................................................................15

8 C.F.R. § 208.30.........................................................................................................34

8 C.F.R. § 208.31.........................................................................................................34

8 C.F.R. § 208.33.........................................................................................................34

**Other Authorities**

142 Cong. Rec. S11491-02...........................................................................................26

65 Fed. Reg. 76121 (Dec. 6, 2000) ................................................................................................32

85 Fed. Reg. 80274 (Dec. 11, 2020) ..............................................................................................38

87 Fed. Reg. 18078 (Mar. 29, 2022)..............................................................10, 29, 35, 36, 39

89 Fed. Reg. 41353 (2024) .............................................................................................................35

89 Fed. Reg. 81156 (Oct. 7, 2024)..................................................................................................5

89 Fed. Reg. 103370 (Dec. 18, 2024) .................................................1, 10, 11, 14, 15, 32, 33, 35,
................................................................................. 36, 37, 38, 39, 40, 41, 42, 43, 44

89 Fed. Reg. 105392 (Dec. 27, 2024) ........................................................................1, 11, 30, 45

90 Fed. Reg. 10030 (Feb. 20, 2025) ................................................................................................9

H.R. Rep. No. 104-469, pt. 1 (1996)........................................................................................26, 28

x

**INTRODUCTION**

Congress created fear screening interviews to ensure that no noncitizen with a potentially viable asylum claim would be returned to persecution without a chance to seek relief in full removal proceedings. The standard Congress adopted for those interviews was deliberately low and focused solely on credibility and the ability to show prima facie eligibility for asylum. The mandatory bars to asylum and withholding of removal, which implicate both complex legal doctrines and intensive fact-finding, have no role in that analysis.

Consistent with congressional intent, the mandatory bars were not addressed in screening interviews for nearly three decades. In 2024, however, Defendants Department of Homeland Security ("DHS") and Executive Office for Immigration Review ("EOIR") issued two Rules that, for the first time, permit consideration of mandatory bars in screening interviews. *See* DHS, *Application of Certain Mandatory Bars in Fear Screenings*, 89 Fed. Reg. 103370 (Dec. 18, 2024) ("DHS Rule" or "Rule"); EOIR, *Clarification Regarding Bars to Eligibility During Credible Fear and Reasonable Fear Review*, 89 Fed. Reg. 105392 (Dec. 27, 2024) ("EOIR Companion Rule"). The Rules permit asylum officers to consider bars whenever they "appear" to be applicable. Once a bar is considered, the Rules require asylum officers to deny relief unless the noncitizen can show it will not apply — typically without being told the basis for the determination that a bar may apply, while detained in horrific conditions, and without access to counsel or evidence.

The Rules are contrary to law in at least three ways. First, they expand credible fear interviews beyond the limits set by the Immigration and Nationality Act ("INA"). Second, while the INA allows bars to be applied only on the basis of a final determination, the Rules permit their predictive application based on mere appearances. Third, they delegate to DHS the authority to make mandatory bars determinations—authority Congress provided only to the Attorney General.

The Rules are also arbitrary and capricious. The DHS Rule's justifications rest on the

1

premise that it applies only where "easily verifiable evidence" exists concerning a bar — a limitation the Rule itself does not contain. The Rule also fails to acknowledge or explain Defendants' departure from prior positions and reaches conclusions contrary to the record: that noncitizens can rebut bars during screening interviews and that the bars are not too complex to assess in that setting. It further ignores fairness concerns raised in public comments and the Rule's interaction with related, contemporaneous policies. And because the EOIR Companion Rule rests wholly on the DHS Rule, it too is arbitrary and capricious.

This Court should grant Plaintiffs' motion for summary judgment and vacate the Rules.

## BACKGROUND

### A.    Asylum and Related Relief

One of the "primary purposes" of the Refugee Act of 1980 (Pub. L. 96-212, 94 Stat. 102 (1980)) was to conform with the United States' treaty obligation not to "*refoul*" refugees—*i.e.*, return them to persecution. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987). The same non-refoulement obligation applies under the Convention Against Torture ("CAT"). *See* Pub. L. No. 105-277, Div. G, Title XXII, 112 Stat. 2681-822 (codified as Note to 8 U.S.C. § 1231). U.S. immigration law provides three primary forms of protection to people fleeing persecution or torture: asylum under 8 U.S.C. § 1158; statutory withholding of removal under 8 U.S.C. § 1231(b)(3); and relief under CAT, *see* 8 C.F.R. § 1208.16-17.

The asylum statute grants any noncitizen who is physically present, or arrives, in the United States a broad right to apply for asylum. 8 U.S.C. § 1158(a)(1). This right to seek asylum is subject to only three narrow exceptions covering situations in which the noncitizen (1) can be removed to a safe third country; (2) filed for asylum more than one year after arriving in the United States; or (3) previously applied for asylum and was denied. *Id.* § 1158(a)(2)(A)-(C). The second and third of these bars can be excused for changed or extraordinary circumstances. *Id.* § 1158(a)(2)(D).

2

To be eligible for asylum, an applicant must show that they meet the definition of a refugee. 8 U.S.C. § 1158(b)(1)(A). That is, they must show that they are unable or unwilling to return to their country of origin due to persecution or a well-founded fear of future persecution inflicted on account of a protected ground—race, religion, nationality, membership in a particular social group, or political opinion. *Id.* § 1101(a)(42)(A). A noncitizen who does so may be granted asylum as a discretionary matter unless "the Attorney General determines that" a bar in 8 U.S.C. § 1158(b)(2) applies. Asylum carries significant benefits: asylees may remain in the United States, travel abroad, and apply for lawful permanent residence and eventually citizenship; these benefits also extend to an asylee's spouse and children. *Id*. §§ 1158(b)(3) & (c)(1)(C), 1159(b).

Unlike asylum, withholding of removal under 8 U.S.C. § 1231(b)(3) is mandatory. The government must withhold removal to a country if a noncitizen is more likely than not to face persecution in that country. *INS v. Stevic*, 467 U.S. 407, 429-430 (1984). The only exception is if "the Attorney General decides that" a mandatory bar applies. 8 U.S.C. § 1231(b)(3)(B).

CAT relief is also mandatory and applies to noncitizens who are more likely than not to be tortured in a particular country. 8 C.F.R. § 1208.16(c)(2). CAT relief includes both withholding of removal (subject to the same mandatory bars as withholding under § 1231(b)(3)) and less permanent relief known as deferral of removal, to which no bars apply. *See id*. § 1208.16-17.

Compared to asylum, withholding of removal and CAT relief require a higher showing of likelihood of harm and provide significantly fewer benefits. They protect against removal only to a specified country and confer no path to lawful permanent residence or citizenship, no right to travel abroad, and no derivative benefits for family members. *See* 8 U.S.C. § 1231(b)(3); 8 C.F.R. §§ 1208.16-17. People granted withholding of removal or CAT protection may face prolonged detention and often have difficulty obtaining permission to work in the United States.

3

### B.    Full and Expedited Removal Proceedings

The INA creates two types of removal proceedings for noncitizens without status in the United States. "Regular" removal proceedings are adversarial administrative proceedings before an EOIR immigration judge in which DHS counsel opposes the noncitizen. *See* 8 U.S.C. § 1229a(b). Noncitizens in regular removal proceedings have the right to counsel not paid for by the government. *Id*. They also have the rights to "a reasonable opportunity to examine the evidence against" them, "to present evidence" on their own behalf, and "to cross-examine witnesses presented by" DHS. *Id.* § 1229a(b)(4)(B); 8 C.F.R. § 1003.10(b). And noncitizens may appeal adverse decisions of the immigration judge to the Board of Immigration Appeals ("BIA") and then to a federal court of appeals. *See* 8 U.S.C. §§ 1229a(b)(4)(B)-(C) & 1252(a)(1). Regular removal proceedings take weeks or months, not days, even when the applicant remains detained during the proceedings. Noncitizens therefore have time to seek counsel, to understand DHS's position, and to contact witnesses and seek evidence before an immigration judge decides their case. *E.g.*, Cmt. of Acacia Center for Justice ("Acacia") at 8.[1]

Expedited removal, by contrast, "lives up to its name." *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 619 (D.C. Cir. 2020). Absent an indication of fear of persecution or torture, a noncitizen placed in expedited removal may be removed almost immediately. *Id.* But Congress balanced the interest in "efficient removal" against "a second, equally important goal: ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution." *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020). To that end, noncitizens in expedited removal who

---

[1]    All comments on the DHS Rule can be found at https://www.regulations.gov/document/USCIS-2024-0005-0001/comment. Unless otherwise noted, all page citations refer to the PDF page number of the cited document (*i.e.*, the page number displayed in the PDF viewer), rather than the document's internal page numbering, which may differ. Plaintiffs will include all cited comments in the appendix submitted under L. Civ. R. 7(n).

express a fear of removal or an intention to apply for asylum must be given a credible fear interview with an asylum officer. 8 U.S.C. § 1225(b)(1)(B). In those interviews, individuals must demonstrate a "significant possibility, taking into account the credibility of the statements made by the [noncitizen] in support of the [noncitizen's] claim and such other facts as are known to the officer, that [they] could establish eligibility for asylum." *Id*. § 1225(b)(1)(B)(v). Congress intended for this to be a low screening standard. *See Grace*, 965 F.3d at 902.

Credible fear interviews also screen for withholding and CAT protection, with a positive finding likewise leading to full removal proceedings. 8 C.F.R. § 208.30(e)(2)-(3). Many such claims are now governed by a heightened screening standard. *See* 8 C.F.R. § 208.35(b)(2)(i); Securing the Border, 89 Fed. Reg. 81156, 81247 (Oct. 7, 2024).

When noncitizens satisfy the relevant screening applied in credible fear interviews, they must be placed in regular removal proceedings, in which they can pursue asylum and other relief. *See id*. § 1225(b)(2)(A). A negative credible fear finding is reviewable only by an immigration judge in a summary proceeding held within a week after the interview; further review is not available. 8 U.S.C. §§ 1225(b)(1)(B)(iii), 1252(a)(2)(A) & (e)(2); 8 C.F.R. § 1208.30.

Two other categories of noncitizens may be placed in accelerated removal procedures conducted outside of immigration court: those who were (i) previously ordered removed, or who departed or were removed from the United States, and then reentered, 8 U.S.C. § 1231(a)(5); or (ii) convicted of an aggravated felony and who then received a final administrative removal order from DHS, *id.* § 1228(b). DHS regulations allow a "reasonable fear" screening process for both groups. *See* 8 C.F.R. § 208.31.

