DECLARATION OF JASON DANIEL MARKS

I, Jason Daniel Marks, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge, memory, and belief:

1. I have personal knowledge of the matters stated herein and could testify competently to them if called upon to do so.

2. I am an attorney admitted to the State Bar of California in 2008.

3. I worked for United States Citizenship and Immigration Services ("USCIS"), within the Department of Homeland Security ("DHS"), from approximately September 2014 until October 4, 2025.

<u>Overview of Experience within USCIS</u>

4. During my tenure with USCIS, I served in multiple adjudicative, training, and supervisory positions within the Refugee, Asylum, and International Operations Directorate ("RAIO"), including Asylum Officer, Refugee Officer, Senior Refugee Officer, Asylum Training Officer, and Supervisory Refugee Officer. I left federal service as a GS-14, Step 3.

5. During my USCIS career, I progressed from adjudicating asylum and refugee claims; to training officers on affirmative asylum cases, Asylum Pre-Screening Officer ("APSO") adjudications, credible fear interviews, reasonable fear interviews, mandatory bars to asylum, adverse information documentation, and terrorism-related inadmissibility grounds ("TRIG"). Ultimately, I supervised officers responsible for complex refugee adjudications involving national security and TRIG concerns.

6. While at USCIS, I completed additional specialized trainings relating to refugee processing, overseas refugee operations, country conditions, national security issues, inadmissibility grounds, and terrorism-related inadmissibility issues.

1

7. From approximately September 2014 to April 2016, I served as an Asylum Officer at the Los Angeles Asylum Office and then the Arlington Asylum Office. I conducted affirmative asylum interviews, assessed credibility and eligibility, analyzed inadmissibility and national security concerns, and prepared written legal assessments and decisions.

8. During my time at the Arlington Asylum Office, I helped mentor and train newer officers on credible fear adjudications, interviewing techniques, note-taking, decision-making, and security checks.

9. During my time at the Arlington Asylum Office, I was also part of the inaugural effort associated with the creation and development of centralized APSO operations in Crystal City, Virginia. Those operations were designed to centralize telephonic credible fear screening work, and related reasonable fear screening work, for detained applicants across a multi-state jurisdiction.

10. From approximately April 2016 to October 2019, I served as a Refugee Officer within the Refugee Affairs Division ("RAD"), later renamed the International and Refugee Affairs Division ("IRAD").

11. As a Refugee Officer and Senior Refugee Officer, I conducted refugee adjudications overseas and performed senior-level review of complex and sensitive refugee cases. My duties included conducting interviews, handling complex interviews and callbacks, reviewing officer notes and legal analyses, making or recommending final determinations, providing feedback to officers, and conducting supervisory-style review of difficult cases involving credibility, eligibility, inadmissibility, national security, and TRIG concerns.

12. From October 2019 until May 7, 2023, I served as an Asylum Training Officer at the Arlington Asylum Office. In that role, I trained officers on nearly every aspect of affirmative asylum and APSO adjudications and processing, including asylum law, policy, credible fear interviews, reasonable fear interviews, associated forms and documentation, interviewing, eliciting testimony, note-taking, credibility, nexus, country conditions, mandatory bars, security checks, legal analysis, and related adjudicative procedures.

13. My training responsibilities included training newly hired asylum officers during in-field training, training officers transitioning from affirmative asylum adjudications to APSO screening work, training refugee officers detailed to APSO operations, and delivering office-wide trainings on specific legal and procedural topics. I also worked with RAIO training personnel to train cohorts of new officers on asylum law and procedure, including mandatory bars and TRIG-related issues.

14. My duties as an Asylum Training Officer included observing interviews, providing verbal and written feedback, evaluating officer performance, reviewing adjudications, developing training materials, and instructing officers on law, policy, process, interviewing, and adjudicative analysis.

15. During my tenure as an Asylum Training Officer, the weekly trainings I developed and delivered at the Arlington Asylum office included a three-hour office-wide training devoted to TRIG. I also co-developed and co-led an office-wide training concerning the identification and documentation of potential mandatory-bar indicators in credible fear adjudications, including identifying indicators that could implicate terrorism-related

3

concerns, persecutor issues, serious nonpolitical crimes, particularly serious crimes, and national security concerns.

16. These trainings addressed the legal standards governing TRIG and mandatory bars, the factual development required for such determinations, the identification of potential bar indicators, and the adjudicative challenges presented by these issues. In the credible fear screening context, officers were trained to identify and document potential mandatory-bar indicators through adverse information memoranda and related documentation, so those concerns could be preserved in the record and considered during subsequent stages of adjudication, not to make final determinations.

