**DECLARATION OF LAURA ST. JOHN,**
**FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT**

I, Laura St. John, make the following declaration based on my personal knowledge and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I am the legal director of the Florence Immigrant & Refugee Rights Project ("Florence Project" or "FIRRP"). I have practiced as an immigration attorney with FIRRP since March 2011.

2. Founded in 1989, FIRRP is a non-profit organization dedicated to providing free legal and social services to the thousands of adults and children in immigration custody in Arizona. As the only such organization in Arizona serving people in immigration detention, our vision is to ensure that every person facing removal proceedings has access to counsel, understands their rights, and is treated fairly and humanely.

3. I am writing to address the substantive harm that FIRRP is experiencing, and will experience, because of the Rules titled *Application of Certain Mandatory Bars in Fear Screening*, 89 Fed. Reg. 103,370 (Dec. 18, 2024) and *Clarification Regarding Bars to Eligibility During Credible Fear and Reasonable Fear Review*, 89 Fed. Reg. 105,392 (Dec. 27, 2024) ("the Rules").

**<u>My Professional Background and Role at the Florence Project</u>**

4. I have practiced as an immigration attorney in Arizona with FIRRP for more than fifteen years. I have worked as a staff attorney, managing attorney, and legal director at FIRRP, in all roles providing free legal services to adults who are facing removal and detained in Immigration and Customs Enforcement ("ICE") custody in Florence and Eloy, Arizona. I have served as legal director since December 2015.

5. As legal director, I manage FIRRP's legal advocacy and our appellate practice before the Board of Immigration Appeals ("BIA") and the Ninth Circuit Court of Appeals. With others, I also supervise staff and direct the provision of services across our children's legal program and adult legal program as well as our integrated social service program. I work particularly closely with our programs serving detained adults by mentoring staff in cases that raise complex or novel issues in the areas of (1) asylum, withholding of removal, and Convention Against Torture protections; (2) representation of individuals with serious mental illness; (3) the intersection between criminal and immigration law; and (4) due process violations.

6. FIRRP is also widely known for developing resources specifically targeted to assist *pro se* respondents in immigration proceedings, including materials to educate and orient individuals in expedited removal proceedings. Florence Project *pro se* guides have been distributed in detention centers throughout the country. In my role as legal director, I oversee staff and contractors working to update and develop these materials.

7.  I also provide support to train and supervise Florence Project staff and pro bono attorneys handling a wide variety of immigration matters.

**Florence Project's Mission and Core Service Areas**

8.  FIRRP's mission is to provide free legal and social services to detained adults and unaccompanied children facing removal in immigration proceedings in Arizona. With no public defender system in immigration removal proceedings, the vast majority—between approximately 69% and 86% of all detained noncitizens nationally—are unrepresented in immigration court. This issue is considerably *more* pronounced in the credible and reasonable fear contexts because people often undergo these interviews shortly after coming into custody and/or with minimal notice or opportunity to try to secure counsel beforehand. FIRRP works to address this inequity both locally and nationally. To that end, FIRRP provides high quality immigration legal services and education to thousands of people in immigration custody in Arizona every year.

9.  FIRRP was founded in 1989, initially as the Florence Asylum Project, after an immigration judge called on local members of the legal community to assist thousands of detained migrants who had fled civil wars in Central America in search of asylum in the United States.

10. Though the scope of the organization's work has expanded somewhat over time, FIRRP has consistently focused on detained individuals, and its history and proximity to the border has resulted in a sustained focus on individuals seeking asylum and related forms of protection. This work is organized around two central goals.

11. First, FIRRP provides critical legal education and orientation services for people who are detained, facing deportation, and unrepresented. This includes Know Your Rights ("KYR") presentations, workshops diving deeper into forms of legal relief, the creation of *pro se* resources to support individuals without counsel, and individualized *pro se* support and education to empower those without counsel to represent themselves as efficiently and effectively as possible.

12. Second, FIRRP is committed to ensuring that people in detention have access to counsel and the opportunity to be represented by an attorney, regardless of their ability to locate or pay private counsel. FIRRP attorneys directly represent both children and adults who are detained and in removal proceedings. We provide representation in credible and reasonable fear interviews, immigration judge ("IJ") reviews of fear screenings, removal and custody proceedings before the immigration courts and the BIA, and limited practice before federal courts, including the Ninth Circuit Court of Appeal. Our attorneys annually represent hundreds of clients who are held in isolated detention centers in Eloy and Florence, Arizona before the immigration courts and the BIA. FIRRP attorneys also serve as appointed counsel for individuals deemed mentally incompetent to represent themselves in removal proceedings, maintaining a caseload of over one hundred such cases.

