**DECLARATION OF KELLY ROJAS, CO-DIRECTOR OF THE DETAINED ADULT PROGRAM AT AMICA CENTER FOR IMMIGRANT RIGHTS**

I, Kelly Rojas, make the following declaration based on my personal knowledge and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1.  I am currently the co-director of the Detained Adult Program ("DAP") at Amica Center for Immigrant Rights ("Amica Center"), formerly known as Capital Area Immigrants' Rights Coalition ("CAIR Coalition"), in Washington, DC. I am an attorney admitted to the Maryland state bar and have practiced immigration law since 2014. I have worked at Amica Center since 2016, serving in my current role as DAP Co-Director since 2023.

2.  Throughout my career, including at Amica Center, I have primarily represented, and supervised staff who primarily represent, adult noncitizens in detention. I have also directed and participated in providing legal orientation, pro se assistance, and pro bono placement for unrepresented adults in detention.

3.  I write this declaration to expand upon the ongoing and future harm that the Rules titled *Application of Certain Mandatory Bars in Fear Screening*, 89 Fed. Reg. 103,370 (Dec. 18, 2024), and *Clarification Regarding Bars to Eligibility During Credible Fear and Reasonable Fear Review*, 89 Fed. Reg. 105,392 (Dec. 27, 2024), (together, "the Rules") are causing, and will cause, to Amica Center and its core activities and work.

4.  Amica Center is a Washington, DC-based nonprofit, legal services organization founded in 1999 that is dedicated to providing legal services to indigent noncitizen men, women, and children who are detained by Immigration and Customs Enforcement ("ICE"), an agency of the Department of Homeland Security ("DHS"), throughout the DMV ("Washington, DC-Maryland-Virginia") metropolitan area and beyond.

5.  Amica Center is comprised of three main programs: the Detained Adult Program, the Detained Children's program, and the Immigration Impact Lab. Our overarching goal is to help families stay together and out of harm's way. DAP focuses on helping detained noncitizen adults understand the immigration court and removal process so they can make better-informed decisions about their cases, including whether or not to pursue immigration relief, and more effectively participate in their proceedings. When possible, we also provide direct representation to detained noncitizens in their immigration cases, as well as pro se legal information and connections to pro bono attorneys for noncitizens we are unable to represent.

6.  In order to carry out its mission, DAP has four main work components: (1) the "Know Your Rights" ("KYR") team, which provides educational and pro se services in the form of delivering "know your rights" presentations, conducting individual intakes and one-on-one legal orientations, and leading pro se workshops with unrepresented noncitizens held at the two ICE detention facilities located in Virginia; (2) connecting unrepresented detained noncitizens who cannot afford a lawyer with pro bono attorneys from our various pro bono firm partners to represent them in their immigration proceedings before the immigration courts, Board of Immigration Appeals ("BIA"), and circuit courts of appeals,

as well as in habeas petitions before the district courts; (3) representing detained adult clients found legally incompetent while appearing pro se before an immigration judge as part of the National Qualified Representative Program ("NQRP"), so that they have legal representation before the immigration courts and BIA in their removal proceedings; and (4) operating an in-house universal representational pilot program of staff attorneys to directly represent indigent detained adult clients who were residents of various localities in the DMV area prior to being detained by ICE, in their removal proceedings before the immigration courts, BIA, and circuit courts of appeals.

7. Under the first programmatic component of our work, the KYR team continues much of the work that Amica Center first began in FY 2009, when it started operating a Legal Orientation Program ("LOP") in Virginia. Currently the KYR team provides legal information and services to pro se noncitizens detained at both over-72-hour ICE detention facilities in Virginia: Farmville Detention Center ("Farmville") in Farmville, Virginia, and Caroline Detention Facility in Bowling Green, Virginia ("Caroline"). The combined detention bedspace in both of these facilities is 1,072 people. Farmville has beds to house 736 people, and Caroline can house 336 people.

8. The federal government began funding the Legal Orientation Program ("LOP") in 2002, contracting with legal service providers, including Amica Center, to share information about immigration court proceedings with detained pro se noncitizens. In 2025, the federal government cut funding to the LOP program, and Amica Center transitioned much of the work that its LOP team had previously been doing to a new KYR team that continues to meet and share information with pro se adult noncitizens held at the two Virginia ICE detention facilities.

