BRETT A. SHUMATE
*Assistant Attorney General*
ANTHONY P. NICASTRO
*Acting Director*
CARA E. ALSTERBERG
*Assistant Director*
JAMES J. WALKER
Senior Litigation Counsel
SHELBY WADE
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 285-8379
Email: Shelby.Wade2@usdoj.gov
Trial Attorneys

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| E.Q., *et al.*, ) | Civil Action No. 1:25-cv-00791 |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| U.S. Department of Homeland ) | |
| Security, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

LEGAL AND PROCEDURAL BACKGROUND.................................................................2

    I.     Statutory Framework ................................................................................2

    II.    Procedural History ...................................................................................7

STANDARD OF REVIEW ...................................................................................................12

ARGUMENT........................................................................................................................14

    I.     The Court Lacks Jurisdiction Over All Plaintiffs' Claims.......................................14

        A.  Plaintiff E.Q. Cannot Establish Article III Standing..........................................14

        B.  Plaintiff E.Q. has not Sufficiently Established a Procedural Injury.. .................20

        C.  Plaintiff E.Q.'s Claims are Moot, and the Voluntary Cessation Exception
            Does Not Apply. ...............................................................................................22

        D.  The Organizational Plaintiffs Cannot Demonstrate Standing............................32

        E.  The Organizational Plaintiffs Are Outside the Zone of Interests of the
            Relevant Statutes..............................................................................................38

        F.  Organizational Plaintiffs Cannot Challenge the Credible Fear Provisions
            of the Rules.. ....................................................................................................39

    II.    The Rule is Consistent with the INA.......................................................................42

        A.  The Rule Does Not Deny Individuals the Ability to Pursue Asylum in
            Section 240 Removal Proceedings....................................................................42

        B.  Asylum Officers Rely on More Than a Preliminary Prediction in Applying
            the DHS Bars Final Rule...................................................................................44

        C.  The Application of the Rule by DHS Does Not Violate the INA.......................46

    III.   The Rules Are Not Arbitrary and Capricious...........................................................49

        A.  The DHS Bars Final Rule Does Not Rest on a False Premise as the Text of
            the Rule Does Not Conflict with the Preamble..................................................49

        B.  The DHS Bars Final Rule Acknowledges and Explains the Agency's
            Departure from its Previous Position.................................................................50

C.  The Rule Does Not Rest on Assertions That Are Contrary to the Record. ........52

D.  Defendants Considered Concerns About Fairness..............................................55

E.  Defendants Considered the Effects of Interrelated, Contemporaneous
    Policies. ..............................................................................................................57

F.  The EOIR Companion Rule is Additionally Not Arbitrary and Capricious. .......61

CONCLUSION...............................................................................................................62

**TABLE OF AUTHORITIES**

**CASES**

*Action on Smoking and Health v. C.A.B.*,
699 F.2d 1209 (D.C. Cir. 1983) ................................................................................ 60

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) ............................................................................................. 23, 25

*Alvarez v. Smith*,
558 U.S. 87 (2009) ................................................................................................... 23

*Am. Wild Horse Pres. Campaign v. Perdue*,
873 F.3d 914 (D.C. Cir. 2017) ................................................................................ 50

*American Immigration Lawyers Association v. Reno*,
199 F.3d 1352 (D.C. Cir. 2000) ........................................................................ 40, 41

*Americans for Safe Access v. DEA*,
706 F.3d 438 (D.C. Cir. 2013) ........................................................................... 13, 57

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. Aug. 19, 2016) ....................................................... 27, 32, 49

*Ark Initiative v. Tidwell*,
749 F.3d 1071 (D.C. Cir. 2014) .............................................................................. 14

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) ................................................................................................. 39

*Camp v. Pitts*,
411 U.S. 138 (1973) ........................................................................................... 15, 18

*Carter v. State Farm Mut. Auto. Ins. Co.*,
808 A.2d 466 (D.C. 2002) ....................................................................................... 44

*Chamber of Commerce of U.S. v. E.P.A.*,
642 F.3d 192 (D.C. Cir. 2011) ................................................................................ 37

*Cigar Ass'n of Am. v. FDA*,
132 F.4th 535 (D.C. Cir. 2025) ............................................................................... 49

*Citizens for Const. Integrity v. Census Bureau*,
115 F.4th 618 (D.C. Cir. 2024) ....................................................................... 20, 21, 22

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) .................................................................................................. 13, 49

*City News & Novelty, Inc. v. City of Waukesha*,
  531 U.S. 278 (2001) .......................................................................................................... 26

*City of Waukesha v. EPA*,
  320 F.3d 228 (D.C. Cir. 2003) .................................................................................... 60, 61

*Cordero-Chavez v. Garland*,
  50 F.4th 492 (5th Cir. 2022) ............................................................................................ 28

*Ctr. for Biological Diversity v. Env't Prot. Agency*,
  861 F.3d 174 (D.C. Cir. 2017) .......................................................................................... 20

*Dept. of Education v. Brown*,
  600 U.S. 551 (2023) .......................................................................................................... 20

*Dian Chun Jiang v. U.S. Atty. Gen.*,
  222 Fed. App'x. 922, 2007 WL 906421 (11th Cir. 2007) ................................................ 28

*Dist. of Columbia v. Gallagher*,
  734 A.2d 1087 (D.C. 1999) ............................................................................................... 44

*Diversity v. U.S. Dep't of the Interior*,
  144 F.4th 296 (D.C. Cir. 2025) ......................................................................................... 32

*DL v. District of Columbia*,
  187 F. Supp. 3d 1 (D.D.C. 2016) ................................................................................ 25, 26

*Equal Rts. Ctr. v. Post Props., Inc.*,
  633 F.3d 1136 (D.C. Cir. 2011) ........................................................................................ 33

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) .......................................................................................................... 50

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ................................................................................................ 2, 49, 61

*FDA v. Alliance for Hippocratic Med.*,
  602 U.S. 367 (2024) ................................................................................... 32, 33, 34, 35, 38

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ............................................................................... 21, 37, 38

v

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
    528 U.S. 167 (2000)..................................................................................... 11, 14, 25, 29

*Fulbright v. McHugh*,
    67 F. Supp. 81 (D.D.C. 2014) ............................................................................... 13

*Growth Energy v. Environmental Protection Agency*,
    5 F.4th 1 (D.C. Cir. 2021).................................................................................... 22

*Gunn v. Minton*,
    568 U.S. 251 (2013)............................................................................................. 39

*Gurung v. Sessions*,
    704 Fed. App'x. 19 (2d Cir. 2017)....................................................................... 28

*Haitian Refugee Center v. Gracey*,
    809 F.2d 794 (D.C. Cir. 1987).............................................................................. 38

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)............................................................................................. 34

*Home Box Office, Inc. v. F.C.C.*,
    567 F.2d 9 (D.C. Cir. 1977).................................................................................. 60

*INS v. Cardoza-Fonseca*,
    480 U.S. 421 (1987)............................................................................................... 3

*INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*,
    510 U.S. 1301 (1993)........................................................................................... 39

*International Dark-Sky Association, Inc. v. Federal Communications Commission*,
    106 F.4th 1206 (D.C. Cir. 2024)...................................................................... 21, 22

*Inv. Co. Inst. v. CFTC*,
    720 F.3d 370 (D.C. Cir. 2013).............................................................................. 52

*Iron Arrow Honor Society v. Heckler*,
    464 U.S. 67 (1983)............................................................................................... 23

*Jordan v. Rubio*,
    795 F. Supp. 3d 46 (D.D.C. July 29, 2025) .................................................... 30, 32

*Larsen v. U.S. Navy*,
    525 F.3d 1 (D.C. Cir. 2008).................................................................................. 30

*Las Americas Immigr. Advoc. Ctr. v. DHS,*
   783 F. Supp. 3d 200 (D.D.C. May 9, 2025) ................................................ 8, 51, 54

*Loma Linda Univ. Med. Ctr. v. Sebelius,*
   684 F. Supp. 2d 42 (D.D.C. 2010) ............................................................... 12

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ........................................................... 2, 14, 15, 19, 32

*Make the Road N.Y. v. McAleenan,*
   405 F. Supp. 3d 1 (D.D.C. 2019) ................................................................. 41

*Make the Road N.Y. v. Noem,*
   2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) ............................................. 40

*Make the Road N.Y. v. Wolf,*
   962 F.3d 612 (D.C. Cir. 2020) ............................................................... 40, 41

*Marsh v. Oregon Natural Res. Council,*
   490 U.S. 360 (1989) ..................................................................................... 13

*Moncrieffe v. Holder,*
   569 U.S. 184 (2013) ....................................................................................... 3

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ............................................................. 1, 49, 51, 61

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife,*
   551 U.S. 644 (2007) ..................................................................................... 13

*Nat'l Black Police Ass'n v. District of Columbia,*
   108 F.3d 346 (D.C. Cir. 1997) ..................................................................... 30

*Peoples Drug Stores, Inc. v. Dist. of Columbia,*
   470 A.2d 751 (D.C. 1983) ............................................................................ 44

*Pub. Citizen v. FERC,*
   92 F.4th 1124 (D.C. Cir. 2024) .............................................................. 25, 26

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.,*
   489 F.3d 1279 (D.C. Cir. 2007) ................................................................... 37

*Public Citizen, Inc. v. F.A.A.,*
   988 F.2d 186 (D.C. Cir. 1993) ..................................................................... 60

*Rural Cellular Ass'n v. FCC*,
  588 F.3d 1095 (D.C. Cir. 2009) ............................................................................. 13

*Samma v. Department of Defense*,
  136 F.4th 1108 (D.C. Cir. 2025) ........................................................................... 26

*Sierra Club v. Mainella*,
  459 F. Supp. 2d 76 (D.D.C. Oct. 25, 2006) ........................................................ 12

*Southwestern Bell Tel. Co. v. FCC*,
  168 F.3d 1344 (D.C. Cir. 1999) ........................................................................... 13

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ............................................................................................... 14

*Swanson Group Mfg. LLC v. Jewell*,
  790 F.3d 235 (D.C. Cir. 2015) ............................................................................. 37

*Thorndyke v. Washington*,
  224 F. Supp. 2d 72 (D.D.C. 2002) ....................................................................... 23

*United States v. Goldenberg*,
  168 U.S. 95 (1897) ............................................................................................... 44

*Warth v. Seldin*,
  422 U.S. 490 (1975) ............................................................................................. 32

*Washington v. Wheeler*,
  352 F. Supp. 3d 1 (D.D.C. 2019) .................................................................... 26, 32

*Whitmore v. Arkansas,*
  495 U.S. 149 (1990) ............................................................................................. 30

*Young v. D.C. Housing Auth.*,
  31 F. Supp. 3d 90 (D.D.C. 2014) .................................................................... 25, 27

## STATUTES

5 U.S.C. § 701(a)(1) ................................................................................................ 39

5 U.S.C. § 706(2)(a) ............................................................................................. 7, 13

5 U.S.C. § 702 ..................................................................................................... 13, 39

6 U.S.C. § 557 ......................................................................................................... 48

8 U.S.C. § 1103(a)(1) ............................................................................................. 48

8 U.S.C. § 1103(a)(3)................................................................................................ 48

8 U.S.C. § 1103(g)(1) ............................................................................................... 46

8 U.S.C. § 1158(a)(1).................................................................................................. 2

8 U.S.C. § 1158(b)(1)(A)......................................................................... 3, 43, 46, 48

8 U.S.C. § 1158(b)(2) ........................................................................................... 42, 43

8 U.S.C. § 1158(b)(2)(A)........................................................................... 3, 43, 46

8 U.S.C. § 1158(b)(2)(A)(ii)........................................................................... 5, 6

8 U.S.C. § 1225(b)(1) ..................................................................... 4, 5, 45, 46

8 U.S.C. § 1225(b)(1)(B) ......................................................................... 48

8 U.S.C. § 1228(b) ..................................................................................... 4, 5

8 U.S.C. § 1231(a)(5)............................................................................. 4, 31

8 U.S.C. § 1231(b)(3) ................................................................................. 3

8 U.S.C. § 1231(b)(3)(B) ....................................................................... 3, 6

8 U.S.C. § 1252(e)(3)......................................................................... 40, 41

8 U.S.C. §§ 1158............................................................................... 28, 39

8 U.S.C. §§ 1158(a)(2)................................................................................ 3

5 U.S.C. § 701(a)(1).................................................................................. 39

**RULES**

Fed. R. Civ. P. 56.................................................................................... 12

Fed. R. Civ. P. 56(c) ............................................................................... 12

**REGULATIONS**

8 C.F.R. § 208.13(c)(1)............................................................................ 47

8 C.F.R. § 208.13(c)(2)............................................................................ 47

8 C.F.R. § 208.30(d) ............................................................................ 53, 54

8 C.F.R. § 208.30(f)............................................................................... 4, 59

8 C.F.R. § 208.31(a)............................................................................................................ 5

8 C.F.R. § 208.31(c)............................................................................................................ 5

8 C.F.R. § 208.31(e)............................................................................................................ 5

8 C.F.R. § 208.33(b)(2)(v).................................................................................................. 59

8 C.F.R. § 208.35(b)(2)(v).................................................................................................. 59

8 C.F.R. § 208.8(f)(1) ........................................................................................................ 48

8 C.F.R. § 208.13(c)........................................................................................................... 48

8 C.F.R. § 208.16–.18 ......................................................................................................... 3

8 C.F.R. § 208.2(a)............................................................................................................. 49

8 C.F.R. § 208.31 .............................................................................................................. 31

8 C.F.R. § 208.31(f) ............................................................................................................ 6

8 C.F.R. § 235.3(b)(4)(ii)......................................................................................... 55, 56, 57

8 C.F.R. § 1003.42(d) ............................................................................................... 7, 46, 62

x

**INTRODUCTION**

Plaintiffs—a single alien, E.Q., and three legal service organizations—bring this matter to challenge two significant rules: (1) the final rule *Application of Certain Mandatory Bars in Fear Screenings*, 89 Fed. Reg. 103,370 (Dec. 18, 2024) ("DHS Bars Final Rule" or "the Rule"), issued by the Department of Homeland Security ("DHS") after public notice and an opportunity to comment in *Application of Certain Mandatory Bars in Fear Screenings*, 89 Fed. Reg. 41, 347 (May 13, 2024); and (2) an interim final rule, issued by the Executive Office for Immigration Review ("EOIR"), *Clarification Regarding Bars to Eligibility During Credible Fear and Reasonable Fear Review*, 89 Fed. Reg. 105,392 (Dec. 27, 2024) ("EOIR Companion Rule"), (collectively, "the Rules"). It is well-acknowledged that regulatory agencies do not establish rules to last forever, and that agencies should be given "ample latitude" to "adapt their rules and policies to the demands of changing circumstances." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*"). These Rules were created to safeguard U.S. national security in an ever-changing immigration system by allowing DHS to more expeditiously remove aliens who are determined not to have the requisite fear of torture and who are clearly ineligible for asylum and withholding of removal because they pose safety and security threats to the American people and ensuring that EOIR's review properly accounts for that DHS procedure. As a result, these Rules strengthen the integrity of the expedited removal process and seek to alleviate new concerns afflicting the immigration system, such as the significant immigration court backlog.

Despite DHS and EOIR's clear authority and sound policy aims in instituting these Rules, Plaintiffs ask this Court to grant their motion for summary judgment and vacate the Rules. However, this Court should deny Plaintiffs' request for several reasons.