Reasonable fear interviews require noncitizens to show a reasonable possibility of proving eligibility for relief. *See* 8 C.F.R. § 208.31(c). As with the credible fear process, a noncitizen who

passes a reasonable fear interview is referred to proceedings in immigration court (limited to withholding and CAT relief), while a noncitizen who does not pass is subject to immediate removal if an immigration judge upholds the negative fear determination. *Id.* § 1208.31(e)-(f).[2]

Both credible and reasonable fear interviews occur under very difficult circumstances. The noncitizen is almost always detained, making access to counsel, witnesses, and documents extremely difficult. *See, e.g.*, Cmt. of Central American Resource Center of Northern California ("CARECEN") at 4; Cmt. of Center for Gender and Refugee Studies ("CGRS") Att. 2 at 72, 77-78; Cmt. of American Bar Association ("ABA") at 4. Detention conditions—especially in Customs and Border Protection ("CBP") custody—are dire and routinely involve the lack of sleep and basic hygiene. *E.g.*, Cmt. of National Immigrant Justice Center ("NIJC") Att. 2 at 137-38; Cmt. of Am. Gateways at 4-5. Interviews occur very shortly after noncitizens have come into the United States and when they are, in many cases, suffering the immediate aftereffects of trauma. Cmt. of DC Volunteer Lawyers Project ("DCVLP") at 4; Cmt. of Immigrant Legal Resource Center ("ILRC") at 5; Cmt. of Tahirih Justice Center ("Tahirih") at 11. Shortly before Defendants promulgated the Rules, DHS decreased the pre-interview consultation period to as little as 4 hours. Cmt. of Aliento at 2; Cmt. of Women's Refugee Commission ("WRC") at 7; NIJC at 15. DHS typically conducts interviews—which can take hours—by telephone. *E.g.*, CARECEN at 4; ABA at 4-5. And interpretation problems are pervasive, especially for noncitizens who speak Indigenous or other rare languages. *See, e.g.*, NIJC at 31-32; NIJC Att. 2 at 15-36; Cmt. of Catholic Legal Immigration Network ("CLINIC") at 3-4.

---

[2]    Judicial review of reasonable fear denials may be available in limited circumstances. *See, e.g.*, *Dominguez Ojeda v. Garland*, 112 F.4th 1241 (9th Cir. 2024).

### C.    The Mandatory Bars to Asylum and Withholding of Removal

The INA contains mandatory bars to asylum and withholding of removal that derive from international law and prevent otherwise-eligible noncitizens from receiving relief. *See* 8 U.S.C. §§ 1158(b)(2)(A) & 1231(b)(3)(B).[3] Each of those bars is extremely complex.

*The persecutor bar* applies to applicants who "ordered, incited, assisted, or otherwise participated" in the persecution of any other person on account of a protected ground. 8 U.S.C. §§ 1158(b)(2)(A)(i) & 1231(b)(3)(B)(i). Application of the bar is highly fact-specific and requires consideration of, among other things, whether the applicant knew that their conduct would result in the persecution of others and whether the alleged harm bore any nexus to a protected ground. *See, e.g.*, *Doe v. Gonzales*, 484 F.3d 445, 447 (7th Cir. 2007); *Chen v. U.S. Att'y Gen.*, 513 F.3d 1255 (11th Cir. 2008).

*The particularly serious crime bar* applies to noncitizens convicted of such a crime by final judgment. 8 U.S.C. §§ 1158(b)(2)(A)(ii) & 1231(b)(3)(B)(ii). But the definition of "particularly serious crime" has generated decades of disputes. "Aggravated felonies," for example, are always particularly serious crimes, but whether a conviction is an aggravated felony involves a nuanced evaluation of state and federal law and has repeatedly reached the Supreme Court. *See, e.g., Pereida v. Wilkinson,* 592 U.S. 224 (2021); *Mellouli v. Lynch,* 575 U.S. 798 (2015); *Moncrieffe v. Holder,* 569 U.S. 184 (2013). There is also uncertainty concerning when a crime that is *not* an aggravated felony, including a crime committed outside the United States, may be considered particularly serious. *See, e.g., Blandino-Medina v. Holder,* 712 F. 3d 1338 (9th Cir. 2013). And on

---

[3]    The "firm resettlement" bar to asylum, *see* 8 U.S.C. § 1158(b)(2)(A)(vi), is not covered by the Rules and is thus not described here.

the factual side, mitigating factors like mental illness may be considered. *See Matter of B-Z-R-*, 28 I & N Dec. 563 (A.G. 2022).

*The serious non-political crime bar* concerns conduct outside of the United States and does not require an arrest or charge, much less a conviction. 8 U.S.C. §§ 1158(b)(2)(A)(iii) & 1231(b)(3)(B)(iii). Rather, it applies wherever an adjudicator has "serious reasons"—interpreted as probable cause, *see Matter of E-A-*, 26 I & N Dec. 1 (B.I.A. 2012)—to believe the applicant committed a serious non-political crime. *Id.* Whether those reasons exist, and whether a crime was political, require careful analysis of available evidence—including relevant foreign statutes. *See, e.g.*, Tahirih at 3; Cmt. of National Immigration Project ("NIP") at 8; CGRS Att. 4, at 7, 47-48. More importantly, it involves a deep inquiry into whether any charge or conviction was retaliatory and political, because many authoritarian governments use criminal laws to persecute their critics. *E.g.*, DCVLP at 4; NIP at 8; CGRS at 26-27, Att. 2 at 15-24; Cmt. of Human Rights First ("HRF") Att. 15; NIJC Att. 2 at 127-36, 385-93; Tahirih Att. 3 at 36-70. And adjudicators must also consider fact-specific mitigating factors such as self-defense, which an applicant will likely be unable to demonstrate during a screening interview. *See, e.g.,* CGRS at 26-27; Cmt. of Larry Gollub at 2; *Berhane v. Holder,* 606 F.3d 819, 825 (6th Cir. 2010).

*The terrorism-related bar*, 8 U.S.C. §§ 1158(b)(2)(A)(v) & 1231(b)(3)(B), broadly applies to "terrorist activity," defined as "the use of any . . . weapon or dangerous device" to "endanger" a person "directly or indirectly" or cause harm to property. 8 U.S.C. § 1182(a)(3)(B)(iii)(V). The bar also covers "material support" for a "terrorist organization." *Id.* § 1182(a)(3)(B)(iv)(VI). Defendants define "material support" to mean *any* provision of goods or services, voluntary or involuntary. *See, e.g.*, *Matter of A-C-M-*, 27 I & N Dec. 303 (B.I.A. 2018). And the statute defines "terrorist organization" to include "any group of two or more individuals" engaged in terrorist

8

activity, 8 U.S.C. § 1182(a)(3)(B)(iv)(VI) & (vi)(III). Defendants recently designated numerous gangs and drug cartels as "terrorist" organizations. *See, e.g.*, *Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana,* 90 Fed. Reg. 10030 (Feb. 20, 2025). Countless victims of extortion or other crimes committed by gangs and cartels are therefore now covered by Defendants' interpretation of "material support." *See* Cmt. of Amica Center for Immigrant Rights ("Amica") at 10-11.

Finally, *the national security bar*, 8 U.S.C. §§ 1158(b)(2)(A)(iv) & 1231(b)(3)(B)(iv), typically applies in two situations: (i) where a person is found to support violence against the United States, and (ii) in conjunction with the terrorism bar. Given its overlap with the terrorism bar, the national security bar is also invoked by Defendants against victims of violent organizations. *See, e.g.*, Cmt. of Robert F. Kennedy Human Rights at 4. And as with the other bars, the national security bar requires careful scrutiny of a well-developed evidentiary record. *See* Cmt. of Interfaith Immigration Coalition ("IIC") at 3; *Yusupov v. Att'y Gen.,* 650 F.3d 968 (3d Cir. 2011).

Defendants have a long history of applying the bars too aggressively and making basic analytical errors—even after full removal proceedings and a BIA appeal. *See, e.g.*, CGRS at 21 n.48 (collecting cases); *Annor v. Garland*, 95 F.4th 820 (4th Cir. 2024); *Dor v. Garland,* 46 F.4th 38 (1st Cir. 2022); *Ojo v. Garland,* 25 F.4th 152 (2d Cir. 2022); *Yan Yan Lin v. Holder,* 584 F.3d 75 (2d Cir. 2009); *Guerra-Castañeda v. United States,* 656 F. Supp. 3d 356 (D. Mass. 2023).

**D.    The Rules**

Although Congress created credible fear interviews in 1996, the mandatory bars did not apply in screening interviews until the Rules at issue here took effect in January 2025. In 2020, Defendants issued a different rule that would have permitted consideration of the mandatory bars

to asylum during credible fear interviews, *see Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review,* 85 Fed. Reg. 80274, 80391 (Dec. 11, 2020), but that rule never took effect. *See Pangea Legal Servs. v. DHS*, 512 F. Supp. 3d 966 (N.D. Cal. 2021). In 2022, Defendants reaffirmed their practice of not applying the bars in screening interviews. *See Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers,* 87 Fed. Reg. 18078, 18093-94 (Mar. 29, 2022). In doing so, Defendants acknowledged that applying the bars would make screening interviews "less efficient," take them "beyond [their] congressionally intended purpose," and raise serious questions of "procedural fairness." *Id.* at 18093.

The Rules reversed Defendants' position. The DHS Rule provides broad discretion for asylum officers conducting screening interviews to "consider the applicability" of mandatory bars wherever a person "appears to be subject to" such a bar. 89 Fed. Reg. at 103413-14; 8 C.F.R. §§ 208.30(e)(5)(ii), 208.31(c); *see also id.* § 208.33(b)(2)(i) ("if there is evidence that" a bar applies). If an asylum officer decides to consider a mandatory bar, a noncitizen in a screening interview must demonstrate, based on the same evidentiary standard that applies throughout the interview, that "no mandatory bar applies." 89 Fed. Reg. at 103413-14; 8 C.F.R. §§ 208.31(c) & 208.33(b)(2)(ii). If a noncitizen does not adequately rebut the applicability of a bar, "[t]he asylum officer shall issue a negative fear finding." 8 C.F.R. § 208.30(e)(5)(ii)(A); *see id.* § 208.33(b)(2)(iii) (using "will").

The DHS Rule states that its "main purpose" is to "facilitate efficiency" by denying barred claims at the credible fear stage. 89 Fed. Reg. at 103398. As support for this purpose—and in dozens of other contexts—the DHS Rule's preamble states that asylum officers will consider bars in screening interviews only where there is "easily verifiable evidence" that a bar applies. *See* 89

10

Fed. Reg. at 103373, 103376, 103378, 103383-89, 103391, 103394-97, 103403, 103411. The Rule itself, however, contains no such limitation. *See id*. at 103413-14. The preamble further claims that, while it "implements a different policy choice," it is not "a reversal of" Defendants' position in 2022. *Id*. at 103386-87.

Public comments on the DHS Rule explained at length that, contrary to the Rule's assertions, *see* 89 Fed. Reg. at 103375, it is impossible for most noncitizens to present evidence during a screening interview and impossible for asylum officers to meaningfully adjudicate issues as complex as the bars in a screening interview. *See, e.g.*, ILRC at 5-10; Tahirih at 11-16**.** Commenters also raised detailed concerns about the fairness of requiring noncitizens to address bars in screening interviews, about the reliability of documents from foreign governments that Defendants often use to support application of the bars, and about the inevitability that the Rule will result in wrongful removals to persecution. *See, e.g.*, ABA at 2-6; CGRS at 16-17; Amica at 6-8. And commenters stated that the Rule should not be adopted because of the interrelated effects of other contemporaneous policy changes. *See, e.g.*, Cmt. of Innovation Law Lab ("ILL") at 14-16; Cmt. of International Refugee Assistance Project ("IRAP") at 29-32.