17. I personally prepared adverse information memoranda and trained officers regarding the preparation of adverse information memoranda and related documentation used to identify, document, and preserve potentially disqualifying information for subsequent stages of adjudication. In my experience, adverse information memoranda were one-page checklist-style documents that recorded basic case information, identified the potential mandatory bar or other concern at issue, and briefly summarized the facts giving rise to the concern so that the issue could be preserved for further review and analysis.

18. On May 7, 2023, I became a Supervisory Refugee Officer within IRAD. I remained in that position until my departure from federal service. I accepted deferred resignation in May 2025 and remained in paid federal employment through October 4, 2025.

19. As a Supervisory Refugee Officer, I supervised refugee officers, reviewed adjudications, mentored officers, assessed officer performance, and signed off on refugee cases. My positions required me to maintain a federal security clearance, and my later work involved highly sensitive refugee adjudications requiring an elevated clearance level.

20. Following the fall of Kabul, I worked on portions of the Afghan evacuation and refugee processing effort. In that role, I supervised officers reviewing complex Afghan cases, most involving applicants who had supported the U.S. mission in Afghanistan or worked with U.S.-aligned organizations, nongovernmental organizations, civil-society programs, development projects, or democratic institutions.

21. These cases frequently involved applicants who appeared to meet the refugee definition but nevertheless required careful review of national-security, admissibility, and TRIG-related concerns because of the environment in which they had lived and worked.

22. These cases demonstrated the importance of careful factual development, layered review, and specialized analysis before reaching reliable conclusions regarding national-security or TRIG-related issues.

23. Over the course of my USCIS career, I adjudicated, reviewed, supervised, or trained officers regarding thousands of asylum, refugee, credible fear, and related protection determinations.

The Adjudication Materials Used in the Credible Fear Process

24. I am familiar with the forms and documentation utilized in credible fear and APSO proceedings, including Forms I-869 and I-870, officer notes, checklists, supervisory review materials, adverse information memoranda, and related adjudicative documentation.

25. Based on my experience with credible fear adjudications and related review materials, the Form I-870 functions as a summary determination form. It records basic information about the interview and the outcome but generally does not contain the full factual and legal reasoning supporting a negative determination or a formal finding. The Form I-869,

by contrast, is completed subsequently based on the adjudicative record and contains check-boxes that serve to formally identify the negative determination and the grounds communicated to the immigration judge for review. The supporting analysis, the officer's notes, and related adjudicative materials provide the fuller factual and analytical basis for the determination.

26. In my experience, none of these documents exists in isolation. Rather, officers and supervisors assess the adjudicative packet as a whole to determine whether the findings reflected in the I-869 are supported by the facts developed during the interview and whether the record supports the determination reached.

27. Where different documents appear to reflect different factual findings, legal conclusions, or rationales, or where the record does not clearly show how the facts developed during the interview support the determination reached, those issues would be identified and addressed during the supervisory review process.

28. Applying the review framework described above, in my experience, adjudicators, trainers, and supervisors would assess the Form I-870 (including any relevant iteration like I-870SB), Form I-869, credible fear determination worksheet, Securing the Border reasonable probability determination checklist and accompanying written analysis, the asylum officer's interview notes, and related adjudicative materials as a single adjudicative packet rather than assessing any individual document in isolation.

6

E.Q.'s Credible Fear Documentation

29. Applying that framework here to the documents in E.Q.'s specific case, I evaluated whether the findings reflected in the Forms I-869 and I-870 were supported by the factual development reflected in the interview notes and related adjudicative materials.

30. Based on my experience adjudicating, reviewing, and training on the credible fear process, the testimony reflected in E.Q.'s interview notes would ordinarily be insufficient to support the "No Nexus" finding reflected as the formal basis for the adverse decision.

31. The applicant stated that Taliban members attacked his home, associated him with his family member's work for the United States, and sought information concerning him and his activities. In assessing nexus, the central inquiry is the persecutor's motivation. Although the interview notes reflect some questioning regarding the applicant's political activities and affiliations, there was no substantial follow-up questioning directed toward why the Taliban sought the applicant, whether the Taliban targeted him because of his relationship to his family member, whether family membership may have motivated the threatened harm, whether a political opinion was imputed to the applicant or his family, why the Taliban targeted the applicant rather than or in addition to other family members, or what specific facts led the applicant to believe he was being targeted. Those are the types of questions ordinarily asked to develop nexus issues raised by testimony of this nature, particularly if an adverse finding is to be based on a lack of nexus.

32. As such, if I had reviewed a packet reflecting those facts but lacking that additional development, I ordinarily would have advised that additional questioning and analysis were needed before a negative nexus determination was approved.

7

33. In E.Q.'s case, the Form I-870 reflects that "Security Risk" and "Terrorist" were checked as possible bars, and the Form I-869 reflects a negative reasonable-probability finding as to withholding of removal based on the conclusion that the applicant had not established that he was not subject to one or more mandatory bars.