2

13. To further meet the goal of ensuring access to counsel, FIRRP works closely with pro bono attorneys, placing both adult and child cases that we have screened with qualified pro bono attorneys and supporting those pro bono attorneys with training, mentorship, and support in matters before the immigration courts, the BIA, and federal courts. While figures vary from year to year, in recent years, FIRRP has typically placed anywhere from 35 to 80 matters with pro bono attorneys annually. Importantly for purposes of this case, nearly all of FIRRP's pro bono case placements occur after someone has undergone the credible fear screening process on their own. That is because the credible fear process occurs too quickly and with too little notice to make it possible to secure pro bono counsel for that process.

14. In 2002, Congress provided funding to the Executive Office for Immigration Review ("EOIR") to increase access to legal information for detained noncitizens. As a result, the Legal Orientation Program ("LOP") was created and, because much of the model for the LOP was based on FIRRP's *pro se* education and orientation model, FIRRP was an inaugural recipient of federal funding to provide legal assistance to *pro se* individuals appearing in immigration court. However, because LOP funding originated with EOIR, which houses the immigration courts and the BIA, FIRRP's programming under the LOP generally *began* once a person was in removal proceedings before the immigration court and did not include services for individuals before the commencement of immigration court proceedings, namely those facing credible or reasonable fear interviews.

15. Because FIRRP's budgeted LOP work began at the commencement of removal proceedings and because threshold screening interviews that precede formal removal proceedings are meant, per the immigration statute and legislative history, to be subject to very low screening standards, FIRRP historically did not focus on providing *pro se* advice or legal representation to individuals going through the credible or reasonable fear process, at least not until they were scheduled for immigration court review of a negative credible fear finding. FIRRP changed this practice, however, beginning in the summer of 2012. At that time, the population of the detention centers we serve began to shift heavily towards an increasing number of asylum seekers detained at the border. FIRRP began to receive requests for legal assistance and orientation from large numbers of individuals who were detained for prolonged periods of time—sometimes months on end—while waiting for their credible or reasonable fear interviews. FIRRP began responding to this population out of necessity partially in response to the shifts in populations. Around this time LOP funding was also adjusted to allow for legal services to individuals in expedited removal proceedings. In 2014 and again in 2017, changes in USCIS policy and asylum officer training heightened the credible and reasonable fear screening standards and made the stakes in these preliminary interviews significantly higher. In response, FIRRP expanded our representation of individuals in fear screening interviews and reviews of negative determinations where possible.

16. As the screening process has continued to become more complex and difficult for detained individuals to navigate, FIRRP has continued to take steps to respond. First, we worked to identify ways to gain access to individuals in that process in Arizona and to obtain the information necessary to reach such individuals early enough to provide them with meaningful legal education, *pro se* support, and direct representation wherever possible.

On various occasions, we have sought access to lists of individuals awaiting fear interviews to try to ensure we could reach all people awaiting a fear interview with critical legal information. Though such efforts have failed, we also have worked to spread the word inside detention facilities and to encourage people awaiting credible and reasonable fear interviews to call or write us to request an orientation as soon as possible so that we can reach them before their interviews. We routinely include people who face upcoming fear interviews in legal orientation sessions and provide follow up legal services when possible. We have created *pro se* education and orientation materials for people at the fear interview stage and at the IJ review stage of the fear interview process. FIRRP has also made efforts to increase full representation of individuals in their fear interviews. For example, we trained and created capacity for our attorneys to represent individuals in fear screenings, and through a now discontinued pilot project, we had an on-call rotation of attorneys to ensure each week at least one attorney could provide rapid response representation in fear interviews if needed.

17. Such representation has proven to be challenging, especially because in our experience asylum offices have been reluctant to schedule the interviews in coordination with attorneys and have even disregarded attorneys' appearance notices. Despite this and other challenges, FIRRP remains committed to trying to reach and represent individuals in credible and reasonable fear interviews where possible. All told, FIRRP has provided *pro se* advice and legal representation in various cases to people in credible and reasonable fear interviews for 14 years.

18. In 2025, the Trump administration terminated funding for LOP. Nevertheless, FIRRP legal staff continue to provide KYR presentations and to conduct individualized orientation, education, and pro bono screening for detained individuals. Our lists of participants for KYR presentations are now created exclusively through sign-up sheets, requests, and referrals. We continue to intentionally include individuals awaiting fear interviews where we are able to timely identify them for KYR presentations and legal services.