9. Through "know your rights" presentations, individual orientations, and pro se workshops, the LOP team, and now the KYR team, have worked to provide detained pro se noncitizens with tools to represent themselves. While KYR team staff cannot provide actual legal representation, they can explain to noncitizens what to expect in immigration court; discuss potential forms of relief such as asylum, including eligibility for that relief; and help noncitizens better understand their rights and chances of success in immigration court. The KYR team also provides limited pro se assistance which can involve collecting and translating evidence, assistance with preparing documents, or filing applications and evidence in court. When possible, KYR team staff also work to vet viable cases to secure pro bono representation with local law school clinics or law firm partners.

10. KYR team staff regularly travel to Farmville and Caroline to provide legal education presentations and individual orientations to detained noncitizens who do not have counsel. Amica Center's KYR team staff visit both Farmville and Caroline once a month, typically for 2–4 days per visit, depending on the number of people detained. KYR team staff also work with our volunteer manager to recruit, train and supervise hundreds of volunteers each year who accompany and assist staff during detention center visits, translate documents for pro se individuals to include in their filings in court, and transfer calls to staff through our free detention hotline.

2

11. The KYR team meets with pro se noncitizens at various stages in their removal proceedings, including before and while they are undergoing credible fear interviews ("CFIs") or reasonable fear interviews ("RFIs"), and while seeking IJ review of negative interview results. In meeting with noncitizens seeking asylum or other fear-based relief such as withholding of removal or protection under the Convention Against Torture ("CAT"), KYR team staff regularly share information about the various steps in the process of seeking relief before USCIS and the immigration court, as well as potential forms of relief and bars to eligibility for that relief—including the mandatory bars at issue in this Rule.

12. Since 2015, Amica Center has also served as a provider under the Department of Justice's National Qualified Representative Program ("NQRP"), through which DAP attorneys and DOJ Accredited Representatives serve as appointed counsel ("Qualified Representatives" or "QRs") to represent detained noncitizens whom an immigration judge has deemed incompetent to represent themselves in their immigration court proceedings. As an NQRP provider, Amica Center represents both individuals in ICE custody who have been designated incompetent by an immigration judge and individuals outside of ICE custody who were previously detained and were designated incompetent by an immigration judge before release.

13. Many NQRP clients have significant, ongoing mental health conditions and trauma—issues that often stem from prior torture or persecution, and which are further exacerbated by the stress of immigration detention. Consequently, providing representation in these cases can be highly time- and resource-intensive and requires specific training, expertise, and sensitivity on the part of the attorneys. Amica Center staff regularly represent NQRP clients as QRs in their removal proceedings before the immigration court and the BIA and assist them in pursuing asylum and other forms of fear-based relief.

14. Based on its unique and longstanding status as the only NQRP provider in the DMV area, Amica Center has grown and cultivated our in-house expertise in representing this client population and has been lauded as one of the national experts on this type of representation. NQRP has been crucial to Amica Center's mission and work for more than a decade.

15. Additionally, thanks to funding from state and local governments in the DMV area, DAP attorneys regularly provide in-house representation to detained, indigent noncitizens facing removal who lived in DMV localities prior to their detention by ICE. This universal representation ("UREP") model involves DAP attorneys providing full merits representation to eligible noncitizens in their immigration proceedings before various immigration courts and the BIA, as well as occasionally in matters before USCIS, including CFIs and RFIs, and increasingly before the circuit courts of appeals on petitions for review and the district courts in habeas petitions.

16. Once cases have been accepted and placed for representation with DAP attorneys, those attorneys pursue any available forms of relief, such as asylum and other forms of fear-based relief, including for new arrivals and individuals in reinstatement proceedings. Most of the detained adults from the DMV area whom DAP represents through its UREP program are held at ICE detention facilities located in Virginia, Texas, and Louisiana

3

during their removal proceedings. However, as ICE has continued to arrest and detain ever greater numbers of noncitizens, those clients have also increasingly been transported further away from the DMV area to detention facilities—and immigration courts—in other states, such as Florida and California. The UREP model seeks to meet the needs of detained indigent DMV area residents, wherever they are detained, and help them stay in the U.S. and pursue any relief for which they may be eligible.