First and foremost, the Court lacks jurisdiction over not only Plaintiff E.Q.'s claim, but the organizational Plaintiffs' claims as well. As this Court previously found, Plaintiff E.Q. lacks standing because he cannot establish a causal connection between his alleged injury and the Rule, and his alleged injury cannot be redressed by a favorable judicial decision. ECF 35 at 13; ECF 41 at 6. Further, even if Plaintiff E.Q. did have standing before this Court, his claims are now moot. The organizational Plaintiffs in this matter also do not have standing because they fail to demonstrate a concrete injury. At the summary judgment stage, they may no longer rely on the thin thread of plausible allegations of harm this Court found saved them from a Rule 12 dismissal. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (finding that while at a pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice," on summary judgment, "the plaintiff can no longer rest on such 'mere allegations.'").

Even if the Court disagrees on standing, Plaintiffs' claims also fail on the merits. Plaintiffs fail to demonstrate that the Rules are contrary to the Immigration and Nationality Act ("INA"). Nor can Plaintiffs demonstrate that the Rules are arbitrary and capricious, because the agencies acted within "a zone of reasonableness" in promulgating the Rules. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Accordingly, this Court should grant summary judgment to Defendants, deny Plaintiffs' motion for summary judgment, and refuse to interfere with Plaintiff E.Q.'s expedited removal order.

## LEGAL AND PROCEDURAL BACKGROUND

### I. Statutory Framework

Asylum and Withholding of Removal. There are three primary forms of protection for aliens processed under Title 8 of the U.S. Code. First, asylum is a form of discretionary relief under the Immigration and Nationality Act ("INA"). 8 U.S.C. § 1158(a)(1); *INS v. Cardoza-Fonseca*,

480 U.S. 421, 444 (1987). To be eligible for asylum, an alien must show that they: (1) meet the definition of "refugee"—that they are unable or unwilling to return to their home country "because of persecution or a well-founded fear of persecution on account of" one of five enumerated protected grounds, 8 U.S.C. § 1158(b)(1)(A); (2) are not subject to an exception, mandatory condition, or bar that precludes applying for or receiving asylum, 8 U.S.C. §§ 1158(a)(2), (b)(2); and (3) merit a favorable exercise of discretion. 8 U.S.C. § 1158(b)(1)(A).

Per § 1158(b)(2)(A), asylum must be denied where an alien: (1) participated in the persecution of others on account of a protected ground; (2) has a conviction for a particularly serious crime; (3) committed a serious nonpolitical crime outside of the United States; (4) is a danger to the security of the United States; (5) has engaged in terrorist activity; or (6) was firmly resettled in another country prior to arriving in the United States.

In addition to asylum, other forms of protection from removal are withholding of removal under 8 U.S.C. § 1231(b)(3) and protection under the regulations implementing the United States' obligations under Article 3 of the Convention Against Torture ("CAT protection")[1]. 8 C.F.R. §§ 208.16–.18, 1208.16–.18. Both provisions are mandatory, not discretionary, and prohibit an alien's removal to a country where he or she more likely than not would be persecuted on account of a protected ground or tortured, respectively. *See Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013). Although a grant of withholding of removal is required where an alien establishes eligibility, like asylum there are also limits on that eligibility. Other than the firm resettlement bar, the mandatory bars for denying asylum generally apply to an individual's eligibility for withholding of removal. *See* 8 U.S.C. § 1231(b)(3)(B).

---

[1] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85 (entered into force for United States Nov. 20, 1994).

The Screening Process. Based on their specific circumstances, aliens may be subject to certain summary removal procedures. Certain arriving aliens and certain other aliens who have not been admitted or paroled and who have not shown that they have been physically present in the United States continuously for two years prior to the inadmissibility determination may be subject to expedited removal. 8 U.S.C. §§ 1225(b)(1)(A)(i), (iii)(II). Aliens who have not been admitted for lawful permanent residence and are convicted of an aggravated felony may be subject to "administrative removal." 8 U.S.C. § 1228(b). Other aliens who have a prior removal order and have reentered the United States illegally may have those removal orders reinstated. *See* 8 U.S.C. § 1231(a)(5). In all these instances, aliens who indicate a fear of persecution or returning to their country of removal receive screening interviews to determine whether they should be allowed to remain in the United States pending their application for asylum or related protection from removal, as applicable.

An alien in expedited removal proceedings under 8 U.S.C. § 1225(b)(1) who then indicates an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of returning to his or her country of removal will receive a "credible fear interview." 8 U.S.C. § 1225(b)(1)(A)(ii). In a credible fear interview, an asylum officer determines if the alien has established a credible fear, which is defined as a "significant possibility" that the alien "could establish eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v). If that alien receives a positive credible fear determination, his or her asylum claim may be heard by another asylum officer or he or she may be placed in removal proceedings before an Immigration Judge, where the alien may apply for asylum, withholding of removal, and/or protection under CAT. 8 C.F.R. § 208.30(f). If the alien receives a negative credible fear determination from the asylum officer, the alien may seek Immigration Judge review of that determination. 8 U.S.C. § 1225(b)(1)(B)(iii)(III). If the

Immigration Judge affirms the negative determination, or the alien declines to seek Immigration Judge review, the alien is ordered removed without further review. 8 U.S.C. § 1225(b)(1).

Aliens who have a reinstated removal order or who were convicted of an aggravated felony and have received a final administrative removal order from DHS, are not eligible for asylum. *See* 8 U.S.C. §§ 1228(b), 1231(a)(5), 1158(b)(2)(A)(ii), (B)(i). Aliens in these categories who express a fear of persecution or torture, or a fear of returning to their country or their country of removal will receive a "reasonable fear interview" rather than a credible fear interview. 8 C.F.R. § 208.31(a). The standard to establish a reasonable fear is significantly higher than that for a credible fear; instead of establishing "a significant possibility . . . that the alien could establish eligibility for asylum, 8 U.S.C. § 1225(b)(1)(B)(v), such aliens must establish a "reasonable possibility" of future persecution or torture on account of a protected ground in their country of removal. 8 C.F.R. § 208.31(c); *see* Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8485 (Feb. 19, 1999) (hereinafter "1999 CAT Rule") ("Because the standard for showing entitlement to these forms of protection (a probability of persecution or torture) is significantly higher than the standard for asylum (a well-founded fear of persecution), the screening standard adopted for initial consideration of withholding and deferral requests in these contexts is also higher.").

Like the credible fear process, all reasonable fear determinations are reviewed by a supervisory asylum officer "for procedural and substantive accuracy and completeness before becoming final." 89 Fed. Reg. 103,375. Further, if an asylum officer determines that an alien has established a reasonable fear of persecution or torture, the alien will be provided with an opportunity to seek withholding of removal and/or CAT protection before an Immigration Judge. 8 C.F.R. § 208.31(e). Yet, if the asylum officer determines that the alien has not established a

reasonable fear of persecution or torture, the alien is subject to immediate removal, but the asylum officer's negative determination "shall be subject to review by an immigration judge upon the alien's request." 8 C.F.R. §§ 208.31(f), (g).

The Rules. On May 13, 2024, DHS issued the DHS Bars Notice of Proposed Rulemaking. *See* 89 Fed. Reg. 41,347. After receiving and considering over 4,000 public comments, on December 18, 2024, DHS issued the DHS Bars Final Rule, which went into effect on January 17, 2025. 89 Fed. Reg. at 103,370. The DHS Bars Final Rule provides asylum officers conducting credible and reasonable fear interviews the discretion to "consider the applicability" of certain security-related bars to asylum and withholding eligibility if an alien appears to be subject to such a bar. *Id.*; 8 C.F.R. §§ 208.30(e)(5)(ii), 208.31(c). Specifically, the Rule allows asylum officers to consider the bars to asylum codified at 8 U.S.C. § 1158(b)(2)(A)(i) through (v), and to withholding of removal at 8 U.S.C. § 1231(b)(3)(B) where: (1) the alien "ordered, incited, assisted, or otherwise participated in the persecution of any person" "on account of" or "because of" a protected ground, 8 U.S.C. §§ 1158(b)(2)(A)(i), 1231(b)(2)(B)(i); (2) the alien has been convicted of a "particularly serious crime," 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1231(b)(2)(B)(ii); (3) "there are serious reasons to believe that the alien committed a serious nonpolitical crime outside the United States," 8 U.S.C. §§ 1158(b)(2)(A)(iii), 1231(b)(2)(B)(iii); (4) "there are reasonable grounds to believe that the alien is a danger to the security of the United States," 8 U.S.C. §§ 1158(b)(2)(A)(iv), 1231(b)(2)(B)(iv); and (5) the alien is described in certain terrorism-related provisions, 8 U.S.C. §§ 1158(b)(2)(A)(v), 1231(b)(2)(B). The Rule makes clear that asylum officers "will only consider a bar in those cases where there is easily verifiable (as opposed to unverified or difficult-to-verify) evidence available to the [asylum officer] that, in their discretion, warrants an inquiry into a bar, and the [asylum officer] can consider that bar efficiently at the screening stage." 89 Fed. Reg. at 103,376.

The EOIR Companion Rule, issued on December 27, 2024, made a technical amendment to EOIR's regulations, clarifying that an Immigration Judge's *de novo* review of an asylum officer's credible or reasonable fear determination shall also include review of the asylum officer's determination of the applicability of any mandatory bar to asylum and withholding of removal. *See generally* 89 Fed. Reg. 105,392; 8 C.F.R. §§ 1003.42(d), 1208.31(g). The IFR reiterates that "both the statute and the regulations contemplate that the immigration judge may make their ultimate de novo determination based on the record the asylum officer provides, as well as evidence or testimony that was not available to the asylum officer." 89 Fed. Reg. at 105,397 (citing 8 U.S.C. § 1225(b)(1)(B)(iii)(III) (explaining that a credible fear review ''shall include an opportunity for the [noncitizen] to be heard and questioned by the immigration judge. . . .''); 8 C.F.R. § 1003.42(d) (noting that, during a credible fear review, the immigration judge will ''tak[e] into account the credibility of the statements made by the [noncitizen] in support of the [noncitizen's] claim, and such other facts as are known to the immigration judge''); Immigration Court Practice Manual, Chapter 7.4(e)(4)(E) (October 25, 2023) (stating that, during a reasonable fear review, ''[e]ither party may introduce oral or written statements'')).

## II. Procedural History

On March 17, 2025, individual alien Plaintiff E.Q., and three organizational Plaintiffs—Amica Center for Immigrant Rights ("Amica"), Florence Immigration and Refugee Rights Project ("Florence"), and Refugee and Immigrant Center for Education and Legal Services ("RAICES") (altogether "Plaintiffs")—filed this suit challenging the DHS Bars Final Rule and EOIR Companion Rule. ECF 1, Complaint ("Compl.") at ¶¶ 12–16. In their Complaint, Plaintiffs allege that the Rules are arbitrary and capricious and not in accordance with the law in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(a). *Id*. at ¶ 8.

7

Plaintiff E.Q. Plaintiff E.Q. is a native of Afghanistan who received his first credible fear interview on February 4, 2025. Compl. ¶ 132; ECF 37-1 at 005–010, 013–042. Based on that interview, the asylum officer found E.Q. to be credible but issued a negative credible fear determination. ECF 37-1 at 005–009, 040–042. The asylum officer made findings regarding asylum, withholding of removal, and CAT. *Id*. at 040–042. First, the asylum officer found that E.Q. was likely subject to a limitation on asylum eligibility under the "Securing the Border Rule." *Id*. at 018–019, 041.[2] Second, the asylum officer found that E.Q. "failed to establish a reasonable probability of persecution or torture because he is subject to a mandatory bar." *Id*. at 005, 041. Regarding withholding of removal, the officer found that E.Q. had not established a reasonable probability of persecution. *Id*. at 040–041. The officer found no nexus between any feared persecution and a protected ground, which is necessary to establish a withholding of removal claim. *Id*. at 016, 041. In the officer's written analysis, he explained that E.Q. had not suffered past persecution as he had not been harmed or directly threatened in Afghanistan. Additionally, the officer found that E.Q failed to establish that he "would be harmed in the future due to a protected characteristic that he possesses." *Id*. at 041–042. The asylum officer's negative credible fear determination was affirmed by an Immigration Judge on February 25, 2025. *Id*. at 001–004.

On March 19, 2025, Plaintiff E.Q. filed an Emergency Motion to Stay Removal asserting that he faced imminent removal, but that he feared removal to Afghanistan or to a third country that may remove him to Afghanistan. ECF 8. However, after Defendants agreed to reconsider

---

[2] *See* 89 Fed. Reg. 81156, 81247 (Oct. 7, 2024). Plaintiffs do not challenge the Securing the Border Rule's reasonable probability standard, which another court in this District previously found lawful. *See Las Americas Immigr. Advoc. Ctr. v. DHS*, 783 F. Supp. 3d 200, 228 (D.D.C. May 9, 2025).

E.Q.'s credible fear determination through a follow-up credible fear interview, the Parties agreed that briefing on the Emergency Motion should be held in abeyance. ECF 18.

On April 14, 2025, E.Q. received a second credible fear interview. ECF 24-2 at 11. The asylum officer again issued a negative credible fear finding but based this finding on the inconsistencies between E.Q.'s statements in his first and second interviews. *Id*. at 2, 14–15. On May 9, 2025, an Immigration Judge affirmed the second negative credible fear determination. ECF 30 at 4. As a result, the Immigration Judge returned the case to DHS for E.Q.'s removal. *Id*. at 5.

After this new determination, Plaintiff E.Q. filed another Emergency Motion to Stay Removal on May 13, 2025, again asserting that he could be removed imminently. ECF 23. Defendants opposed and, on June 12, 2025, the Court issued a memorandum opinion and order denying Plaintiffs' motion to stay E.Q.'s removal. ECF 35 at 19. In its opinion, the Court concluded that E.Q. had not shown a likelihood of success on the merits as he appeared to lack standing. *Id*. at 12. Specifically, the Court found that E.Q.'s alleged injury—his first negative credible-fear determination and associated removal order—was not fairly traceable to the Rule as the Rule was just one justification for his negative credible-fear determination, and not a but-for cause. *Id*. at 13. Instead, E.Q.'s failure to establish future persecution because of a protected ground—the no-nexus finding— "provided an independent and sufficient legal basis to support the determination." *Id*. Additionally, the court found that E.Q.'s injury was not likely redressable because even without the Rule, E.Q. would still be denied asylum because he failed to establish nexus. *Id*.

On June 26, 2025, the Court re-affirmed its finding that E.Q. lacks standing in denying Plaintiffs' emergency motion to alter its order denying E.Q.'s stay motion. *See* ECF 36; ECF 41. In that order, the Court rejected Plaintiffs' argument that the Immigration Judge's decision failed

9

to show that it did not rely solely on the Rule. *Id*. at 5 The Court found instead that "[t]he IJ decision simply affirmed the asylum officer's determination that E.Q. 'had not established a reasonable possibility of persecution.' [] The Court reads this decision to affirm the asylum officer's denial of relief on both grounds: the no-nexus finding and the application of the mandatory bars." *Id*.

On July 14, 2025, Defendants filed a Motion to Dismiss for lack of subject-matter jurisdiction and Plaintiffs' failure to state a claim. ECF 42. In their motion, Defendants argued that E.Q. did not have standing to challenge the Rule and that his claims were moot as he received a second credible fear interview. *Id*. at 13–15. Additionally, Defendants asserted that the organizational Plaintiffs did not plead a cognizable injury and that the organizations additionally lacked standing to challenge the Rule. *Id*. at 16–22. Defendants further asserted that the organizational Plaintiffs lacked associational or third-party standing and are also outside the zone of interests. *Id*. at 22–25. Defendants argued that the organizational Plaintiffs could not challenge the reasonable fear provisions of the Rule because Plaintiff E.Q. was not subject to the reasonable fear provisions and the INA precludes review in suits brought under the APA by Plaintiff organizations. *Id*. at 25–27. Lastly, Defendants asserted that the Rule is consistent with the INA and is not arbitrary and capricious. *Id*. at 27–38.