The EOIR Companion Rule states that immigration judges will review the application of the mandatory bars whenever asylum officers consider a bar in the context of a screening interview. *See* 89 Fed. Reg. at 105402; 8 C.F.R. §§ 1003.42(d), 1208.31(g), 1208.33(b)(1). EOIR issued the Companion Rule to "clarify" its regulations in light of the DHS Rule. 89 Fed. Reg. at 105392.

### E.      The Plaintiffs and Their Injuries

Plaintiffs E.Q., Amica Center for Immigrant Rights ("Amica Center"), Florence Immigrant and Refugee Rights Project ("FIRRP"), and Refugee and Immigrant Center for Education and Legal Services ("RAICES") timely filed this suit challenging the Rules under 8 U.S.C. § 1252(e)(3). The Complaint alleges that the Rules are both contrary to law and arbitrary and

11

capricious in violation of the Administrative Procedure Act ("APA").

E.Q. is an Afghan national who fled the Taliban and received a credible fear denial on the basis of the bars. CFI Packet 1 (Dkt. 24-1).[4] The only form that E.Q. received immediately following the interview, a Form I-869 Record of Negative Credible Fear Finding and Request for Review by Immigration Judge, indicated that the bars were the sole reason for the denial. *Id*. at 1-2. The Form I-870 Record of Determination/Credible Fear Worksheet generated during the interview suggests that lack of nexus might have been an alternate basis for the denial. *Id*. at 12. But two declarations from long-serving asylum officers interpreting E.Q.'s interview documents make clear that the Form I-869 controls and that the bars were the sole reason E.Q. received a negative fear finding. *See* Decl. of Amanda Caroline Meadow (Dkt. 44-1) ¶¶ 8-12; Decl. of Jason Daniel Marks ¶¶ 29-53. After E.Q. filed suit, Defendants gave him a second credible fear interview in which the Rules did not apply—but in which he received a denial based solely on comparisons with the interview in which the Rules did apply. CFI Packet 2 (Dkt. 42-2) at 62-65.

Amica Center, FIRRP, and RAICES are legal service providers that serve detained noncitizens facing screening interviews. All three organizations have already seen their core services impaired by the Rules, even though a separate policy has meant that Defendants have conducted far fewer screening interviews than normal since the Rule took effect. *See, e.g.*, Decl. of Laura St. John ("FIRRP Decl.") ¶¶ 35-40, 42, 49-54; Decl. of Kelly Rojas ("Amica Decl.") ¶¶ 17-20, 26, 30, 34; Decl. of Rodolfo C. Atillo ("RAICES Decl.") ¶¶ 10, 13-15. And all three organizations will see major upheavals requiring them to redo service models and serve fewer clients once the number of screening interviews returns to normal. *See, e.g.*, FIRRP Decl. ¶¶ 36-

---

[4]     The declarations and materials specific to E.Q. that Plaintiffs cite in this brief are provided solely for purposes of establishing this Court's jurisdiction.

37, 43-47, 53, 56; Amica Decl. ¶¶ 24-27, 30-32; RAICES Decl. ¶¶ 15-18.

This Court previously denied Defendants' motion to dismiss the Complaint. Dkt. 49. Plaintiffs now move for summary judgment on each of their claims.

## LEGAL STANDARD

"When a plaintiff challenges an agency's final action under the [APA], summary judgment is the mechanism for deciding whether as a matter of law an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Council of Parent Att'ys & Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28, 47 (D.D.C. 2019) (quotation omitted). "The APA requires courts to 'hold unlawful and set aside' an agency's action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.*

## ARGUMENT

**I.       This Court Has Jurisdiction Over Plaintiffs' Claims**

This Court has jurisdiction over Plaintiffs' claims. E.Q. has standing to sue, and his claims are not moot. The Organizational Plaintiffs satisfy the well-settled test of organizational standing.

**A.       The Court Has Jurisdiction Over E.Q.'s Claims**

E.Q. satisfies the general standing requirements of Article III because the evidence shows that he received a negative credible fear determination on the sole basis of the Rules—and in any event, he has alleged a procedural injury and satisfies the less-demanding causation and redressability requirements that apply to such injuries. E.Q.'s claims are also not moot, not least because Defendants' decision to give E.Q., and only E.Q., a new credible fear interview not governed by the Rules triggers the voluntary-cessation exception to mootness.

**1.       E.Q. has standing to sue**

**a.       E.Q. satisfies general standing requirements**

A plaintiff has Article III standing if he "demonstrate[s] injury-in-fact … caused by the

defendant and capable of being redressed by a court order." *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 4 (D.C. Cir. 2005). E.Q. satisfies these requirements.

E.Q.'s initial credible fear interview resulted in a Form I-869 stating that the mandatory bars were the sole basis for his negative credible fear determination. *See* CFI Packet 1 (Dkt. 24-1) at 1-2. And the record evidence—in the form of declarations from two highly experienced former asylum officers—establishes that Form I-869 "is the controlling document regarding the reason for [a] negative [credible fear] determination," Meadow Decl. (Dkt. 44-1) ¶ 11, and that a bar "was in fact the basis for the decision rendered in [E.Q.'s] original CFI," Marks Decl. ¶ 35; *see also, e.g., id*. ¶ 25 (Form I-869 "serve[s] to formally identify the negative determination and the grounds communicated to the immigration judge for review"). E.Q. has thus shown that the bars were the sole cause of his denial.

Defendants' reliance on Form I-870, *see* Dkt. 25, at 15 n.4; Dkt. 42-1, at 9, is misplaced. That form is, as a general matter, *not* the controlling one. *See* Meadow Decl. (Dkt. 44-1) ¶ 9; Marks Decl. ¶ 25. Further, "[t]he Asylum Officer's checking of the 'no nexus' box on Form I-870" does not necessarily mean there is a "legally sufficient denial based on a lack of nexus." Meadow Decl. (Dkt. 44-1) ¶ 10. Indeed, in E.Q.'s case, "the reasoning for" potential bases for a denial other than the bars is "incomplete and not … legally sufficient to deny [his] claim." *Id.* ¶ 12; *accord* Marks Decl. ¶¶ 30-32.

There is ample support for the unequivocal statements of these experienced former asylum officers. Longstanding regulations provide that a "negative credible fear determination" is "issued on the Form I-869." 8 C.F.R. § 1003.42(e). This is the only document that is "read to the noncitizen aloud at service of the decision in a language they understand," DHS Rule, 89 Fed. Reg. at 103378, and the only document E.Q. received immediately following his interview, Dkt. 24-1 at 2.

14

Moreover, the DHS Rule itself specifies that bars are considered *only after* the applicant is "able to establish a credible fear of persecution." 89 Fed. Reg. at 103413 (codified at 8 C.F.R. § 208.30(e)(5)(i)). And to establish a credible fear of persecution, a noncitizen must satisfy the nexus requirement. *See* 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A), 1225(b)(1)(B)(v). Under the plain text of the DHS Rule, then, an asylum officer who reaches the mandatory bars has already determined nexus. This sequence reflects the underlying structure of the asylum statute, in which the mandatory bars are "exceptions" that apply to noncitizens who otherwise show "eligibility" for asylum. 8 U.S.C. § 1158(b)(1)(A) & (b)(2)(A).

Although the Court previously inferred that Form I-869 does not control, Dkt. 40, at 14-15, the bases for that inference do not contradict the unambiguous evidence that it does. The statutory and regulatory requirements governing credible fear interviews do not designate Form I-870 as controlling. The absence of "a summary of material facts" or "analysis" on a Form I-869, *id.* at 15, does not diminish its legal significance; court orders formally setting out relief often contain neither. The fact that a supervisory asylum officer signed E.Q.'s Form I-870, *id.*, is immaterial given that the regulations require the supervisor to "concur[] with … Form I-869," not Form I-870, 8 C.F.R. § 1003.42(e). Finally, *Singh v. DHS*, 2020 WL 420589, at *9 (W.D. Wash. Jan. 3, 2020), *report and recommendation adopted by* No. C19-1224, 2020 WL 419755 (W.D. Wash. Jan. 24, 2020), held only that a detailed analysis on Form I-870 defeated a claim that a credible fear determination lacked "reasoned analysis," not that Form I-870 overrides Form I-869.

The fact that E.Q. received a negative credible fear determination on the sole basis of the bars suffices to show all three elements of standing. E.Q. suffered an injury-in-fact: the interview involved unlawful procedures that resulted in both his inability to apply for asylum and related relief and the issuance of an expedited removal order, which means Defendants can remove him

15

to grave danger in Afghanistan. *See, e.g.*, *INS v. Chadha*, 462 U.S. 919, 935 (1983). This injury was caused by the Rules, which are the sole basis on which Defendants determined the applicability of the mandatory bars in E.Q.'s credible fear interview. And a favorable decision by this Court would redress E.Q.'s injury by vacating the Rules and declaring them unlawful. *See, e.g.*, *Ctr. for Energy & Econ. Dev. v. EPA*, 398 F.3d 653, 657 (D.C. Cir. 2005).[5]

> **b.**      **E.Q.'s procedural injury is subject to relaxed standing requirements**

Even if the basis for E.Q.'s negative credible fear determination were somehow unclear, he would have standing. It is undisputed that Defendants applied the unlawful Rules to E.Q. in his credible fear interview—and in doing so, placed on him the burden of proving, without evidence or knowledge of the bars, that no bar would apply. Both the application of the unlawful Rules and the imposition of that impossible burden are procedural injuries that turn not on the substantive outcome but on the fact that "DHS failed to comply with required procedures in making its determination." *Ranjan v. DHS*, 747 F. Supp. 3d 192, 200 (D.D.C. 2024). Although the procedural-injury framework most commonly arises in notice-and-comment or environmental-review cases, the D.C. Circuit just last year applied it to the use of allegedly unlawful standards in immigration benefit determinations. *Pietersen v. Dep't of State*, 138 F.4th 552, 559 (D.C. Cir. 2025).

Because E.Q. alleges a procedural injury, he "need not prove the outcome would have been different if the protection were afforded"—as this Court previously recognized. Dkt. 40, at 18. Instead, E.Q. must show only that Defendants "failed to abide by a procedural requirement that was 'designed to protect'" a "'concrete interest'" and that the procedural requirement "was

---

[5]      Standing is determined at the time suit is filed. *Davis v. Federal Election Commission*, 554 U.S. 724, 734 (2008). E.Q.'s second interview—which postdated his filing—is therefore irrelevant to standing.

connected to" the substantive result of the interview. *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 24-25 (D.D.C. 2020) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n.8 (1992)); *see Las Americas Immigrant Advoc. Ctr. v. DHS*, 783 F. Supp. 3d 200, 215-216 (D.D.C. 2025), *appeal filed*, D.C. Cir. No. 25-5313 (Aug. 28, 2025); *Grace v. Whitaker*, 344 F. Supp. 3d 96, 119 (D.D.C. 2018), *aff'd in relevant part*, 965 F.3d 883 (D.C. Cir. 2020). E.Q. easily satisfies that test. He was entitled to a lawful credible fear interview; the Rules—which permit the application of mandatory bars in such interviews with the burden of proof on the applicant—are unlawful; and the Rules were applied both *to* E.Q. and *against* him in his interview. The fact that Defendants reinterviewed E.Q. without applying the Rules confirms that the Rules were connected to his initial denial.