34. As part of my review of E.Q.'s Packet, I observed references suggesting a concern regarding terrorism-related inadmissibility grounds. Specifically, the materials appear to reflect that the applicant worked as a mechanic and that individuals believed to be associated with the Taliban may have brought vehicles to the shop where he worked.

35. Though E.Q.'s circumstances likely reflect a premature or improper application of a terrorism-related inadmissibility ground, the content of these materials do reflect that this was in fact the basis for the decision rendered in his original CFI.

### Mandatory Bars Assessments

36. During my USCIS career, I gained substantial experience with both asylum mandatory bars and the distinct refugee inadmissibility provisions. Mandatory bars are part of asylum and related protection adjudications on the merits; refugee adjudications involve separate statutory and regulatory eligibility and inadmissibility analyses.

37. Although asylum mandatory-bar determinations and refugee inadmissibility determinations arise under different legal frameworks and in different procedural contexts, they often involve many of the same underlying factual questions and related issues, including TRIG, national security concerns, material support, organizational membership, coercion, duress, and exemptions.

38. For threshold screening cases, officers were trained to identify potential mandatory-bar issues and to ask questions designed to elicit relevant facts.

39. When information arose during a credible fear or related screening interview suggesting the possible applicability of a mandatory bar, TRIG concern, persecutor issue, serious nonpolitical crime, particularly serious crime, or other significant eligibility concern, officers were trained to ask follow-up questions. Those questions were designed to clarify the nature of the conduct, the applicant's role, the frequency of the conduct, the identity of the individuals or organizations involved, the applicant's knowledge of those individuals or organizations, any compensation received, and any circumstances suggesting coercion, duress, or inability to refuse participation, and to document the concern in the record.

40. One mechanism for doing so was the preparation of adverse information documentation, including adverse information memoranda.

41. The purpose of adverse information documentation was to identify and preserve potentially disqualifying information revealed during the screening process so that the issue could be addressed during later stages of adjudication where these bars would be assessed on their merits.

42. The existence of indicators suggesting a possible bar did not itself establish that the bar had been proven or that a final determination had been reached. In particular, TRIG determinations are among the most fact-intensive and legally complex determinations made by refugee and asylum officers. Identifying facts that raise a potential TRIG concern is often only the beginning of the analysis.

43. A reliable TRIG analysis may require detailed questioning concerning the nature of the alleged support for a terrorist organization, the applicant's knowledge, intent, and

relationship to the organization, frequency of the conduct, compensation, coercion, threats, duress, ability to refuse participation, and other surrounding circumstances.

44. Facts that may initially appear to implicate a TRIG concern frequently require substantial additional factual development before a reliable legal conclusion can be reached.

45. For example, circumstances involving work, commerce, transportation, services, payments, repairs, or interactions occurring in areas controlled by armed groups frequently require extensive factual development before a reliable legal determination can be made.

46. Additional questioning may reveal coercion, duress, lack of knowledge, mistaken identity of the group, incidental contact, payment under threat, or circumstances showing that the applicant had no realistic ability to refuse.

47. During my tenure as a Refugee Officer, Senior Refugee Officer, and Supervisory Refugee Officer, refugee cases involving potential TRIG concerns were subject to heightened review procedures.

48. Certain cases, including many involving Afghan applicants, could require additional review or guidance from USCIS Headquarters, including where policy issues, exemption-related questions, or pending litigation affected the guidance needed before a case could be decided.

49. These procedures reflected the agency's recognition that TRIG determinations often involve complex factual and legal questions requiring careful analysis and substantial factual development.

50. In my experience, screening interviews were designed to identify potentially relevant issues and gather preliminary facts. The identification of a potential TRIG or mandatory-

bar concern during a screening interview was not equivalent to a final determination that a bar had been established.

51. Rather, such facts could reasonably be viewed as indicators warranting additional inquiry regarding possible TRIG concerns. However, identifying a potential indicator is not the same as completing a reliable TRIG analysis.

52. Where potential TRIG concerns arise, officers ordinarily would be expected to develop additional facts concerning the nature of potential involvement or affiliation with the terrorism-related group. Based upon my review of the materials provided to me in E.Q.'s case, I did not observe the type of extensive factual development that I would ordinarily associate with a completed TRIG analysis.

53. Even though, in my assessment, the TRIG analysis in E.Q's case was insufficient, I did observe that this bar formed the basis for E.Q.'s initial negative fear determination. I reached that conclusion because the written analysis indicated that "the applicant worked for a place of work that gave material support to the Taliban," and proceeded from that premise to the conclusion that the applicant was a danger to the security of the United States and a person described in the Terrorism-Related Inadmissibility Grounds.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, memory, and belief.

Executed on June 17, 2026, in Gaithersburg, Maryland.



_____

Jason Daniel Marks