19. Finally, since 2017 FIRRP has provided legal education, accompaniment, and direct representation to migrants in Nogales, Mexico. We expanded that program in 2020 due to Arizona's inclusion in the so-called Migrant Protection Protocols and other shifts in border policy that placed people at the border in constructive custody—stuck at the U.S. Mexico border trying to gain access to U.S. asylum and immigration court processes. FIRRP legal teams provide individuals at the border with basic education and information regarding the immigration legal system, including information on legal requirements for asylum, withholding of removal, and Convention Against Torture protections. This education includes orientation regarding expedited removal and fear screening procedures as well as updates on border processing policies, which have changed repeatedly since this program has been in place.

20. One central component of the work FIRRP does in Nogales relates to teaching migrants about what to expect when they encounter border officials upon their arrival in the United States. Because almost all people who enter the United States in this circumstance could face expedited removal, explaining the credible fear interview process is a key component

of the work we do in Nogales. And though other policy changes that have occurred both before and since the finalization of the Rules at issue here have changed, or in some cases eliminated, access to that interview process, our team still strives to make sure that people are informed as to what legal rights they have and what they should expect from the interview process if they decide to seek protection in the United States.

21. FIRRP has a staff of more than 130 people, including attorneys, social workers, and support staff. They are dedicated to FIRRP's core work of providing legal and social services to the thousands of detained adults and children facing removal in Arizona. Our staff are based in Phoenix, Tucson, and Florence, Arizona.

22. In 2024, the last year for which we have complete data, FIRRP provided legal services, including legal orientation and education, to more than 12,500 people. While 2025 figures are still being finalized, in that year—following elimination of programs designed to ensure legal access such as the LOP—FIRRP still provided legal services, including legal education and orientation, to nearly 3,000 individuals. FIRRP clients were nationals of over 80 countries and spoke more than 35 languages. With such a broad client base consisting almost entirely of detained individuals, many of whom have historically faced threshold fear screening interviews, the Rules will significantly undermine FIRRP's ability to provide our core services and will have a tremendously detrimental impact on the people we serve.

## The Rules' Intersection with Florence Project's Core Services

23. To understand the depth to which the Rules will interfere with FIRRP's core services, it is important to understand FIRRP's basic organizational structure. FIRRP has four broad programmatic areas tasked with providing direct legal services to our clients: the Adult Program, the Children's Program, the Integrated Social Services Program, and the Advocacy Program.

24. The Adult Program primarily serves adults who are detained in ICE custody in the three immigration detention centers located in Florence and Eloy, Arizona. Individuals in these detention centers include some facing expedited removal, some who are in full removal proceedings before an immigration judge, some facing reinstatement of a prior removal order, and some who are subject to a final removal order, including final administrative removal orders based on a past criminal conviction.

25. The Children's Program serves children who are either detained in Office of Refugee Resettlement ("ORR") custody or in long-term foster care while facing removal proceedings or were previously detained in ORR custody prior to being reunified with sponsors. Because of certain statutory protections that apply to unaccompanied children, the vast majority of the unaccompanied children we serve in this project are not subject to expedited removal or reinstatement of a prior removal order and therefore would not have a credible or reasonable fear interview. I have therefore generally excluded this portion of our work from this declaration except where relevant.

26. Those who are in full removal proceedings attend hearings before IJs in these remote facilities in Florence or Eloy, or by video with IJs in different parts of the country. Those in expedited removal proceedings, who must receive a positive credible fear or reasonable fear determination before gaining access to a full hearing before a judge, almost always have their interviews with asylum officers conducted by phone. Most credible and reasonable fear interviews with individuals detained in Arizona are conducted by an asylum officer located somewhere else in the country, often in a different time zone. Likewise, the IJ review of negative credible and reasonable fear findings generally occurs remotely with an IJ in a different part of the country.

27. In 2024, the Adult Program provided free legal services to nearly 2,500 adults in ICE custody, including full representation to nearly 300 adults facing removal, more than 100 of whom had been deemed mentally incompetent to represent themselves due to a serious mental health condition. Preliminary numbers from 2025 show that, due in large part to the termination of legal access programs like the LOP, the Adult Program provided legal services to approximately 1,400 adults in ICE custody and provided full representation to more than 200 adults facing removal, more than 100 of whom had been deemed incompetent to represent themselves due to a serious mental health condition.