17. The Rules have already had a negative impact upon each of these programmatic focuses of DAP's work. As long as the Rules remain in effect, they will continue to harm Amica Center's ability to provide its core services.

18. It is important to acknowledge that in addition to the Rules, this administration has simultaneously implemented many other anti-immigrant policies and barriers to fear-based relief that have drastically reduced the number of border arrivals and people undergoing CFIs and RFIs, including among the detained clients and pro se noncitizens whom we serve. These Rules have already frustrated Amica Center's work in a number of concrete ways, and they will continue to have a long-term negative impact upon our organization's work going forward, even if some of the other structural barriers to asylum and other fear-based relief are later reversed or eased.

19. As an initial matter, the Rules have made our KYR team's efforts to share information and provide limited non-representation support to detained pro se noncitizens more labor-intensive and time-consuming. We have had to expend additional, already limited resources on training for our KYR team staff about the Rules and, when the number of number of CFIs/RFIs dramatically increases, we will also be forced to spend additional time and effort updating our presentation materials, intake forms, and other resources for pro se noncitizens seeking fear-based relief in order to account for the impact of the Rules.

20. As our KYR team has observed firsthand, the number of people undergoing CFIs and RFIs while detained at Farmville and Caroline has declined over the past year and a half, partly based on the aforementioned external factors, such as a steep overall decrease in the number of recent border arrivals nationwide, as well as limited numbers of people being placed in expanded expedited removal relative to initial expectations at the start of 2025.

21. Particularly before this sharp decrease in border arrivals, our KYR team spent a significant amount of time and energy addressing the CFI/RFI processes. For example, we would sometimes conduct group KYR presentations specifically focused on the CFI process and its requirements. We would also regularly create and share informational materials about the CFI process with noncitizens with whom we met individually before their CFIs and/or IJ reviews, so they knew what to expect. We still do this for noncitizens with whom we are able to meet individually before their RFIs and/or IJ reviews. Part of whether we are able to meet with noncitizens before their fear interviews also depends on when we are able to speak with them, as ICE only allows us to visit each facility one time per month.

22. When (not if) some of the current draconian restrictions in place at the border inevitably ease, there will be greater numbers of people transferred directly from the border to the Virginia ICE detention facilities and placed in expedited removal. In addition, as

aggressive interior enforcement continues to escalate in the DMV area, including the potential expanded use of expedited removal, this will inevitably lead to more people detained at Farmville and Caroline receiving CFIs and RFIs. When that occurs, our KYR team staff will have to spend much more time and resources informing these pro se noncitizens about the Rules and their consequences at a much earlier stage in their cases—before and during their CFIs/RFIs or subsequent IJ review—rather than during their immigration court proceedings, as we did before the Rule.

23.    Our KYR team staff are uniquely positioned to work with people undergoing CFIs and RFIs, given that those noncitizens are typically even less likely to be able to obtain legal representation compared to other detained noncitizens. This is because most noncitizens receiving CFIs are recent border arrivals who don't yet have a local fixed address and/or local family members to qualify for UREP, while those receiving RFIs may include people who have been convicted of illegal re-entry and are receiving RFIs after being transferred directly from federal criminal custody. Relative to other detained noncitizens, who may have been living and working in the United States for years prior to their detention, people receiving CFIs/RFIs who have recently arrived here or were previously incarcerated are often less likely to have the resources to afford a private immigration attorney or to have family and friends in the United States who can assist them with finding a lawyer. This reality makes the education and limited pro se assistance work that our KYR team does all the more important for that population.

24.    That being said, in order to meaningfully educate those pro se noncitizens about how to prepare for their CFIs/RFIs and defend themselves against possible application of the mandatory bars in their cases, we will have to identify and meet with them much earlier in their proceedings than is currently the case. In addition, we will have to complete related time- and resource-intensive tasks on a very short timeline, such as gathering relevant documents from family members that those pro se noncitizens can use to respond to any suggestion during their CFIs/RFIs that the mandatory bars might apply.

25.    This reallocation of time and resources within the work of our KYR team will also mean that we will have less capacity to inform and assist pro se noncitizens who may have viable merits claims during their immigration court proceedings, including people who have not been directly impacted by the Rule. Many of the funding sources for the Detained Adult Program's other programmatic focus areas are very specifically restricted, such as our NQRP program or local- and state-based UREP funding for DMV-area residents, and cannot simply be shifted to the KYR team even if there are additional demands on its time and resources. The effect will be that our KYR team will be stretched even more thinly than is already the case, impeding its work by forcing us to spend time creating and updating new materials and decreasing the number of individuals to whom we can provide meaningful pro se assistance.