On August 29, 2025, Plaintiffs filed their Opposition to Defendants' Motion to Dismiss. ECF 44. In their opposition, Plaintiffs argued that Plaintiff E.Q. has standing to challenge the Rule because the Form I-869 in his credible fear packet reflected "a denial solely based on mandatory bars[.]" *Id*. at 11. Plaintiffs asserted that the Form I-869 is the "controlling document regarding the reason for [a] negative [credible fear] determination[]" based on a declaration from a former senior asylum officer at USCIS. *Id*. at 11–12. Plaintiffs also argued that Plaintiff E.Q.'s claims are not

10

moot as Defendants' actions implicated the voluntary cessation doctrine and that Defendants must show that it is "*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Id*. at 18–22 (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000)). Plaintiffs asserted that the organizational Plaintiffs have Article III standing as there is a cognizable injury where the Rule directly affected and interfered with their core business activities. *Id*. at 18–23. The organizational Plaintiffs additionally discussed that they are within the zone of interests of the INA and that they may challenge the reasonable fear portion of the Rule. *Id*. at 24–28.

Following a hearing on Defendants' Motion to Dismiss, on March 31, 2026, the Court issued a Memorandum Opinion and Order denying in part and striking in part Defendants' Motion to Dismiss. ECF 49, Public Version of the Court's Memorandum Opinion and Order Denying Defendants' Motion to Dismiss. Specifically, the Court found that—with the declaration submitted by Plaintiffs from a former senior asylum officer—Plaintiffs' argument that "the agency's negative credible fear decision [. . .] was based on the mandatory bars and *not* the no-nexus finding strikes the Court as at least plausible." *Id*. at 19 (emphasis in original). The Court also elected to defer a ruling on the mootness of Plaintiff E.Q.'s claims until the summary judgment phase, and as such, struck that portion of the pending motion to dismiss. *Id*. at 20–23. Regarding organizational Plaintiffs, the Court found that Plaintiffs adequately demonstrated that the organizations' core activities, providing legal services to detained noncitizens, will be "materially impaired by the government's new regulations." *Id*. at 23–27. As such, the Court found that at "this early stage in the case," the organizational Plaintiffs carried their standing burden. *Id*. at 30. Lastly, the Court found that Plaintiffs fell within the zone-of-interests protected by provisions of the INA, and that the Rule's reasonable fear provisions are not insulated from review by the INA. *Id*. at 30–34.

11

Consequently, following the Court's Order, on April 17, 2026, Defendants submitted the Administrative Records in this matter to Plaintiffs. ECF 53. On June 18, 2026, Plaintiffs filed their Motion for Summary Judgment ("Pls' Motion"), ECF 54. In their motion, Plaintiffs assert that the Court has jurisdiction over both Plaintiff E.Q.'s and the organizational Plaintiffs' claims. Pls' Motion at 13–25. Plaintiffs additionally argue that the Rules are contrary to the INA because they (1) deny individuals with a credible fear the right to apply for asylum in full removal proceedings; (2) allow claims to be denied on the basis of DHS employees' "predictions that a bar might apply rather than a final determination that a bar does apply;" and (3) impermissibly delegate to DHS authority that Congress exclusively reserved to the Attorney General. *Id*. at 25–32. Plaintiffs additionally argue that the Rules are arbitrary and capricious and violate the APA because they (1) rest on a core assumption that is inconsistent with the Rule's text; (2) fail to acknowledge or explain Defendants' change in position; (3) rest on assertions that are contrary to the record; (4) fail to consider fairness and the unreliability of much bars-related evidence, and (5) fail to consider the effect of contemporaneous and interrelated policies. *Id*. at 32–45.

## STANDARD OF REVIEW

Summary judgment under Fed. R. Civ. P. 56 is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the standard of review under the APA. *See Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F. Supp. 2d 42, 52 (D.D.C. 2010). Under Fed. R. Civ. P. 56(c), summary judgment is normally appropriate "when the pleadings and the evidence demonstrate that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law[,]'" *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. Oct. 25, 2006). However, due to the "limited role of a court in reviewing the administrative record," Rule 56's typical summary judgment standards do not apply in matters involving review of a final agency action under the APA. *Id*.

12

(noting that but that standard does not apply; *see also* Comment to Local Civil Rule 7(h) (clarifying that a statement of material facts as to which the moving party contends there is no genuine issue is not necessary in cases in which judicial review is based solely on the administrative record).

In matters such as that present here, the APA provides the standard for judicial review of final agency actions. *See* 5 U.S.C. §§ 702, 704. Under the APA, the Court can set aside agency actions, findings, and conclusions that it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). This is a "highly deferential" standard, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007), which "presume[s] the validity of agency action." *Southwestern Bell Tel. Co. v. FCC*, 168 F.3d 1344, 1352 (D.C. Cir. 1999). This standard precludes the Court from substituting its judgment for that of the agency, even if the Court might find contrary views more persuasive. *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989); *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009). The Court "will not disturb the decision of an agency that has examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Americans for Safe Access v. DEA*, 706 F.3d 438, 449 (D.C. Cir. 2013) (quotations and citation omitted). A court's reversal of an agency's decision, therefore, is appropriate only where the decision was not "based on a consideration of the relevant factors" or where there "has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). The plaintiff bears the burden of establishing the invalidity of the agency's action. *Fulbright v. McHugh*, 67 F. Supp. 81, 89 (D.D.C. 2014) (citation omitted).

13

## ARGUMENT

### I.    The Court Lacks Jurisdiction Over All Plaintiffs' Claims.

This Court lacks jurisdiction over not only Plaintiff E.Q.'s claims, but the organizational Plaintiffs' claims as well. Plaintiff E.Q. does not have Article III standing because, as this Court already found, he cannot establish a "causal connection" between his injury and the Rule, and his injury cannot be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61; ECF 35 at 16–18. Additionally, even if Plaintiff E.Q. could establish a redressable injury from his first interview, that claim is now moot because he received a second credible fear interview; and the voluntary-cessation exception to mootness does not apply here. Lastly, the organizational Plaintiffs fail to demonstrate a concrete injury to establish standing, and the organizational Plaintiffs are outside the zones of interest of the relevant statutes.

### A.  Plaintiff E.Q. Cannot Establish Article III Standing.

Standing is a core component of the Article III case or controversy requirement. *Lujan*, 504 U.S. at 560. Standing is the "personal interest that must exist at the commencement of the litigation[,]" and must continue throughout the existence of the litigation. *Friends of the Earth, Inc.*, 528 U.S. at 189. To satisfy standing, a plaintiff must demonstrate that he has: "(1) an 'injury in fact' that is 'concrete and particularized' as well as 'actual or imminent'; (2) a 'causal connection' between the injury and the challenged conduct; and (3) a likelihood, as opposed to mere speculation, 'that the injury will be redressed by a favorable decision." *Ark Initiative v. Tidwell*, 749 F.3d 1071, 1075 (D.C. Cir. 2014). A plaintiff "invoking federal jurisdiction bears the burden of establishing its existence," specifically to include these requirements for standing. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998); *Lujan*, 504 U.S. at 561. While at a pleading stage, "general factual allegations of injury resulting from the defendant's conduct may

14

suffice," on summary judgment, "the plaintiff can no longer rest on such 'mere allegations.'" *Id.* at 561.

As this Court previously found, Plaintiff E.Q. likely lacks the requisite personal interest needed to establish standing in this litigation. ECF 35 at 13; ECF 41. In particular, where the asylum officer's negative credible fear determination included the legally independent basis that Plaintiff E.Q. failed to establish a nexus, he cannot demonstrate a "causal connection" between his injury—a negative credible fear determination—and the challenged action of the Defendants—the application of the Rules. *Lujan*, 504 U.S. at 560; ECF 35 at 16–18. Plaintiffs erroneously assert that the Form I-869 stated that "the mandatory bars were the sole basis for [E.Q.'s] credible fear determination." Pls' Motion at 14. Plaintiffs base this assertion on the declarations of two former asylum officers who claim that the Form I-869 is the controlling document for a negative credible fear determination and that the Form serves to formally identify the grounds for the determination. *See id.* (citing ECF 44-1 (Decl. of Amanda Caroline Meadow); ECF 54-2 (Decl. of Jason Daniel Marks)). However, as the Court previously found, "[n]othing in the statutes, regulations, or caselaw indicates that [a] Form I-869 has special force." ECF 34 at 14.

Notably, Plaintiffs improperly submit Attorney Marks' Declaration as "record evidence," despite making no effort to establish a need for evidence outside of the administrative record. Pls' Motion at 14; *see Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("As with all APA cases, the Court's review of the agency's action is limited to the administrative record."). Only when there is "such a failure to explain administrative action as to frustrate effective judicial review," a court may "obtain from the agency, either through affidavits or testimony, such additional explanations of the reasons for the agency decision as may prove necessary." *Id.* at 143.

15

Here, Plaintiffs offer undisclosed expert testimony on the premise that it "establishes that Form I-869 'is the controlling document regarding the reason for [a] negative [credible fear] determination.'" Pls' Motion at 14. But these Declarations go much farther, arguing the merits of the agency's decision. Attorney Marks explains, "[a]pplying [his experience as an asylum adjudicator] here to the documents in E.Q.'s specific case, I evaluated whether the findings reflected in the Forms I-869 and I-870 were supported by the factual development reflected in the interview notes and related adjudicative materials." ECF No. 54-2 at ¶¶ 29, 30-35 (assessing merits of the agency's credible fear analysis); *see id* at ¶ 30 (". . . the testimony reflected in E.Q.'s interview notes would ordinarily be insufficient to support the 'No Nexus' finding . . ."); *id*. at ¶¶ 36-53 (assessing the merits of the mandatory bars analysis). The Meadow Declaration similarly assesses the merits of the agency's decision rather than discuss the significance of the I-869. *See, e.g.*, ECF 44-1 at ¶ 12 ("Although the checklist does include a brief mention of other potential bases for denial of the claim, the reasoning for those bases is incomplete and not adequate to serve as legally sufficient to deny the applicant's claim."). The Court should strike the Marks and Meadow Declarations for this reason alone.

However, the Marks Declaration and Plaintiffs also fail to disclose that Attorney Marks is an expert witness and asylum advocate. *See* Jason Marks, Featured Media & Expert Analysis, Expert Work, https://jasonmarksadvocacy.com/ (last visited July 28, 2026) (touting "Complex asylum and refugee matters: strategic attorney consultations, case assessment, expert declarations, litigation support, record review, mock interviews, professional training, CLEs, and operational analysis."). Attorney Marks's website provides a link to his declaration submitted in this case, describing it as an "Expert declaration in federal litigation challenging a new DHS rule that allows asylum seekers to be denied during their initial screening based on complex legal bars—before

they can fully present their claims." *Id*. But his Declaration informs this Court only that he is "an attorney admitted to the State Bar of California in 2008," and makes no mention of his extensive asylum and refugee advocacy work as an expert witness nor of his bias towards Plaintiffs' claims. ECF 54-2 at 1. This deliberate obfuscation of his credentials and bias and Plaintiffs' failure to disclose him as an expert witness should, at a minimum, give the Court pause in considering the value of his opinion on the relevance of the Form I-869.

Ultimately, though, Attorney Marks' Declaration contradicts Plaintiffs' assertion that the I-869 is the sole document determining the grounds for a denial. Instead, Attorney Marks explains that, "[a]pplying the review framework described above, in my experience, adjudicators, trainers, and supervisors would assess the Form I-870 (including any relevant iteration like I-870SB), Form I-869, credible fear determination worksheet, Securing the Border reasonable probability determination checklist and accompanying written analysis, the asylum officer's interview notes, and related adjudicative materials as a single adjudicative packet *rather than assessing any individual document in isolation*." *Id*. at 28 (emphasis added). Attorney Meadow, herself an "immigration law expert" and asylum advocate,[3] also notes the intertwining nature of the various documents in the asylum decision packet. ECF 44-1 at ¶ 8 ("The reason for the denial is analyzed in either a Reasonable Possibility or Reasonable Probability checklist ('the checklist'), which must explain why the decision is legally sufficient, and then indicated on the I-869."). Her ultimate conclusion that the I-869 is the most important document appears to be mainly based on its position at the front of the packet. *Id*. at ¶ 11. Thus, the Court should strike Plaintiffs' extra-record affidavits

---

[3] *See* Alonso & Alonso, About Us, https://alonsoandalonsolaw.com/en/about-us/ (last visited July 28, 2026).

as improperly submitted and for addressing the merits instead of the question of the I-869's relative importance. If not, the Court should find the affidavits contradict Plaintiffs' claim.

In response to Plaintiffs' inappropriate extra-record submissions, Defendants provide further support for the Court's determination that the I-869 holds no particular significance through a Declaration from USCIS Associate District Director Simone Grant. Defs' Exh. A, Declaration of Simone Grant; *see Camp*, 411 U.S. at 143 (court may "obtain from the agency . . . such additional explanations of the reasons for the agency decision as may prove necessary."); *see also* ECF 35 at 19 ("Plaintiffs' suggestion that Form I-869 somehow overrides the findings and explanation in the rest of the record finds no support. Nothing in the statutes, regulations, or caselaw indicates that Form I-869 has special force.").

Based on her 14 years of experience in DHS/USCIS, Ms. Grant notes that a credible fear determination packet contains eight different documents, including both a Form I-869 and I-870. *Id*. at 2. Ms. Grant writes that the "primary document" for asylum officers "to document the legal justification for a [credible fear] determination" is the credible fear determination checklist and written analysis. *Id*. This checklist is always submitted to the Immigration Judge for a review of the asylum officer's determination, and for a negative credible fear determination, the checklist requires asylum officers "to assess the outcome determinative element[;]" for example, an asylum officer would provide a written analysis about nexus if an alien failed to meet their burden on that point. *Id*. Yet, contrary to Plaintiffs' assertions, Ms. Grant states that the Form I-869 "serves to notify *the alien*" of the negative credible fear determination, and to record whether he or she is requesting review by an Immigration Judge. *Id*. at 3 (emphasis added). Asylum officers can only select one reason why an alien failed to meet his/her burden on a I-869; even if there are multiple reasons the alien's claim failed, asylum officers "can only select one reason that the claim fails for

persecution or torture on the Form I-869." *Id*. As a result, the reason the asylum officer selects on the I-869 is generally the strongest reason why the alien failed to meet their burden, and asylum officers are then instructed to explain "any additional reasons on the CF checklist." *Id*.

Ms. Grant also conducted a review of E.Q.'s credible fear determination packet for his first credible fear interview. *Id*. at 4. She noted that the asylum officer included written analysis in the credible fear checklist to document their findings that (1) E.Q. did not show his harm rises to the level of persecution; (2) E.Q. did not show that he would suffer harm in the future on the account of a protected characteristic he possesses; and (3) E.Q. was subject to a mandatory bar. *Id*. In E.Q.'s situation, based on the credible fear checklist and the written analysis, Ms. Grant concludes that the asylum officer's written analysis on the credible fear checklist "clearly reflects that *one of the reasons* for the negative determination was that [E.Q.] failed to meet his burden regarding nexus." *Id*. (emphasis added).