Moreover, the record does not support a finding that the "outcome would *not* have been different *even if* the protection" of a lawful interview "were afforded." Dkt. 40, at 18 (emphasis in original). At worst, the record creates substantial uncertainty as to whether the outcome of E.Q.'s interview would have differed absent the Rules. But that does not matter; all that matters is that E.Q. was denied at least in part because of the Rules, meaning that the Rules are connected to his injury. *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013).

The D.C. Circuit's opinion in *Citizens for Constitutional Integrity v. Census Bureau*, 115 F.4th 618 (D.C. Cir. 2024) ("*CCI*"), which this Court previously raised, Dkt. 49, at 17, does not alter the analysis. The plaintiff in *CCI* directly challenged a substantive result: the apportionment of congressional seats. *See id.* at 621. E.Q., in contrast, does *not* contest whether Defendants reached the correct conclusion in his credible fear interview. Indeed, review of that question would be barred. *See* 8 U.S.C. § 1252(a)(2). He instead argues that, by using the Rules to consider the bars in his interview, Defendants used an unlawful procedure. *CCI* thus has no purchase here.

17

And while *CCI* suggested that "[a]rbitrary and capricious review under Section 706(2)(A) is inherently designed for review of *substantive* agency actions," *id.* at 627, that statement does not preclude arbitrary and capricious review in the context of procedural injuries. The D.C. Circuit routinely engages in such review. *See Int'l Dark Sky Ass'n v. FCC*, 106 F.4th 1206 (D.C. Cir. 2024) (conducting arbitrary and capricious review after finding standing on procedural-injury theory); *Growth Energy v. EPA*, 5 F.4th 1, 26-32 (D.C. Cir. 2021) (same); *WildEarth Guardians*, 738 F.3d 298 (same). And it has continued to do so since *CCI. See Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356 (D.C. Cir. 2026); *Am. Whitewater v. FERC*, 125 F.4th 1139 (D.C. Cir. 2025).

*CCI* instead stands for the long-established requirement that the agency's unlawful *action* must be procedural in nature. *See, e.g.*, *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 94 (D.C. Cir. 2002). Accordingly, both the D.C. Circuit and other courts in this district court have, following *CCI*, continued to treat the application of allegedly illegal policies in immigration-benefit determinations as a procedural injury. In *Pietersen*, a unanimous panel of the D.C. Circuit applied the procedural-injury framework in a case concerning the application of challenged guidance in visa adjudications. 138 F.4th at 559. And in *Las Americas*, Judge Contreras held that the application of a heightened screening standard in credible fear interviews—an injury directly analogous to E.Q.'s injury—is procedural in nature. 783 F. Supp. 3d at 216. E.Q. would therefore have standing to sue even if he could not meet the usual requirements of Article III.

### 2.     Defendants' voluntary actions cannot moot E.Q.'s claims

Dismissal of E.Q.'s claims on mootness grounds would be improper. As an initial matter, the distinctive features of 8 U.S.C. § 1252(e)(3) prevent mootness. That section permits challenges to expedited removal policies only within a 60-day window that the D.C. Circuit has held to be jurisdictional. *M.M.V. v. Garland*, 1 F.4th 1100, 1109-10 (D.C. Cir. 2021). That window has long since closed. E.Q. is thus the *only* noncitizen who can challenge the Rules, and he effectively

18

stands in the shoes of all noncitizens subject to them, giving him a representational interest in continuing the suit even if his individual claim is moot.

In any event, the voluntary-cessation exception to mootness applies. Under that exception, "the voluntary cessation of challenged conduct does not ordinarily render a case moot." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012); *see Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 189 (2000). Specifically, where a defendant voluntarily ceases the challenged conduct, the exception to mootness applies unless "the facts do not suggest any arguable manipulation of [the Court's] jurisdiction." *Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1128 (D.C. Cir. 2024) (quotation omitted).

This case presents a paradigmatic example of voluntary cessation. Defendants never ceased applying the Rules; to the contrary, Defendants concede that they continue to apply the Rules in other fear screenings. Dkt. 25, at 31. And their second interview of E.Q., in which Defendants did not directly apply the Rules, came *after* Defendants knew that E.Q. was the sole individual plaintiff in this lawsuit. *See* Dkt. 1 (Complaint, filed Mar. 17, 2025); CFI Packet 2 (Dkt. 24-2, interview conducted on Apr. 30, 2025). These circumstances raise a very strong inference that Defendants reinterviewed E.Q. for the sole purpose of attempting to moot his claims. Indeed, Defendants have not attempted to provide any alternative explanation for the reinterview.

The factors counseling against application of the voluntary-cessation doctrine are also absent here, because this is not a case in which Defendants "oppose[] mootness" or have "little to gain from … dismissal." *Pub. Citizen*, 92 F.4th at 1129. Rather, Defendants affirmatively pressed mootness as a basis for both resisting interim relief and for dismissal. *See* Dkt. 25, at 29-33; Dkt. 42-1, at 14-15. And given the exceptionally short deadline for filing suit against expedited removal policies, Defendants have everything to gain from a mootness finding. Dismissal of this lawsuit

19

would enable Defendants to apply the challenged rules forever without needing to defend their legality. *See O.A. v. Trump*, 404 F. Supp. 3d 109, 140 (D.D.C. 2019). There can thus be little question that Defendants "sought to strategically avoid judicial review by ceasing a challenged activity." *Samma v. U.S. Dep't of Defense*, 136 F.4th 1108, 1114 (D.C. Cir. 2025).

Because the voluntary cessation doctrine applies, Defendants bear the "heavy burden" of satisfying two exacting standards. *Friends of the Earth*, 528 U.S. at 189; *see Guarascio v. FBI*, No. 18-cv-2791, 2023 WL 7182057, at *5 (D.D.C. Nov. 1, 2023) (Cooper, J.). First, Defendants must show that "interim relief or events … have completely and irrevocably eradicated the effects of the alleged violation." *Aref v. Lynch*, 833 F.3d 242, 251 (D.C. Cir. 2016) (quotation omitted). Second, Defendants must also show that it is "'*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* (quoting *Friends of the Earth,* 528 U.S. at 189) (emphasis in *Aref*). Defendants cannot begin to satisfy either prong.

Defendants are categorically excluded from satisfying the first prong of this test, because they have "neither ceased the [challenged] conduct … nor professed any intent" to do so. *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1258 (D.C. Cir. 2020). As this Court has previously held, a challenge to policies is not moot if the policies "have not yet been revised." *Colo. Wild Pub. Lands v. U.S. Forest Serv.*, 691 F. Supp. 3d 149, 172 (D.D.C. 2023) (Cooper, J.); *see, e.g., Sierra Club v. U.S. Dep't of Transp.*, 125 F.4th 1170, 1180 (D.C. Cir. 2025) (rule's suspension insufficient to moot case); *Am. Clinical Lab. Ass'n v. Becerra*, 40 F.4th 616, 622-23 (D.C. Cir. 2022) (replacement of policy insufficient where agency did not foreclose reinstating the policy). That conclusion has special force here given the now-or-never nature of challenges under § 1252(e)(3).

20

At all events, E.Q.'s second credible fear interview did not "completely and irrevocably eradicate[] the effects" of the interview governed by the Rules. *Aref*, 833 F.3d at 251. Defendants could have provided E.Q. with an interview completely disconnected from the Rules. They did not do so. Instead, Defendants provided a second interview that was a *continuation* of the first interview. The longest section of the transcript concerns that "Past Interview," and the asylum officer there re-canvassed the same topics covered in the mandatory bars section of the first interview and elicited elaboration on those topics. *See* CFI Packet 2 (Dkt. 24-2)**,** at 47-55. Worse, the outcome of the second interview rests solely on supposed inconsistencies between the statements E.Q. made in the first and second interviews. Three of the four "concern[s]" the asylum officer noted about E.Q.'s credibility start with the phrase "[d]uring the applicant's 1st credible fear interview," and the fourth "concern" likewise rests on a distinction between the interviews. *See id*. at 63-65. Defendants thus cannot show, as they must, that they "completely and irrevocably eradicated" the application of the Rule in the first interview.

Defendants also cannot "satisfy [their] heavy burden" of showing with absolute clarity that E.Q. will never again be subjected to the Rules. *Guarascio*, 2023 WL 7182057, at *5. E.Q. has been released from immigration detention via a habeas petition. *See* Order, *E.Q. v. McGregor*, D. Ariz. No. 2:26-cv-00628, Dkt. 7 (Apr. 23, 2026). From within the United States, E.Q.'s only path to permanent status involves the rescission of his expedited-removal order in an exercise of unfettered discretion by DHS—an act that would give Defendants another opportunity to apply the Rule to him. Even if E.Q. is later removed from the United States, he will, if he returns to this country, face renewed application of the Rules.[6] If Defendants were to reinstate his expedited

---

[6]     Given that E.Q. faces likely violence from the Taliban and has family in the United States, it is entirely reasonable to think that he would make every effort to return.

21

removal order after a reentry, he would receive a reasonable fear interview—in which the Rules apply. *See* 8 C.F.R. § 1208.31. And if Defendants did not reinstate the removal order, they would almost certainly give E.Q. a new credible fear interview—in which the Rules also apply. This near-certain future treatment is more than sufficient to defeat Defendants' attempt to moot E.Q.'s claims. *See, e.g.*, *FBI v. Fikre*, 601 U.S. 234, 243 (2024) (Defendant may not "resume its challenged conduct" either "immediately or later."); *City of N.Y. v. Baker*, 878 F.2d 507, 511 (D.C. Cir. 1989) (case not moot where plaintiff could refile a visa application, and be subjected to the same policy, in the future). Defendants have therefore failed to satisfy either prong of the voluntary cessation test.

## B.     The Organizational Plaintiffs Have Standing

The Organizational Plaintiffs also have standing to challenge the Rules, because Defendants' actions "are 'directly' poised 'to affect[] and interfere[] with' the organizations' 'core business activities.'" Dkt. 49, at 24; *see FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) ("*Alliance*"); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("*Havens*"). All three Organizational Plaintiffs provide legal representation and other services to noncitizens who are seeking asylum or other relief in regular or expedited removal proceedings. FIRRP's core work involves providing Know Your Rights presentations, workshops, written resources, *pro se* support, and direct representation to detained noncitizens. FIRRP Decl. ¶¶ 8, 11-13. The Amica Center's Detained Adult Program provides educational services, legal orientations, referrals, and direct representation to detained noncitizens in removal proceedings. Amica Decl. ¶¶ 5-11. Through the National Qualified Representative Program, both Amica Center and FIRRP also provide representation to individuals not competent to represent themselves. FIRRP Decl. ¶¶ 29-30; Amica Decl. ¶¶ 12-14. And RAICES's core activities include representing asylum seekers in both regular and expedited removal proceedings. RAICES Decl. ¶¶ 4, 7-9.