28. In 2024, we routinely encountered and provided education and legal support to people facing either a credible or reasonable fear interview or who were undergoing an IJ review of a negative credible or reasonable fear finding. We encountered far fewer people in this posture in 2025, in large part because of other policies, particularly the Executive Order issued on January 20, 2025 that prevents people from having access to asylum or other fear screenings at the border.[1] Although asylum officers conducted more than 38,000 credible fear interviews in the last three months of 2024, that number plummeted to only 1,800 by the second quarter of 2025 and has remained well below prior levels since then. *See* USCIS, *All USCIS Application and Petition Form Types (Fiscal Year 2025, Quarter 4)*.[2] FIRRP has nonetheless continued to occasionally encounter individuals who are awaiting fear screenings and to work with those individuals where possible to ensure that they understand their rights and are able to prepare appropriately for their fear screening or IJ review.

29. In the context of our representation to individuals who are deemed mentally incompetent, FIRRP attorneys are appointed by EOIR to serve as a qualified representative under the federal National Qualified Representative Program ("NQRP") and the permanent injunction in the *Franco-Gonzalez* litigation.[3] Because these appointments are made by an

---

[1] Proclamation 10888, "Guaranteeing the States Protection Against Invasion," 90 Fed. Reg. 8333 (Jan. 20, 2025).

[2] https://www.uscis.gov/sites/default/files/document/data/quarterly_all_forms_fy2025_q4.xlsx.

[3] *See Franco-Gonzalez v. Holder*, No. CV 10-02211 DMG, 2013 WL 8115423 (C.D. Cal. Apr. 23, 2013) (mandating appointment of a qualified representative for any noncitizen who is unrepresented, detained in ICE custody in Arizona, California, or Washington, and who an IJ finds to be mentally incompetent to represent themselves as a reasonable accommodation under Section 504 of the Rehabilitation Act). The NQRP is a federal program that emerged after the *Franco*

immigration judge, we cannot be appointed to represent someone in a credible or reasonable fear interview, which is conducted by a USCIS asylum officer. In cases where we have encountered a person who is facing such an interview but who seems incompetent to represent themselves, we have occasionally advocated with the relevant asylum office to ask for these cases to be transferred directly to immigration court because threshold screening interviews are not set up in a manner that safeguards the rights of people with serious mental health concerns.

30. The Adult Program has the following cohorts:

a.  *Pro Se* Cohort: Legal staff in the *pro se* cohort offer legal orientation and education services as well as other forms of *pro se* support to individuals in ICE custody who do not have counsel and are facing removal from the United States while in ICE custody. This includes providing group KYRs; one-on-one education in immigration law and procedure, including procedures for fear screenings and IJ reviews; *pro se* workshops on various forms of relief; assistance gathering, understanding, and translating documents, including assistance interpreting and understanding forms; and developing and distributing specialized *pro se* guides.

b.  Direct Representation Cohort: The direct representation cohort provides free, in-house representation to detained individuals in removal proceedings, occasionally beginning at the credible or reasonable fear interview and/or covering IJ review of negative determinations in those interviews. Attorneys in our direct representation practice routinely represent individuals in appeals to the BIA, often addressing issues regarding eligibility for asylum and withholding, including the proper application of the mandatory bars. This cohort also routinely represents individuals whom the immigration court has deemed to be incompetent to represent themselves in their immigration court proceedings under *Franco-Gonzalez* and/or the NQRP. Our *Franco*/NQRP clients regularly include individuals who initially were subject to credible or reasonable fear interviews before being referred to immigration court. These clients are some of the very few that FIRRP attorneys continue to represent in non-detained removal proceedings.

c.  Pro Bono Team: FIRRP's Adult Pro Bono Team places cases with outside pro bono counsel and mentors those pro bono lawyers. Because there are relatively few pro bono resources in Arizona, FIRRP has a long history of cultivating pro bono resources from national pools. Pro bono attorneys advance FIRRP's core work and mission by providing access to counsel and mitigating the legal and due process errors that arise when so many individuals with valid legal claims must go forward in their immigration process *pro se*. Because of the speed and lack of structure that exists in the credible fear and reasonable fear interview context, we generally cannot place cases for pro bono representation during these screening interviews. We have considered attempting to create a pro bono project for such representation,

permanent injunction that extended the accommodation of a qualified representative beyond the geographic scope of the *Franco* injunction.