26.    To the extent that the KYR team also screens for viable cases for placement with pro bono attorneys, there are often delays in placing cases with pro bono counsel (typically, attorneys at large law firms, who may have more intensive conflict check and case opening procedures, and can require significant guidance if they have not previously worked on other detained immigration cases). These delays mean that pro bono placement will likely

not occur until after the CFI/RFI stage (including any subsequent IJ review) is over and the mandatory bars have already been applied, frustrating pro bono counsel's ability to defend against the mandatory bars until it is already too late, even for otherwise viable asylum/withholding claims. This situation will negatively impact Amica Center's core activities because it will limit the number of viable cases that we can find and place with pro bono counsel, who are otherwise ready and willing to take on and win cases for noncitizens who would otherwise go unrepresented.

27. In addition, the Rules will negatively affect our ability to successfully represent and work with our NQRP clients. Under the existing NQRP appointment timeline, we do not begin representing noncitizens until they have already been placed in full removal proceedings, deemed incompetent by an IJ, and had a QR appointed—after the CFI or RFI and any subsequent IJ review of the interview has already taken place. Given that the applicability of the bars will now be determined during fear screenings, before our staff have been appointed as QRs, we will be unable to pursue previously viable arguments in immigration court proceedings that the mandatory bars do not apply—foreclosing those clients from asylum and/or withholding before they have ever had a chance to secure representation by an attorney.

28. NQRP clients often deal with serious trauma and mental health issues that make it extremely unlikely that they will be able to understand the legally and factually complex nature of the mandatory bars without legal assistance—let alone adequately defend themselves against the mandatory bars pro se in their CFIs/RFIs. Because assessing whether the mandatory bars apply often entails discussing highly traumatic events in those noncitizens' pasts, raising these events in CFIs/RFIs can trigger intense anxiety that makes it even harder for pro se noncitizens to respond to allegations regarding mandatory bars.

29. As a result, NQRP clients are particularly in need of effective legal representation to ensure they are prepared to respond to allegations that the mandatory bars may apply. If those noncitizens fail their CFIs/RFIs because of the mandatory bars and are never placed in full removal proceedings before an IJ, they will never even have the opportunity to receive a competency hearing before an IJ and be appointed a QR to make it into our NQRP program.

30. This will significantly undermine our core activities and work representing this population of noncitizens, because we will be able to serve smaller numbers of NQRP clients. That change will also harm us financially by reducing a significant funding source for our organization, given that NQRP funding is partly based on the number of clients whom we represent.

31. Finally, the Rules will force our UREP program to place cases much earlier, at the CFI/RFI stage or in subsequent IJ review, in order to ensure that we can effectively defend those clients against possible application of the mandatory bars before it is too late. Front-loading the timeline of when we can begin representation in these cases also means that it will take even longer to resolve the cases that we are able to place. This reallocation of our UREP program's already-limited capacity will mean that we can represent fewer clients with otherwise viable fear-based claims in their immigration merits proceedings, further impairing our work.

32.    Because our local- and state-based funding streams for UREP programs are tied to the number of clients whom we are able to serve, this reduction in the number of clients will also negatively impact our long-term funding and ability to hire and retain staff.

33.    For clients impacted by the Rules who have received negative RFIs that were upheld during IJ review, we will be forced to expend significant additional time and resources to file petitions for review with the circuit courts of appeals in order to directly challenge the application of the mandatory bars in their cases.

34.    These consequences illustrate some of the negative effects that the Rules are having, and will have, upon Amica Center, our staff, and the noncitizens whom we serve if the Rules are allowed to remain in effect. In short, the Rules will severely impact our organization's core work activities by impairing our ability to effectively represent and support the detained noncitizens for whom Amica Center exists.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 18, 2026, in Washington, DC.

Kelly Rojas
Co-Director, Detained Adult Program
Amica Center for Immigrant Rights
1025 Connecticut Ave NW Ste. 701
Washington, DC 20036
Tel: (202) 888-3507
Fax: (202) 331-3341
kelly.rojas@amicacenter.org