As such, Ms. Grant's Declaration confirms that E.Q.'s removal order does not have a "causal connection" to the Rule. *Lujan*, 504 U.S. at 560. Instead, the Rule was just *one* justification for E.Q.'s removal, and as Ms. Grant noted, the credible fear packet[4] clearly shows that another reason for E.Q.'s negative credible fear determination and subsequent removal order was that E.Q. failed to meet his burden regarding nexus. Exh. A at 4. As such, as this Court has already found, Plaintiff E.Q.'s first negative credible fear determination rested not solely on the challenged Rule, but also on the independently dispositive no-nexus finding. ECF 40 at 18 ("As explained above,

---

[4] Defendants note that the credible fear packet presented to the Immigration Judge for review of E.Q.'s first negative credible fear determination included the Form I-869, Form I-863, List of Pro Bono Legal Service Providers, Form I-860, Form I-870, the asylum officer interview notes, and the credible fear determination checklist and written analysis. *See* ECF 24-1. On February 25, 2025, based on this record, the Immigration Judge affirmed the negative determination. ECF 37-1 at 001–004.

E.Q.'s negative credible-fear determination rested on two independent grounds, only one of which is tied to the challenged Rules."); ECF 49 at 16 (noting that this Court concluded in both its decision on the motion to stay E.Q.'s removal and in a motion to reconsider that decision "that E.Q. likely lacked standing because there was an independent and sufficient ground for his negative credible fear determination: the no-nexus finding on the Form I-870[.]"). As such, E.Q. lacks the requisite personal interest needed to establish standing in this litigation.

Lastly, even if Plaintiff E.Q. could establish a redressable injury from his first interview, the second credible fear interview on April 14, 2025, where the asylum officer issued a negative credible fear determination based on E.Q.'s inconsistent testimony nevertheless moots his claims, and subsequently this issue. ECF 24-2 at 11; *see infra* Part I(C).

### B. Plaintiff E.Q. Has Not Sufficiently Established a Procedural Injury.

Plaintiffs further assert that Plaintiff E.Q. would still have standing as the application of the "unlawful" Rule and the imposition of the burden of proof on E.Q. to demonstrate that a mandatory bar does not apply "are procedural injuries that turn on the fact that 'DHS failed to comply with required procedures in making its determination.'" Pls' Motion at 16.

Where plaintiffs sue based on a "procedural injury," the Court "relax[es] the redressability and imminence requirements" for standing. *Ctr. for Biological Diversity v. Env't Prot. Agency*, 861 F.3d 174, 182 (D.C. Cir. 2017) (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)). Plaintiffs in a procedural-rights case "may proceed under the relaxed standard when 'a statute affords [the] litigant 'a procedural right to protect his concrete interests.'" *Citizens for Const. Integrity v. Census Bureau*, 115 F.4th 618, 625 (D.C. Cir. 2024) ("*CCI*") (quoting *Dept. of Education v. Brown*, 600 U.S. 551, 561 (2023)). As such, to establish an imminent injury premised on a procedural harm sufficient to sustain Article III standing, plaintiffs must "show both

20

(i) a substantially increased risk of harm and (ii) a substantial probability of harm with that increase taken into account" resulting from the challenged agency action or inaction. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015).

As this Court previously noted, in considering *CCI*, "[t]he application of a specific, substantive rule during an agency adjudication is not *self-evidently a procedural injury*." ECF 49 at 17 (emphasis added). In *CCI*, the circuit court acknowledged that there is "no established test . . . for determining whether a claimed right is procedural or not," but instead "suggested that where the 'heart' of a 'challenge is substantive' in nature—*i.e.*, where it focuses less on the agency's conduct from an 'operational standpoint' and more on the impact of the agency's conduct on the 'rights and interests' of particular beneficiaries or constituencies—the challenge does not implicate a strictly procedural right." *Id*. (quoting *CCI*, 115 F.4th at 625–26).

Plaintiffs cite several cases to support their argument that the D.C. Circuit regularly engages in arbitrary and capricious review in the context of procedural injuries. Pls' Motion at 18. However, the matter at hand is distinguishable from the cases Plaintiffs cite. Those cases all center around complaints that the relevant agencies failed to conduct a particular step or process required by a policy. For example, *International Dark-Sky Association, Inc. v. Federal Communications Commission*, concerns a request for a review of a license issued by the Federal Communications Commission ("FCC") for a new satellite system. 106 F.4th 1206 (D.C. Cir. 2024). The plaintiffs alleged that the FCC "did not adequately consider the risk of signal interference with other satellites" and objected to the FCC's decision not to perform an environmental review, which the plaintiffs assert was a requirement per the National Environmental Policy Act. *Id*. at 1211–12. The Court found that the plaintiffs demonstrated a procedural injury because if the FCC switched course and performed an environmental review, the FCC could change its position and deny the

license on remand, reducing the alleged harms. *Id*. at 1218. Similarly, the plaintiffs in *Growth Energy v. Environmental Protection Agency* ("EPA"), alleged that the EPA failed to consult with the U.S. Fish and Wildlife Service and National Marine Fisheries Service when making a rule regarding renewable fuel. 5 F.4th 1, 27 (D.C. Cir. 2021). These cases are distinct from the challenge at issue here, which focuses not on the agency's conduct from an "operational standpoint" but on the impact of the agency's conduct on the "rights and interests" of Plaintiff E.Q. *See CCI*, 115 F.4th at 625–26.

Consequently, Plaintiffs assert the D.C. Circuit's ruling in *CCI* "has no purchase here[,]" because Plaintiff E.Q. "does *not* contest whether Defendants reached the correct conclusion in his credible fear interview[,]" but instead that "by using the Rule[] to consider the bars in [E.Q.'s] interview, Defendants used an unlawful procedure." Pls' Motion at 17. Yet, this Court already found that "E.Q.'s injury appears substantive, rather than procedural, because the gravamen of his alleged harm goes *directly to his rights and interests as an asylum seeker*." ECF 49 at 17–18 (emphasis added). As such, Plaintiff E.Q.'s challenge "does not implicate a strictly procedural right." *CCI*, 115 F.4th at 626; *see also* ECF 49 at 17–18. Thus, Plaintiff E.Q.'s assertion of a procedural injury lacks merit, and he cannot meet the Article III standing requirements.

### C. Plaintiff E.Q.'s Claims are Moot, and the Voluntary Cessation Exception Does Not Apply.

Even if Plaintiff E.Q. could establish standing at the time he filed this action, his claims would now be moot. Plaintiff E.Q. received a second credible fear interview on April 14, 2025, where the Rule was not applied to him. *See* ECF 24-2 at 11. The findings from that second interview—that Plaintiff E.Q. provided testimony that was not credible under the totality of the circumstances and no non-testimonial evidence established a reasonable probability of persecution or torture—were reached entirely independent of the Rule, and Plaintiffs allege no errors or injuries

from that decision. ECF 24-2 at 2, 63–65. Because an order vacating the Rule would do nothing to alter the determination from the second interview, Plaintiff E.Q. no longer has a redressable injury and his claim is moot. *See* ECF 49 at 21 (noting that the asylum officer's determination at the second interview "did not purport to rest on the consideration of the mandatory bars in E.Q.'s first interview[,]" and "[a]s such, the Court is not convinced that the information unearthed in the first interview is somehow tainted by the Rules or [the asylum officer's] findings in the first interview.").

Mootness goes to a Court's subject matter jurisdiction, as a federal court's constitutional authority to decide cases extends only to live cases or controversies. *Iron Arrow Honor Society v. Heckler*, 464 U.S. 67, 70 (1983). The Supreme Court has "repeatedly held that an 'actual controversy' must exist *not only* 'at the time the complaint is filed,' but through 'all stages' of the litigation." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013) (emphasis added) (quoting *Alvarez v. Smith*, 558 U.S. 87, 92 (2009)). A claim may be rendered moot by "[a]n intervening factual event" that "may . . . deprive[] the plaintiff of a present right to be vindicated or cause[] the plaintiff to no longer have a stake in the outcome of the litigation." *Thorndyke v. Washington*, 224 F. Supp. 2d 72, 74 (D.D.C. 2002).

Plaintiff E.Q.'s claim is moot because, in the follow-up credible fear interview, the asylum officer did not apply the challenged Rule to E.Q.'s case at all. ECF 24-2 at 14–15. While the asylum officer issued a second negative credible fear determination, this determination was based on the inconsistencies between E.Q.'s statements in his first and second interviews. *Id*. at 2, 14–15. The asylum officer laid out four main credibility concerns. *Id*. at 63–65. First, the asylum officer had concerns about specific details in Plaintiff E.Q.'s testimony about why he fled his home country; in E.Q.'s second interview, he testified for the first time that he left Afghanistan because

23

of a summons the Taliban sent to his home, information that was omitted in his first interview. *Id*. at 63. The asylum officer found E.Q.'s explanation that he omitted this information from his first interview because he was "stressed" to be not reasonable because E.Q. did recall other details during his first credible fear interview. *Id*. Second, the asylum officer was concerned regarding the lack of detail in E.Q.'s testimony about allegedly receiving that summons from the Taliban; for example, E.Q. could not recall the exact date or month the summons directed him to report to local law enforcement. *Id*. The asylum officer noted that E.Q. found this event to be "so fundamental to his claim that it caused him to alter his life, go into hiding, and eventually flee the country." *Id*. As such, the asylum officer found that E.Q.'s testimony "calls into question whether [he] ever received a summons to report to the Taliban." *Id*. Third, the asylum officer found E.Q.'s testimony at the second interview about his previous employment to be lacking in detail; for example, E.Q. could not recall the date or month he stopped working at his prior employment. *Id*. at 64. The asylum officer noted that E.Q. remembered the time and date of other events, and it was reasonable to expect E.Q. to remember "basic details" such as what month he stopped working in Afghanistan. *Id*. Fourth, the asylum officer noted that in his second interview, E.Q. testified that he was not present when the Taliban went to his home as he was in hiding right after he received the summons from the Taliban. *Id*. However, this contrasts with E.Q.'s testimony at his first interview, where he testified about specific details regarding this encounter, as if he had personally been there when the Taliban arrived at his home. *Id*. For example, E.Q. knew what the Taliban seized, and what they were investigating; E.Q. also stated that the Taliban knocked at his door and "once 'we' answered they came in[.]" *Id*. The asylum officer found E.Q.'s explanation for this discrepancy— that he meant to include in his first credible fear interview that his mother opened the door to his home—to be unpersuasive and not reasonable. *Id*. at 4–5.

Thus, the asylum officer's notes detailing the reasoning for his negative fear determination show independent findings that were completely unconnected from the Rule. Instead, the asylum officer simply found that E.Q. was not credible, and that he had not established a credible fear of persecution or torture. *Id*. at 14–15, 63–65. As such, Plaintiff E.Q. lacks "a legally cognizable interest in the outcome" of this matter, and his claims are moot.[5] *Already, LLC*, 568 U.S. at 91.

Plaintiffs claim an exception to mootness here: that Defendants voluntarily ceased applying the mandatory bar and so must show it is "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Pls' Motion at 20 (citing *Friends of the Earth,* 528 U.S. at 190). Plaintiffs misstate the burden *Friends of the Earth* sets in this case, as explained in more detail below, but are also incorrect that the voluntary cessation exception to mootness applies at all.

The voluntary cessation exception "exists where a party has extinguished the controversy by voluntarily changing its allegedly unlawful conduct after the commencement of a lawsuit." *DL v. District of Columbia*, 187 F. Supp. 3d 1, 6 (D.D.C. 2016). The "heightened voluntary-cessation standard is grounded in concerns that a party may be manipulating 'the judicial process through the false pretense of singlehandedly ending a dispute.'" *Pub. Citizen v. FERC*, 92 F.4th 1124, 1127–28 (D.C. Cir. 2024).  As such, a party's voluntary cessation of a challenged practice will moot a case only if (1) "there is no reasonable expectation that the alleged violation will recur," and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Young v. D.C. Housing Auth.*, 31 F. Supp. 3d 90, 96 (D.D.C. 2014). Further,

---

[5] The Court indicated in its March 31, 2026 Memorandum Opinion and Order that the Court would tend to agree with the Defendants that Plaintiff E.Q.'s claims for relief were mooted by his second negative fear determination if the voluntary cessation exception does not apply. ECF 49 at 20–23. Plaintiffs' motion does not overcome the Court's reasoning.

"[t]he party asserting mootness bears the burden . . . and it is a 'heavy' one." *Citizens for Resp. & Ethics in Washington v. Wheeler*, 352 F. Supp. 3d 1, 13 (D.D.C. 2019).

Plaintiffs' assertion that this matter is a "paradigmatic example of voluntary cessation" is wrong. Pls' Motion at 19. As the D.C. Circuit has explained, the voluntary cessation exception "exists for cases *in which a party voluntarily ceases the challenged activity*." 92 F.4th at 1128 (emphasis added). But Defendants have not ceased enforcing the DHS Bars Final Rule at all—and the outcome of Plaintiff E.Q.'s second interview was by no means a "false pretense of singlehandedly ending a dispute." *Pub. Citizen*, 92 F.4th at 1127–28. Rather, the denial decision was based entirely on evidence developed in the second interview by Plaintiff E.Q. himself, evidence Plaintiffs do not dispute here. As such, Plaintiff himself failed to establish potential eligibility for relief and Defendants had no reason to invoke the Rule. It was this change in factual circumstances that mooted E.Q.'s claim. *Thorndyk*, 224 F. Supp. 2d at 74. As such, Defendants have not "extinguished the controversy by voluntarily changing [their] allegedly unlawful conduct after the commencement of [this] lawsuit." *DL v. District of Columbia*, 187 F. Supp. 3d 1, 6 (D.D.C. 2016).

Despite Plaintiffs' characterization otherwise, "[t]he voluntary-cessation doctrine . . . does not apply automatically whenever the prospect of mootness is raised by a party's voluntary conduct." *Samma v. Department of Defense*, 136 F.4th 1108, 1113 (D.C. Cir. 2025) (quoting *Pub. Citizen*, 92 F.4th at 1128); *Pub. Citizen*, 92 F.4th at 1128 ("[C]ourts have declined to apply the [voluntary cessation] doctrine when the facts do not suggest any 'arguable manipulation of our jurisdiction.'") (quoting *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 (2001)). Because the second credible fear interview resulted in a denial on new grounds arising out of

26

Plaintiff E.Q.'s own testimony, a change in factual circumstances, Plaintiffs cannot show a manipulation of the Court's jurisdiction—and the voluntary cessation doctrine does not apply.

Furthermore, because Plaintiff E.Q.'s lack of credibility (a finding Plaintiffs do not challenge here) may be considered in future interviews, *see* 8 U.S.C. § 1158(b)(1)(B)(iii), Defendants would likely have no reason in the future to invoke the Rule again if he receives another interview.[6] Thus, the second credible fear interview "completely and irrevocably eradicated the effects of the alleged violation." *Aref v. Lynch*, 833 F.3d 242, 251 (D.C. Cir. Aug. 19, 2016).

Plaintiffs attempt to refute the effect of the second interview by characterizing it as a "continuation" of the first interview, noting "the outcome of the second interview rests solely on supposed inconsistencies between statements E.Q. made in the first and second interviews." Pls' Motion at 21. Though this claim is irrelevant, Plaintiffs are correct that the second interview compared his responses from the first interview, but incorrect that it was improper to do so.