22

The Rules have caused the Organizational Plaintiffs harm even though Defendants have conducted far fewer screening interviews in 2025 and 2026 because of a policy that ended credible fear interviews entirely. *See* FIRRP Decl. ¶¶ 57-60; Amica Decl. ¶ 18, 20; RAICES Decl. ¶ 10; *RAICES v. Noem*, 793 F. Supp. 3d 19 (D.D.C. 2025) (vacating policy), *aff'd sub nom RAICES v. Mullin*, 174 F.4th 81 (D.C. Cir. 2026), *pet. for rhg. en banc pending*, No. 25-05243 (D.C. Cir. June 8, 2026). RAICES has been forced to shift from a model of having legal assistants provide support for noncitizens facing screening interviews to a model involving much more technical support from attorneys. RAICES Decl. ¶ 17. Amica has already had to expend limited resources on conducting additional staff training and will be forced to spend additional time and effort updating presentation materials, intake forms, and other resources, Amica Decl. ¶ 19—and RAICES is in the middle of updating similar materials, RAICES Decl. ¶¶ 13-14. And because the Rules "improperly screen[ noncitizens] out of full removal proceedings," they "cut[] to the heart of FIRRP's core work educating and representing people so that they understand their rights and have a fair opportunity to present their claims in removal proceedings." FIRRP Decl. ¶ 42.

These injuries will be greatly amplified if, and when, Defendants resume routinely conducting fear screenings. FIRRP has warned that, when the Rules are in use, it will face "a massive increase in the need for rapid technical assistance to pro se individuals" and be forced to commit "immense additional resources to rapidly identify and … prepare supporting materials" before those interviews. FIRRP Decl. ¶¶ 36-37. The Rule will also harm FIRRP's federal appellate practice because there is no judicial review of credible fear denials. *Id.* ¶¶ 43-47. RAICES has likewise warned that widespread application of the Rule will force it to divert resources from affirmative legal representation and other programs. RAICES Decl. ¶¶ 16, 19, 21. And Amica has made clear that it will need to reorganize its service model, "identify[ing] and meet[ing] with

23

clients … much earlier" in the process and on a compressed timeline—and will need to sacrifice part of its "capacity to inform and assist pro se noncitizens" in regular removal proceedings in order to do so. Amica Decl. ¶ 25. When the number of screening interviews increases, the Rules will also "limit the number of viable cases" that Amica can place with pro bono counsel under its service model. Amica Decl. ¶ 26.

As the number of screening interviews increases, the Rules will also reduce the total number of noncitizens the Organizational Plaintiffs can assist. Amica will be able to represent fewer clients in regular removal proceedings because of the additional time needed to address the bars in its know-your-rights presentations, and it will be able to represent fewer clients through its universal representation program because of the need to shift resources to screening interviews. Amica Decl. ¶¶ 25, 31. FIRRP and Amica both represent noncitizens found incompetent to represent themselves—a group particularly likely to face bars allegations—but can do so only *after* the noncitizen passes a screening interview. FIRRP Decl. ¶¶ 49-50; Amica Decl. ¶ 27. Both the decreasing number of these clients and the reduction in universal-representation clients will cause direct financial injury to FIRRP and Amica. FIRRP Decl. ¶¶ 49-50; Amica Decl. ¶¶ 30, 32. And RAICES will be able to conduct fewer intakes of people undergoing fear screenings because the Rules make each intake much more complicated. RAICES Decl. ¶ 15.

The Rules thus "perceptibly impair[]" the Organizational Plaintiffs' ability to provide counseling and representation services, *Havens*, 455 U.S. at 379—and that impairment will worsen significantly when Defendants resume conducting routine screening interviews. No more is needed for them to show standing. *See Alliance*, 602 U.S. at 395; *Havens*, 455 U.S. at 379. Indeed, this Court has already recognized that the injuries facing the Organizational Plaintiffs are "analogous to the paradigmatic organizational standing injury described by the Supreme Court in *Havens*."

24

Dkt. 49 at 26. That conclusion harmonizes with the decisions of many other courts in this district. *See, e.g.*, *RAICES v. Noem*, 793 F. Supp. 3d 19; *Las Americas*, 783 F. Supp. 3d at 216; *O.A.*, 404 F. Supp. 3d at 142-43.

Furthermore, as this Court has already concluded, the Organizational Plaintiffs satisfy the "zone-of-interests" test because their "interests are neither inconsistent with nor marginally related to the INA." Dkt. 49 at 32 (quotation omitted). Other courts in this district have uniformly reached the same conclusion. *See, e.g.*, *O.A.*, 404 F. Supp. 3d at 144; *RAICES*, 793 F. Supp. 3d at 75; *Las Americas*, 783 F. Supp. 3d at 218. And given that "Congress plainly had as an objective under the INA to optimize the availability of pro bono or low-cost counsel to persons subject to removal," *Catholic Legal Immigration Network, Inc. v. EOIR*, 513 F. Supp. 3d 154, 171 (D.D.C. 2021), there is no cause for the Court to revisit that holding.

## II.    The Rules Are Contrary to Law

Under the APA, a court "shall … hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A). The Rules are contrary to the INA because they (i) deny individuals with a credible fear of persecution the right to apply for asylum in full removal proceedings; (ii) allow claims to be denied on the basis of DHS employees' predictions that a bar might apply rather than a final determination that a bar does apply; and (iii) impermissibly delegate to DHS authority that Congress reserved exclusively to the Attorney General.[7]

### A.    The Rules Impermissibly Prevent Noncitizens with a Credible Fear of Persecution from Applying for Relief

Congress designed the screening standard for credible fear interviews to identify noncitizens who "could establish eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v). As Congress

---

[7]    All of Plaintiffs' arguments apply equally to the credible- and reasonable-fear contexts except where one type of interview is specifically discussed.

25

fully understood at the time, a focus on asylum eligibility means a focus solely on whether a noncitizen is a "refugee" within the meaning of the INA—to the exclusion of the mandatory bars. *Grace*, 344 F. Supp. 3d at 107 (citing 142 Cong. Rec. S11491-02 ("The credible fear standard ... is intended to be a low screening standard for admission into the usual full asylum process") and H.R. Rep. No. 104-469, pt. 1, at 158 (1996) (stating "there should be no danger that [a noncitizen] with a genuine asylum claim will be returned to persecution")). That understanding is reflected in the text and context of 8 U.S.C. § 1158(b), which sets forth the mandatory bars; the text of 8 U.S.C. § 1225(b), which creates the credible fear process; the pertinent legislative history; and Defendants' own historical practice.

In § 1158(b)(1), Congress addressed the "conditions for granting asylum." Under the heading "Eligibility," Congress provided that noncitizens may receive asylum if they meet a singular defining condition: they must qualify as "a refugee within the meaning of section 1101(a)(42)(A) of this title." 8 U.S.C. § 1158(b)(1)(A). Then, under the heading "Burden of Proof," Congress directed that "[t]he burden of proof is on the applicant to establish" one thing and one thing only: "that the applicant is a refugee, within the meaning of section 1101(a)(42)(A) of this title." *Id.* § 1158(b)(1)(B). Section 1101(a)(42)(A), in turn, defines a refugee as a person who is "unable or unwilling to return to" their country of origin "because of persecution or a well-founded fear of persecution on account of" a protected ground.

The bars do not appear in § 1158(b)(1). Instead, they appear in a separate subsection titled "Exceptions." 8 U.S.C. § 1158(b)(2). There, Congress directed that the discretionary authority to grant asylum "shall not apply" to an applicant if the Attorney General determines that the applicant is subject to a mandatory bar. *Id*. The mandatory bars thus define the narrow class of people who are entitled to apply for asylum, and who otherwise show eligibility as a refugee, but who must

26

nevertheless be denied relief. And under the plain text of § 1158(b), Defendants may not wield the bars to prevent people from applying for asylum.

Of course, § 1158(b) does not exist in a vacuum, and neighboring provisions make Congress's intent unmistakable. In § 1158(a), Congress addressed the right to apply for asylum separately from the eligibility provisions of § 1158(b). Section 1158(a) begins by creating a broad right to apply for asylum. 8 U.S.C. § 1158(a)(1). It then lists three narrow "exceptions" to that right that are wholly distinct from the bars in § 1158(b)(2). In short, Congress created both bars to the right to apply for asylum and different bars that prevent otherwise-eligible applicants from receiving a grant of asylum—and placed the bars at issue here in the latter camp.

Section 1225 is to the same effect. There, Congress made clear that any noncitizen who shows a "credible fear of persecution" must be allowed to seek relief in regular removal proceedings. 8 U.S.C. § 1225(b)(1)(B)(ii). And Congress defined a "credible fear of persecution" as "a significant possibility … that the [noncitizen] could establish *eligibility for asylum under section 1158*." *Id.* § 1225(b)(1)(B)(v) (emphasis added); *see* 8 C.F.R. § 208.30(e)(2)-(3). The only provision of § 1158 that addresses "eligibility for asylum" is § 1158(b)(1), the subsection titled "eligibility." As shown above, § 1158(b)(1) defines eligibility solely by reference to refugee status under § 1101(a)(42)(A); the mandatory bars appear only in § 1158(b)(2), a separate subsection titled "Exceptions" that governs the class of otherwise-eligible refugees who may nonetheless be denied. Section 1225(b) therefore incorporates the "Eligibility" standard found in § 1158(b)(1)(A), which asks only whether a person is a refugee, not whether they are subject to a mandatory bar. Section 1225(b) also makes clear that noncitizens are not required to provide documentary evidence in a credible fear interview. *See* 8 U.S.C. § 1225(b)(1)(B)(v) (decisions made based on "the credibility of the [noncitizen's] statements … and such other facts as are known to the

27

officer"). Given the complexity of the bars, that language is also incompatible with consideration of the bars in screening interviews.

The legislative history of § 1225(b) confirms Plaintiffs' reading. The relevant House committee report states that a credible fear interview "will focus on two questions: is the [noncitizen] telling the truth; and does the [noncitizen] have some characteristic that would qualify the [noncitizen] as a refugee." H.R. Rep. No. 104-469, at 158 (1996). Congress never suggested that it somehow intended for a third question involving the mandatory bars to be part of the screening analysis.

This is not surprising. Congress adopted the "credible fear of persecution" standard that the former Immigration and Naturalization Service ("INS") had used since 1991 to screen Haitians detained at sea. Testimony of Gene McNary, INS Comm'r (Apr. 9, 1992).[8] Under that standard, the INS considered the same two questions: whether (1) "it is more probable than not that the statements made by the person in support of his or her asylum claim are true," and (2) "there is a significant possibility … that the person could establish eligibility as a refugee." *Id.*

Congress's choice to carry forward an INS standard asking about "eligibility as a refugee"—while codifying it in § 1225(b)(1)(B)(v) using the phrase "eligibility for asylum"—was not a departure from refugee-status analysis. To the contrary, by 1996, the two phrases had long been treated as synonymous. The Supreme Court had repeatedly equated asylum eligibility with refugee status, saying that "in order to be eligible for asylum, a [noncitizen] must meet the definition of 'refugee,'" *INS v. Stevic*, 467 U.S. 407, 423 (1984), and that "eligibility for asylum

---

[8]    Department of the Treasury's Report on Issues Related to the Compliance with U.S. Tax Laws by Foreign Firms Operating in the United States: Hearing Before the Subcommittee on Oversight of the Committee on Ways and Means, House of Representatives, 102nd Cong. (1992)*, https://heinonline.org/HOL/P?h=hein.cbhear/cbhearings6020&i=214.

depends *entirely* on the Attorney General's determination that [a noncitizen] is a 'refugee,'" *INS v. Cardoza-Fonseca*, 480 U.S. 421, 427–28 (1987) (emphasis added); *accord INS v. Elias-Zacarias*, 502 U.S. 478, 485 (1992). Congress is presumed to have legislated with knowledge of that settled judicial equivalence and to have adopted it. *Molzof v. United States*, 502 U.S. 301, 307 (1992); *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992).