but have determined that doing so is not tenable because we do not have access to the potential clients sufficiently far in advance to make such a project viable. We do, however, place cases for pro bono representation after an individual has received a positive credible or reasonable fear finding and are in full removal proceedings.

d.  Border Action Team: This cohort delivers legal services and orientation to migrants in Mexico. The core activities of the team reflect FIRRP's broader core work of providing legal education and orientation to ensure people understand their rights, have access to counsel, and are treated fairly and humanely in our immigration system. This team provides education and orientation services, as well as technical assistance to people who are at the border seeking information regarding immigration procedures. A critical element of this team's work is to educate migrants as to what they should expect upon arrival in the United States, which will include a credible or reasonable fear interview in many circumstances.

31.  The Integrated Social Services Program works closely with the Adult and Children's Programs to provide trauma-informed case management. FIRRP social workers focus on needs assessment and service planning; provide critical support to legal teams in developing a trauma-informed approach to their legal cases; and provide specialized services to help FIRRP identify and provide ongoing support to clients who are experiencing serious mental health conditions. Because most clients struggle with the experience of detention, our social workers support clients with psychoeducation and trainings on situation-specific coping mechanisms. They also train and support FIRRP legal staff on how to work with suicidal clients or clients experiencing serious mental health conditions.

32.  The Advocacy Program works closely with legal and social services staff across FIRRP's program areas. Staff in the advocacy program support FIRRP's mission and vision by representing clients in strategic federal court litigation, including petitions for review before the Ninth Circuit; BIA appeals of particularly high importance, potential impact, or complexity; and petitions for writs of habeas corpus and other district court cases. Our appellate attorneys routinely represent clients on appeals addressing issues impacting eligibility for asylum and withholding, including proper application of the mandatory bars. Additionally, the Advocacy Program supports legal programs by mentoring and providing technical support to staff on cases that raise particularly complex or novel legal issues, particularly when such cases are on appeal to the BIA. Currently, FIRRP has four attorneys, including me, on the advocacy team who specialize in litigating immigration matters in federal court.

33.  Across programs, FIRRP attorneys routinely provide legal services to individuals who are pursuing appeals before the BIA and the Ninth Circuit, including both full representation and *pro se* orientation and support. Such appeals often address complex legal issues arising in asylum law, including the proper application of any mandatory bars to asylum or withholding of removal cases, *e.g.*, whether a judge erred in finding that a person had committed a serious nonpolitical crime in the applicant's home country. In my experience,

most of the mandatory bars to asylum and withholding involve legally complex and/or factually intensive inquiries. FIRRP routinely takes such cases up on appeal through the BIA and, when appropriate, to the Ninth Circuit. Additionally, FIRRP's appellate practice includes a significant number of BIA appeals involving individuals who were previously *pro se* before the immigration court and experienced various due process errors related to the agency's failure to fully and fairly develop the record. Such appeals are possible for individuals who were in full removal proceedings before an immigration judge. Importantly in the context of this Rule, neither the complex legal questions raised by the mandatory bars analysis nor the fundamental due process errors that may occur in a fear screening process can be challenged through appeal for a case where the final decision was made in a screening interview.

34.   For individuals pursuing their cases *pro se*, FIRRP explains the credible and reasonable fear process, helps people understand what kind of information is important to raise, and explains the rapid timeline on which the case will proceed. We explain the limited right to review of a negative determination by an immigration judge and the small chance that an attorney would be able to help with that IJ review. We also explain how the immigration courts work and the relevant appellate procedure. These services are particularly critical when individuals speak a language other than English or have limited or no literacy, which is a common circumstance in my experience.

## The Rules Irreparably Harms FIRRP and Our Clients

35.   The Rules harm FIRRP's ability to perform our core services in a number of ways.

36.   The Rules advance to the fear screening interview stage the legally complex and fact-intensive inquiry required for proper consideration of the mandatory bars to asylum and withholding of removal. By doing so, the Rules will inevitably cause massive injustices and result in the wrongful removal of individuals who otherwise would be eligible for protection. People, particularly detained individuals, almost universally lack both the legal understanding and the time and resources to obtain the evidence necessary to show that a mandatory bar does not apply. Yet under the Rules they will be required to make such showings typically mere days after they have come into the United States. The Rules will create a sort of Catch-22 for FIRRP. We now must make a choice. One option is to divert substantial resources towards intervention at this earlier point to ensure people are not unjustly screened out of their opportunity to seek legal relief for which they are eligible and to ensure that they understand their rights and legal options at that stage of removal proceedings—a choice that will directly impact our ability to provide our other services. Our only other option is to ignore the fact that individuals will be undergoing a legally complex removal process without access to counsel and without access to information necessary to understand their legal proceedings, in direct contravention of FIRRP's mission.