Notably, Plaintiffs do not challenge the substance of the first interview, only the application of the Rule at the end to deny relief. *See, e.g.*, Pls' Motion at 16 ("Both the application of the unlawful Rules and the imposition of that impossible burden are procedural injuries that turn not on the substantive outcome but on the fact that 'DHS failed to comply with required procedures in making its determination.'") (citation omitted); *id.* ("a favorable decision by this Court would redress E.Q.'s injury by vacating the Rules and declaring them unlawful."). Plaintiffs otherwise provide no reason why the officer conducting the second interview should not consider the responses given in the first interview. Indeed, consistency (or inconsistency) of answers among

---

[6] As explained more below, even another theoretical interview would be for different relief and under a different burden, such that "there is no reasonable expectation that the alleged violation will recur." *Young*, 31 F.Supp.3d at 96.

oral and written responses over time is key to determining an asylum applicant's credibility. *See* 8 U.S.C. § 1158(b)(1)(B)(iii) ("[A] trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements . . ."); *see also Cordero-Chavez v. Garland*, 50 F.4th 492, 496 (5th Cir. 2022) ("When making adverse credibility determinations 'an IJ may rely on any inconsistency or omission.' [. . .] This includes inconsistencies between the applicant's statements made at a credible-fear interview, during her testimony, and on her asylum application.") (emphasis in original) (internal citation omitted); *Gurung v. Sessions*, 704 Fed. App'x. 19, 20–21 (2d Cir. 2017) ("First, the agency did not err by relying on Gurung's credible fear interview record. [. . .] 'Where the record of a credible fear interview displays the hallmarks of reliability, it appropriately can be considered in assessing an alien's credibility.'") (citation omitted); *Dian Chun Jiang v. U.S. Atty. Gen.*, 222 Fed. App'x. 922, 924, 2007 WL 906421, at \*2 (11th Cir. 2007) ("Here, the IJ provided specific, cogent reasons for his adverse credibility determination, pointing to inconsistencies and discrepancies in Petitioner's testimony at the asylum hearing and in the statements he made during his credible fear interview.").[7]

Thus, the second credible fear determination was legally sufficient based on the inconsistencies in Plaintiff E.Q.'s testimony when compared to his testimony at a separate event—

---

[7] Circuit cases addressing an asylum applicant's credibility are almost exclusively channeled through the petition for review process after a positive credible fear determination followed by a merits hearing in a removal proceeding before an Immigration Judge, and then consideration by the Board of Immigration Appeals. *See* 8 U.S.C. §§ 1158, 1229a, 1252. While the cited cases do not speak directly to the atypical scenario where an asylum officer's consideration of a first credible fear interview during a second credible fear interview is challenged in federal court, the principle is the same and the burden of proof factors under Section 1158(b)(1)(B)(iii) apply just the same.

his first credible fear interview. ECF 24-2 at 63–65. As the immigration officer noted, all the concerns related to disparities in facts and details between E.Q.'s two testimonies, such as when E.Q. testified for the first time in his second credible fear interview that he left the country because of a summons the Taliban sent to his home ordering him to report to local law enforcement for questioning, a fact that was completely omitted from his first credible fear interview. *Id*. at 63. Plaintiff E.Q.'s testimony also lacked important details such as when he received this summons that allegedly caused him to go into hiding and flee Afghanistan, or other dates about his employment in Afghanistan. *See id*. at 63–64. He additionally provided inconsistent testimony about a significant event—when the Taliban allegedly came to his home. *See id*. at 64. As such, Plaintiffs cannot demonstrate that the Rule in any way prevented Plaintiff E.Q. from presenting credible and consistent testimony at either his first or second credible fear interview.[8] Because the second interview provided independent grounds to deny Plaintiff E.Q. relief, the voluntary cessation doctrine has no application here.

Even assuming, *arguendo*, that the voluntary cessation doctrine applied, the Court should still find Plaintiff E.Q.'s claims moot. Plaintiffs' claim that Defendants voluntarily ceased applying the mandatory bar and so must show it is "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur," is incorrect. Pls' Motion at 20 (citing *Friends of the Earth*, 528 U.S. at 190). Plaintiffs fail to acknowledge the full holding in *Friends of the Earth*. First, the "formidable burden" applies where "a defendant claim[s] that its voluntary compliance moots a case." 528 U.S. at 190. But Defendants make no such assertion. Instead, "[b]y contrast, in a lawsuit brought to force compliance, it is the *plaintiff's burden* to establish standing by demonstrating that,

---

[8] From a practical standpoint, Plaintiffs do not explain what topics the asylum officer could have possibly questioned E.Q. on if he was precluded from asking questions related to establishing E.Q.'s eligibility for asylum during his second credible fear interview.

if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the 'threatened injury [is] certainly impending.'" *Id.* (emphasis added) (citing *Whitmore v. Arkansas,* 495 U.S. 149, 158 (1990)). Plaintiff E.Q. claims "DHS failed to comply with required procedures in making its determination[,]" and so he bears the burden of showing likely recurrence. Pls' Motion at 16.

Plaintiffs' assertions that Plaintiff E.Q. will be subject to the Rule again are speculative and highly unlikely to occur. Plaintiffs assert (1) DHS *could* exercise its discretion and elect to rescind E.Q.'s expedited removal order; or (2) E.Q. *may* return to the United States unlawfully following his removal and face renewed application of the Rule at a reasonable fear interview sometime in the future. *See* Pls. Mot. at 21–22. However, "'such speculative contingencies' do not show that challenged conduct is likely to recur 'in the absence of evidence that this is a prospect of immediacy and reality.'" *Jordan v. Rubio*, 795 F. Supp. 3d 46, 54 (D.D.C. July 29, 2025) (finding that plaintiff's arguments regarding the government potentially revoking her passport at any time did not support the first element of the voluntary cessation test); *see also Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 350 (D.C. Cir. 1997) (stressing that plaintiffs' speculative fears were a "wholly inadequate basis" to find a reasonable chance of recurrence); *see also Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008) (plaintiffs could not overcome government's mootness showing where "[t]he record . . . contain[ed] no . . . evidence" that plaintiffs' fear of recurrence would materialize).

Here, Plaintiff E.Q.'s assertion that he will be subjected to the Rule again relies entirely on his own speculative fear. First, as Plaintiffs explain, if Plaintiff E.Q. does not leave the United States, his only path to obtain a lawful status would be if DHS *voluntarily elects* to use its discretion to rescind E.Q.'s expedited removal order, "an act that would give Defendants another opportunity

30

to apply the Rule to him." Pls. Mot. at 21. However, Plaintiffs offer no support for this bizarre turn of events, and the Court should grant it no consideration.

On the other hand, Plaintiffs assert that if E.Q. is removed from the United States and then reenters, he will "face renewed application of the Rules." *Id*. at 21–22. As Plaintiffs concede, however, if E.Q. does so, and he is processed for reinstatement, he will receive a reasonable fear interview[9]—a different process than the credible fear interview process E.Q. underwent on February 4, 2025, and April 14, 2025—and he will not be eligible for asylum at all. *Id*. As explained above, reasonable fear interviews apply, inter alia, to aliens subject to reinstatement of a prior order of removal following illegal re-entry or administrative removal. *See* 8 U.S.C. § 1231(a)(5); 8 C.F.R. §§ 208.31, 1208.31. The reasonable fear screening process carries a higher burden of proof than a credible fear screening. *See* 1999 CAT Rule, 64 Fed. Reg. at 8485. As such, although Plaintiff E.Q. may undergo *another* screening process if he attempts to reenter the United States unlawfully, sometime in the future, following his removal, it will not be the *same* process he previously underwent.[10] Where the asylum officer in E.Q.'s second interview issued a negative credible fear determination because he found E.Q. not credible on the basis of his inconsistent testimony when compared to his first credible fear interview,  the asylum officer found no need to apply the DHS Bars Final Rule. ECF 24-1 at 14–15. Plaintiffs' speculation that E.Q. will be found

[9] DHS could alternatively place Plaintiff E.Q. into full removal proceedings under Section 240, in which case E.Q. would also not be subject to the DHS Bars Final Rule.

[10] Plaintiffs assert that E.Q. may have a new credible fear interview if Defendants do not reinstate his removal order upon his theoretical future reentry. Pls' Motion. at 22. However, like their assertion that DHS may just reverse his removal order now, Plaintiffs offer no reason why DHS would not reinstate Plaintiff E.Q.'s removal order if he reentered the country. It would be similarly unreasonable to speculate that he would again be subject to the credible fear screening process rather than the reasonable fear screening process if he reenters sometime in the future.

31

credible under a higher standard at a theoretical future reasonable fear interview, and that the Rules will then be applied to him, is thus highly implausible. *Jordan*, 795 F. Supp. 3d at 54.

Even if Plaintiff E.Q. one day makes his way back to the United States, he has not shown that it is likely that he would undergo another credible fear interview; and because he would almost certainly fail to meet the heightened burden in any potential reasonable fear interview, it is "absolutely clear that the allegedly wrongful behavior"—here, an alleged application of the Rule to Plaintiff E.Q.— "could not reasonably be expected to recur." *Aref*, 833 F.3d at 251. Consequently, even if voluntary cessation applied here, and even if Defendants had a "heavy" burden of demonstrating that Plaintiff E.Q.'s claims are moot, that burden is met. This Court lacks jurisdiction over Plaintiff E.Q.'s claim because he cannot establish continuing Article III standing. *Citizens for Resp. & Ethics in Washington*, 352 F. Supp. 3d at 13.

### D.  The Organizational Plaintiffs Cannot Demonstrate Standing.

Where a plaintiff "challenges the government's 'unlawful regulation (or lack of regulation) of *someone else*,' 'standing is not precluded, but it is ordinarily substantially more difficult to establish.'" *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 369 (2024) (emphasis in original) (citing *Lujan*, 504 U.S. at 562). Where, as here, an organization alleges injury to itself rather than to its members, it must establish standing in the same manner as an individual. *Warth v. Seldin*, 422 U.S. 490, 511 (1975); *see FDA*, 602 U.S. at 369 ("[O]rganizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals[.]"). An organizational plaintiff "demonstrates a sufficient injury in fact by alleging a *concrete and demonstrable* injury to the organization's activities that is more than simply a setback to the organization's abstract societal interests." *Ctr. for Bio. Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 314 (D.C. Cir. 2025) (cleaned up) (emphasis added). The causation requirement for

32

such plaintiffs also precludes "speculative" or "attenuated" links, "that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs [, or] where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." *Id*. at 383 (internal citations omitted); *see id*. at 384 ("Without the causation requirement, courts would be 'virtually continuing monitors of the wisdom and soundness' of government action.") (internal citation omitted). Organizational Plaintiffs here fail to bring their claims of harm beyond the speculative stage.

While the Court found at the motion to dismiss stage that the organizational Plaintiffs stated "'a plausible claim' that each group has 'suffered an injury in fact fairly traceable to the actions of the [Defendants] that is likely to be redressed by a favorable decision on the merits," ECF 49 at 23–30, that determination is no longer sufficient at the summary judgment stage. Plaintiffs can no longer rely on "mere allegations," but must instead "set forth 'specific facts' establishing its injury in fact" by affidavit or other evidence. *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011).

To demonstrate an injury in fact, it is not enough that "an organization diverts its resources in response to a defendant's actions" even if it will "expend considerable time, energy, and resources" in response to a policy change. *FDA*, 602 U.S. at 394–95. Instead, to demonstrate organizational standing, an organization must demonstrate how an agency's action "directly affected and interfered with" the organizations' "core business activities." *Indep. Mkt. Monitor for PJM v. FERC*, 162 F.4th 11677, 1172 (D.C. Cir. 2025) (denying organizational standing because the organizational plaintiffs suffered a lack of concrete harm to its interests) (quoting *Alliance*, 602 U.S. at 395–96).

33

As this Court noted, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." ECF 49 at 24 (quoting *FDA*, 602 U.S. at 394). Yet, the Court then found that Plaintiffs' claims of increased expenditures necessary to adapt their services to the Rule satisfied their injury-in-fact requirement. *Id*. at 26 ("[T]he groups have plausibly alleged the need to make new 'programmatic expenditures' to alleviate the Rules' direct interference with the legal services they offer to current and prospective clients."). The Supreme Court was clear, however, that the theory that an organization has standing if it "diverts its resources in response to a defendant's actions . . . is incorrect." *FDA*, 602 U.S. at 394. "Indeed, that theory would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id*.

The Supreme Court in *FDA* also rejected that plaintiff's attempt to rely on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), finding "*Havens* does not support such an expansive theory of standing." 602 U.S. at 395. In *Havens*, defendant Havens "gave [organizational Plaintiff] HOME's employees false information about apartment availability," which 'perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers.'" *Id.* (citing *Havens*, 455 U.S. at 379). The Supreme Court noted that "Havens's actions directly affected and interfered with HOME's core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id*.

Here, the organizational Plaintiffs are three legal services provider groups that provide legal assistance and representation to aliens who claim asylum or other forms of protection from removal. The organizational Plaintiffs assert that the Rule has caused them harm; they detail these

34

alleged harms in three new declarations submitted with Plaintiffs' Motion. ECF 54-3 (Florence Project Declaration); ECF 54-4 (Amica Center Declaration); ECF 54-5 (RAICES Declaration). However, Plaintiffs here raise organizational claims of harm in their Declarations that are nearly identical to those rejected in *FDA*. *See* 602 U.S. at 394 (plaintiffs claiming "FDA has 'caused' the associations to conduct their own studies on mifepristone so that the associations can better inform their members and the public about mifepristone's risks[;] that FDA has 'forced' the associations to 'expend considerable time, energy, and resources' drafting citizen petitions to FDA, as well as engaging in public advocacy and public education[; a]nd all of that has caused the associations to spend 'considerable resources' to the detriment of other spending priorities."). For example, the Florence Project's Declaration notes that it will have to decide whether to "divert substantial resources" to intervening to assist aliens at the fear screening interview stage or decide not to intervene at this stage; they also assert they will suffer an injury because the Rule will result in a "massive increase in the need for rapid technical assistance to *pro se* individuals facing" fear interviews and/or the review of negative fear determinations by Immigration Judges. ECF 54-3 at 9, 10.

Similarly, the Amica Center's Declaration details harms that it believes it will suffer because of the Rule that are similar to those presented in *FDA*, such as a "reallocation of time and resources" in response to the Rule, and allegations that the Rule will harm Amica "financially by reducing a significant funding source" for the organization. ECF 54-4 at 5, 6.

The Declaration by RAICES also details that it anticipates the Rule "will require it to divert resources from other programs to account for the increased time, procedures, and staffing needed to prepare" aliens for their fear interviews. ECF 54-5 at 4.

Respectfully, the Court's determination that such ordinary diversion of resources to adjust to a new policy constitutes the kind of interference based in fraud that *Havens* found to be an injury is not supported by that case or by *FDA*. Because Plaintiffs offer nothing new to establish a concrete injury-in-fact to their organizational missions caused by the Rule, the Court should now find they lack standing.