Defendants' historical practice eliminates any residual doubt. In 1997, the year after Congress passed § 1225(b), the INS issued guidance instructing that "[i]f there is some evidence or concern that [a noncitizen] who meets the credible fear standard may be a security risk or subject to a terrorist bar," the noncitizen's "case should" nonetheless "be referred for a [full] removal hearing" in immigration court. INS Sends More Expedited Removal Instructions, 75 No. 7 Interpreter Releases 255 (1998). Defendants hewed to that practice for almost three decades until 2025. And in 2022, Defendants acknowledged that adjudicating mandatory bars in screening interviews would expand them "beyond [their] congressionally intended purpose." 87 Fed. Reg. at 18093. The INA thus precludes consideration of the mandatory bars in screening interviews.

**B.     The Rules Impermissibly Allow Denials on the Basis that a Bar Might Apply**

The Rules also violate the INA by authorizing the denial of relief based on a preliminary prediction that a bar *might* apply. The asylum and withholding statutes disqualify an applicant from relief only if the Attorney General "determines" or "decides" that a mandatory bar applies. 8 U.S.C. §§ 1158(b)(2)(A) & 1231(b)(3)(B). To "determine" is "to settle (a dispute, question, etc.) conclusively. Webster's New World College Dictionary 375 (3d ed. 1997). And to "decide" similarly means to "pass[] judgment." *Id.* at 357. The statute thus permits bar-based denials only after the adjudicator reaches a final conclusion that the bar applies, not on the basis of a prediction.

The Rules, however, do not require an asylum officer or immigration judge to determine that a bar applies. The DHS Rule allows asylum officers to consider a bar wherever one "appears"

29

to apply—a standard lower than the standard DHS must meet to raise certain bars in regular removal proceedings. *See, e.g.*, *Budiano v. Lynch*, 837 F.3d 1042, 1048 (9th Cir. 2016) ("particularized evidence of the bar's applicability"); *Matter of E-A-,* 26 I & N Dec. at 1 (probable cause). The DHS Rule then requires the officer to apply the bar unless the noncitizen establishes "a significant possibility that [they] would be able to show by a preponderance of the evidence that such bar(s) do not apply"—a task that is practically impossible given the circumstances in which screening interviews take place. 8 C.F.R. § 208.30(e)(5)(ii)(A); *see infra* Section III.C.

The result is that the DHS Rule allows application of the bar on a standard far below an actual "determination" or "decision" that a bar applies. The EOIR Companion Rule, meanwhile, directs immigration judges to review only whether the asylum officer's appearance-based prediction was correct. *See* 89 Fed. Reg. at 105402; 8 C.F.R. §§ 1003.42(d), 1208.31(g), 1208.33(b)(1).

### C.      The Rules Impermissibly Allow DHS to Make Bars Determinations

The Rules independently violate the INA by delegating to DHS authority that Congress reserved exclusively for the Attorney General. The INA is explicit about who may make bars determinations. Both the asylum statute and the withholding statute provide for the denial of relief on the basis of a mandatory bar only "if the Attorney General" determines, or decides, that the bar applies. 8 U.S.C. §§ 1158(b)(2)(A) & 1231(b)(3)(B).

Amendments to the INA made in 2005 confirm that the statute means what it says. Until 2005, the asylum-eligibility provisions of § 1158(b)(1)(A) and the mandatory-bar provisions of § 1158(b)(2)(A) referred solely to the Attorney General. In the Emergency Supplemental Appropriations Act for Defense, The Global War on Terror, and Tsunami Relief, Pub. L. No. 109-13, Div. B, 119 Stat. 231, 302 (2005) ("Real ID Act"), Congress amended § 1158(b)(1) by "striking 'the Attorney General' ... and inserting 'the Secretary of Homeland Security or the Attorney

30

General.'" *Id.* § 101(a)(1). In the same bill, Congress also amended Section 1158(b)(2)—but those changes did *not* include adding the Secretary of Homeland Security to the list of those able to make determinations about the mandatory bars. *See id.* § 101(b).

Where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *City & Cnty. of San Francisco v. EPA*, 604 U.S. 334, 344 (2025) (quotation omitted). That presumption applies with full force here. A May 2005 report prepared for Congress expressly noted that "the REAL ID Act would [] amend [8 U.S.C. § 1158(b)(1)] to insert references to both the Attorney General and the Secretary of Homeland Security. However, this would only address references for that particular subsection and would not amend the rest of [§ 1158], which would continue to refer only to the Attorney General." Michael J. Garcia *et al.*, Cong. Rsch. Serv., RL32754, Immigration: Analysis of the Major Provisions of H.R. 418, the REAL ID Act of 2005 13–14 (May 9, 2005). Congress thus legislated with full awareness of the distinction and preserved it.

The plain text of the INA reflects Defendants' own longstanding practice. Affirmative asylum cases adjudicated by asylum officers almost always lead to one of two substantive results: a grant of asylum or referral to immigration court for *de novo* review. *See* 8 C.F.R. § 1208.14(c). The only circumstance in which DHS may deny asylum outright is where a person has some other ongoing legal status and is not amenable to removal. *See id.* It is thus immigration judges, not DHS, that make all bars determinations leading to removal in asylum cases. And as noted above, the bars played no part in screening interviews until the Rules took effect.

Defendants previously argued that the INA's text should be ignored because the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002) ("HSA"), transferred the relevant

31

authority to DHS. *See* Dkt. 42, at 32. But the HSA did not transfer all powers to DHS. Rather, the HSA gave the DHS Secretary the authority to implement the INA "except insofar as [the immigration laws] relate to the powers, functions, and duties conferred upon" other officials, including "the Attorney General." 8 U.S.C. § 1103(a)(1). And the HSA retained for the Attorney General any "authorities and functions … relating to the immigration and naturalization of [noncitizens] as were exercised by [EOIR]" in 2002. *Id.* § 1103(g)(1).

That carve-out is dispositive. As Defendants have acknowledged, the INS prohibited asylum officers from applying the mandatory bars in screening interviews. *See* Dkt. 42, at 29 (citing *Asylum Procedures,* 65 Fed. Reg. 76121, 76129 (Dec. 6, 2000)); that authority rested exclusively in EOIR immigration judges. The authority to make bars determinations did not transfer to, and cannot now be exercised by, DHS.

## III.     The Rules Are Arbitrary and Capricious

Agency action that is arbitrary and capricious violates the APA and must be set aside. 5 U.S.C. § 706(2)(A). The DHS Rule is arbitrary and capricious because it: (i) rests on a core assumption inconsistent with the Rule's text; (ii) fails to acknowledge or reasonably explain Defendants' change in position; (iii) rests on assertions that are contrary to the record; (iv) fails to consider fairness and the unreliability of much bars-related evidence; and (v) fails to consider the effect of contemporaneous and interrelated policies. And if the DHS Rule is set aside, the EOIR Companion Rule loses its only justification, rendering it arbitrary and capricious as well.

### A.     The DHS Rule Rests on a False Premise

As an initial matter, the DHS Rule is arbitrary and capricious because it "rest[s] on a false factual premise." *Cigar Ass'n of Am. v. FDA*, 132 F.4th 535, 540 (D.C. Cir. 2025). In the Rule's preamble, Defendants assert at least thirty times that the Rule limits review of mandatory bars to circumstances where there is "easily verifiable evidence" that a bar applies. DHS Rule, 89 Fed.

32

Reg. at 103373, 103376, 103378, 103383-89, 103391, 103394-97, 103403, 103411. Among other things, the preamble says that the Rule permits consideration of bars "only where there is sufficient, easily verifiable evidence that a bar applies to a noncitizen." *Id.* at 103378. The preamble further says that "the Rule instructs that" mandatory bars may be considered only "when there is easily verifiable evidence." *Id.* at 103385. And the preamble says that, under its provisions, asylum officers "would determine whether there is easily verifiable information." *Id.* at 103387.

This supposed "easily verifiable evidence" limitation permeates the Rule's justifications. The "main purpose" of the Rule—to "facilitate efficiency," 89 Fed. Reg. at 103398—rests on it, because an asylum officer can possibly "consider [a] bar efficiently" *only* where "easily verifiable evidence" exists*, id.* at 103411; *see id.* at 103378, 103383. The Rule also uses the same supposed limitation to reject many critical comments. For example, in response to comments that noncitizens cannot gather evidence before screening interviews, the Rule asserts only that "evidence gathering" is unnecessary because asylum officers "will only consider a bar in those cases where there is easily verifiable (as opposed to unverified or difficult-to-verify) evidence" that a bar applies. 89 Fed. Reg. at 103375-76. As another example, the Rule relies on the same limitation to rebut comments that the Rule "is inconsistent with congressional intent that the 'significant possibility' standard be a low threshold to avoid the risk that people would erroneously be screened out." *Id*. at 103385; *see also, e.g.*, *id.* at 103383 (responding to comment that an "'overtly hostile anti-immigrant administration' could abuse the discretion that the rule allows"); *id.* at 103384 (comment that the rule is a deterrence measure); *id.* at 103385 (comments that rule violates international law); *id.* at 103387 (concern about wrongful removals).

The text of the Rule, however, does not limit consideration of the bars to cases involving "easily verifiable evidence." Indeed, that phrase is absent from the regulatory text. Rather, the

plain text of the regulations permits asylum officers to consider mandatory bars whenever it "appears" that a noncitizen is "subject to one or more of the mandatory bars." 8 C.F.R. §§ 208.30(e)(5)(ii), 208.31(c), 208.33(b)(2)(i). This language includes no restriction on the type or quantum of evidence needed to consider the bars. To the contrary, by allowing the application of a bar whenever it "appears"—which is to say, *seems*—to apply, the Rule permits asylum officers to preclude noncitizens from applying for asylum on the basis of mere speculation.

This disconnect renders the Rule arbitrary and capricious. Where a rule's preamble conflicts with the regulatory text, "the language of the regulatory text … controls." *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 570 (D.C. Cir. 2002); *see AT&T Corp. v. FCC*, 970 F.3d 344, 350 (D.C. Cir. 2020) ("[T]he real dividing point between the portions of a final rule with and without legal force is designation for publication in the Code of Federal Regulations.") (quotation omitted); *Elevance Health, Inc. v. Becerra*, 736 F. Supp. 3d 1, 23 (D.D.C. 2024) (citing further cases). Thus, because the regulatory text unambiguously lacks any "easily verifiable evidence" limitation, the Rule is much broader than the preamble admits. And given the preamble's heavy reliance on the purported limitation, that fact completely undermines the Rule's purpose and justifications. Defendants' reliance on the phantom "easily verifiable evidence" limitation is thus sufficient, without more, to compel the conclusion that the Rule "constitute[s] arbitrary agency action." *Cigar Ass'n*, 132 F.4th at 540; *see, e.g.*, *NDRC v. EPA*, 559 F.3d 561, 565 (D.C. Cir. 2009) (preamble section referring to nonexistent rule is "a legal nullity").