37.   The Rules do the most harm to the detained *pro se* litigants whom FIRRP serves. Such individuals typically go through their credible or reasonable fear screenings within days of being detained. What was once a purposefully low bar screening to determine basic

9

eligibility has, with the Rules, become a legally complex, fact intensive analysis, one that in represented cases often requires hours of research, legal argument, and the collection of factual evidence. None of these steps is possible on the timeline in which screening interviews proceed. Yet *pro se* individuals will now be asked to navigate these issues alone, in a telephonic interview, with limited ability to provide evidence or traditional legal arguments. This will create a massive increase in the need for rapid technical assistance to *pro se* individuals facing credible and reasonable fear interviews and/or the review of negative fear decisions by IJs.

38. This change interferes with, and harms, the core work of the Florence Project. As addressed above, the Florence Project has historically reached most people we serve largely *after* they pass a fear screening interview and were thus beginning full proceedings in immigration court. This approach was viable because the screening was a purposefully low legal hurdle. Now, however, the Rules allow asylum officers to deny people with otherwise facially valid and viable claims for relief the opportunity to present their full case to a judge. In doing so, the Rules effectively shift a critical legal analysis almost wholly to the fear interview space, substantially increasing the need for FIRRP to reach people before this threshold fear screening.

39. While FIRRP has made efforts for years to identify, educate, and represent individuals before their fear screening, the timing of these screening procedures makes doing so difficult. And supporting individuals facing fear screenings at scale—as would be necessary if the Rules are in effect at a time when asylum officers conduct a large number of screening interviews[4]—would require immense additional resources. We would have to rapidly identify and intake individuals in the mere days (or even hours) they have before an interview is conducted. We would have to prepare supporting materials and appear at the interview itself on extremely short notice or no notice at all. Establishing such a structure would create significant strain on FIRRP's existing programs, which still focus on individuals who have cases before the immigration courts.

40. The Rules increase the pressure that FIRRP faces to reach people in threshold screening interviews because those interviews are now more likely than ever to represent the only opportunity that FIRRP staff will have to advise and assist people who may be barred from protection because of a mandatory bar. Preparing applicants for their fear interviews was already complex, and now staff must incorporate new, additional complexities into this time-compressed educational process. Waiting for people with potential bar issues to reach immigration court is an insufficient alternative because the IJ review of negative credible and reasonable fear findings will be dispositive of complicated questions.

41. Further, the IJ review process is deeply flawed. In cases involving credible fear interviews, the sole appellate review is conducted by an IJ; no federal court review or further appellate review is available. Despite being the sole mechanism for review of these decisions, the

---

[4] As discussed below, the only reason the Rules have not already caused enormous harm for FIRRP is because—from January 20, 2025 (three days after the DHS Rule took effect) to the present, DHS has relied on a Presidential Proclamation to suspend most fear screenings.

procedural protections in such reviews are abysmally lacking. For example, many judges prohibit individuals from presenting any evidence they were unable to present in the telephonic interview, and they refuse to consider any further testimony or legal argument beyond that which was allegedly provided to the asylum officer. Instead, they make determinations based solely on the credible fear worksheet, which, though written as if it is a transcript of the interview, is not in fact a transcription at all but rather the asylum officer's one-sided, unreviewed, notes. In these hearings, IJs also routinely limit counsel's ability to speak at all or to raise legal arguments regarding potential error in the fear interview process.

42.    The lack of meaningful appellate review of these mandatory bar determinations in credible fear screenings undermines FIRRP's core work in two ways. First, as noted above, it results in individuals being improperly screened out of full removal proceedings and deprived of an opportunity to present their cases, which cuts to the heart of FIRRP's core work educating and representing people so that they understand their rights and have a fair opportunity to present their claims in removal proceedings.

43.    Second, it undermines FIRRP's appellate practice because, by screening people out of relief at a stage where appellate review is jurisdictionally limited, the Rules limit FIRRP's ability to engage in impact appellate litigation to the BIA and Ninth Circuit, where we have opportunities to shape and clarify the law in a way that positively impacts our clients and others who are similarly situated.