Not only do Plaintiffs fail to establish concrete injuries-in-fact to their organizational missions in their new Declarations, but these Declarations also continue to heavily rely on potential future speculative harms. For example, the RAICES Declaration states that it "anticipates that the majority of contemplated harms resulting from the Rules will manifest *in the future*." ECF 54-5 at 2 (emphasis added). The remainder of the harms RAICES alleges will occur all rest on the organization's anticipation of things that may potentially occur in the future. *See id*. at 3–4 ("After the *RAICES v. Mullin* decision takes effect, RAICES *anticipates* it will see a dramatic increase in the number of credible fear and reasonable fear interviews, and that the Rules will require additional questions and time for each RAICES service recipient.") (emphasis added); *see also id.* at 4 ("Given the *anticipated* increase in negative fear determinations resulting from the Rules, RAICES *expects* a heightened demand for legal representation[.]") (emphasis added). This "updated" Declaration simply echoes RAICES original allegations of potential harms expressed in Plaintiffs' original Complaint, filed back in March 2025. ECF 1 at ¶¶ 163–167. This is also true about the Declarations submitted by the Florence Project and the Amica Center, which also discuss potential future harm, which were first relayed in the March 2025 Complaint. *Compare* ECF 54-4 at 5 ("The effect *will be* that our ["Know Your Rights"] team *will be* stretched even more thinly than is already the case, impeding its work by forcing us to spend time creating and updating new materials and decreasing the number of individuals to whom we can provide meaningful pro se

assistance.") (emphasis added), *with* ECF 1 at ¶¶ 145–154; *compare* ECF 54-3 at 13 ("[T]he increased demand for *pro se* support *is likely to* stretch our *pro se* cohort extremely thin and *may force* [the Florence Project] to redirect resources for representation, our other core work, to *pro se* support.") (emphasis added), *with* ECF 1 at ¶¶ 155–162.

The fact that the organizational Plaintiffs still allege that the same harm may potentially happen a year after the Complaint was filed demonstrates the injuries the organizational Plaintiffs specify are overly vague and speculative. *See* ECF 42-1 at 18–21; *see also* ECF 49 at 28–29. While the Court may have found the organizational Plaintiffs' speculative claims sufficient to demonstrate an injury-in-fact at the motion-to-dismiss stage, the organizational Plaintiffs' Declarations relying on the same speculation about possible *future* harm they may face due to the Rule at the summary judgment stage are clearly inadequate to establish an injury-in-fact. *See* ECF 49 at 28–29 n.9 (addressing that at the motion-to-dismiss stage, it is enough for an organizational plaintiff to describe how the defendants' conduct will interfere with its core business activity without pinpointing the precise monetary cost of that interference).

It is settled law "that disputes about future events where the possibility of harm to any given individual is remote and speculative are properly left to the policymaking Branches, not the Article III courts." *Food and Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015) (quoting *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1295 (D.C. Cir. 2007)); *Swanson Group Mfg. LLC v. Jewell*, 790 F.3d 235, 242 (D.C. Cir. 2015) (plaintiff's assertion that its facility "*may not* be able to continue to operate its facility and keep its current work force employed[,]" is "the kind of uncertain and unspecific prediction of future harm that is inadequate to establish Article III standing" at the summary judgment level) (emphasis in original); *see Chamber of Commerce of U.S. v. E.P.A.*, 642 F.3d 192, 201–02 (D.C. Cir. 2011) (where the

37

circuit court concluded in light of its precedent that, where an injury to the petitioners' members hinged on the actions of third parties, declarations that a challenged policy "could" or "may" cause injury were "insufficient to establish standing.").

Plaintiffs have now had over a year since they filed their Complaint in March 2025 to establish a concrete harm with specific details, numbers, or facts to show that the Rule "perceptibly impair[s]" or "interfere[s] with" their activities by imposing an affirmative "impediment" to performing those activities. *FDA*, 602 U.S. at 394–95. However, the organizational Plaintiffs' allegations do not satisfy this standard. Instead, the organizational Plaintiffs here do little more than present an "abstract injury to [their] interests[,]" which is "insufficient to support standing." *Food & Water Watch, Inc.*, 808 F.3d at 921. Furthermore, even if these abstract, potential injuries were to come to fruition, they would not meet the requisite level of a concrete injury in fact to the organizations, as discussed in *FDA*, 602 U.S. at 394–95. As such, the organizational Plaintiffs have not demonstrated that they have standing.

### E. The Organizational Plaintiffs Are Outside the Zone of Interests of the Relevant Statutes.

Plaintiffs maintain that the organizational Plaintiffs satisfy the zone of interests test as their "interests are neither inconsistent with nor marginally related to the INA." Pls' Motion at 25 (citing ECF 49 at 32). Defendants acknowledge that the Court already found the zone of interests test in this matter "poses no barrier to suit for the organizational plaintiffs." ECF 49 at 32. Although the Court made findings to the contrary, Defendants maintain that Plaintiffs lack standing under the zone of interests test because the organizational Plaintiffs have failed to demonstrate that their interests are the ones in which Congress intended to be "protected or regulated" by the statutory provisions they allege are violated. *Haitian Refugee Center v. Gracey*, 809 F.2d 794, 814 (D.C. Cir. 1987). Regarding expedited removal, neither section 1225 nor section 1252 reflect any

concern with organizations or the organizations' interest in representing aliens subject to expedited removal; similarly, no provision in the asylum or withholding of removal statutes protects or regulates the organizations' interest in providing social and legal services to aliens. *See* 8 U.S.C. §§ 1158, 1231. These provisions do not regulate the organizational Plaintiffs' conduct or create any benefits for which they may be eligible. Instead, organizations that "provide legal help to immigrants" do not satisfy the zone of interests test in this context. *See INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1302 (1993) (finding that federal immigration law "was clearly meant to protect the interests of undocumented aliens, not the interests of organizations[.]").

### F. Organizational Plaintiffs Cannot Challenge the Credible Fear Provisions of the Rules.

Finally, assuming, *arguendo*, that the Organizational Plaintiffs can prove standing, they cannot challenge the credible fear provisions of the Rules because Congress has limited review of expedited removal and credible fear policies to suits brought by certain aliens to whom they are applied. "Federal courts are courts of limited jurisdiction, possessing only that power authorized by . . . statute." *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quotations omitted). While it is true that the "APA confers a general cause of action upon persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702, that general cause of action can be withdrawn "to the extent the relevant statute 'preclude[s] judicial review,' 5 U.S.C. § 701(a)(1)." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). Here, the INA expressly bars the Plaintiff Organizations' challenges.

Under the INA, the implementation of orders stemming from expedited removal proceedings, a decision to invoke expedited removal, and "procedures and policies adopted" to implement expedited removal are generally not subject to judicial review. 8 U.S.C. §§

39

1252(a)(2)(A)(i), (ii), (iv); 1252(e)(3)(A)(ii). The exception at § 1252(e)(3) permits challenges claiming a policy implementing expedited removal "is not consistent with" the INA or otherwise violates the law. *See Make the Road N.Y. v. Wolf*, 962 F.3d 612, 625 (D.C. Cir. 2020) (*Make the Road I*). The D.C. Circuit has explained "that litigation" under § 1252(e)(3) must "be brought by affected individuals themselves." *Id*. at 628.

In *American Immigration Lawyers Association v. Reno*, 199 F.3d 1352, 1355 (D.C. Cir. 2000) ("*AILA*"), the D.C. Circuit considered a suit challenging regulations implementing expedited removal policies brought, like here, by "[o]rganizations who represent and assist aliens seeking to enter the United States." The organizations there claimed that the regulations violated "not their rights or the rights of their members, but the constitutional and statutory rights of unnamed aliens who were or might be subject to the statute and regulations." *Id*. at 1357. But the D.C. Circuit held that 8 U.S.C. § 1252(e)(3) "contemplate[s] that lawsuits . . . would be brought, if at all, by individual aliens who . . . were aggrieved by the statute's implementation." *Id*. at 1359; *see Make the Road I*, 962 F.3d at 628 (*AILA* "specifically contemplated that litigation could be brought by affected individuals themselves"). Thus, "[w]hether . . . on their own or band[ed] together through a representative association," the subsection (e)(3) exception to the jurisdiction strip in 8 U.S.C. § 1252(a)(2)(A)(i)–(ii), (iv), requires that "the lawsuit [be] seeking to remedy" individual aliens' injuries "arising from" implementation of expedited removal. *Make the Road I*, 962 F.3d at 628; *see Make the Road N.Y. v. Noem*, 2025 WL 3563313, at *5 (D.C. Cir. Nov. 22, 2025) (*Make the Road II*) ("[*I*]*ndividuals* may bring challenges to the validity of the statute itself or to any regulation, policy, or written directive implementing it.") (emphasis added) (citing 8 U.S.C. § 1252(e)(3)(A)).

That is not the case here. Finding jurisdiction over the Organizational Plaintiffs' claims disregards that precedent. However, as this Court itself noted—and as the Organizational Plaintiffs have consistently argued—the Organizational Plaintiffs' injuries are specific to them; that is, they are in no way connected to any particular alien's injuries arising from the challenged policies. *See* ECF 49 at 24–26 (this Court's memorandum decision discussing the specific harm to Amica Center, the Florence Project, and RAICES); Pls' Motion at 22–25 (stating that "Defendants' actions 'are 'directly' poised 'to affect[] and interfere[] with' the organizations' 'core business activities[,]'" and discussing specific harms to each individual Organizational Plaintiff).

To be sure, these Organizational Plaintiffs—unlike the plaintiffs in *AILA*—are not "assert[ing] third-party standing on behalf of" aliens who are or might be subject to these policies. *Make the Road N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 30 (D.D.C. 2019) (making that distinction); ECF 49 at 27 ("Indeed, the plaintiffs have disavowed any third-party theory of standing."). But the key point in *Make the Road I* was that the plaintiffs had invoked "associational standing to prosecute a case on behalf of individuals directly regulated and affected by the challenged rule." 962 F.3d at 928. By contrast, there is no meaningful distinction between an organization's suit to address an injury to its business of providing asylum services to "aliens who have been or will be" subject to the challenged rules—as Organizational Plaintiffs do here—and a third-party suit brought by an organization. *AILA*, 199 F.3d at 1357. Neither "is derivative and reflective of [an alien's] individual standing," *Make the Road I*, 962 F.3d at 628, and both "impose[] no confining influence on the scope of the lawsuit," *AILA*, 199 F.3d at 1359. As a result, both are outside what "Congress must have contemplated" when it enacted 8 U.S.C. § 1252(e)(3). *Id*.

41

## II.    The Rule Is Consistent with the INA.

DHS's decision to apply the DHS Bars Final Rule during credible and reasonable fear screenings is consistent with the INA. While in their Motion Plaintiffs argue that "the Rules" are contrary to the INA, Plaintiffs fail to acknowledge that the EOIR Companion Rule merely states that an Immigration Judge may review the decision of the asylum officer de novo. 89 Fed. Reg. at 105,392. As such, without the DHS Bars Final Rule, the EOIR Companion Rule does not apply the bars at all. As such, Defendants infer that Plaintiffs' arguments that the Rules are contrary to the INA are really challenging the DHS Bars Final Rule. *See* Pls' Mot. at 25–32. As such, Defendants counter each of Plaintiffs' assertions regarding the DHS Bars Final Rule in turn.

### A.    The Rule Does Not Deny Individuals the Ability to Pursue Asylum in Section 240 Removal Proceedings.

Assuming arguendo Plaintiffs have standing to challenge the Rules, Plaintiffs' claim that the DHS and EOIR Rules are contrary to the INA because they deny aliens with a credible fear of persecution the right to pursue asylum in full removal proceedings is incorrect. Pls' Motion at 25–29. Plaintiffs argue that both the structure and the text of the asylum and expedited removal statutes make clear that the mandatory bars are to be considered *after* an alien satisfies their burden of demonstrating that they meet the definition of a refugee and are placed in removal proceedings. *Id*. at 26–29.

Plaintiffs incorrectly assert that, in the text of 8 U.S.C. § 1158(b)(2), "Congress directed that the *discretionary authority to grant asylum* 'shall not apply' to an applicant if the Attorney General determines that the applicant is subject to a mandatory bar." Pls. Mot. at 26 (emphasis added). Through this inaccurate revision of the statutory language, Plaintiffs conclude: "The mandatory bars thus define the narrow class of people who are entitled to apply for asylum, and who otherwise show eligibility as a refugee, but who must nevertheless be denied relief." *Id*. at

42

26–27. Yet, § 1158(b)(2) says no such thing. Rather, that section says simply, "Paragraph (1) shall not apply" to individuals the Attorney General determines fall under one of the enumerated bars at subsections (i)-(vi). 8 U.S.C. § 1158(b)(2)(A). And paragraph (1) of § 1158(b) is much more than the discretionary authority to grant asylum. It encompasses *everything* an individual must do to establish herself as a refugee. *See id*. (Subsection (A) - defining eligibility as a refugee "within the meaning of section 1101(a)(42)(A)"; Subsection (B) - (i) defining the burden of proof as belonging to the individual and describing the qualifying categories of persecution, (ii) describing the means of sustaining the burden of proof through testimony and evidence, and (iii) describing the nature and process of credibility determinations). Subsection (b)(2)(A) is clear that no aspects of the asylum eligibility determination in subsection (b)(1) are available to an individual for whom the Secretary or Attorney General has determined a bar applies.

Plaintiffs additionally assert that the text of the expedited removal statute furthers their arguments, claiming "Section 1225(b) therefore incorporates the 'Eligibility' standard found in § 1158(b)(1)(A), which asks only whether a person is a refugee, not whether they are subject to a mandatory bar." Pls' Mot. at 27. Yet, as stated above, § 1225(b)(1)(B)(v) defines "credible fear of persecution" not in reference to whether an alien is a "refugee," but instead to whether the alien demonstrates a significant possibility that he could establish eligibility for asylum "under section 1158." And, as explained above, the eligibility criteria in § 1158(b)(1) do not apply in their entirety to a person subject to one of the bars listed in § 1158(b)(2). As such, the language in the context of the statutory scheme demonstrates that the Rule does not expand the credible fear inquiry, but instead, is consistent with the INA.

Although Plaintiffs next turn to the legislative history of § 1225(b) to confirm their reading, this is an unnecessary step. *See* Pls' Mot. at 28–29. In examining statutory language, the statute's

43

words "should be construed according to their ordinary sense and with the meaning commonly attributed to them." *Peoples Drug Stores, Inc. v. Dist. of Columbia*, 470 A.2d 751, 753 (D.C. 1983). "The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used." *United States v. Goldenberg*, 168 U.S. 95, 102–03 (1897); *accord Dist. of Columbia v. Gallagher*, 734 A.2d 1087 (D.C. 1999).

While there are exceptions to "the plain meaning rule," such as, for example, if the literal meaning of a statute produces absurd results, these exceptions should not "be understood to swallow the rule completely[.]" *Carter v. State Farm Mut. Auto. Ins. Co.*, 808 A.2d 466, 471 (D.C. 2002). Instead, there are "strong policy reasons for maintaining the certainty, fairness, and respect for the legal system that the plain meaning rule engenders in most instances." *Id.* (citing *Peoples Drug Stores, Inc.*, 470 A.2d at 755). As such, a court will "look beyond the ordinary meaning of the words of a statute *only* where there are 'persuasive reasons' for doing so." *Id.* (emphasis added). Because the plain language of § 1225(b) is unambiguous, and Plaintiffs here have not demonstrated that there are persuasive reasons for looking beyond the statute's plain language, the Court need not analyze the legislative history of the statute.

### B. Asylum Officers Rely on More Than a Preliminary Prediction in Applying the DHS Bars Final Rule.

Plaintiffs next assert that the Rules violate the INA as they allow the denial of relief based on a "preliminary prediction that a bar *might* apply." Pls' Motion at 29 (emphasis in original). Plaintiffs additionally claim that while the asylum and withholding statutes disqualify an applicant from relief or protection only on the basis of a determination, not a prediction, the DHS Rule does not require such a determination. *See id.* at 29–30. Plaintiffs then assert that the EOIR Companion Rule meanwhile, "directs immigration judges to review only whether the asylum officer's appearance-based prediction was correct." *Id.* at 30.