### B.      Defendants Failed to Acknowledge or Reasonably Explain Their Changed Position

"A central principle of administrative law is that, when an agency decides to depart from decades-long past practices and official policies, the agency must at a minimum acknowledge the change *and* offer a reasoned explanation for it." *Am. Wild Horse Pres. Campaign v. Perdue*, 873

F.3d 914, 923 (D.C. Cir. 2017) (emphasis added); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). When explaining the change, "conclusory statements will not do; an 'agency's statement must be one of *reasoning*.'" *Nat'l Women's L. Ctr. v. OMB*, 358 F. Supp. 3d 66, 89 (D.D.C. 2019) (quoting *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014)). Here, the Rules represent an about-face from nearly thirty years of policy and practice that the agencies fail either to acknowledge or to reasonably explain.

Defendants' longstanding policy was not to apply bars in screening interviews. Indeed, in 2022, Defendants rejected the application of mandatory bars during the screening process on the ground that considering them would undermine the efficiency of the screening process, be unfair to applicants, and take screening interviews "beyond [their] Congressionally intended purpose." 87 Fed. Reg. at 18093. Defendants stated that "considerations of procedural fairness counsel against applying mandatory bars that entail extensive fact-finding during the credible fear screening process." *Id.*; *see also id.* at 18134-35. They added that considering the bars "would require asylum officers to spend significantly more time developing the record during the interview and conducting additional research following the interview." *Id.* at 18093.

The Rule reverses course and asserts that considering the bars *will* serve efficiency. 89 Fed. Reg. at 103379, 103382-83. Defendants previously justified the asylum bans contained in the Circumvention of Lawful Pathways Rule on efficiency grounds reasoning that, unlike the mandatory bars, those asylum bans were "easier to apply" than mandatory bars to asylum. *Application of Certain Mandatory Bars in Fear Screenings,* 89 Fed. Reg. 41353 (2024) (notice of proposed rulemaking). But in the Rule, they said experience applying the same sorts of asylum bans meant that the bars *could* be considered efficiently, 89 Fed. Reg. at 103387. Similarly, in 2022, DHS determined that the particularly serious crime bar was especially unsuited for

consideration in fear screening interviews, 87 Fed. Reg. at 18093; two years later, DHS claimed that the same bar is not "legally and factually too complex to be analyzed in a screening interview," 89 Fed. Reg. at 103390-91.[9] And in 2022 DHS's position was that applying the mandatory bars in screening interviews would be inconsistent with congressional intent, 87 Fed. Reg. at 18093, but two years later, DHS claimed that it "is consistent with Congress' intent," 89 Fed. Reg. at 103385.

The Rule refuses to acknowledge these about-faces. To be sure, the Rule admits the obvious fact that it "implements" a different "policy choice," but it claims that its choice is "not inconsistent with," and does not "represent a reversal of," Defendants' earlier position. 89 Fed. Reg. at 103386-87. As shown above, that is false; Defendants reversed numerous positions—and have simply failed to acknowledge those reversals.

In any event, Defendants have not reasonably explained their reversals. The Rule cites the "permissive" nature of the Rule as a reason why the bars can be considered efficiently and fairly. 89 Fed. Reg. at 103386-87. But while the Rule gives asylum officers unfettered discretion to consider a bar, they *must* apply a bar once it is considered unless the noncitizen adequately rebuts it. 8 C.F.R. § 208.30(e)(5)(ii)(A). The inevitable result is that asylum officers will consider bars in complex cases, undermining efficiency (and fairness). And while the Rule again invokes the "easily verifiable evidence" limitation, 89 Fed. Reg. at 103387, reliance on a nonexistent limitation fares no better here. Defendants thus failed to adequately explain their changed positions.

---

[9]    The Rule itself takes contradictory positions on this point. Elsewhere, it concedes that, at least where the difference between the asylum and withholding versions of the particularly serious crime bar is relevant, an asylum officer "would likely be unable to efficiently address the particularly serious crime bar." 89 Fed. Reg. at 103395.

#### C.        The Rule Rests on Assertions That Are Contrary to the Record

The Rule is also arbitrary and capricious because it rests on two related factual premises that are contrary to the record: (1) that noncitizens have the opportunity to present evidence to refute the application of a mandatory bar during a credible or reasonable fear interview; and (2) that the mandatory bars are not too complex to be considered in screening interviews. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (arbitrary and capricious to "offer[] an explanation … that runs counter to the evidence before the agency").

*First*, the Rule asserts that "[i]ndividuals who may be subject to a mandatory bar will have the opportunity to show that the bar does not apply during the screening interview." 89 Fed. Reg. at 103375; *see also id.* (asylum officers "are well-suited … to ensure the noncitizen has an opportunity to provide evidence as to why a given bar does not apply"); *id.* at 103378 (similar). But the record confirms that in screening interviews noncitizens do not have a reasonable opportunity to present documentary evidence or testimony to prevent the bars' application.

Noncitizens lack access to documentary evidence because people fleeing violence and persecution generally must "embark[] on their journeys hastily and without long-term planning." ILRC at 5. Moreover, once they reach the United States, noncitizens are typically detained in isolated facilities without access to documents. HRF Att. 16 at 32-35; Tahirih at 18-20; ILRC at 8; Cmt. of Brooklyn Defender Services ("BDS") at 7-8. And even if a noncitizen miraculously *did* have relevant documents, they would not know *which* documents to produce because very few noncitizens either understand the relevant evidentiary burdens or have access to counsel prior to screening interviews. ILRC at 6; Cmt. of Harvard Immigration and Refugee Clinical Program ("HIRC") at 10; CGRS Att. 2 at 67-89; Aliento at 2; Cmt. of Texas Civil Rights Project ("TCRP") at 9-10; ILL at 7-8; Tahirih at 13; Cmt. of North Suburban Legal Aid Clinic ("NSLAC") at 3-4.

The same lack of legal knowledge undermines any effort by noncitizens to present

37

testimony concerning why a bar should not apply. Moreover, asylum officers often do not expressly tell noncitizens either that they believe a bar applies or why, depriving noncitizens of notice that a bar is at issue. Amica at 25; CGRS at 35. And commenters explained in detail that trauma leaves noncitizens "unable to effectively articulate the details of their case histories." DCVLP at 3; Tahirih at 11-16; NSLAC at 2-3.

The conditions in which screening interviews occur further compound the problem. *See* FIRRP at 6-7; ILL at 6-7; Tahirih at 11-16. Despite formal regulations requiring privacy for the interviews, many interviews are conducted in places where others will hear a noncitizen's descriptions of the traumatic events they experienced. ILL at 6; FIRRP at 6-7; CLINIC at 3-4. Torturous conditions in immigration detention, including forced lack of sleep and a systematic lack of adequate medical care or nutrition, make it more difficult still for noncitizens to provide the sort of detailed testimony needed to counteract the bars. *E.g.*, NIJC Att. 2 at 137-38; Am. Gateways at 4-5. And pervasive issues with interpretation routinely prevent noncitizens from being understood even when they are able to articulate those traumatic events. *See e.g.*, NIJC Att. 2 at 73-74; ILL at 7; Cmt. of New York Legal Assistance Group ("NYLAG") at 4; FIRRP at 6-7; Tahirih at 16-18. The Rule's claim that noncitizens can present evidence to rebut application of the bars is thus contrary to the record.

*Second*, the record belies the Rule's claim that the mandatory bars are not too complex to be decided in screening interviews. *See* 89 Fed. Reg. at 103375. Defendants themselves previously admitted that even the most complicated piece of the analysis concerning whether a person is a "refugee" is less complicated than the bars because the screening standard does not require "legal precision," leaving any detailed analysis for an immigration judge to undertake in regular removal proceedings. *Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable*

38

*Fear Review,* 85 Fed. Reg. 80274, 80317 (Dec. 11, 2020). Before the Rules, asylum officers treated the bars in a similar way: they would note potential issues while leaving the decision for an immigration judge in regular removal proceedings. *See* 89 Fed. Reg. at 103391.

The evidence shows that the additional analysis required by the Rule is far too complex to be applied at a screening interview because application of the mandatory bars requires both consideration of a fully developed factual record and a difficult and complicated legal analysis. *E.g.*, Cmt. of Lawyers' Committee for Civil Rights of the SF Bay Area at 2-3; Tahirih at 3; Acacia at 10-11. That kind of detailed inquiry is not possible during screening interviews. Cmt. of American Friends Service Committee ("AFSC") at 2-3; NIP at 7. Systemic errors are the inevitable result, as shown by ample examples in the record—including cases in which an immigration judge improperly applied a bar even after a full hearing on the merits. *See e.g.*, HRF at 9; NIJC at 21-29; AFSC at 2-3; BDS at 7; HIRC at 10; CGRS at 21 n.48, 24, 27.

The particularly serious crime bar and the terrorism bar highlight the point. The "particularly serious crime" bar is "not statutorily defined in detail." 87 Fed. Reg. at 18093; *see* 8 U.S.C. § 1158(b)(2)(A)(ii). Rather, whether an offense is a "particularly serious crime" requires consideration of the elements of the crime, whether it "falls within the 'ambit' of a particularly serious crime," the "nature of the conviction," and "the circumstances and underlying facts of the conviction.'" NIJC Att. 2 at 5 (quoting *Matter of N-A-M-*, 24 I & N Dec. 336, 342 (B.I.A. 2007)). This analysis implicates, among other things, whether a crime is an "aggravated felony"—a question that requires consideration of both state and federal criminal law and that has led to countless appellate and Supreme Court cases. *E.g.*, NIJC Att. 2 at 9-13. There are also nuanced differences between the asylum and withholding versions of the bar. *See id.*; NIP at 7.

This legal complexity is matched by factual complexity. The particularly serious crime

39

analysis implicates "'all reliable information' concerning the specific facts of a case," including the records of conviction and sentencing. ILRC at 13 (quoting *Matter of N-A-M-*, 24 I & N Dec. 336); IRAP at 26-27. The inquiry centers on a noncitizen's dangerousness to the community, and evidence about the noncitizen's mental health can be considered. NIJC at 8-9; NIJC Att. 2 at 7-8; NIP at 6-7. The process of gathering the relevant evidence—some of it from abroad—often takes months. *See, e.g.*, CARECEN at 3-4. And if the conviction occurred outside the United States, an adjudicator also considers whether the conviction was *bona fide* or fabricated. Tahirih at 20-21; NIJC Att. 2 at 55-63, 127-36; TCRP at 8.