44.    For example, at this time, we have at least two active appellate cases in which highly technical legal issues regarding the proper application of mandatory bars are at the heart of the appeal. These cases likely would never have reached immigration court, much less an appellate court, had the Rules been in effect when these cases began.

45.    One case, currently before the Ninth Circuit Court of Appeals, is the petition for review following the BIA's recent decision in *Matter of D-G-B-L-*, 29 I&N Dec. 392 (BIA 2026), in which the BIA held for the first time in a published decision that there is no duress exception to the serious non-political crime bar. Another case, currently at the BIA, involves a challenge to a material support of terrorism finding where an IJ found an individual barred from asylum despite the circumstances involved, which included being attacked, tied up, and robbed against his will. This case raises important and complex legal questions regarding what constitutes "committing an act" sufficient for the material support of a terrorist organization—including the minimum actus reus and mens rea necessary to trigger that bar. Yet under the Rule, many cases like these would never even have a full hearing, much less an opportunity for appellate review where the law could be meaningfully clarified and explained.

46.    The same deeply flawed IJ review process described above also serves as the primary procedure for appellate review of reasonable fear decisions. While there is jurisdiction to file a petition for review of a negative reasonable fear finding before the federal courts of appeals, the Supreme Court's recent decision in *Riley v. Bondi*, 145 S. Ct. 2190 (2025), which held that an agency decision to deny relief in withholding-only proceedings was not

a final order of removal, makes seeking judicial review incredibly complicated and resource-intensive. Under *Riley*, the relevant final order of removal for purposes of calculating the deadline for filing a petition for review is the underlying final administrative decision or the decision to reinstate a prior order of removal. Thus, in nearly every case involving wrongful denial of a reasonable fear proceeding, FIRRP attorneys must now file at least two PFRs, one challenging the original decision to reinstate a prior removal order and another challenging the reasonable fear screening process itself. Moreover, given the relatively unsettled state of the law in this area, in FIRRP's experience, such cases also require exponentially more legal briefing and analysis in the opening stages of an appeal; Department of Justice attorneys often oppose stays of removal and move to dismiss cases raising issues in the reasonable fear and/or withholding-only context.

47.   The Rules directly harm FIRRP's core appellate work in the reasonable fear/withholding-only context because it creates increased opportunities for individuals to be wrongly denied in their reasonable fear process based on a complex legal assessment of the potential application of a mandatory bar—and thus increased demand for PFRs of such decisions. Because each such PFR has always been complicated, and now takes more than double the work after *Riley*, the Rules create substantial strain on our small appellate team, made up of only two full-time appellate attorneys. In fact, as soon as *Riley* was issued, this team had to pause work on other matters to be able to assist in the identification of existing clients affected by the new ruling and ended up filing 7 *Riley* PFRs in a matter of weeks between July and August of 2025. That was a big team effort but also a significant constraint when it comes to the provision of services to other clients. The PFR to review a negative reasonable fear finding due to the application of mandatory bars poses an additional layer of work and even more limitations on our capacity, as it not only involves the two PFRs already mentioned, but also particularly intricated legal issues and technical arguments. This will require the prioritization of these appeals, leading to an inevitable reduction in services to other clients.

48.   The Rules also affect the Florence Project's core work of representing people pursuant to *Franco-Gonzalez* and as part of the NQRP program. Many of the people we serve through *Franco*/NQRP are seeking asylum, withholding of removal, and/or protection under the Convention Against Torture. FIRRP regularly works with *Franco*/NQRP clients who began their immigration process by undergoing some form of threshold fear screening, but FIRRP only gets appointed in these cases by an immigration judge *after* the credible fear or reasonable fear process has been completed.

49.   Application of the Rules to this population is of serious concern to FIRRP. First, in our experience representing this population, there is serious potential for a mandatory bar to be erroneously applied to a person who lacks capacity to represent themself and may be reporting delusional or inaccurate information in a fear screening setting. Second, in our experience, many clients with criminal histories have those histories for reasons directly related to serious mental health conditions. And there are serious concerns with requiring individuals who are experiencing serious mental health conditions to defend themselves against application of legally complex mandatory bars in a fear interview that lacks even the most basic accommodations required under Section 504 of the Rehabilitation Act.

50. Ultimately, because the Rules result in the application of the bars to people in this category *before* they have an opportunity to have counsel appointed, FIRRP's ability to be appointed to represent these individuals is jeopardized. This has a direct financial impact on FIRRP under the NQRP contract which is based on the number of cases to which we are appointed.