In a credible fear interview, the Rule provides asylum officers conducting the interview the discretion to "consider the applicability" of the mandatory bars if the alien "appears to be subject" to one of them. 89 Fed. Reg. at 103, 370; 8 C.F.R. § 208.30(e)(5)(ii). If the alien does appear to be subject to a mandatory bar, then the asylum officer determines whether there is a sufficient likelihood that "in a proceeding on the merits, the alien would be able to establish by a preponderance of the evidence that such bar(s) do not apply." *Id*.

Plaintiffs, however, first downplay the burden required to make a negative credible fear determination. The standard under the DHS Bars Final Rule, 89 Fed. Reg. at 103,370, is consistent with the standard prescribed by Congress in the expedited removal statute 8 U.S.C. § 1225(b)(1) ("[T]he term 'credible fear of persecution' means that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum[.]"). 8 U.S.C. § 1225(b)(1)(B)(v); *see* 89 Fed. Reg. at 103,385 (discussing § 1225(b)(1)(B)(v) and finding that "It follows that when considering whether a noncitizen has a significant possibility of establishing eligibility for asylum, an AO may consider factors that would render the noncitizen ineligible for asylum.").

Further, Plaintiffs' argument that the DHS Rule allows application of the bars on a standard below that required by an adjudicator at full removal proceedings is incorrect. Pls' Motion at 29–30. The Rule is applied at *credible fear interviews*, not during full removal proceedings, which is when the standards addressed by Plaintiffs are applied. *See id*. at 29 ("The asylum and withholding statutes disqualify an applicant from relief only if the Attorney General "determines" or "decides" that a mandatory bar applies."). As such, it is logical that one process—a credible fear interview— would have a different standard than a completely different process—the evaluation of eligibility

45

for asylum in full removal proceedings. Significant here, as addressed above, is that the standard under the DHS Bars Final Rule is consistent with the standard prescribed by Congress in the expedited removal statute 8 U.S.C. § 1225(b)(1), and as such, is not contrary to the INA.

Plaintiffs' characterization of the EOIR Companion Rule is similarly misleading. As explained above, EOIR does not merely "review only whether the asylum officer[] . . . was correct," but conducts a de novo review, including consideration of new evidence and testimony if appropriate. 89 Fed. Reg. 105,392; 8 C.F.R. §§ 1003.42(d), 1208.31(g); *see* 89 Fed. Reg. at 105,397 ("both the statute and the regulations contemplate that the immigration judge may make their ultimate de novo determination based on the record the asylum officer provides, as well as evidence or testimony that was not available to the asylum officer."). This procedure is no different than an immigration judge's de novo consideration of an asylum officer's determination that an applicant lacks credibility or fails to establish a nexus.

### C. The Application of the Rule by DHS Does Not Violate the INA.

Lastly, Plaintiffs allege that the Rule impermissibly delegates "to DHS authority that Congress reserved exclusively for the Attorney General." Pls' Motion at 30. Specifically, Plaintiffs assert that the wording in 8 U.S.C. § 1158(b)(2)(A) provides for a denial of relief "*only* 'if the Attorney General determines that' a mandatory bar applies[.]" *Id*. (emphasis added). Plaintiffs contrast this language with the amended language in 8 U.S.C. § 1158(b)(1)(A) which states that "[t]he Secretary of Homeland Security or the Attorney General" may grant asylum to an alien. *Id*. at 30–31.

Plaintiffs point to 8 U.S.C. § 1103(g)(1), to support their assertion that in 2002, when DHS was created, the authority to apply mandatory bars was exclusively exercised by Immigration

Judges in the Department of Justice. *Id*. at 32. Thus, "the authority to make bar determinations did not transfer to, and cannot now be exercised by, DHS." *Id*.

Plaintiffs' reading that only the Attorney General may consider the application of the mandatory bars, and an asylum officer cannot, is peculiar and unavailing. Reading the statute as Plaintiffs assert would result in an absurd circumstance where either the Secretary of Homeland Security or the Attorney General can grant asylum but only allow the Attorney General can deny relief based on statutory grounds. Another example is that this reading would never allow USCIS asylum officers to deny affirmative asylum applications on a security-related ground, and it would mean that DHS would not have to provide notice to aliens of the privilege of counsel and the consequences of filing a frivolous asylum application as they are currently required to do per § 1158(d)(4). Plaintiffs' claim that only Immigration Judges could apply mandatory bars before the creation of DHS, *see* Pls' Motion at 30–31, is demonstrably false. The current regulations, which were adopted by the former INS and EOIR after the passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") explicitly provide that "[a]n immigration judge *or asylum officer* shall not grant asylum to any applicant who filed his or her application before April 1, 1997," and is subject to one of the mandatory bars. *See Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 Fed. Reg. 10,312, 10,342 (Mar. 6, 1997) (codified at 8 C.F.R. § 208.13(c)(2)). And for applications filed after April 1, 1997 (the effective date of IIRIRA), former INS and EOIR adopted regulations clearly stating that "an applicant shall not qualify for asylum" if subject to one of the mandatory bars—without stating that such bars only applied before Immigration Judges. *Id.* (codified at 8 C.F.R. § 208.13(c)(1)). The above-quoted language remains

unchanged in both 8 C.F.R. §§ 208.13(c) (regulations governing DHS) and 1208.13(c) (regulations governing EOIR).

Even the very first asylum regulations adopted in 1980, which originally adopted the mandatory bars versions of which Congress later adopted by statute, explicitly provided for application of those then-newly adopted regulatory bars by INS. *Aliens and Nationality; Refugee and Asylum Procedures,* 45 Fed. Reg. 37,392, 37,392–93 (June 2, 1980) (adopting bars applied by the INS at 8 C.F.R. § 208.8(f)(1)).

Moreover, Plaintiffs' argument does not acknowledge 8 U.S.C. § 1103(a)(3), which authorizes the Secretary of Homeland Security to "establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter." Under the INA, DHS has the authority to not only adjudicate asylum applications, but also to conduct credible fear interviews, to make credible fear determinations in the expedited removal context, and to establish procedures for further consideration of asylum applications after an individual is found to have a credible fear. 89 Fed. Reg. 103,370 (Dec. 18, 2024); *see* 8 U.S.C. § 1103(a)(1), (3); 8 U.S.C. § 1158(b)(1)(A), (d)(1), (d)(5)(B); 8 U.S.C. § 1225(b)(1)(B); 6 U.S.C.§271(b)(3) (providing for the transfer of the Commissioner of Immigration and Naturalization's functions relating to adjudication of asylum and refugee applications to the Director of the Bureau of Citizenship and Immigration Services, now USCIS); 6 U.S.C. § 557 (providing that references to any officer from whom functions are transferred under the Homeland Security Act ("HSA") are to be understood as referring to the Secretary of Homeland Security).

As the DHS Bars Final Rule notes, "[w]ithin DHS, the Secretary has delegated some of those authorities to the Director of USCIS." 89 Fed. Reg. 103,371 (Dec. 18, 2024). Significant here, USCIS asylum officers conduct credible fear interviews, make credible fear determinations,

48

and determine whether an alien's asylum application should be approved. *See* DHS, Delegation to the Bureau of Citizenship and Immigration Services, No. 0150.1 (June 5, 2003); 8 C.F.R. §§ 208.2(a), 208.9, 208.14(b), 208.30(b), (e)(6)(i), (e)(8). All these decisions are subject to review by a supervisory asylum officer.

Yet, this delegation to asylum officers does not extinguish the role of Immigration Judges. Immigration Judges within EOIR still have the final decision when an alien requests review of the asylum officer's negative credible fear determination. Consequently, the Rule does not violate the INA, as the delegation of powers to DHS and USCIS has been authorized by Congress.

## III.    The Rules Are Not Arbitrary and Capricious.

The arbitrary and capricious review standard "is narrow and a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. A reviewing court must be satisfied that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id*. The agency's decisions are entitled to a "presumption of regularity," *Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 415, and although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." *Id*. at 416. At bottom, arbitrary-and-capricious review asks only whether "the agency has acted within a zone of reasonableness." *Prometheus Radio Project*, 592 U.S. at 423. The Rules easily meet that deferential standard; however, Defendants address each of Plaintiffs' arguments that the Rules are arbitrary and capricious in turn.

### A.    The DHS Bars Final Rule Does Not Rest on a False Premise as the Text of the Rule Does Not Conflict with the Preamble.

Plaintiffs argue that the DHS Rule "rest[s] on a false factual premise" because it "permits asylum officers to preclude noncitizens from applying for asylum on the basis of mere speculation." Pls' Motion at 32–34 (citing *Cigar Ass'n of Am. v. FDA*, 132 F.4th 535, 540 (D.C.

Cir. 2025)). Plaintiffs note that the Rule's preamble states several times that the Rule limits the review of the mandatory bars to circumstances where there is "easily verifiable evidence" that a bar applies but argue that the text of the Rule itself does not contain the same limitation. Pls' Motion at 32–33.

However, Plaintiffs' argument is based on a faulty premise—that the plain text of the regulations instructs asylum officers to consider mandatory bars whenever it "appears" that one might apply. *Id*. at 34 (quoting 8 C.F.R. §§ 208.30(e)(5)(ii), 208.31(c), 208.33(b)(2)(ii)). Not so. The Rule instead states that asylum officers "*may* consider the applicability of such bar(s)," thus providing asylum officers discretion. 8 C.F.R. § 208.30(e)(5)(ii). The preamble explains how DHS expects this discretion to be exercised—that is, where there is "easily verifiable evidence." 89 Fed. Reg. at 41,351. As such, the text of the Rule itself does not conflict with the preamble.

### B. The DHS Bars Final Rule Acknowledges and Explains the Agency's Departure from its Previous Position.

Plaintiffs also argue that Defendants failed to acknowledge or explain their departure from prior policy judgments, in particular, its previous policy not to apply bars in screening interviews. Pls' Motion at 34–36; *see FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009) (when an agency changes policy is must "display awareness that it is changing position" and "show that there are good reasons for the new policy"); *accord Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017). Plaintiffs allege the Rule is contrary to a 2022 DHS rule that declined to allow for the application of mandatory bars during credible fear screenings. Pls' Motion at 35; *see Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 87 Fed. Reg. 18,078 (Mar. 29, 2022) (reversing regulations adopted by 2020 rule to consider mandatory bars during credible fear screenings).

While Plaintiffs assert that DHS did not acknowledge its departure from prior policy, the DHS Bars Final Rule clearly acknowledges the departure from the 2022 policy: "DHS acknowledges that this rule implements a policy choice that is different from its position in 2022[.]" 89 Fed. Reg. at 103,386. Additionally, contrary to Plaintiffs' arguments, the Rule explains the reasoning behind DHS's deviation from the 2022 policy. *Id*. at 103,386–87. For example, DHS explains that, although the policy has changed, the reasoning for it is not inconsistent with its 2022 position and does not significantly change the prior policy but now helps preserve the government's resources by allowing for the application of mandatory bars where it makes sense to apply them but not requiring their consideration in all cases, which was the policy the 2022 rule rejected. *Id*. DHS acknowledged and reasonably explained the change in position, and Plaintiffs' disagreement with that reasoning does not render the Rule arbitrary nor capricious. *See Las Americas Immigr. Advoc. Ctr.*, 783 F. Supp. 3d at 228 (upholding the government's adoption of a higher screening standard for some claims in the Securing the Border Rule, concluding that the government's prior rejection of a higher screening standard in the Asylum Processing IFR "is not enough, on its own, to render this Rule's standard arbitrary and capricious"); *id*. (finding the government "reasonably explained why changed circumstances compelled them to depart from" their prior policy); *see also State Farm*, 563 U.S. at 42 (recognizing that "regulatory agencies do not establish rules of conduct to last forever," and that "an agency must be given ample latitude to 'adapt their rules and policies to the demands of changing circumstances.'") (citations omitted). Consequently, Defendants have adequately and reasonably explained their reversals from previous positions.

51

### C. The Rule Does Not Rest on Assertions That Are Contrary to the Record.

Plaintiffs assert that the Rule is arbitrary and capricious because it rests on two factual premises that they assert are contrary to the record. Pls' Motion at 37–41. However, Plaintiffs' assertions on these issues are unavailing as they boil down to nothing more than disagreement with DHS's policy choices. *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 380 (D.C. Cir. 2013) ("This argument amounts to nothing more than another policy disagreement with CFTC, so we must reject it.").

*First*, Plaintiffs contend that the record confirms that aliens do not have a reasonable opportunity to present documentary evidence or testimony to prevent the bars' application. Pls' Motion at 37 (citing 89 Fed. Reg. at 103,375). But the DHS Rule states that "[i]ndividuals who may be subject to a mandatory bar will have the opportunity to show that the bar does not apply during the screening interview[,]" while the EOIR Companion Rule notes that the Immigration Judge's role in the credible fear process is "to conduct a de novo review of the asylum officer's" fear determination "based on the record the asylum officer provides, as well as evidence or testimony that was not available to the asylum officer." 89 Fed. Reg. at 103,375; 89 Fed. Reg. at 105,397. Otherwise, Plaintiffs seem to ignore the detailed responses to comments that the Defendants provided in publishing the DHS Rule. *See id*. at 103,372–404. In the General Opposition to the Proposed Rule section, DHS addressed concerns about an alien's "ability to collect and present evidence during credible fear screenings." *Id*. at 103,375. The commenters expressed their worries that asylum seekers would not have the ability to present the extensive evidence needed to rebut a finding that one of the mandatory bars applies, and that a detained alien in expedited removal proceedings may have difficulty discussing or defending themselves against the application of the mandatory bars. *Id*.

In response to these concerns, DHS noted that asylum officers "have a duty to elicit all relevant and useful information on a fear claim." *Id*. (citing 8 C.F.R. § 208.30(d)). Additionally, as the response to the comments noted, "[c]redible testimony *alone* may be the basis of a positive fear determination *without the need for any corroborative documentary evidence*." *Id*. (emphasis added). Asylum officers are also trained and have experience in the "substantive application of mandatory bars and non-adversarial interviewing" and as such, are well-positioned to develop and evaluate the record in mandatory bar claims." *Id*. This includes situations in which aliens may have trauma and have issues discussing challenging topics such as torture, sexual assault, and familial violence, among other topics. *Id*. at 103,376. The "permissive" nature of the Rule is "well-tailored" to these situations, as asylum officers "should only apply a mandatory bar in a screening where there is 'easily verifiable information' that the bar may apply, and even then, to only do so if the inquiry can be done efficiently." *Id*. However, if the asylum officer determines that an issue may be better considered at a later stage, "they retain the discretion under this proposed rule to decline to consider mandatory bars during the screening determination." *Id*.

*Second*, Plaintiffs assert that the evidence suggests "that the additional analysis required by the Rule is far too complex to be supplied at a screening interview." Pls' Motion at 38–41. Plaintiffs point to the particularly serious crime bar and the terrorism bar to demonstrate their point. *Id*. at 38–39. Yet, the agency addressed concerns relating to the complexity of the security-related mandatory bar and whether that complexity made their consideration inappropriate. DHS specifically rejected this assertion based on its experience and expertise in conducting screening interviews. 89 Fed. Reg. at 103,385. Specifically, the Rule states:

> DHS rejects the assertion that the mandatory bars present issues that are inherently more complex than other issues that are regularly considered in screening interviews. While the Department acknowledges that certain issues in the consideration of mandatory bars can present complex factual and legal

> issues, it also believes that other issues routinely considered by AOs as part of a credible fear or reasonable fear determination, including, for example, the viability of certain particular social groups, whether certain types of harm rise to the level of persecution, complex issues surrounding the motivation of the persecutor, whether the noncitizen has provided credible testimony, and whether certain types of feared harm would constitute torture if carried out, also involve complex legal and factual determinations.