Contrary to the Rule's assertion, *see* 89 Fed. Reg. at 103377, the terrorism bar involves similar complexities. Indeed, there are actually multiple terrorism bars, and those bars contain complex concepts that Defendants frequently misapply. 8 U.S.C. § 1158(b)(2)(A)(v); *see, e.g.*, CLINIC at 5-6. For example, the bar applies to anyone who provides "material support" to "terrorist organizations." HRF at 8-9; Cmt. of Immigrant ARC at 1-2. Defendants have previously (and erroneously) applied the bar to many victims of such organizations, including a man robbed of four dollars and a meal and medical workers who were kidnapped and forced to provide care. *See* HRF at 9, HRF Att. 4 at 41-42; NYLAG at 5. Moreover, Defendants have the authority to grant exemptions to the bar, and applying those exemptions—which are not mentioned in the Rule—involves a multi-step process that cannot be implemented during a screening interview. HRF at 9-10; CLINIC at 5-6; Cmt. of DePaul Asylum and Immigration Law Clinic at 3.

The remaining bars are likewise complex. *See supra* pp. 7-9. This undeniable complexity vitiates the Rule's primary purpose rooted in efficiency. The Rule asserts that it "will allow the Department to efficiently identify and remove noncitizens who are found subject to one of the outlined mandatory bars without subjecting them to lengthy proceedings." 89 Fed. Reg. at 103382.

But that assertion is belied by the record, which shows that the bars' application *cannot* be efficiently decided in a screening setting. The Rule is arbitrary and capricious for that reason as well. *State Farm*, 463 U.S. at 43; *Solondz v. FAA*, 141 F.4th 268, 276 (D.C. Cir. 2025).

### D.    Defendants Failed to Consider Important Aspects of the Problem

The DHS Rule is also arbitrary and capricious because it fails to address three significant fairness concerns revolving around the "real life circumstances" noncitizens in screening interviews face. *Make the Rd. N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 55 (D.D.C. 2019) (K.B. Jackson, J.), *rev'd on other grounds*, 962 F.3d 612 (D.C. Cir. 2020).

*First*, commenters noted that individuals faced with application of the bars would need counsel they are exceedingly unlikely to find before a screening interview. ABA at 2-6; Cmt. of American Immigration Lawyers Association & American Immigration Council ("AILA & AIC") at 1; Aliento at 2; CGRS Att. 2 at 64-89; Cmt. of Church World Service at 3. And even in the extraordinary case when a noncitizen finds counsel, the interviews occur too quickly to enable counsel to prepare legal arguments or gather necessary evidence. FIRRP at 6-8; NIJC at 15.

Instead of providing a substantive response, the Rule ducks these concerns as purportedly "outside the scope of the rulemaking" and on the basis that noncitizens can address bars "during" an interview. 89 Fed. Reg. at 103374-75. But far from being outside the scope of the rule, the inability of noncitizens to meaningfully address bars lies at the heart of a rulemaking forcing them to do so in screening interviews**.** Commenters, meanwhile, made perfectly clear that unprepared noncitizens *cannot* meaningfully rebut bars on the fly during a screening interview. Acacia at 7-8; American Gateways at 4; CGRS at 32-36; WRC at 4; *supra* Section III.C. And the Rule has no response beyond the inadequate "conclusory statement" that they can. *Nat'l Women's L. Ctr.*, 358 F. Supp. 3d at 89.

*Second*, the Rule fails to meaningfully respond to comments concerning the dangers of

41

relying on bars-related evidence from foreign governments. Acacia at 10-11; Cmt. of Anna Mintz at 1; AFSC at 2-3; CGRS at 15-17. Commenters pointed to the problematic nature of INTERPOL Red Notices, which are essentially "an accusation" that is often erroneous or used by governments for persecutory purposes, *see, e.g.*, CGRS Att. 2 at 20-21, and that is often misused by DHS, *see* CGRS Cmt. at 15-16, n.37; NIJC at 25. Commenters also noted that other kinds of evidence, including foreign records or laws which may contain biases against protected groups, present similar issues. *See, e.g.*, Cmt. of US Committee for Refugees and Immigrants at 6-7; NIJC Att. 2 at 241-63.

The Rule's sole response asserts that DHS has "internal guidance on the appropriate handling" of suspect INTERPOL Red Notices. 89 Fed. Reg. at 103375. But that guidance applies only to U.S. Immigration and Customs Enforcement ("ICE"), not to asylum officers—which makes it easier to use unreliable Red Notices against unrepresented noncitizens in credible fear proceedings than in full immigration court proceedings. CGRS Att. 2 at 24. In any event, the Rule fails in its duty to respond both to comments regarding other types of evidence and to Defendants' routine misuse of Red Notices *despite* the internal guidance. *See, e.g.*, *Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 15 (D.C. Cir. 2015) (agencies must "respond to relevant and significant comments") (quotation omitted).

*Third*, the Rule does not confront the fact that applying the bars in credible fear interviews will result in individuals being improperly removed to persecution and torture. *See, e.g.*, CGRS Att. 1. at 13-31; Amica at 6-7; WRC at 5-6; AILA & AIC at 14. As explained above (Section III.C), the conditions under which screening interviews occur make presenting bar-related evidence—and thus any meaningful adjudication—impossible. American Gateways at 4-5; CLINIC at 3; Cmt. of Communities United for Status & Protection at 2. Commenters noted that

42

improper removals would be the inevitable result. *E.g.*, FIRRP at 8; HRF at 4.

The Rule ignores all of this. Instead, it repeats its conclusion—belied by the record—that the bars are not especially complex; asserts the conclusion that immigration-judge review, which occurs rapidly and generally with no additional argument or evidence, is sufficient to prevent wrongful removals because immigration judges are "familiar" with the bars; and states that DHS "has no authority to create additional mechanisms" for appeals from such findings. 89 Fed. Reg. at 103379. The Rule's statement about immigration-judge review is just another inadequate, conclusory statement lacking reasoning or a basis in evidence. And all the rest is beside the point: either the conditions of screening interviews will inevitably lead to improper removals, or they will not. Commenters showed that they will—and the Rule, rather than disagreeing, impermissibly dodges the question.

### E.    Defendants Failed to Consider the Effects of Interrelated, Contemporaneous Policies

Finally, the DHS Rule is arbitrary and capricious because Defendants failed to consider how the Rule interacts with contemporaneous and interrelated policy changes. An agency has an "obligation to acknowledge and account for a changed regulatory posture the agency creates," especially when the change is "contemporaneous and related." *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011). Here, Defendants failed to address at least five interrelated policy changes to asylum processing that Defendants made, or were actively considering, at the time they promulgated the Rule.

Three of those changes operate to make it more difficult for noncitizens to pass screening interviews—and to rebut the bars. *First*, Defendants began conducting credible fear interviews while noncitizens are in CBP (rather than ICE) custody, a change commenters warned would make it exceedingly difficult for noncitizens to rebut the bars because they would be subjected to sleep

deprivation and other horrific detention conditions and would be almost categorically unable to access counsel. *E.g.*, IRAP at 29-32. *Second*, Defendants shortened the pre-credible fear interview consultation period to as little as 4 hours, further reducing the chance that a noncitizen could access counsel or evidence before an interview. *E.g.*, WRC at 7. *Third*, Defendants had recently adopted guidance that, for the first time, allowed the broad use of classified information against noncitizens in the asylum process, meaning that bar findings could be made based on information a noncitizen could never know. ILL at 15.

The fourth change—Defendants' adoption of guidance requiring consideration in screening interviews of whether a noncitizen could reasonably relocate within their country of origin—further complicates interviews and thus undermines the stated efficiency purpose of the Rule. ILL at 14. And the last change involved a final rule, paused but under active consideration (and that Defendants have since adopted), that expands the national security bar to cover the spread of infectious diseases. *Id*. at 15; Cmt. of Gerald Neuman at 2.

The Rule considers none of these interactions. It does not even mention the reduced consultation period, the classified information guidance, or the internal relocation guidance. While the Rule briefly notes the use of CBP custody for screening interviews, 89 Fed. Reg. at 103404, it does not acknowledge that CBP custody poses unique problems, much less explain why the Rule should be enacted even in the face of those problems. And the Rule impermissibly skirts concerns about the broader definition of a security threat by dismissing comments on the ground that the related rule was not yet in effect and that there was no then-current public health emergency. *Id.* at 103399. Defendants thus failed to satisfy their duty to consider whether they should promulgate the Rule "given" these contemporaneous and closely related policy changes. *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1173 (D.C. Cir. 1994); *see Portland Cement Ass'n*, 665

F.3d at 187. For that reason, too, the DHS Rule is arbitrary and capricious.

### F.      The EOIR Companion Rule Is Arbitrary and Capricious

The EOIR Companion Rule rests on the sole basis that it is a "clarifying" measure made in response to the DHS Rule. *See* 89 Fed. Reg. at 105396-97, 105399. Absent the DHS Rule, then, the justification for the EOIR Companion Rule disappears. Thus, because the DHS Rule should be vacated as arbitrary and capricious, the EOIR Companion Rule should be vacated on the same basis. *See, e.g.*, *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 623 (D.C. Cir. 2016) ("The adequacy of the underlying justification offered … is what matters in arbitrary-and-capricious review ….").

### CONCLUSION

This Court should vacate the Rules and issue a declaratory judgment holding that the Rules are both contrary to law and arbitrary and capricious and rescind E.Q.'s expedited removal order.

Dated: June 18, 2026

Respectfully Submitted,

/s/ Richard Caldarone

Jared A. Levine (admitted *pro hac*)
CROWELL & MORING LLP
375 9th Ave, 44th Floor
New York, NY 10001
(212) 223-4000
JLevine@crowell.com

Judy He (admitted *pro hac*)
Jung Shin (admitted *pro hac*)
CROWELL & MORING LLP
455 N Cityfront Plaza Dr #3600,
Chicago, IL 60611
(312) 321-4200
JHe@crowell.com

Robert Pauw
CENTER FOR GENDER & REFUGEE STUDIES
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104

Keren Zwick (D.D.C. Bar No. IL0055)
Richard Caldarone (D.C. Bar No. 989575)
Colleen Cowgill*
Fizza Davwa*
NATIONAL IMMIGRANT JUSTICE CENTER
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
(312) 660-1370
kzwick@immigrantjustice.org
rcaldarone@immigrantjustice.org
ccowgill@immigrantjustice.org
fdavwa@immigrantjustice.org

Melissa Crow (D.C. Bar No. 453487)
CENTER FOR GENDER & REFUGEE STUDIES
1901 Pennsylvania Avenue, NW
Suite 900, PMB 228
Washington, DC 20006
(202) 355-4471
crowmelissa@uclawsf.edu

(206) 682-1080
rpauw@ghp-law.net

Peter Alfredson (D.C. Bar No. 1780258)
AMICA CENTER FOR IMMIGRANT RIGHTS
1025 Connecticut Ave. NW, Suite 701
Washington, DC 20036
(202) 899-1415
peter@amicacenter.org

Anne Peterson
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister Street
San Francisco, California 94102
T: 415.610.5729
petersonanne@uclawsf.edu

Anwen Hughes*
HUMAN RIGHTS FIRST
75 Broad St., 31st Fl.
New York, NY 10004
(212) 845-5244
HughesA@humanrightsfirst.org

*Certificate of pro bono representation or pro
hac vice forthcoming

46