51. The follow-on result is that these individuals are likely to face removal based on the premature application of a bar, even in cases where the FIRRP attorneys would have been able to rebut the application of that bar if given the chance to do so. This cuts to the core of FIRRP's work of ensuring that people facing removal have access to basic due process.

52. In addition to the harms to FIRRP's mission and core services described above, the Rules will have an overarching adverse impact on FIRRP as an organization.

53. The Rules will require us to devote more resources to fewer cases, meaning we will serve fewer clients. This is the natural result of the Rules for several reasons. First, because FIRRP will have to expend more resources to reach people early in the fear interview process, this will reduce our overall capacity to serve individuals who have their cases before the immigration courts. Moreover, the extremely compressed timelines and high pressure to reach individuals in the fear interview process quickly will significantly contribute to staff burn-out and turnover.

54. Second, to the extent that we are unable to reach and educate individuals prior to their fear screenings, FIRRP will have to expend more resources to try to represent individuals at the IJ review stage, which requires complex legal and factual analysis on an extremely abbreviated timeframe. This work will reduce our overall capacity for other types of immigration court representation and, again, will likely contribute substantially to staff burn-out and turnover.

55. Finally, to the extent that the Rules will result in people being wrongly screened out of full removal or withholding only proceedings at all, this will reduce the overall population of individuals that FIRRP can serve in full hearings before the immigration agency and on relevant appeals.

56. Also, because Arizona has daily bedspace for more than 3,000 adults and children in custody, any change that decreases representation puts significant strain on FIRRP's *pro se* support programs. As FIRRP attorneys and our pro bono partners must represent fewer cases, there will be a corresponding increase in demand for FIRRP's *pro se* services. FIRRP will likely need to increase staff resources devoted to providing *pro se* services to support the increased numbers of people without counsel. However, as noted above, these services recently lost government funding. As a result, we have already had to undergo reductions in staffing and changes to frequency of services. Unless or until we can fund additional support, the increased demand for *pro se* support is likely to stretch our *pro se* cohort extremely thin and may force FIRRP to redirect resources for representation, our other core work, to *pro se* support. It surely will require substantial additional fundraising to sustain these mission critical efforts.

57. Finally, I want to address the likelihood of these changes and why some of these harms remain mostly future-looking even though the Rules have been in place for more than 15 months. The DHS Rule took effect on January 17, 2025, but three days later President Trump closed the border to asylum seekers and entirely suspended the credible fear process for any person who entered the United States on or after January 20, 2025, except insofar as the person was being screened for protection under the Convention Against Torture after having affirmatively "manifested" a fear of torture in their home country. Those residual torture screenings do not implicate the Rules because the mandatory bars do not foreclose access to deferral of removal under the Convention Against Torture.

58. FIRRP participated in a legal challenge to that Proclamation, and a different judge in this district found the Proclamation unlawful. *See Refugee & Immigrant Ctr. for Educ. & Legal Servs. (RAICES) v. Noem*, 793 F. Supp. 3d 19 (D.D.C. 2025). The government sought and received a partial stay of that decision, which currently remains in effect. *See RAICES v. Noem*, D.C. Cir. No. 25-5243 (Aug. 1, 2025). Though the D.C. Circuit recently affirmed the summary judgment decision on the merits, *RAICES v. Mullin*, 174 F.4th 81 (D.C. Cir. 2026), the partial stay remains in place as of this writing because the mandate in the case has not issued and Defendants have filed a petition for rehearing en banc.

59. As a result of the Proclamation, the number of people subject to the credible fear process has dropped dramatically. Despite this change, the Rules have had a perceptible impact on FIRRP's work, which will increase dramatically if and when the Proclamation suspending asylum processing at the border is lifted.

60. For example, one reason the Rules are perceptibly impacting FIRRP's work despite there being very few people facing the credible fear process is that the Department of Homeland Security began authorizing expedited removal nationwide and applying it to people who have been present in the country for up to two years. *See, e.g.*, 90 Fed. Reg. 8139 (Jan. 24, 2025). As a result of this change, there are people facing credible fear interviews who should not have ever had them to begin with, including people who had already been placed into regular removal proceedings only to have those proceedings dismissed. Accordingly, although FIRRP is not currently seeing a large number of recent arrivals who are facing credible fear interviews, we have still had to train staff to understand this issue and to be prepared to address it in the credible and reasonable fear contexts as they arise.

Laura St. John, Legal Director
Florence Immigrant & Refugee Rights Project
P.O. Box 86299
Tucson, AZ 85754

14