*Id*. The Rule additionally discussed the complexities surrounding the terrorism bar, acknowledging that it is applied through a "case-by-case analysis" and that "noncitizens seeking protection may have faced unique circumstances[.]" *Id*. at 103,392. As such, an asylum officer "retain[s] discretion to analyze a mandatory bar at the screening stage and if further evidence, interviews, or analysis are needed, may opt not to analyze that bar during the screening," instead allowing that analysis to occur later on before an Immigration Judge or during an asylum merits interview. *Id*.

The Rule also addresses whether the particularly serious crime bar is too complex to be analyzed in a screening interview. *Id*. at 103,391. As DHS points out, asylum officers "already inquire into the potential applicability of mandatory bars, including the particularly serious crime bar, during credible fear and reasonable fear screenings, noting any relevant information in the record." *Id*. Asylum officers are specially trained in asylum law, and "are highly capable of assessing mandatory bars at the credible fear screening[.]" *Id*. Significantly, asylum officers also "retain discretion not to analyze the bars, especially where it is clear that further evidence and fact-gathering is needed." *Id*. Asylum officers continue to receive training on certain relevant topics to "ensure their ability to conduct thorough interviews and make legally sufficient determinations." *Id*.

While Plaintiffs may have competing views about DHS's policies, that does not render an agency's actions arbitrary and capricious. *Las Americas Immigr. Advoc. Ctr.*, 783 F.Supp.3d at 228 ("Competing views about policy do not render an agency's action arbitrary and capricious.").

54

And Plaintiffs' disagreement with DHS policy does not compel this Court to rule against DHS's policy choice, which is supported by decades of experience conducting both screening interviews and merits adjudications.

## D. Defendants Considered Concerns About Fairness

Plaintiffs assert that the Rule does not address several fairness concerns "revolving around the 'real life circumstances' noncitizens in screening interviews face." Pls' Motion at 41–43. *First*, Plaintiffs argue that the Rule does not provide a substantive response to a comment that notes that "individuals faced with application of the bars would need counsel they are exceedingly unlikely to find before a screening interview." *Id*. at 41. Plaintiffs oversimplify the detailed response provided by the Rule on this issue. 89 Fed. Reg. at 103,374–75. First, DHS explained that the Rule "does not alter procedures governing consultation or representation," which DHS identified as "outside the scope of this rulemaking" because these procedures are governed by separate DHS regulations, guidance, and policies. *Id*. at 103,374 (citing 8 C.F.R. §§ 235.3(b)(4)(ii); 208.30(d)(4), 208.31(c)). The Rule does not change the pre-existing rights of aliens to representation during fear screenings at no expense to the Government. *See id*. at 103,374–103,375. Yet, the Rule also explains "the non-adversarial nature of credible fear and reasonable fear screenings, in contrast with adversarial [] removal proceedings, sufficiently mitigates the [] concerns about the more compressed timeframe noncitizens have to secure an attorney during the expedited removal process[.]" *Id*. at 103,375.

*Second*, contrary to Plaintiffs' assertions, the Rule also meaningfully responds to comments about the dangers of relying on bars-related evidence from foreign governments, such as INTERPOL Red Notices and foreign records. Pls' Motion at 41–42; 89 Fed. Reg. at 103,375. In response to commenters' concerns, DHS ensured that it "has implemented measures to combat the

impact of abusive or unwarranted INTERPOL notices separate and apart from this rule." *Id.*. An example of this is DHS issuing internal guidance on the "appropriate handling of INTERPOL notices that are suspected of having been issued by a country for the purpose of persecuting an individual or otherwise appear to be prohibited or noncompliant." *Id*. As such, not only is DHS aware of these issues, but it has already taken precautionary steps to safeguard against these concerns raised by both commenters of the Rule and Plaintiffs.

*Third*, the Rule additionally addresses Plaintiffs' concerns that "the bars in credible fear interviews will result in individuals being improperly removed to persecution and torture" as the conditions under which credible fear interviews occur "make presenting bar-related evidence— and thus any meaningful adjudication—impossible." Pls' Motion at 42–43. As previously stated, the Rule addresses several concerns about the conditions under which credible fear interviews occur and the worries about that setting, such as potential inhibited access to legal counsel, the timeline of credible fear interviews, and potential issues with accessing documentary materials to support an applicant's claims. 89 Fed. Reg. at 103,374. As explained above, the Rule does not amend the "pre-existing rights of noncitizens" regarding their rights to representation during fear screenings that the law currently provides. *Id*. (citing 8 U.S.C. § 1225(b)(1)(B)(iv)).

As such, during credible fear and reasonable fear screenings, individuals may be represented by an attorney or an accredited representative, but at no cost to the Government. *Id*. at 103,375. As stated above, asylum officers are trained and have practical experience "conducting non-adversarial interviews, eliciting testimony, working with interpreters, cross-cultural communication, and working with vulnerable populations." *Id*. Also addressed above, the Rule notes that asylum officers "have a duty to elicit all relevant and useful information on a fear claim[,]" and that "[c]redible testimony alone may be the basis of a positive fear determination

56

without the need for any corroborative documentary evidence." *Id*. Lastly, the EOIR Companion Rule provides an applicant a second opportunity to obtain representation in preparation for the review, and to present additional evidence and testimony before a final removal order is issued. 89 Fed. Reg. at 105,397.

Here, Plaintiffs' arguments are less that DHS did not consider relevant evidence or provide adequate responses to concerns in developing the Rule, but that Plaintiffs would have come to a different conclusion. However, that Plaintiffs would reach a different conclusion is not sufficient to establish that the Rule is arbitrary and capricious, in particular when it is supported by extensive reasoning and analysis. *See generally* 89 Fed. Reg. at 103,374; *see also Americans for Safe Access*, 706 F.3d at 449.

### E.  Defendants Considered the Effects of Interrelated, Contemporaneous Policies.

Plaintiffs next assert that Defendants failed to take into consideration how the Rule interacted with contemporaneous and interrelated policies. Pls' Motion at 43.

Plaintiffs first assert that the Rule did not consider that credible fear interviews begin while aliens are in U.S. Customs and Border Protection ("CBP") custody, which would make it harder for aliens to rebut the bars as they will be subject to "horrific detention conditions." Pls' Motion at 43–44. Yet, the Rule *did* consider these concerns. The Rule discusses that it does not inhibit or preclude the existing rights of aliens to have representation during fear screenings. 89 Fed. Reg. at 103,374. Additionally, DHS believes that the non-adversarial nature of the fear screenings sufficiently mitigates the concerns about "the more compressed timeline noncitizens have to secure an attorney during the expedited removal process, and challenges of accessing counsel in detention." *Id*. at 103,375. Further, asylum officers are "trained to work with noncitizens who are experiencing the effects of trauma[,]' and "routinely interview noncitizens in protection screening

57

interviews on matters that many find challenging to discuss, including torture, sexual assault, familial violence, and the deaths of family members." *Id*. at 103,376.

Plaintiffs additionally assert that Defendants "shortened the pre-credible fear interview consultation period to as little as 4 hours," which reduces the chance that an asylum applicant can secure counsel or evidence before an interview. Pls' Motion at 44. However, as the public comment that Plaintiffs cite notes, the concerns raised in the comment by the Women's Refugee Commission deals with aliens subject to a different rule, the Circumvention of Lawful Pathways Rule, which the commenter asserts "reduc[es] the amount of time people have to consult an attorney [. . .] in CBP custody." Cmt. of Women's Refugee Commission at 6–7.[11] Additionally, the DHS Bars Final Rule addresses concerns surrounding aliens subject to the Circumvention of Lawful Pathways Rule ("CLP") extensively. *See, e.g.*, 89 Fed. Reg. at 103,387-89, 400-404; *see also id*. at 103,389 ("The Department previously accepted comments on that rule and responded to those in the CLP final rule. 88 FR at 31324–441."). Here, DHS pointed out that the Rule "does not change substantive eligibility for asylum or for withholding of removal," so the Rule "will not affect the ultimate forms of relief available to a noncitizen." *Id*. Lastly, DHS also noted that it "believes this [R]ule will impact a relatively small number of individuals who are not eligible for protection because they present a national security or public safety threat." *Id*.

Additionally, the Rule addressed the general concerns about access to attorneys on a shortened timeline and noted that the Rule itself did not alter the procedures already in place governing consultation with an attorney or attorney representation, which are governed by other DHS regulations, guidance, and policies. *Id*. at 103,374. Specifically, regarding the "more

---

[11] Defendants cite to the comments on the DHS Rule the same way as Plaintiffs. *See* Pls' Motion at 4 n. 1. The comments can be found at https://www.regulations.gov/document/USCIS-2024-0005-0001/comment, and all page citations refer to the PDF page number of the cited document.

compressed timeline," DHS noted that the non-adversarial nature of the fear screenings, in contrast with the adversarial nature of removal proceedings, "sufficiently mitigates the commenters' concerns about the more compressed timeframe noncitizens have to secure an attorney during the expedited removal process[.]" *Id*. at 103,375.

Third, Plaintiffs assert that Defendants did not acknowledge recently adopted guidance that allows for "the broad use of classified information against noncitizens in the asylum process, meaning that bar findings could be made based on information a noncitizen could never know." Pls' Motion at 44. Again, the Rule generally addresses these concerns raised by Plaintiffs and the commenters. The Rule discussed concerns about the "opacity of the screening interview process" as well as the discretion given to asylum officers. 89 Fed. Reg. at 103,393–103,394. DHS notes that aliens undergoing fear screenings still have the right to consult with a person of their choosing who may be present at the interview. *Id*. at 103,393. Additionally, following the fear screening, the alien receives a record of the credible fear determination, including copies of the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based. *Id*. at 103,394 (citing 8 C.F.R. §§ 208.30(f), (g); 8 C.F.R. § 208.33(b)(2)(v), 8 C.F.R. § 208.35(b)(2)(v)). Significantly, as the Rule points out, aliens may have a negative fear determination reviewed by an Immigration Judge de novo. *Id*. These measures ensure the screening processes "are transparent and subject to accountability through review, including before an Immigration Judge at the noncitizen's request." *Id*.

Lastly, Plaintiffs assert that the Defendants failed to acknowledge comments regarding recent changes or proposed changes to immigration law, such as "guidance requiring consideration in screening interviews of whether a noncitizen could reasonably relocate within their country of origin" or "paused" rule that "expands the national security bar to cover the spread of infectious

59

diseases." Pls' Motion at 44. But DHS's responses to public comments on the proposed version of what became the DHS Bars Final Rule were published on December 18, 2024, before the more recent developments Plaintiffs claim Defendants allegedly ignored. *See* 89 Fed. Reg. at 103,370. Indeed, the comments Plaintiffs pinpoint to support these assertions are speculations based on guidance that had not yet been implemented. For example, the comments raised by the Innovation Law Lab concerning internal relocation bars was based on indications and announcements by DHS about new guidance, but "[t]he text and details of this guidance [were] not yet public" at the time the comments were made. Cmt. of Innovation Law Lab at 14. Similarly, the comments regarding expanding the national security bar to cover the spread of infectious diseases concerns a separate Rule that at that time was "paused, but under active consideration[.]" Pls' Motion at 44. However, an agency "need not respond at all to comments that are 'purely speculative and do not disclose the factual or policy basis on which they rest.'" *Public Citizen, Inc. v. F.A.A.*, 988 F.2d 186, 197 (D.C. Cir. 1993) (citing *Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 35 n. 58 (D.C. Cir. 1977)).

Although not every comment was specifically addressed by DHS in the federal regulation, that is not required. *See City of Waukesha v. EPA*, 320 F.3d 228, 257 (D.C. Cir. 2003) ("The agency need not address every comment, but it must respond in a reasoned manner to those that raise significant problems."). Here, while DHS did not individually respond to the over 4,000 comments on the Rule, it responded in a "reasoned manner" to the comments that Plaintiffs point out in their Motion. *See Action on Smoking and Health v. C.A.B.*, 699 F.2d 1209, 1216 (D.C. Cir. 1983) (finding that while an agency does not need to respond to every comment, it must "respond in a reasoned manner to the comments received, to explain how the agency resolved any significant problems raised by the comments, and to show how that resolution led the agency to the ultimate rule.").

60

As such, the Rule is not arbitrary and capricious simply because DHS did not address every comment, as Plaintiffs seem to suggest. Instead, DHS permissibly responded "in a reasoned manner" to those comments that raised "significant problems." *City of Waukesha*, 320 F.3d at 257. Because the Rule demonstrates that DHS engaged in significant consideration of the relevant factors, the fact that DHS did not respond to every individual comment is not significant. *See id*. at 258. Here, the record does not demonstrate that DHS failed to consider relevant factors, and as such the Rule is not arbitrary and capricious.

## F. The EOIR Companion Rule is Additionally Not Arbitrary and Capricious.

Plaintiffs' argument that the EOIR Companion Rule is arbitrary and capricious rests on their assertion that the DHS Bars Final Rule should be vacated as arbitrary and capricious. Pls' Motion at 32 ("And if the DHS Rule is set aside, the EOIR Companion Rule loses its only justification, rendering it arbitrary and capricious as well."); *see id*. at 2, 45. First, where Plaintiffs offer no substantive argument in support of their claim that the EOIR Companion Rule Is unlawful under the APA, the Court must deny that claim. Second, as Defendants have demonstrated above, the DHS Bars Final Rule is not arbitrary and capricious as DHS "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. Plaintiffs offer no other independent explanation as to why the EOIR Companion Rule is arbitrary or capricious or why the agency has acted outside "a zone of reasonableness" in promulgating the EOIR Companion Rule. *See Prometheus Radio Project*, 592 U.S. at 423. Because the agency's decisions are entitled to a "presumption of regularity," and Plaintiffs have not rebutted that presumption, the EOIR Companion Rule is neither arbitrary nor capricious.

Additionally, all of Plaintiffs' objections and arguments that the Rules are arbitrary and capricious are clearly directed to the DHS Bars Final Rule, not the EOIR Companion Rule. And none of Plaintiffs' assertions as to the DHS Bars Final Rule apply to the EOIR Companion Rule. The EOIR Companion Rule simply makes a "technical amendment" to DHS regulations that clarifies the Immigration Judge's *de novo* review of an asylum officer's credible and reasonable fear determinations. 89 Fed. Reg. 105,392; 8 C.F.R. §§ 1003.42(d), 1208.31(g); *see also* 89 Fed. Reg. at 105,397 (citing 8 U.S.C. § 1225(b)(1)(B)(iii)(III)). Consequently, the EOIR Companion Rule could operate on its own, even without the application of any mandatory bars at the credible and reasonable fear interview. Thus, Plaintiffs offer no cogent or compelling arguments that the EOIR Companion Rule —on its own—is arbitrary or capricious.

## CONCLUSION

For these reasons, the Court should grant summary judgment to Defendants on all claims, deny Plaintiffs' motion for summary judgment, and uphold Plaintiff E.Q.'s expedited removal order.

Dated: July 30, 2026

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ANTHONY P. NICASTRO
*Acting Director*

CARA E. ALSTERBERG
*Assistant Director*

JAMES J. WALKER
Senior Litigation Counsel

*/s/ Shelby Wade*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station

Washington, DC 20044
Tel: (202) 285-8379
Email: Shelby.Wade2@usdoj.gov

Counsel for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of July 2026, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which provided an electronic notice and electronic link of the same to all attorneys of record through the Court's CM/ECF system.

/s/ Shelby Wade
SHELBY WADE
Trial Attorney
United States Department of Justice
Office of Immigration Litigation
*Attorney for Defendants*